UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-14008-CIV-MIDDLEBROOKS/LYNCH

NITRO LEISURE PRODUCTS, LLC, a
Delaware Limited Liability Company, d/b/a
GOLFBALLSDIRECT.COM and
SECOND CHANCE

        Plaintiff,

v.

ACUSHNET COMPANY,
a Delaware Corporation

        Defendant.

_____/



## **FIRST AMENDED COMPLAINT**

    Plaintiff Nitro Leisure Products, LLC ("Nitro"), by its attorneys and for its First

Amended Complaint against Defendant Acushnet Company ("Acushnet"), alleges as follows:

### **GENERAL NATURE OF THE ACTION**

    1.    Nitro, a small company with its principal place of business in Stuart, Florida, sells

golf balls.  Acushnet is the dominant seller of golf balls in the United States, including "Titleist"

(which Acushnet markets as "the #1 ball in golf") and "Pinnacle" golf balls.  Nitro brings this

action against Acushnet for violations of the false advertising, product disparagement, unfair

competition and antitrust laws.  Acushnet has engaged in a campaign that is false and misleading

and designed to destroy Nitro's used golf ball business.  Acushnet has leveraged its position as

the dominant premium golf ball competitor to eliminate and suppress competition in the

premium and mid-price golf ball markets.  Acushnet has threatened and intimidated golf

specialty stores by telling them that if they carried Nitro's used golf balls, Acushnet would not

sell them Acushnet's premium golf balls.  In addition, Acushnet has also threatened and intimidated mass retailers.  Acushnet has told mass retailers that if they carried Nitro's used golf balls, Acushnet would refuse to supply those retailers with Acushnet golf balls.  Acushnet's illegal conduct has destroyed the goodwill and reputation of Nitro and Nitro's used products, has excluded Nitro from the sale of golf balls, has eliminated competition from used balls, has injured competition for golf balls, has resulted in higher prices and limited choices for consumers, and has injured and will continue to injure Nitro's business.  Acushnet's illegal actions have contributed to Acushnet maintaining its monopoly position in the premium golf ball market and acquiring monopoly power in the mid-price market by excluding Nitro from channels of distribution.  Because of Acushnet's illegal conduct, Nitro seeks, among other things, injunctive relief, treble and punitive damages, as well as Nitro's reasonable costs and attorney's fees in prosecuting this action.

I.      **PARTIES AND JURISDICTION**

2.      Nitro is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 1943 SE Airport Road, Stuart, Florida 34996. Nitro also does business under the names SECOND CHANCE and Golfballsdirect.com.

3.      Acushnet is a corporation organized and existing under the laws of Delaware, having its principal place of business at 333 Bridge Street, Fairhaven, Massachusetts 02719. Acushnet sold approximately $1 billion of golf equipment, including balls, clubs, bags, shoes and gloves.

4.      This is a civil action for claims arising under the false advertising, product disparagement, and unfair competition laws of the United States, 15 U.S.C. §§ 1051 *et seq.* (the "Lanham Act"), the antitrust laws of the United States, 15 U.S.C. § 2 (the "Sherman Act"), the

MIA 245034-2.051998.0073

federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Florida statutory and common law regarding false and misleading advertising, unfair and deceptive trade practices, unfair competition, slander, product disparagement, libel and tortious interference with business relationships.

5.      The Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 (action arising under the Lanham Act); 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1338(a) (any action of Congress relating to trademarks); 15 U.S.C. §§ 15, 26 (claims arising under the Sherman Act), and, with respect to certain claims, 28 U.S.C. § 1367 (supplemental jurisdiction).

6.      The Court has personal jurisdiction over Acushnet and venue is proper in this district under 28 U.S.C. § 1391 because (a) Acushnet conducts business in this district, including advertising, promoting, and selling "Titleist" and "Pinnacle" golf balls; (b) a substantial portion of the acts giving rise to the claims asserted herein have occurred in Florida; (c) Nitro's principal place of business is in this district; and (d) Nitro has suffered economic injury and irreparable harm to its goodwill and reputation in this district as a direct and proximate result of Acushnet's unlawful conduct.

## II.     FACTUAL BACKGROUND

7.      In 2001, there were over 26.7 million golfers in the United States, who purchased an estimated $750 million of new golf balls in the United States.

8.      The primary locations at which consumers buy golf balls are golf pro shops at country clubs and golf courses which typically are managed by a PGA professional; golf specialty stores, such as Edwin Watts, which may or may not have a PGA professional on staff; and, mass retailers, such as Wal-Mart and The Sports Authority.

-3-

9.     A typical golfer will use four or five balls per round. Many of those balls are hit into lakes and ponds and become "pond" balls which are retrieved by golfers and reused. Many "pond" balls are retrieved by entrepreneurs who resell the balls in competition with new golf balls.

10.     Used golf balls are a significant competitive threat to the new ball manufacturers. Every used ball that is retrieved and reused is one less new ball that a golf ball manufacturer can sell. The threat to new ball manufacturers from used golf balls is greater now because of the advancement of technology to retrieve balls and to refurbish them.

A.     **The Premium Golf Ball Market**

11.     Golf balls are sold at a variety of price points. Acushnet, other golf ball manufacturers and consumers divide golf balls into several markets based primarily on price, the location where the balls are sold and professional tour usage.

12.     The premium golf ball market includes the most expensive golf balls. Premium golf balls typically retail at prices in excess of $35 per dozen and generally are sold through retail establishments that have a PGA golf professional on staff, such as golf pro shops at country clubs and public courses, and certain select golf specialty stores. Acushnet sells its premium golf balls to golf specialty retailers who usually have a PGA golf professional on staff. The consumers of premium golf balls are generally avid players. At least until recently, consumers of premium balls typically play only new premium balls. However, over the past few years, there has been a dynamic change in the premium golf ball market with the launch of Acushnet's Titleist Pro V1 golf ball. Because of their construction and durability, Pro VI balls have enabled a flourishing market for refurbished Pro VI balls which are purchased by golfers who otherwise

would have bought non-premium balls as well as some who previously would have purchased only new premium balls.

13.     Acushnet is the dominant producer of premium golf balls.  Acushnet produces and sells the Titleist Pro V1 and the Titleist Pro V1*, all of which have a suggested retail price of $54 per dozen.  In August 2001, Acushnet's George Sine, Vice President - Golf Ball Marketing and Strategic Planning, stated publicly that the "Titleist brand enjoys over 60% share of the premium segment of golf balls sold."  Acushnet's next "largest" competitor in the premium golf ball market has a share that is approximately ten times less than Acushnet.

14.     The Titleist Pro V1, which was introduced in December 2000, is the most successful golf ball ever launched in the United States and has been the number-one selling golf ball in the United States since February 2001.  Acushnet's web site claims:  "Our aggressive new product and marketing initiatives have clearly paid off. ... The Pro V1 alone captured an astounding 28% of the dollars spent at on-course golf shops in December [2001]...".

15.     Acushnet has done several things to maintain its position as the dominant producer of premium golf balls.  Acushnet has aggressively incentivized golf professionals to promote Titleist premium golf balls by offering them extra discounts in exchange for exclusively displaying the Titleist branded balls.  At the most recent PGA Club Professionals Championship, the pre-eminent tournament for club professionals, 128 of the club professionals, or 82% of the field, played with a Titleist ball.  This represented 13 times more players than the next closest ball, which only 10 club professionals were playing.  Acushnet also pays numerous members of the PGA Tour, LPGA Tour and Senior PGA Tour, including the Tours' leading stars, to play its premium golf balls.  Some of the leading professionals paid to play the Titleist premium balls

-5-

include John Daly, Ernie Els, Sergio Garcia, Davis Love III, Phil Mickelson, Greg Norman, Hale Irwin and Karrie Webb.

**B.     The Mid-Price Golf Ball Market**

16.     Acushnet describes the next most expensive golf ball market as the "mid-price point, top-grade segment" (referred to herein as the "mid-price market"). Acushnet has focused on this segment as an area in which it wants to grow. Acushnet introduced its NXT Tour and NXT Distance brands in August 2001 to grow its share of this segment. When these balls were introduced, Acushnet claimed it had approximately a 35% share of the mid-price market. Acushnet hoped to leverage the success of its Titleist Pro V1 golf balls to expand its sales of its mid-price point, top-grade balls. When the NXT balls were released, Mr. Sine, Vice President of Acushnet, stated that "With the Pro V1 serving as the performance benchmark, and best-selling model within the premium segment of the golf ball market, the NXT Distance and NXT Tour will establish a best seller position within the mid-price point, top-grade segment for golfers seeking next generation attributes of long distance and soft feel for less than $34.00 per dozen (Manufacturer's Suggested Retail Price.)"

17.     Consumers of mid-price balls are generally golfers with mid to high handicaps who typically do not purchase premium or low-end golf balls. The consumers of mid-price balls typically play golf with only mid-price balls and will not switch to premium or low price balls.

18.     Acushnet has been successful in increasing its share of the mid-price ball market. In addition to expanding its share of the mid-price market through legitimate means by introducing new products, Acushnet has undertaken a strategy to exclude competition through illegal and anticompetitive means. Specifically, as described below, Acushnet has sought to eliminate Nitro as a competitor and to eliminate competition from used golf balls.

C.      **Nitro And Its Recycled And Refurbished Golf Ball Business**

19.     Nitro is in the business of refurbishing and recycling used golf balls, including Acushnet golf balls. Nitro purchases used golf balls, including Titleist Pro V1 golf balls and other Titleist golf balls. Nitro sorts the used balls by condition and by type (such as Titleist Pro V1, Strata, etc.). Some balls are unusable and are discarded. Approximately 30% of the balls are "recycled." These golf balls are washed, sometimes clear coated and packaged for resale as used golf balls. The remainder of golf balls which may have blemishes, scuffs, cart path marks or other personal marks are refurbished using a process which involves stripping off the balls' base coat, clear coat and markings, repainting the balls (where appropriate), adding a clear coat (where appropriate), reaffixing the original manufacturer's markings, and adding the following notification on the refurbished golf balls: "REFURBISHED BY SECOND CHANCE" or "REFURBISHED BY GOLFBALLSDIRECT.COM". Nitro is in the process of implementing a notification on its refurbished golf balls to read: "USED & REFURBISHED BY SECOND CHANCE" or "USED & REFURBISHED BY GOLFBALLSDIRECT.COM." (Nitro's recycled and refurbished golf balls are hereinafter referred to as "Nitro's Products").

20.     The business of recycling and refurbishing golf balls has existed in the United States for decades, and sales of recycled and refurbished golf balls have grown to the level of tens of millions of dollars. Nitro had annual sales of approximately $10 million of Nitro's Products in 2001, $4.8 million of which represented refurbished golf balls.

21.     With the recycled and refurbished Titleist Pro V1 and other Titleist golf balls, Nitro is a competitor of Acushnet in both the premium and mid-price markets. There is strong consumer demand for refurbished and recycled Pro V1 golf balls and other Titleist golf balls.

22.     Nitro's Products are advertised and sold over the internet at **www.golfballsdirect.com** and primarily through mass retailers, sports stores and retail golf outlets, including retailers in this district.  As described below, Acushnet's actions have prevented Nitro from obtaining effective distribution and have resulted in significant decrease in the sale of Nitro's Products.

23.     Nitro's refurbished and recycled Titleist Pro V1 golf balls are priced competitively with Acushnet's mid-price brands such as the Titleist NXT and, Nitro understands that its refurbished and recycled Pro V1 golf balls compete primarily against those mid-price Titleist balls.  Nitro's refurbished and recycled Titleist golf balls other than the Pro V1 also compete against the Titleist mid-range balls, but also compete with Acushnet's low-priced Pinnacle balls.

24.     Nitro takes substantial steps and makes significant efforts to ensure that actual and potential consumers know that Nitro's Products are recycled, refurbished, used and/or "second-hand."

25.     Nitro stamps "REFURBISHED BY SECOND CHANCE" or "REFURBISHED BY GOLFBALLSDIRECT.com" on the refurbished balls that Nitro sells. In the near future, Nitro will be amending the notification on its refurbished golf balls to read: "USED & REFURBISHED BY SECOND CHANCE" or "USED & REFURBISHED BY GOLFBALLSDIRECT.COM."

26.     SECOND CHANCE and GOLFBALLSDIRECT.com are trademarks owned by Nitro and are well-known in the golfing industry as designating Nitro's used refurbished and recycled golf balls.  SECOND CHANCE is a federally registered trademark of Nitro.

27.     Nitro's refurbished golf balls are sold in packaging that clearly and prominently informs actual and potential purchasers that the balls have been refurbished by Second Chance or Golfballsdirect.com.

28.     Nitro's advertising for Nitro's refurbished golf balls, including, without limitation, on its web site at **www.golfballsdirect.com**, clearly and prominently informs actual and potential purchasers that Nitro is selling used golf balls that have been refurbished by Second Chance or Golfballsdirect.com.

29.     For decades, Acushnet has been closely monitoring the success of used golf balls. Acushnet has attempted to destroy used golf ball competitors through, among other things, aggressive federal court litigation.  In 1995, Acushnet filed a Complaint for trademark infringement, unfair competition, trademark counterfeiting and related wrongs against a golf ball refurbisher known as Birdie Golf Ball Company.  *Acushnet Company v. Birdie Golf Ball Company, Inc. and Dale L. Updike*, Case No. 95-7030-Civ-Gonzalez.  In that case, Judge Jose A. Gonzalez, Jr. held first in a preliminary injunction, and then in a Consent Judgment, that the sale of used golf balls, including refurbished golf balls, is lawful, so long as "Titleist" and "Pinnacle" are correctly reaffixed to the refurbished golf balls and appropriate precautions are taken with respect to notifying the public that the golf balls are used, *i.e.*, precautions that Nitro has taken. Based on this Court's ruling in *Birdie*, Nitro developed through acquisition and internal development the first and only large scale U.S. based refurbishment factory built specifically for refurbishment that is capable of mass refurbishment.  Given Nitro's pre-litigation distribution of Nitro's Products (5000 store fronts), Nitro's capacity, the fact that Nitro was emerging as a major golf ball provider and the advancement in pond harvesting rolling devices, Nitro was emerging

-9-

as a significant competitive threat at the time that Acushnet engaged in the illegal conduct that forms the basis for this action.

    **D.**    **Acushnet's Unlawful Conduct Giving Rise To The Instant Action**

    30.    Despite the foregoing rulings from this Court, Acushnet has engaged in a false and misleading advertising campaign designed to destroy Nitro's used golf ball business, has unlawfully used its monopoly in the premium golf ball market to attempt to monopolize the mid-price golf ball market through the exclusionary conduct described herein, and has engaged in other conduct to attempt to monopolize the mid-price golf ball market.  Acushnet has undertaken this course of conduct with the specific intent to destroy Nitro's business and monopolize the relevant markets, and has created a dangerous probability that if it has not already obtained a monopoly in the mid-price golf ball market, it will do so in the future by means of the conduct described herein.

    31.    Upon information and belief, as part and furtherance of its course of false, deceptive and anticompetitive conduct and effort to monopolize the mid-price golf ball market, Acushnet has engaged in the following illegal conduct:

        a.    Acushnet is stating to Nitro's customers (including distributors and retailers of Nitro products) that Nitro's use of "Titleist" and "Pinnacle" in connection with advertising, promotion, distribution and sale of refurbished "Titleist" and "Pinnacle" golf balls is illegal, unlawful and constitutes trademark counterfeiting.  The statements have intimidated retailers and caused certain Nitro customers to cancel orders and others to decline to continue doing business with Nitro.

        b.    Acushnet has stated to Nitro's customers that Acushnet intended to commence litigation against Nitro on account of Nitro's use of "Titleist" and "Pinnacle" in

-10-

connection with the advertising, promotion, sale and distribution of refurbished "Titleist" and "Pinnacle" golf balls and has led Nitro's customers to believe that if Nitro's customers sell Nitro's refurbished golf balls, Acushnet may commence legal action against them for violations of Acushnet's alleged rights or withhold Titleist balls. The statements have intimidated retailers and caused certain Nitro customers to cancel orders and others to decline to continue doing business with Nitro.

        c.      Acushnet has threatened Nitro's customers that if they sell Nitro's refurbished golf balls, Acushnet will cease supplying Titleist golf balls to those customers. Without access to Acushnet's Titleist golf balls, retailers will not be competitive. Retailers have acceded to Acushnet's threats and refused to do business with Nitro and/or dropped Nitro as their customer, due to Acushnet's monopoly power in the premium golf ball market. Those actions have so seriously threatened Nitro's access to distribution that Nitro may fail.

        d.      In particular, at golf pro shops and golf specialty shops that carry the Titleist premium golf balls, Acushnet has intimidated the retailers by threatening to refuse to supply of Titleist premium golf balls if they sold Nitro recycled or refurbished balls. Upon information and belief, this has caused pro shops and specialty stores to refuse to do business with Nitro or to drop Nitro as a supplier. At mass retailers, Acushnet has intimidated these customers by threatening not to supply Acushnet's mid-price and low-priced golf balls if they sold Nitro recycled and refurbished golf balls. (Acushnet as a policy does not sell its premium golf balls to mass retailers). Upon information and belief, Acushnet's actions have caused mass retailers to refuse to do business with Nitro or to drop Nitro as a supplier.

e.       Acushnet has knowingly published false, misleading, disparaging and *per se* defamatory statements about Nitro and Nitro's Products, including, but not limited to, in a press release issued on or about January 16, 2002.

f.       Upon information and belief, Nitro believes Acushnet has complained to retailers about the price at which Nitro's golf balls are priced.

32.       Acushnet's statements, publications, and anticompetitive conduct are causing the public to believe that Nitro's Products are illegal, unlawful and counterfeit and that Nitro, Second Chance and Golfballsdirect.com are disreputable, dishonest and unlawful businesses.

33.       Acushnet's statements and publications are false and misleading, because Nitro's advertising, promotion, distribution and sale of refurbished and recycled "Titleist" and "Pinnacle" golf balls is lawful and does not constitute counterfeiting.

34.       Acushnet's false and misleading statements and publications about Nitro's Products are material because they have, and are likely to continue to affect adversely consumers' decisions to purchase Nitro's Products.

35.       Acushnet's false and misleading statements and publications described herein have been knowingly and recklessly false and made with the intent to injure Nitro, Second Chance, Golfballsdirect.com and their businesses and to destroy the market for refurbished golf balls in the United States.

36.       Acushnet's false and misleading statements and publications have caused Nitro to lose distribution and sales and customers and have irreparably injured the goodwill and reputation of Nitro, Second Chance and Golfballsdirect.com.

-12-

37.     If Acushnet succeeds in its campaign of deceptive and anticompetitive conduct, it is likely to increase its market share in both the premium golf ball market and the mid-price golf ball market by eliminating competitors like Nitro, which is the largest seller of used golf balls.

38.     The conduct of Acushnet described above has resulted in actual injury to competition and to the public because Acushnet has restrained, foreclosed, and eliminated competition from efficient and effective competitors, including Nitro, and has caused prices to be higher, output to be lower, and quality to be poorer than would otherwise be the case in a freely competitive market.  These actions have hurt golf ball consumers in this district and throughout the United States.

<u>COUNT I</u>

<u>VIOLATIONS OF SECTION 43(a) OF THE FEDERAL LANHAM ACT</u>

39.     Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-38 of the First Amended Complaint as though fully set forth herein.

40.     Acushnet's conduct, described herein, constitutes false advertising, product disparagement and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

41.     Acushnet's commercial statements to customers that Nitro's Products, including used "Titleist" and "Pinnacle" golf balls, are illegal, unlawful and counterfeit are literally false and misleading statements of fact, which misrepresent the nature, characteristics and qualities of Nitro's Products, because Nitro's Products are, in fact, lawful and not counterfeit.

42.     Acushnet's commercial statements to customers that Acushnet may initiate litigation against Nitro on account of Nitro's advertising, promotion, distribution and sale of refurbished "Titleist" and "Pinnacle" golf balls and that Acushnet may initiate litigation against

-13-

consumers who sell such products create the false and misleading impression that Nitro's

Products are illegal and that Nitro, Second Chance and Golfballsdirect.com are dishonest,

disreputable and unlawful businesses.

43.     Acushnet's false and misleading statements, described above, have mislead and

have the tendency to mislead customers that Nitro's Products, including its refurbished, recycled,

used and/or second-hand "Titleist" and "Pinnacle" golf balls, are illegal and counterfeit and that

Nitro, Second Chance and Golfballsdirect.com are dishonest, disreputable and unlawful

businesses.

44.     Acushnet's false and misleading statements are material because they are likely to

and have adversely affected consumers' decisions to purchase Nitro's Products.

45.     Acushnet's false and misleading statements are willful because Acushnet knew

that Nitro's advertising, promotion, sale and distribution of refurbished "Titleist" and "Pinnacle"

golf balls is lawful and does not constitute counterfeiting.

46.     Nitro has suffered actual economic injury, including the loss of sales and

irreparable injury to its goodwill and reputation as a direct and proximate result of Acushnet's

false and misleading statements.

47.     Acushnet's conduct is continuing and will continue unless restrained by the Court.

Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer

irreparable injury and harm for which it has no adequate remedy at law.  Acushnet's actions,

which were timed to coincide with the start of the golf ball selling season, have so severely

injured Nitro's access to distribution, that Nitro may fail.

## COUNT II

## PRODUCT DISPARAGEMENT IN VIOLATION OF FLORIDA COMMON LAW

48.     Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-47 of the First Amended Complaint as though fully set forth herein.

49.     Acushnet's false and misleading statements, described herein, constitute product disparagement in violation of Florida common law.

50.     Acushnet's false and misleading statements have mislead and have the tendency to mislead customers that Nitro's Products, including its refurbished, recycled, used and/or second-hand "Titleist" and "Pinnacle" golf balls, are illegal and counterfeit and that Nitro, Second Chance and Golfballsdirect.com are dishonest, disreputable and unlawful businesses.

51.     Acushnet's false and misleading statements constitute willful and deliberate efforts to cause consumers to refrain from purchasing Nitro's Products.

52.     Acushnet's false and misleading statements have caused Nitro to lose sales and customers, and have caused Nitro actual economic injury and irreparable injury to its goodwill and reputation.

53.     Acushnet's conduct is continuing and will continue unless restrained by the Court. Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer irreparable injury and harm for which it has no adequate remedy at law.

## COUNT III

## UNFAIR COMPETITION IN VIOLATION OF FLORIDA COMMON LAW

54.     Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-53 of the First Amended Complaint as though fully set forth herein.

MIA 245034-2.051998.0073

55.     Acushnet's false and misleading statements, described herein, constitute unfair competition in violation of Florida common law.

56.     Acushnet's false and misleading statements have mislead and have the tendency to mislead customers that Nitro's Products, including its refurbished, recycled, used and/or second-hand "Titleist" and "Pinnacle" golf balls, are illegal and counterfeit and that Nitro, Second Chance, Golfballsdirect.com are dishonest, disreputable and unlawful businesses.

57.     Acushnet's false and misleading statements constitute willful and deliberate efforts to cause consumers to refrain from purchasing Nitro's Products.

58.     Acushnet's false and misleading statements have caused Nitro to lose sales and customers, and have caused Nitro actual economic injury and irreparable injury to its goodwill and reputation.

59.     Acushnet's conduct is continuing and will continue unless restrained by the Court. Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer irreparable injury and harm for which it has no adequate remedy at law.

## COUNT IV

### FALSE AND MISLEADING ADVERTISING IN VIOLATION OF FLORIDA STATUTORY LAW

60.     Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-59 of the First Amended Complaint as though fully set forth herein.

61.     Acushnet's commercial statements, described herein, constitute false and misleading advertising in violation of Fla. Stat. chs. 817.40, *et seq.*

62.     Acushnet's statements have mislead and have the tendency to mislead Nitro's actual and potential customers that Nitro's Products, including its refurbished, recycled, used

-16-

and/or second-hand "Titleist" and "Pinnacle" golf balls, are illegal and counterfeit and that Nitro,

Second Chance and Golfballsdirect.com are dishonest, disreputable and unlawful businesses.

63.     Acushnet's false and misleading statements are material because they are likely to

and have adversely affected consumers' purchasing decisions relating to Nitro's Products,

including its refurbished, recycled, used and/or second-hand golf balls.

64.     Acushnet's false and misleading statements are willful because Acushnet knew

that Nitro's advertising, promotion, sale and distribution of refurbished, recycled, used and/or

second-hand "Titleist" and "Pinnacle" golf balls is lawful and does not constitute trademark

counterfeiting or otherwise violate Acushnet's rights.

65.     Acushnet's false and misleading statements were made in order to increase the

sales of Acushnet's golf balls and to decrease the demand for Nitro's Products.

66.     Nitro has suffered actual economic injury and irreparable injury to its goodwill

and reputation as a direct and proximate result of Acushnet's false and misleading statements.

Acushnet's conduct is continuing and will continue unless restrained by the Court.  Unless

Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer

irreparable injury and harm for which it has no adequate remedy at law.

67.     Acushnet's conduct is continuing and will continue unless restrained by the Court.

Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer

irreparable injury and harm for which it has no adequate remedy at law.

## COUNT V

### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS IN VIOLATION OF FLORIDA COMMON LAW

68.     Nitro repeats and incorporates by reference the statements and allegations in

paragraphs 1-67 of the First Amended Complaint as though fully set forth herein.

-17-

69.    Acushnet's statements, described herein, are knowingly false and defamatory statements about Nitro; Nitro's refurbished, recycled, used and second-hand golf ball business; and Nitro's Products.

70.    Acushnet's threats and intimidation tactics, described herein, are unfair and anti-competitive trade practices.

71.    Acushnet has intentionally and maliciously the false statements, described herein, and engaged in the unfair and anti-competitive trade practices, described herein, to cause injury to Nitro and to Nitro's goodwill, reputation and business.

72.    Acushnet's knowingly false, misleading and disparaging statements are causing the public to believe that Nitro's Products are illegal and counterfeit and that Nitro, Second Chance and Golfballsdirect.com are disreputable, dishonest and unlawful businesses.

73.    Acushnet is aware that Nitro has developed and/or intends to develop, a business relationship with golf ball retailers and other parties involved in the sale, distribution and advertisement of golf balls.

74.    Acushnet has intentionally and unjustifiably interfered with the business relationship between Nitro and those retailers and other parties by making knowingly false and misleading statements regarding Nitro and Nitro's Products and by engaging in the unfair and anti-competitive conduct described above.

75.    Acushnet's conduct is causing irreparable injury to Nitro's business relationships with its customers, as well as to Nitro's goodwill and reputation.

76.    Nitro has lost sales and customers as a direct and proximate result of Acushnet's knowingly illegal conduct.

77.     Acushnet's conduct is continuing and will continue unless restrained by the Court. Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer irreparable injury and harm for which it has no adequate remedy at law.

<div align="center">

## COUNT VI

## TORTIOUS INTEREFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS IN VIOLATION OF FLORIDA COMMON LAW

</div>

78.     Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-77 of the First Amended Complaint as though fully set forth herein.

79.     Acushnet's statements, described herein, are knowingly false and defamatory statements about Nitro; Nitro's refurbished, recycled, used and second-hand golf ball business; and Nitro's Products.

80.     Acushnet's threats and intimidation tactics, described herein, are unfair and deceptive trade practices.

81.     Acushnet has intentionally and maliciously made the false statements, described herein, and engaged in the unfair and anti-competitive trade practices, described herein, to cause injury to Nitro and to Nitro's goodwill, reputation and business.

82.     Acushnet's knowingly false, misleading and disparaging statements are causing the public and consumers to believe that Nitro's Products are illegal and counterfeit and that Nitro, Second Chance and Golfballsdirect.com are disreputable, dishonest and unlawful businesses.

83.     Acushnet is aware the Nitro has developed and/or intends to develop, a business relationship with golf ball retailers and other parties involved in the sale, distribution and advertisement of Nitro's Products.

<div align="center">-19-</div>

84.     Acushnet has intentionally and unjustifiably interfered with the business relationship between Nitro and those retailers and other parties by making knowingly false and misleading statements regarding Nitro and Nitro's Products and by engaging in the unfair and anti-competitive conduct described herein.

85.     Acushnet's conduct is causing irreparable injury to Nitro's business relationships with its customers, as well as to Nitro's goodwill and reputation.

86.     Nitro has lost sales and customers as a direct and proximate result of Acushnet's knowingly illegal conduct.

87.     Acushnet's conduct is continuing and will continue unless restrained by the Court. Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer irreparable injury and harm for which it has no adequate remedy at law.

<div align="center">

**COUNT VII**

**SLANDER IN VIOLATION OF FLORIDA COMMON LAW**

</div>

88.     Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-87 of the First Amended Complaint as though fully set forth herein.

89.     Acushnet statements, described herein, are knowingly false, misleading and defamatory statements about Nitro, Nitro's management personnel, and Nitro's Products.

90.     Acushnet has intentionally and maliciously uttered the statements described herein solely to cause injury to Nitro, Nitro's Products and Nitro's business.

91.     Acushnet's knowingly false, misleading and disparaging statements are causing the public to believe that Nitro's Products are illegal and counterfeit and that Nitro, Second Chance and Golfballsdirect.com are disreputable, dishonest and unlawful businesses.

-20-

92.     Acushnet's conduct is causing irreparable injury to Nitro's business relationships with its customers, as well as to Nitro's goodwill and reputation.

93.     Nitro has lost sales and customers as a direct and proximate result of Acushnet's knowingly false, misleading, defamatory and slanderous statements.

94.     Acushnet's conduct is continuing and will continue unless restrained by the Court. Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer irreparable injury and harm for which it has no adequate remedy at law.

## COUNT VIII

### DECLARATORY JUDGMENT THAT NITRO'S ADVERTISING, PROMOTION, DISTRIBUTION, AND SALE OF USED TITLEIST AND PINNACLE GOLF BALLS DOES NOT VIOLATE THE LANHAM ACT, THE PATENT ACT OR RELATED FEDERAL, STATE OR COMMON LAWS OR ANY OTHER RIGHTS THAT ACUSHNET MAY OWN OR ASSERT

95.     Nitro repeats and incorporates by reference the statements and allegations contained in paragraphs 1-94 of the First Amended Complaint as though fully set forth herein.

96.     This is a count for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

97.     On account of Acushnet's conduct, described herein, Nitro reasonably anticipated that it would be sued by Acushnet for trademark infringement and related claims arising from the advertising, promotion, distribution and sale of refurbished, recycled, used and/or second-hand "Titleist" and "Pinnacle" golf balls.

98.     On January 15, 2002, subsequent to the filing of the instant action, Acushnet filed a Complaint in the U.S. District Court for the Central District of California against Nitro alleging that Nitro infringed certain trademarks and patents by selling used "Titleist" and "Pinnacle" golf balls.  That action was transferred to this Court.

MIA 245034-2.051998.0073

99.     An actual controversy exists between the parties with respect to whether Nitro's advertising, promotion, distribution and sale of used "Titleist" and "Pinnacle" golf balls dilutes, infringes, unfairly competes with or otherwise violates Acushnet's rights, if any, to "Titleist" and "Pinnacle" under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, under the Patent Act, or otherwise pursuant to any other federal laws or the laws or statutes of any state.

100.    Nitro's advertising, promotion, sale and distribution of refurbished, recycled, used and second-hand "Titleist" and "Pinnacle" golf balls does not dilute, infringe, unfairly compete with or otherwise violate any of Acushnet's rights, if any, including any rights that Acushnet may have to "Titleist" and "Pinnacle" under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, any right that Acushnet may have to any patent, or any other rights that Acushnet may have or may assert under any federal law or the laws or statutes of any state.

101.    Neither Nitro nor any of Nitro's Products infringe, either directly, indirectly, literally, or under the doctrine of equivalents any claim of any of Acushnet's patents, and Nitro is not liable for infringement thereof.

102.    Acushnet's patents which it alleges that Nitro has infringed, and each claim, thereof, are invalid for failing to comply with the provisions of the Patent Laws, including one or more of 35 U.S.C. §§ 102, 103, 112, and 135.

## COUNT IX

## LIBEL IN VIOLATION OF FLORIDA COMMON LAW

103.    Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-102 of the First Amended Complaint as though fully set forth herein.

104.    Acushnet has knowingly published false, misleading, disparaging and *per se* defamatory statements about Nitro, Nitro's refurbishing process, Nitro's business operations, and

-22-

Nitro's Products, including, but not limited to, in a press release issued by Acushnet on or about January 16, 2002.

105.    Acushnet has intentionally and maliciously published the statements described herein solely to cause injury to Nitro, Nitro's Products, Nitro's business, and Nitro's business reputation.

106.    Acushnet's knowingly false, misleading, disparaging publications are causing the public to believe that Nitro's Products are illegal, unlawful and counterfeit and that Nitro, Second Chance and Golfballsdirect.com are disreputable, dishonest and unlawful businesses.

107.    Acushnet's conduct is causing irreparable injury to Nitro's business relationships with its customers, as well as to Nitro's goodwill and reputation.

108.    Nitro has lost sales and customers as a direct and proximate result of Acushnet's knowingly false, misleading, defamatory and libelous publications.

109.    Acushnet's conduct is continuing and will continue unless restrained by the Court. Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer irreparable injury and harm for which it has no adequate remedy at law.

## COUNT X

### CANCELLATION OF ACUSHNET'S
### FEDERALLY REGISTERED TRADEMARKS

110.    Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1-109 of its First Amended Complaint as though fully set forth herein.

111.    Nitro seeks cancellation of each and every federally registered mark that Acushnet has asserted is infringed and/or diluted by Nitro.  15 U.S.C. Section 1119.

112.    Acushnet has engaged in a variety of activities that has caused Acushnet's alleged trademarks to fail to serve as symbols of origin and quality.

-23-

113.    For many years, Acushnet has knowingly allowed third parties to engage in the unauthorized use Acushnet's alleged marks in connection with the advertising, promotion and sale of refurbished, recycled and used golf balls.

114.    On information and belief, Acushnet has engaged in uncontrolled licensing of its alleged trademarks to third parties in connection with the advertising, promotion and sale of refurbished, recycled and used golf balls.

115.    Acushnet's conduct has caused Acushnet's alleged trademarks to lose any significance as a symbol of equal quality or a source of origin.

116.    Nitro is likely to be damaged by the continued registration of Acushnet's federally registered trademarks.

## COUNT XI

### ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

117.    Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1 through 116 of the First Amended Complaint as though fully set forth herein.

118.    Acushnet has monopoly power in the premium golf ball market in the United States.

119.    The conduct of Acushnet described herein constitutes an attempt by Acushnet to monopolize the mid-price golf ball market in the United States.  With a dangerous probability of success and with specific intent to monopolize, Acushnet has used its power in the premium golf ball market to foreclose competition, gain a competitive advantage, and destroy competitors in the mid-price golf ball market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  In addition, Acushnet has, with specific intent to monopolize, used its power in the mid-price golf

-24-

ball market to foreclose competition, gain a competitive advantage and destroy competitors in the mid-price golf ball market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

120.   Any restraint upon free competition in the marketing of golf balls in the United States necessarily and directly restrains and affects interstate commerce.  The activities of Acushnet and violations of law by Acushnet described herein have had a direct, substantial, intended, and foreseeable effect on interstate commerce in the United States.

121.   Acushnet's illegal acts have resulted in injury to competition by eliminating consumer choice in the mid-price golf ball market, and have injured Nitro in its business or property.  Nitro is therefore entitled to recover three-fold such actual damages as the jury finds Nitro to have sustained, injunctive relief, and Nitro's cost of suit, including reasonable attorney's fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

## COUNT XII

## MONOPOLIZATION IN VIOLATION OF
## SECTION 2 OF THE SHERMAN ACT

122.   Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1 through 121 of the First Amended Complaint as though fully set forth herein.

123.   Acushnet has monopoly power in the premium golf ball market in the United States.  Nitro's used golf balls compete against Acushnet's premium golf balls.

124.   The conduct of Acushnet described herein constitutes illegal monopolization of the premium golf ball market.  Acushnet has used its monopoly power to foreclose competition, gain a competitive advantage and destroy competition in the premium golf ball market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.   Any restraint upon free competition in the marketing of golf balls in the United States necessarily and directly restrains and affects interstate commerce.  The activities of

-25-

Acushnet and violations of law by Acushnet described herein have had a direct, substantial, intended, and foreseeable effect on interstate commerce in the United States.

126.    Acushnet's illegal acts have resulted in injury to competition by eliminating consumer choice in the premium golf ball market, and have injured Nitro in its business or property.  Nitro is therefore entitled to recover three-fold such actual damages as the jury finds Nitro to have sustained, injunctive relief, and Nitro's cost of suit, including reasonable attorney's fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

## COUNT XIII

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

127.    Nitro repeats and incorporates by reference the statements and allegations in paragraphs 1 through 126 of the First Amended Complaint as though fully set forth herein.

128.    Acushnet's conduct, described herein, constitutes a deceptive and unfair trade practice in violation of Fla. Stat. §§ 501.204(1) *et seq.*

129.    Acushnet's statements have mislead and have the tendency to mislead Nitro's actual and potential customers that Nitro's Products, including its refurbished, recycled, used and/or second-hand "Titleist" and "Pinnacle" golf balls, are illegal and counterfeit and that Nitro, Second Chance and Golfballsdirect.com are dishonest, disreputable and unlawful businesses.

130.    Acushnet's false and misleading statements are material because they are likely to and adversely affect consumers' purchasing decisions relating to Nitro's Products, including its refurbished, recycled, used and/or second-hand golf balls.

131.    Acushnet's false and misleading statements are willful because Acushnet knew that Nitro's advertising, promotion, sale and distribution of refurbished, recycled, used and/or

second-hand "Titleist" and "Pinnacle" golf balls is lawful and does not constitute counterfeiting or otherwise violate Acushnet's rights.

132.    Acushnet has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce, the effect of which threatens to eliminate Nitro and others as significant competitors in the mid-price golf ball, which actions threaten to cause substantial injury to Nitro and its business and property, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

133.    Nitro has suffered actual economic injury and irreparable injury to its goodwill and reputation as a direct and proximate result of Acushnet's illegal conduct.

134.    Acushnet's conduct is continuing and will continue unless restrained by the Court. Unless Acushnet is enjoined from engaging in its wrongful conduct, Nitro will continue to suffer irreparable injury and harm for which it has no adequate remedy at law.

135.    Acushnet engaged in the foregoing conduct to establish its nationwide dominance and monopoly in the relevant markets.

## **PRAYER FOR RELIEF**

WHEREFORE, Nitro requests that this Court grant the following relief:

(1)    A preliminary and permanent injunction enjoining Acushnet, its officers, agents, directors, employees, attorneys, representatives, affiliates, subsidiaries, servants, successors and assigns, and all those persons in active concert or participation with any of them or acting on their behalf, from the following acts:

(a)    making any false, misleading, slanderous, defamatory, libelous or disparaging statements or engaging in false, misleading or unfair trade practices or tortious interference with business relationships, including, without limitation, stating,

MIA 245034-2.051998.0073

claiming, suggesting, intimating or implying in any manner whatsoever that Nitro's

Products are illegal, unlawful or counterfeit or that Nitro, Second Chance or

Golfballsdirect.com is a dishonest, disreputable or unlawful business;

       (b)     making any other false, misleading, slanderous, libelous, disparaging or

defamatory statements about Nitro or Nitro's Products;

       (c)     engaging in acts, either directly or through other entities, of false

advertising, product disparagement, slander, unfair and deceptive trade practices, unfair

competition, or tortious interference with actual or prospective business relations; and

       (d)     engaging in the violations of the antitrust laws set forth herein.

     (2)     A declaration that Nitro's advertising, promotion, sale and distribution of

refurbished, recycled, used and second-hand "Titleist" and "Pinnacle" golf balls does not dilute,

infringe, unfairly compete with or otherwise violate any of Acushnet's rights, if any, including

any rights that Acushnet may have to "Titleist" and "Pinnacle" under the Lanham Act, 15 U.S.C.

§§ 1051 *et seq.*, any patent rights that Acushnet may own, or any other rights that Acushnet may

have or may assert under any federal law or the laws or statutes of any state.

     (3)     An Order requiring Acushnet to immediately place a corrective advertisement in a

form, frequency and manner that is acceptable to Nitro and the Court that expressly (i) notifies

the public that Nitro's Products are legal and not counterfeit and (ii) apologizes for Acushnet's

unlawful conduct;

     (4)     An Order requiring Acushnet to notify, in a form and manner that is acceptable to

Nitro and the Court, the recipients of its false and misleading advertising and slanderous, libelous

and defamatory statements that Nitro's Products are legal and not counterfeit and to apologize

for Acushnet's unlawful conduct;

MIA 245034-2.051998.0073

(5)     An Order requiring Acushnet to file with the Court and serve upon Nitro, within thirty (30) days after the entry of such order, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the injunction, including, without limitation, the specific measures that were taken to ensure that (i) Acushnet's salespersons, agents and employees have actual knowledge of the injunction and that said persons are in full compliance with the injunction, (ii) the unlawful conduct that is the basis for this Complaint does not continue to occur, and (iii) the remedial action that was taken against the salespersons and employees on account of Acushnet's unlawful conduct;

(6)     An Order canceling all of Acushnet's federally registered trademarks which Acushnet contends have been infringed and/or diluted by Nitro and declaring invalid all of Acushnet's alleged patents that it contends have been infringed by Nitro;

(7)     A declaration that Acushnet's false, misleading, defamatory, slanderous, libelous and disparaging statements were knowing and willful;

(8)     Treble monetary damages, including statutory enhancements, enhancements on account of the willful and egregious nature of Acushnet's acts, and an award for corrective advertising;

(9)     Punitive damages;

(10)    Prejudgment and postjudgment interest;

(11)    Nitro's costs and expenses, including, without limitation, Nitro's reasonable attorneys' fees; and

(12)    All such other and further relief, in law or in equity, to which Nitro may be entitled or which the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Nitro demands a trial by jury of all

issues and claims so triable in this action.


Dated: April 26, 2002

<div style="margin-left: 40%;">

McDermott, Will & Emery

By: _____

Steven E. Siff (FBN 352330)
ssiff@MWE.com
201 South Biscayne Boulevard
22nd Floor
Miami, Florida  33131-4336
(305) 358-3500
(305) 347-6500 (facsimile)


William Barrett (D.C. Bar No. 954,131)
Craig P. Seebald (D.C. Bar No. 438,968)
John J. Dabney (N.Y. Bar No. 519,413)
McDermott, Will & Emery
600 13th Street, N.W.
Washington, DC  20005
(202) 756-8000
(202) 756-8087 (facsimile)


Attorneys for Plaintiff Nitro Leisure
  Products, LLC

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct of the foregoing First Amended Complaint was served via regular U.S. Mail this 26th day of April, 2002 on L. Martin Reeder, Jr., Esq., Greenberg, Traurig, P.A., 777 South Flagler Drive, Suite 300-East, West Palm Beach, Florida 33401 and Harley I. Lewin, Esq., Greenberg, Traurig, P.A., 885 Third Avenue, New York, New York 10022.

Steven E. Siff

MIA 245034-2.051998.0073

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-14008-CIV-MIDDLEBROOKS

NITRO LEISURE PRODUCTS, LLC,

      Plaintiff,

vs.

ACUSHNET CO.,

      Defendant.

_____/

FILED by _____ D.C.

APR - 9 2002

CLARENCE MADDOX
CLERK U S. DIST. CT.
S D. OF FLA.

### ORDER SETTING TRIAL DATE, ESTABLISHING PRETRIAL DEADLINES, AND REFERRING CASE TO MEDIATION

THIS CAUSE having come on to be heard upon the parties' Joint Scheduling Report and the scheduling conference held April 9, 2002, and pursuant to Local Rule 16.1.B, it is hereby,

ORDERED AND ADJUDGED as follows:

1. This case is set for a jury trial on Judge Middlebrooks' Fort Pierce calendar commencing on **Monday, April 7, 2003.** The parties shall appear for calendar call in West Palm Beach on **Wednesday, April 2, 2003 at 1:15 p.m.** The parties may appear by telephone as long as such request is made to Judge Middlebrooks' chambers the day prior to calendar call. The parties request two to three weeks for trial.

2. The following timetable shall govern the pretrial procedure in this case.

**April 26, 2002** - Joinder of additional parties and amended pleadings

**April 26, 2002** - List of witnesses exchanged

**December 13, 2002** - Expert witness summaries/reports exchanged

**January 10, 2003** - All discovery must be completed

**February 7, 2003** - All substantive pretrial motions must be filed

**March 21, 2003** - Joint pretrial stipulation must be filed

3.   Pursuant to Fed.R.Civ.P. 16 and L.R. 16.2, this case is referred to mediation as follows:

a.   Mediation shall be completed at least sixty (60) days prior to the beginning of the trial calendar;

b.   The parties shall, within fifteen (15) days of the date of this order, agree upon a mediator and advise the Clerk's office of their choice, failing which the Clerk will designate a mediator from the list of certified mediators on a blind random basis;

c.   Plaintiff's counsel shall be responsible for coordinating the mediation conference date and location agreeable to the mediator and all counsel of record; and

d.   Within five (5) days of the mediation conference, the mediator shall file a Mediation Report indicating who attended the mediation and the result thereof.

4.   Counsel shall meet at least one (1) month prior to the beginning of the trial calendar to confer on the preparation of a pretrial stipulation.

5.   Each party shall file their proposed jury instructions, including a diskette in WordPerfect format, at least one (1) week prior to the beginning of the trial calendar.  Each jury instruction shall be typed on a separate sheet and supported by

2

citation of authority.  The parties shall utilize as a guide the Pattern Jury Instructions for civil cases approved by the United States Court of Appeals for the Eleventh Circuit.

6.  All exhibits must be pre-marked.  A typewritten exhibit list setting forth the number or letter, and description of each exhibit shall be submitted at the time of trial.

7.  A motion for continuance shall not stay the requirement for the filing of a pretrial stipulation and, unless an emergency situation arises, a motion for continuance will not be considered unless it is filed at least seventy-two (72) hours prior to calendar call.

8. Failure to comply with any provision of this order may subject the offending party or counsel to sanctions or dismissal. It is the duty of all counsel to enforce the timetable set forth herein.

DONE AND ORDERED in Chambers at Fort Pierce, Florida, this 9th day of April, 2002.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc:  Honorable Donald M. Middlebrooks
     L. Martin Reeder, Esq.
     Steven E. Siff, Esq.
     L. Martin Reeder, Jr., Esq.

3