UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**NIGHT BOX**
**FILED**

CASE NO. 02-14008 CIV-MIDDLEBROOKS

IN RE: NITRO LEISURE PRODUCTS, LLC

_____/

MAY 1 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## NITRO LEISURE PRODUCTS, LLC'S OPPOSITION TO
## ACUSHNET COMPANY'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Nitro Leisure Products, LLC ("Nitro"), by and through its undersigned counsel, hereby opposes the Motion for Preliminary Injunction filed by Defendant Acushnet Company ("Acushnet") and states as follows:[1]

### INTRODUCTION

Acushnet's motion is its latest attempt to squash an emerging segment of the used golf ball business, as well as a smaller competitor--in this case, Nitro. Rather than compete fairly, Acushnet has adopted a strategy of disparaging Nitro to its customer base and now seeks to continue its campaign to destroy Nitro in its lawful business of selling used golf balls by filing suit against Nitro (after Nitro brought suit against Acushnet for its own wrongful conduct) and then by filing its baseless motion for a preliminary injunction. As Acushnet well knows--based on the law and particularly from its own past experience--there is nothing unlawful about Nitro's conduct in the golf ball business.

Acushnet has previously perpetuated a similar strategy to crush a small used golf ball company. Acushnet failed, as a matter of law, to prohibit the very practice it complains of in this case--the refurbishing, re-marking and re-selling of golf balls bearing Acushnet trademarks. Notably, in its memorandum, Acushnet _never mentioned_ the strikingly similar case, Acushnet Company v. Birdie Golf Ball Company, Inc. and Dale L. Updike, Case No. 95 CIV 7030-Gonzalez (S.D. Fla.) ("Birdie"), much less the Court's ruling on Acushnet's motion for

---

[1] While Acushnet seeks injunctive relief as to Nitro and "Nitro Leisure Services, L.L.C.," Nitro has advised Acushnet's counsel that it is not aware of such an entity. The parties anticipate a stipulation of dismissal with respect to claims against Nitro Leisure Services, L.L.C. being filed shortly.

preliminary injunction.[2]    As explained more fully below, District Judge Gonzalez soundly rejected Acushnet's claim that the stripping, refurbishing, re-stamping of marks, and subsequent selling of used golf balls was a violation of Acushnet's rights; instead, the Court held that such conduct was lawful as long as the refurbished nature of the balls was noted.    Because the same conclusion must hold true here, Acushnet's motion for a preliminary injunction must be denied. Similarly, any claim that Nitro's own brands of golf balls violate Acushnet's patents must be rejected, particularly where the practice alleged by Acushnet is not occurring.

## STATEMENT OF FACTS

### A.    Nitro Leisure Products, LLC

Nitro is a relatively small golf ball company located in Stuart, Florida. (Khoury Decl. ¶ 2.) Since October 2000, Nitro has been engaged in the business of advertising, promoting and selling used golf balls -- a well-known industry that has existed in the United States for decades. (Id. ¶ 3.)  Because of Acushnet's dominant position in the industry, many of the used balls sold were originally manufactured by Acushnet. (Id.)[3]

Nitro, like others in the industry, sells two different types of used golf balls, i.e., "recycled" golf balls and "refurbished" golf balls. (Khoury Decl. ¶¶ 3-4.) "Recycled" golf balls are washed and re-sold to the public as used golf balls. (Id. ¶ 4.) Acushnet admits, as it must, that the sale of recycled golf balls is lawful. (Acushnet Mem. at 15.) "Refurbished" golf balls, the subject of Acushnet's trademark claims, are cosmetically restored before they are resold to the public as used golf balls. (Khoury Decl. ¶¶ 4, 9-10; Jepson Decl. ¶¶ 22-23.)[4]

Nitro's refurbishing process[5] is a highly sophisticated, industry-leading operation, even by the standards of the former highest-ranking officer of Acushnet's Titleist division, John Jepson. (See Jepson Decl. ¶¶ 17, 26.) Nitro purchases used golf balls from various vendors who, in turn, have retrieved the balls from golf course hazards, including lakes and ponds.

---

[2]  The fact that a case had already been decided adversely to Acushnet on this issue in this District most likely explains why Acushnet filed its own suit in California despite the fact that Nitro filed suit in the Southern District of Florida just days earlier.

[3]  See Nitro's First Amended Complaint, alleging that Acushnet has unlawfully monopolized or attempted to monopolize the markets for premium and mid-price golf balls.

[4]  Nitro objects to Acushnet's repeated use of the term "remanufactured" to describe "refurbished" golf balls. This is a blatantly deliberate and self-serving mischaracterization of Nitro's products.

[5]  While the changes have not been tremendously significant, Nitro's refurbishing process has evolved and continues to evolve over time. (Khoury Decl. ¶ 5.) The refurbishing process as described in the text below has been used by Nitro since April 1, 2002. (Id.)

(Khoury Decl. ¶ 5; Jepson Decl. ¶ 18.)  Upon arriving at Nitro's facility, the balls are washed to remove materials such as mud, sticks, insects, fish, algae and golf course chemicals.  (Khoury Decl. ¶ 5.)  The balls are then hand-sorted to eliminate badly damaged balls and to categorize the balls by groups of approximate value.  (Khoury Decl. ¶ 6; Jepson Decl. ¶ 19.)  The high value balls are then hand-sorted by brand and (if appropriate) model, and placed in pre-designated areas by brand and (if appropriate) model.[6]  (Khoury Decl. ¶ 7; Jepson Decl. ¶ 20.)

Once the balls are segregated by brand and (if appropriate) model type, the balls are hand-sorted again to ensure that no ball is placed in the wrong group and to identify those balls that are in sufficiently good condition to be recycled without refurbishing.  (Khoury Decl. ¶ 8; Jepson Decl. ¶ 21.)  The golf balls that are in sufficiently good condition are removed, re-packaged and re-sold as used golf balls.  (Khoury Decl. ¶ 8; Jepson Decl. ¶ 21.)  The remaining balls which suffer from one or more of the following detriments: scuff marks, cart path marks, tree marks, lack of clear coat or discoloration, are sent to the final quality control sort.  (Khoury Decl. ¶ 8; Jepson Decl. ¶ 21.)  At the final quality control sort, these balls are hand-sorted again to ensure that no ball is in the wrong group.  (Khoury Decl. ¶ 9; Jepson Decl. ¶ 22.)

Following this fourth hand-sort, the balls are refurbished in small batches by removing the base coat paint and the clear coat from the balls, which also has the effect of removing the markings on the balls.[7]  (Khoury Decl. ¶ 9; Jepson Decl. ¶ 22.)  Nitro then re-applies base coat paint (if the ball originally had a base coat of paint).  (Khoury Decl. ¶ 10; Jepson Decl. ¶ 23.)  The balls are then re-stamped with the appropriate markings. (Khoury Decl. ¶ 10; Jepson Decl. ¶ 23.)  The re-stamped markings appear in the same font, size, and type as they appeared on the balls before the balls were refurbished.  (Khoury Decl. ¶ 10.)  Nitro re-stamps the precise model type only for those models that its consumers have expressed a demand, e.g., Titleist Pro V1's.  (Khoury Decl. ¶ 10; Jepson Decl. ¶ 23.)  For other balls, such as the Titleist DT family (e.g., Titleist DT 2-Piece, Titleist DT Wound, Titleist DT Spin, and Titleist DT Distance), for which there is not a high consumer demand, the precise model type is not reapplied, but only the terms "Titleist" and "DT."  (Khoury Decl. ¶ 10; Jepson Decl. ¶ 23.)

---

[6]  Nitro currently separates out by model only those models for which there is a high consumer demand, e.g., "Titleist Pro V1."  (Khoury Decl. ¶ 7; Jepson Decl. ¶ 20.)
[7]  For some models of golf balls, such as the "Titleist DT," no base coat of paint is removed, because the original golf ball did not have a base coat of white paint.  (Khoury Decl. ¶ 9; Jepson Decl. ¶ 22.)

In order to ensure that the public understands that the golf balls are used and refurbished, Nitro stamps the following notice on each ball: "REFURBISHED BY SECOND CHANCE" or "REFURBISHED BY GOLFBALLSDIRECT.COM." (Khoury Decl. ¶ 11; Jepson Decl. ¶ 24.)[8] "SECOND CHANCE" is a federally registered trademark, and, as the name suggests, is well-known in the industry as designating used and refurbished golf balls. (Khoury Decl. ¶ 12.) The notification appears in a black font that stands out from the white background of the ball. (Khoury Decl. ¶ 11.) Second Chance's logo, which consists of a golf ball wearing a swimming mask and flippers (further emphasizing that the balls are recovered from golf course hazards), is also featured on most of the refurbished golf balls. (Khoury Decl. ¶¶ 11, 14.)

Following the re-stamping, Nitro re-applies the clear coat. (Khoury Decl. ¶ 13; Jepson Decl. ¶ 25.) Every golf ball is then inspected by hand once again. (Khoury Decl. ¶ 13; Jepson Decl. ¶ 25.) Each ball is also compression checked and visually examined. (Khoury Decl. ¶ 13; Jepson Decl. ¶ 25.) If the compression falls outside of a pre-established range or if there is a detracting mark, such as a visible club mark, remaining on the ball that is deemed to be serious to the end product, the ball is rejected. (Khoury Decl. ¶ 13; Jepson Decl. ¶ 25.) Samples of golf balls are randomly selected to be weighed and tested for roundness. (Khoury Decl. ¶ 13; Jepson Decl. ¶ 25.)

The refurbished golf balls are packaged to clearly inform consumers that the golf balls are refurbished and used. (Khoury Decl. ¶ 14.) The packaging currently bears the following notice, and has so since soon after Acushnet filed its Complaint in this matter and well before Acushnet filed its preliminary injunction motion:

> ATTENTION USED/REFURBISHED GOLF BALLS. The enclosed contents of used/refurbished golf balls are USED GOLF BALLS. Used/refurbished golf balls are subject to performance variations from new ones. These used/refurbished balls were processed via one or more of the following steps: stripping, painting, stamping and/or clear coating in our factory. This product has NOT been endorsed or approved by the original manufacturer and the balls DO NOT fall under the original manufacturer's warranty. (Khoury Decl. ¶ 14, Ex. A.)

---

[8]  Before filing its Complaint, Acushnet never contacted Nitro regarding the conduct that forms the basis for Acushnet's Complaint, and thus Nitro did not know the precise nature of Acushnet's contentions. (See Khoury Decl. ¶ 16.) After reviewing Acushnet's Complaint in this action, Nitro changed the notification to read "USED & REFURBISHED BY SECOND CHANCE" or "USED & REFURBISHED BY GOLFBALLSDIRECT.com" in a good faith effort to be sure of the avoidance of all possible confusion. (Id. ¶ 11.) Nitro also has increased the size of the notification on the golf ball by over 10 %. (Id.)

4

The term "REFURBISHED BALLS" is prominently displayed in numerous locations on the packaging and on virtually every panel of the packaging. (Khoury Decl. ¶ 14.) Second Chance's logo, *i.e.*, a golf ball wearing a swimming mask and flippers, is also prominently featured on the packaging. (Id. ¶¶ 11, 14.) None of the original manufacturers' markings, *e.g.*, Titleist, appears on the packaging of the golf balls. (Id. ¶ 14.) The refurbished balls are sold at a fraction of the price of new golf balls, further emphasizing that the balls are used. (Id.) Nitro also includes its address and telephone number on the packaging so that consumers can contact Nitro regarding Nitro's refurbished golf balls. (Id.)

Nitro's website **www.golfballsdirect.com** also features numerous statements that notify customers that Nitro's golf balls are used and refurbished. (Id. ¶ 15.) For example, Nitro's website currently advertises:

> Refurbished golf balls, like recycled golf balls, are a form of USED golf balls. USED golf balls do NOT fall under the warranty for durability or performance of the original manufacturer. Used/Refurbished Golf balls have no affiliation or endorsement from the original manufacturer. Refurbished balls have been refinished, in our factory, to provide a rejuvenated, consistent appearance. Each ball has been stamped "Refurbished by Second Chance Golf" in order to prevent ANY confusion between refurbished balls, and those of the original manufacturer.
>
> \* \* \*
>
> The Refurbished PRO V1 features a new basecoat, no tinting, and no personal marks. Each ball has been carefully hand sorted several times to ensure consistent quality and a unique, excellent value. The Refurbished Pro V1 is a USED golf ball that has been refinished in our factory. All used/refurbished golf balls do not fall under the original manufacturer's warranty for durability or performance, and have no affiliation or endorsement from the original manufacturer; during processing we apply a "Refurbished by Second Chance Golf" marking to prevent ANY CONFUSION between used/refurbished products, and brand new products. (Khoury Decl. ¶ 15, Exs. B and C.)

Nitro is unaware of any instance where any person or business believed that Nitro was affiliated with Titleist, that Titleist was selling Nitro's refurbished golf balls, or that Titleist sponsored or approved the sale of Nitro's refurbished golf balls. (Khoury Decl. ¶ 19.) Nitro is also unaware of any instance where a customer believed that a refurbished "Titleist" golf ball was a new "Titleist" golf ball. (Id.) Nitro's customers have not been confused about Nitro's

refurbished golf balls. (See, e.g., Scott Decl. ¶¶ 5, 8; Bauer Decl. ¶¶ 5, 8; McMichael Decl. ¶¶ 5, 8; Sampey Decl. ¶¶ 5, 8; Curnen Decl. ¶¶ 5, 7; Wynn Decl. ¶¶ 5, 9.)

Nitro's refurbished golf balls have been very successful and appeal to consumers because they give golfers, including children and other low income golfers, the opportunity to play with a used, premium well-known golf ball, such as a "Titleist Pro V1," which has been cosmetically restored for a fraction of the price of a new golf ball. (Khoury Decl. ¶ 17.) Consumers are quite satisfied with the performance, appearance and durability of Nitro's refurbished "Titleist" golf balls. (See, e.g., Scott Decl. ¶¶ 6-7, 10; Bauer Decl. ¶¶ 6-7, 9; McMichael Decl. ¶¶ 6-7, 10; Sampey Decl. ¶¶ 6-7, 10; Curnen Decl. ¶¶ 6, 8; Wynn Decl. ¶¶ 6-8, 12-13.) Millions of Nitro's refurbished golf balls have been sold, and Nitro has never lost an account based on the quality of its refurbished golf balls, including the following accounts: K-Mart; Big Five; Wal-Mart Canada; The Sports Authority; Big Five Sporting Goods; BJ's Wholesale Clubs; JJB's Sports; and Martin Barrier. (Khoury Decl. ¶ 17.) Indeed, sales of Nitro's refurbished golf balls and Nitro's customer base were increasing before Acushnet engaged in the illegal conduct that forms the basis for Nitro's First Amended Complaint. (Khoury Decl. ¶ 17.) The typical consumer of Nitro's refurbished golf balls usually cannot discern any difference in performance between a refurbished "Titleist" golf ball and a new "Titleist" golf ball. (See McMichael Decl. ¶ 7; Wynn Decl. ¶ 8; Khoury Decl. ¶ 17; Jepson Decl. ¶ 27; Piotrowski Decl. ¶ 20.) And Nitro has had almost no complaints regarding the performance of its refurbished products. (Khoury Decl. ¶ 17.) Nitro's refurbished golf balls are a tremendous value to consumers who cannot afford or are unwilling to pay full price for a new "Titleist" golf ball. (Scott Decl. ¶¶ 4-5,10; Bauer Decl. ¶¶ 4, 7, 9; McMichael Decl. ¶¶ 4-5, 10; Sampey Decl. ¶¶ 4-5, 9-10; Curnen Decl. ¶¶ 4, 8; Wynn Decl. ¶¶ 4-5, 12-13; Jepson Decl. ¶¶ 17, 26.)

Similarly, balls sold under Nitro's own brand name offer quality balls to consumers at a good price. While Nitro previously used pre-existing golf ball cores from recovered balls, Nitro has not used that method to make its own balls for at least 18 months. (Khoury Decl. ¶ 28.)

**B.      Acushnet and Its Effort to Destroy the Used Golf Ball Market**

Acushnet is the leading manufacturer of golf balls in the United States. (Acushnet Mem. at 3.) Acushnet spends millions of dollars annually advertising its "Titleist" golf balls. (Id. at 6.) Acushnet has annual sales of hundreds of millions of dollars, and, by its own admission, has

captured an overwhelmingly dominant percentage of the premium golf ball market in the United States. (Id. at 4, 6.)

Because refurbished golf balls are a threat to Acushnet's market dominance, Acushnet has attempted through, among other things, aggressive federal court litigation to destroy businesses offering refurbished golf balls; thus attempting to suppress the development of a vibrant refurbished golf ball segment of the industry to complement the sale of recycled and new golf balls, which maximizes consumer choice. (See Khoury Decl. ¶ 24.) For example, in 1995, Acushnet filed its Complaint for trademark infringement and related alleged wrongs against Birdie Golf Ball Company ("Birdie"). (See Siff Decl. Ex. A (Acushnet Complaint against Birdie Golf Ball Company).) In that case, relying on Supreme Court authority, Judge Gonzalez ruled that the sale of refurbished golf balls is lawful, provided that "Titleist" is correctly re-affixed to the refurbished golf balls and appropriate precautions are taken to notify the public that the golf balls are used, i.e., precautions that Nitro has taken. (See Siff Decl. Ex. B (Birdie Preliminary Injunction); Khoury Decl. ¶¶ 21-23.) Following that ruling, Acushnet entered into a final Consent Judgment on the same terms as Judge Gonzalez's ruling, i.e., Acushnet agreed that a final judgment should be entered that allowed Birdie to continue to strip the Titleist golf balls, including the markings, re-affix the markings, including "Titleist," and sell the balls to the public, provided that a sufficient notification appeared on the refurbished golf ball and its packaging -- the types of notifications that Nitro is using. (See Siff Decl. Ex. C. (Consent Judgment).) Birdie, like Nitro, is selling refurbished Acushnet golf balls today. (Khoury Decl. ¶ 21.)

In July 2001, Acushnet focused its anti-competitive attack on Nitro (see Lewin Decl. ¶ 3 (attached as Exhibit 3 to Acushnet's Motion to Dismiss); Arnold Decl. ¶¶ 3-4), who, like Birdie five years earlier, was emerging as a significant competitive threat to Acushnet. (See Khoury Decl. ¶ 24.) Despite the rulings from this Court in Birdie, Acushnet implemented a false advertising campaign designed to destroy Nitro's business. (Id.) Acushnet told Nitro's customers, including retailers, that Nitro's golf balls were illegal and counterfeit. (Id.) Acushnet's illegal conduct has substantially harmed, and is still harming, Nitro's business; thus, on January 10, 2002, Nitro filed an action against Acushnet in this Court seeking injunctive relief, as well as treble and punitive damages for claims arising under the false advertising and unfair business practices laws. (Id. ¶ 25.)

7

In apparent response, on January 15, 2002, Acushnet filed its own action, alleging claims for trademark infringement, trademark dilution and patent infringement.  Instead of filing a counterclaim to Nitro's Complaint in this Court, Acushnet filed an affirmative claim in the United States District Court for the Central District of California -- over 2,500 miles from both parties' principal places of business and the district that rendered the <u>Birdie</u> decision.  On Nitro's motion, the California federal court transferred the action to this Court.  Acushnet has now filed the instant motion seeking a preliminary injunction, even though: (1) it has had actual knowledge of the conduct that forms the basis for the instant motion for at least nine months before the filing of its motion (<u>see</u> Arnold Decl. ¶¶ 6-14; V. Hasenstaub Decl. Ex. C; Lewin Decl. ¶ 3); (2) it filed its initial Complaint nearly four months ago; (3) there are, and have been for years, third parties engaged in the sale of refurbished "Titleist" golf balls (<u>see</u> Khoury Decl. ¶¶ 20-21); and (4) after a partially-adverse ruling against Acushnet, it consented in this Court to allow a third party to engage in the conduct that forms the basis for its present motion (<u>see</u> Siff Decl. Ex. C (<u>Birdie</u> Consent Judgment)).

## LEGAL STANDARD

To prevail on a preliminary injunction motion in a Lanham Act case, Acushnet must establish the following:

> (1) a substantial likelihood that the plaintiff will prevail on the merits; (2) a substantial threat that the plaintiff will suffer irreparable harm if the injunctive relief is not granted; (3) a threatened injury to the plaintiff which outweighs the threatened harm an injunction would cause the defendant; and (4) the injunction must not disserve the public interest.

<u>Swatch Watch, S.A. v. Taxor, Inc.</u>, 785 F.2d 956, 958-59 (11th Cir. 1986).  The standards are virtually identical in patent cases.  <u>See</u> <u>Amazon.com, Inc. v. Barnesandnoble.com, Inc.</u>, 239 F.3d 1343, 1350 (Fed. Cir. 2001).  As the Eleventh Circuit has noted, a "preliminary injunction is an *extraordinary* and *drastic* remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites."  <u>Siegel v. Lepore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (emphasis added) (quotations omitted).  Acushnet has not "clearly established" its burden of persuasion, as required, on any of the four factors necessary to grant a preliminary injunction.  Therefore, its motion must be denied.

8

**LEGAL ARGUMENT**

I.   **ACUSHNET'S MOTION FOR PRELIMINARY INJUNCTION MUST BE DENIED ON THE CLAIMS FOR ALLEGED TRADEMARK INFRINGEMENT, COUNTERFEITING, AND DILUTION.**

    A.   **Acushnet Has Not Demonstrated a Likelihood of Success on the Merits of Its Trademark Claims.**

To prevail on its trademark infringement claims, Acushnet must prove, among other things, that Nitro's use of a confusingly similar mark causes a likelihood of confusion among an appreciable amount of reasonably prudent purchasers. See, e.g., Swatch Watch, 785 F.2d at 958-59; Glen Raven Mills, Inc. v. Ramada Int'l, Inc., 852 F. Supp. 1544, 1548 (S.D. Fla. 1994). Acushnet has not met --and indeed cannot meet-- its burden on this element.

For over fifty years, the law has been well-settled that if a defendant is reconditioning or refurbishing a used product -- as opposed to creating a product of a different design -- the defendant's use of the manufacturer's mark on the used product does not create a likelihood of confusion, provided that the defendant labels the product to inform consumers that the product has been refurbished. See, e.g., Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 128-30 (1947); Brandtjen & Kluge, Inc. v. Prudhomme, 765 F. Supp. 1551, 1565-67 (N.D. Tex. 1991).[9] In Champion, the defendant sold reconditioned "Champion" spark plugs. The defendant's reconditioning was extensive and involved:

> cleaning the plugs so as to remove burned and pitted portions of the center electrodes, readjusting the side electrodes and where they were worn away welding them to new metal in order to provide proper gap spacing. [The process] also involved cleaning and painting [the plugs] so that they would look more attractive for selling.

Champion Spark Plug Co. v. Sanders, 156 F.2d 488, 489 (2d Cir. 1946), aff'd, 331 U.S. 125 (1947). The Supreme Court held that the defendant's use of "Champion" on the plugs did not cause a likelihood of confusion, provided that the designation "USED" or "REPAIRED" was placed on the plugs. 331 U.S. at 127-28 and 130-31 n.3. It was "immaterial" that the

---

[9] In its Memorandum, Acushnet merely made a passing reference to Champion, notwithstanding its direct relevance to this issue.

reconditioned spark plugs were inferior to new spark plugs. Id. at 130.  As the Supreme Court noted:

> [S]o long as the [plaintiff] is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the [defendant,] [f]ull disclosure gives the [plaintiff] all the protection to which he is entitled.  Id.

In Birdie, a case that is conspicuously absent from Acushnet's Memorandum, this Court applied Champion to refurbished golf balls. (Siff Decl. Ex. A (Birdie Preliminary Injunction).) In Birdie, the defendants, like Nitro here, refurbished golf balls by stripping the ball, including the original manufacturers' markings. (Id.) The balls were then re-stamped with their original marks, including "Titleist," and the clear coat was re-applied. (Id.) Acushnet sued for trademark infringement, trademark dilution and related wrongs under federal and state law.  (Id.) Following Champion, this Court held that the defendants' refurbishing did not result in a product of a new design, but rather was a restoration of the product. (Id.) Thus, the defendants in Birdie were legally permitted to continue to refurbish golf balls and re-stamp them with the "Titleist" mark, provided that the balls were also stamped with the words "USED/REFINISHED BY BIRDIE GOLF." (Id.) Birdie is still selling refurbished "Acushnet golf balls. (See Khoury Decl. ¶¶ 21-22.)

Applying Champion and Birdie here, Nitro's refurbished "Titleist" golf balls clearly do not create a likelihood of confusion.  Nitro's refurbishing process restores the cosmetic appearance of the used golf balls. It does not create a product of a new design. See supra pp. 2-4. Nitro's refurbishing process is far less extensive than the restorations of used products in other cases where courts have found no likelihood of confusion.  See supra pp. 2-4; compare Champion, 331 U.S. at 125 (extensive reconditioning and repainting of used spark plugs is lawful with disclaimer); Brandtjen, 765 F. Supp. at 1559 (extensive restoration of used printing presses is lawful with disclaimer).  Consumers are pleased with the enhanced aesthetic appearance of Nitro's refurbished golf balls. See supra. Consumers are also pleased with the performance and durability of Nitro's refurbished "Titleist" golf balls.  Indeed, most consumers acknowledge they are unable to discern any performance difference between a refurbished "Titleist" golf ball and a new "Titleist" golf ball. See supra.

10

1.    **There Is No Likelihood of Confusion Arising from Nitro's Refurbishing Process.**

Acushnet's primary argument is that there is a likelihood of confusion because Nitro's refurbished "Titleist" balls do not perform as well or look as good as new "Titleist" balls. (See Acushnet Mem. at 12; Felker Decl. ¶¶ 24-25; Wunderlich Decl. ¶ 6.) But that alleged inferiority is "immaterial," see Champion, 331 U.S. at 129-30, because Nitro is not selling refurbished "Titleist" golf balls as new balls. Instead, Nitro sells them as used balls and informs the public that the balls have been refurbished. *Supra* pp. 4-5. See Champion, 331 U.S. at 129-30. Nitro places prominent notices on the packaging for the balls and on the balls themselves to notify customers that the balls are used and refurbished. *Supra* pp. 4-5. Further, Nitro sells the refurbished balls for a fraction of the price of new "Titleist" golf balls, which reinforces that the balls are used. *Supra* p. 6. Under these circumstances, and contrary to Acushnet's central thesis in this case, it is "immaterial" if the refurbished "Titleist" golf balls do not perform as well or look as good as new "Titleist" golf balls.[10] See Champion, 331 U.S. at 129-30. As the Supreme Court explained the governing rule long ago:

> [I]nferiority is expected in most second-hand articles. Indeed, they generally cost the customer less. That is the case here. Inferiority is immaterial so long as the article is clearly and distinctly sold as repaired or reconditioned rather than as new. Id. at 129-30.[11]

---

[10]  The absolute absurdity of Acushnet's comparison between alleged performance and aesthetic differences between new "Titleist" golf balls and refurbished "Titleist" golf balls is demonstrated by the fact that Acushnet expressly admits that it is legal to sell washed "Titleist" golf balls, which, according to Felker's Declaration (¶¶ 24-25), do not perform as well as new "Titleist" golf balls. (Acushnet Mem. at 15.)

[11]  Acushnet asserts that certain advertising statements by Nitro create confusion about the nature of Nitro's refurbished balls. (Acushnet Mem. at 9.) If Acushnet had consulted with Nitro before filing its motion, as it represented that it had (Acushnet Motion at 1), Acushnet would know that Nitro permanently stopped making those statements long ago. Nitro no longer advertises that its refurbished golf balls are "like new," "almost new," or have a "pristine" appearance. (Khoury Decl. ¶ 16.) Those statements were made for a very short time on Golfballsdirect.com or the Golfballsdirect.com eBay store and did not appear on packaging. Those statements were made out of pride in the refurbishing process and not to mislead any consumer. (Id.) Nitro believes that those statements were not false or misleading in context, but elected to permanently stop making those statements after reviewing Acushnet's Complaint in a good faith effort to take every step possible to be sure of the avoidance of all possible confusion. (Id.) Contrary to Acushnet's assertion (Acushnet Mem. at 9), Nitro never stated that its refurbishing "process had no effect on the aerodynamic performance of the ball." Nitro did state that it had an "unwavering corporate desire to never impact the aerodynamic qualities of the original manufacturer," and Nitro has permanently stopped making that statement in a good faith effort to be sure of the avoidance of all possible confusion. (Id.)

Acushnet's secondary argument is that Nitro's refurbishing process creates a likelihood of confusion because it results in balls that do not perform as well as recycled "Titleist" golf balls. (Acushnet Mem. at 8, 15.) Acushnet claims that refurbished golf balls so underperform recycled balls that it is a "misnomer" to call the refurbished balls "Titleist" any longer. (Id. at 12-13.) Acushnet's only evidence supporting that argument is the Felker Declaration and underlying study. (Id. at 8-9.) But the Felker Declaration and study are unreliable because they are deficient in multiple and material ways. To begin, Felker manipulated the "Iron Byron" mechanical golfer to generate a swing speed of 109 miles per hour, the speed that the USGA estimates is the average swing speed of a *professional golfer*, which is manifestly not the average swing speed of Nitro's consumers. (Piotrowski Decl. ¶ 11; Jepson Decl. ¶ 29.) This increased swing speed maximizes any performance differences between the balls. (Piotrowski Decl. ¶ 11; Jepson Decl. ¶ 29.) Felker also tested in high wind conditions which further distorted the results of the tests and provided no indication of the humidity conditions during testing. (Piotrowski Decl. ¶¶ 13-14; Jepson Decl. ¶¶ 30-31.) Indeed, most of the time that Felker was testing, the wind conditions were unacceptable. (Piotrowski Decl. ¶ 13.) Given all of these flaws, it is hardly surprising that the Felker report renders a series of unreliable, unprofessional and nonsensical conclusions about each group of golf balls tested, including opining that (i) the washed Titleist DT 2-piece is over 2 yards longer on average than the new Titleist DT 2-piece (see Felker Report, Vol. 1, Ex. D p.15), (ii) the DT-series washed balls have on average less total dispersion than new DT-series (id.), and (iii) the washed Pro V1 has less carry dispersion than a new Pro V1 (id.). (See Piotrowski Decl. ¶ 17; Jepson Decl. ¶ 33.)

Felker's study does not even measure what it purports to measure, *i.e.*, the effect of Nitro's refurbishing process on the used golf ball. (See Felker Decl. ¶ 18; Felker Report Vol. 1, p. 2; Piotrowski Decl. ¶ 19; Jepson Decl. ¶ 35.) The recycled "Titleist" golf balls that Nitro sells are in better condition when they come into Nitro's refurbishing facility than the "Titleist" golf balls that are refurbished by Nitro. (Khoury Decl. ¶ 8; Jepson Decl. ¶ 21.) Therefore, Felker's comparison between refurbished and recycled golf balls is misleading because it does not take into account that significant difference. (Piotrowski Decl. ¶ 19; Jepson Decl. ¶ 35.) Acushnet appears to blame the alleged shorter distance of the refurbished balls on the new paint and other alleged changes in the balls, rather than on their inferior condition when they first arrived at the Nitro facility. In addition, a test using an Iron Byron does not reflect the marketplace conditions,

12

because, unlike the mechanical Iron Byron, the average golfer (and certainly a below average golfer who might be buying Nitro's products) does not swing in the same perfect way every time, always hitting the ball in the "sweet spot."   (See Piotrowski Decl. ¶ 12; Jepson Decl. ¶ 37.) Felker's failure to measure accurately true marketplace conditions renders his conclusions unreliable. (See Piotrowski Decl. ¶ 12; Jepson Decl. ¶ 37.)   See also Coherent, Inc. v. Coherent Techs., Inc., 935 F.2d 1122, 1126 (10th Cir. 1991) (rejecting test in trademark case because it did not accurately mimic market conditions).   Indeed, there is substantial evidence that a test of true marketplace conditions would demonstrate *no difference* between new or washed Titleist golf balls and refurbished "Titleist" golf balls.[12]  See *supra* p. 6.

But even accepting the legitimacy of Felker's decidedly unreliable and illegitimate test, the difference between a refurbished golf ball and a recycled golf ball in total distance is less than 3%.[13]   (See Felker Report ¶ 24, Vol. 1, Ex. D., p. 15; Piotrowski Decl. ¶ 20.)   That is an altogether insufficient basis on which to hold that Nitro's refurbishing process so dramatically affects the performance of the golf ball that it is a "misnomer" to call it a "Titleist."[14]   See Champion, 331 U.S. at 129-30 ("[I]nferiority is expected in most second-hand articles . . . [and

---

[12]   The contrived nature of Acushnet's distinction between recycled golf balls, on the one hand, and refurbished golf balls, on the other hand, is highlighted by the fact that, according to Felker's report, an appreciable percentage (15%-20%) of certain models of washed Titleist golf balls performs worse in terms of overall distance than the average refurbished Titleist golf ball, but Acushnet does not object to the sale of those washed balls, which, according to Acushnet, perform so poorly they cannot be called "Titleist." (Felker Report Ex. 32.) Indeed, for some Titleist models, an appreciable percentage (approximately 20%) of the new "Titleist" balls performed worse in terms of overall distance than the average refurbished "Titleist" golf ball. (Felker Report Ex. 33.) It is disingenuous for Acushnet to claim that the average distance of the refurbished golf ball is so poor that the ball cannot properly be called a Titleist, when, in some cases, approximately 20% of its new "Titleist" golf balls do not travel as far as that average refurbished golf ball.

[13]   Acushnet claims that it is significant that some refurbished golf balls hook or slice, but Nitro's customers do not expect that the refurbished golf ball is always going to perform as well as a new golf ball; indeed, that is why it costs less and that is why consumers buy it. (See, e.g., Scott Decl. ¶ 4.) It is very significant, however, that according to the Felker report certain types of Acushnet's new Titleist golf balls have such errant flight trajectories that they result in being hit off the testing range -- indeed, 5% of the new Titleist DT 2-piece golf ball had such a problem. (Felker Report, Vol. 1, Ex. D., p.16.)  Consumers who are purchasing new "Titleist" golf balls (including for golf tournaments) certainly would not expect Acushnet's new golf balls to perform in that manner especially in view of their exorbitant price.  See McDonald's Corp. v. Hardee's Food Systems, Inc., 195 U.S.P.Q. 63 (N.D. Ill. 1976) (plaintiff's own inequitable conduct is valid defense to Lanham Act claim).

[14]   Acushnet contends that there is a likelihood of confusion because, according to Felker, some of the refurbished golf balls do not comply with USGA standards. (Acushnet Mem. at 8.) Nitro's consumers do not care whether the refurbished balls comply with USGA standards; instead, they purchase the balls because they are a good value, not to play in a USGA tournament. (See, e.g., Scott Decl. ¶ 9; McMichael Decl. ¶ 9; Sampey Decl. ¶ 9; Wynn Decl. ¶ 11.) Moreover, Felker's report shows that some new "Titleist" golf balls (indeed, over 3% of some new "Titleist" models) do not meet USGA standards, which is troubling because golfers do play new "Titleist" golf balls in USGA tournaments. (See Felker's Report, Vol. 1, Ex. A, pp. 4-5; Exs. 58-59.)

is] immaterial . . . so long as the manufacturer is not identified with the inferior qualities of the product resulting from . . . the reconditioning by the dealer."); Brandtjen, 765 F. Supp. at 1559 (extensive restoration of used printing presses is lawful with disclaimer).

The cases cited by Acushnet in support of its claim that the refurbished "Titleist" golf balls perform so poorly that it is a "misnomer" to call them "Titleist" are plainly distinguishable. Nitro's refurbishing process is far less extensive than the changes made to the watches in Rolex Watch, U.S.A., Inc. v. Michel Co., 179 F.3d 704 (9th Cir. 1999), and accurate and full notice that Nitro's golf balls are refurbished  is given on the golf balls, whereas such notice was not capable of being given on the face of the watch in Rolex.  Karl Storz Endoscopy-Am, Inc. v. Surgical Techs., Inc., 285 F.3d 848 (9th Cir. 2002) is inapplicable because the defendant there was not marking the product that it had refurbished as a refurbished product and admitted that the failure to do so created the false impression that the plaintiff was responsible for defects in the product. Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614 (9th Cir. 1993), is inapposite because it involved a defendant selling new computer chips under the plaintiff's trademark and intentionally marking them with a false model type that represented a higher capability than that for which the chip was originally manufactured.  Davidoff & Cie, S.A. v. PLD Int'l Corp., 263 F.3d 1297 (11th Cir. 2001) is also inapplicable, because the defendant there was re-selling a "degraded" product as a new product and did not disclose to the public that the product had been altered by the defendant, thus creating the false impression that the plaintiff was the source of the altered product.

##    2.    There Is No Likelihood of Confusion as to the Source or Sponsorship of Nitro's Refurbished Golf Balls.

Acushnet also contends that Nitro's refurbished "Titleist" golf balls have led consumers to believe that the refurbished golf balls are "sold by or with the permission of Acushnet." (Acushnet Mem. at 9, 13.)  The only evidence that Acushnet -- a billion dollar company that has been investigating this case for nearly a year -- submits in support of consumer confusion demonstrates the complete lack of confusion.  (See Declarations of V. Hasenstaub, A. Hasenstaub, and Wunderlich.)

Ms. Hasenstaub admits in her letter to Acushnet, which is attached as Exhibit C to her Declaration, that she knew that Acushnet did not sell or give permission to Nitro to sell the refurbished golf balls.  (V. Hasenstaub Decl. Ex. C ("Do you know that your name is used on inferior balls? I think you don't, which is why I am writing to you.").)  Ms. Hasenstaub also

14

admits that she has focused her alleged displeasure with the refurbished golf balls on Nitro -- not Acushnet. (Id. ("I have certainly learned my lesson and will never again buy a reconditioned golf ball.").) The Wunderlich Declaration also is evidence of the lack of confusion. Mr. Wunderlich -- like the Hasenstaubs -- admitted that he knew that the refurbished golf balls were used balls and "were retrieved from various water hazards and chemically washed for re-sale." (Wunderlich Decl. ¶ 3.) Tellingly, Mr. Wunderlich is unable to bring himself to say that he believed that Titleist was selling the refurbished golf balls or was connected with Nitro. (See Wunderlich Decl.)[15]

Nitro's evidence confirms what Acushnet's evidence shows: there is no consumer confusion in this case. Nitro has been selling refurbished "Titleist" golf balls since at least as early as October 2000. (Khoury Decl. ¶ 18.) During that period, Nitro has sold millions of dollars worth of refurbished "Titleist" golf balls. (Id.) These balls were sold to tens of thousands of customers throughout the United States. (Id.) Nitro is unaware of a single instance where any person was confused that Nitro was affiliated with Titleist, or that Titleist was selling the refurbished golf balls. (Id. ¶ 19.) The fact that consumers are not in fact confused is demonstrated by Declarations from Nitro's customers who all state that they were not confused. See supra. This complete lack of actual confusion over more than a year and a half of substantial sales of Nitro refurbished golf balls to tens of thousands of customers throughout the United States is substantial evidence that there is no likelihood of confusion in this case. See, e.g., Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 4 (1st Cir. 1993) ("[A]n absence of actual confusion, or a negligible amount of it, between two products after a long period of co-existence on the market is highly probative in showing that little likelihood of confusion exists."); Sun Banks of Fla. v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 311, 319 (5th Cir. 1981)

---

[15] The only other evidence that Acushnet offers in support of its claim that there is consumer confusion is the Declaration of John McNamara. But the McNamara Declaration consists of nothing more than a bald legal conclusion without any factual basis. Mr. McNamara, a long-time Titleist independent contractor, asserts that there is consumer confusion based on some past studies that he conducted that "were not specifically commissioned with [Nitro's] consumers in mind." (McNamara Decl. ¶ 13.) Based on those irrelevant studies, McNamara concludes that Nitro's refurbished golf balls will cause confusion because there are so many different golf ball models on the market. (Id. ¶¶ 12-13.) That conclusion is ridiculous, and should be given no weight. McNamara's Declaration is contradicted by Acushnet's own Declarations of the Hasenstaubs and Wunderlich, as well as all of the other evidence in this case.

15

("less than fifteen" incidents of confusion reported by employees over three years and four customers who made inquiries insufficient to show actual confusion).[16]

Acushnet's failure to come forward with any consumer survey showing a likelihood of confusion as to the source or sponsorship of Nitro's refurbished "Titleist" golf balls, even though Acushnet has been actively collecting evidence in this case for nearly a year, is further evidence that there is no confusion. See, e.g., Essence Communications, Inc. v. Singh Indus., Inc., 703 F. Supp. 261, 269 (S.D.N.Y. 1988) ("[Plaintiff's] failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown."). That is especially true, where, as here, the party that failed to offer the survey plainly had the financial means to conduct one. See, e.g., Eagle Snacks, Inc. v. Nabisco Brands, Inc., 625 F. Supp. 571, 583 (D.N.J. 1985) (denying motion for preliminary injunction based in part on plaintiff's failure to offer survey evidence of confusion even though it had the means to conduct such a survey).

### 3. There Is No Likelihood of Confusion Arising From Alleged Mismarkings of the Refurbished Golf Balls.

Finally, Acushnet contends that Nitro's refurbished golf balls created a likelihood of confusion because some allegedly have been mismarked. (Acushnet Mem. at 8-9.) Acushnet apparently has some evidence that the wrong model side stamps were placed on some refurbished "Titleist" balls, that a few non-Titleist balls were marked as "Titleist," and that one golf ball that was originally a Titleist ball was marked with the trademark of a different manufacturer. (Id.) Assuming the accuracy of Acushnet's evidence, that hardly justifies the drastic relief sought in this case. Acushnet, a large company with virtually unlimited resources, has been aggressively investigating this case for nearly a year. See *supra* p. 7. The fact that Acushnet could only unearth a few instances of mismarked balls is substantial evidence of the

---

[16] Acushnet contends in passing that Nitro's sale of "Nitro" golf balls containing cores that were originally manufactured by Acushnet constitutes reverse palming off in violation of the Lanham Act. (Acushnet Mem. at 13.) However, in order to prevail on a reverse palming off claim, Acushnet must prove, among other things, that such conduct is likely to cause confusion in the marketplace and harm to Acushnet. See Del Monte Fresh Produce Co. v. Dole Food Co., 136 F. Supp. 2d 1271, 1290-91 (S.D. Fla. 2001). In Del Monte, the court dismissed plaintiff's reverse palming off claim, precisely because plaintiff failed to allege that defendant's conduct was likely to cause consumer confusion or injury to plaintiff. The same is true here. Because Acushnet has failed to explain how Nitro's conduct has caused consumer confusion or how that confusion has injured Acushnet, Acushnet is not entitled to a preliminary injunction based on its reverse palming off claim.

lack of a likelihood of confusion given the millions of refurbished golf balls sold by Nitro.[17] See, e.g., Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 173 (7th Cir. 1996) (isolated instances of confusion did not create a genuine issue of material fact as to a likelihood of confusion, against a background where there were substantial opportunities for such confusion). Indeed, in Birdie, this Court allowed the continued sale of refurbished golf balls, even though Birdie had mismarked tens of thousands of golf balls. Nitro has enhanced its quality control and sorting procedures to ensure that golf balls are not mismarked. See supra p. 3. Each refurbished golf ball is now sorted by hand on four separate occasions. See supra p. 3. The balls of different makes and models are segregated on the factory floor so as to ensure that no mismarking takes place. See supra p. 3. These substantial steps will ensure that golf balls are not improperly marked.[18] See supra 3.

### B. Acushnet Cannot Carry Its Burden of Establishing Irreparable Harm on Its Trademark Claims.

#### 1. Acushnet's Procrastination Is Fatal to Its Claim of Irreparable Harm.

Even if Acushnet demonstrated that there is a likelihood of success on the merits of its trademark claims, Acushnet cannot satisfy the element requiring a substantial threat of irreparable harm in the absence of a preliminary injunction. While Acushnet notes that "irreparable injury is presumed" where a trademark plaintiff has made a strong showing of likelihood of success (Acushnet Mem. at 14)[19], Acushnet overlooks the standard that such a

[17] Acushnet also contends that Nitro's refurbished golf balls create a likelihood of confusion because Nitro does not always re-apply the model types, and instead simply re-applies the term TITLEIST. (Acushnet Mem. at 8.) Acushnet claims that the omission of model types will lead consumers to believe that they are playing with a particular model. (Id.) Acushnet provides no factual or legal support for that novel theory. Because the omission of the model types is not confusing, there is no reason for a purchaser of such a refurbished ball to believe falsely that that he is playing with a particular model type. (See Morgan Decl. ¶ 36 ("If the Model Side Stamp is removed . . . a consumer has no way to determine the model of a golf ball"); see, e.g., PIC Design Corp. v. Sterling Precision Corp., 231 F. Supp. 106, 115 (S.D.N.Y. 1964) (removing a trademark from a product and re-selling the product is not actionable under the Lanham Act). Although on some balls the model side stamps are not applied in the exact location where the side stamps were initially placed on the ball by Acushnet (Acushnet Mem. at 8), Acushnet never explains how that creates a likelihood of confusion, a conclusion for which Acushnet provides no legal basis.
[18] Acushnet argues in passing that the Court should grant a preliminary injunction based on its dilution claims, but there is no merit to that argument. (Acushnet Mem. at 13-14.) Contrary to Acushnet's insistence, Nitro's refurbished products are not tarnishing the image of Acushnet. Indeed, consumers are happy with Nitro's refurbished products, see supra p. 6, and do not focus any perceived displeasure with the products with Acushnet, but rather with Nitro.
[19] In the Third Circuit case relied upon by Acushnet for this proposition, the court relied upon Second Circuit precedent to conclude that there was a "presumption" of irreparable harm. See Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 196 (3d Cir. 1990). It should be noted that the Second Circuit has been emphatic that the presumption can be defeated. See, e.g., Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985); Majorca, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985).

"presumption" is not irrebuttable. The Eleventh Circuit case upon which Acushnet relies does not state that the "presumption" is mandatory. See E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1530 n.14 (11th Cir. 1985) (noting that "irreparable injury *could be* presumed" (emphasis added)).

In fact, a plaintiff's delay or lack of diligence in seeking a preliminary injunction can lead to the rejection of a plaintiff's assertion of irreparable harm--even if likelihood of success on the merits has been demonstrated--whether the plaintiff delayed in bringing suit in the first place or whether the plaintiff delayed in moving for a preliminary injunction once it commenced litigation. See Citibank, 756 F.2d at 276 (plaintiff waited more than 10 weeks to file suit after allegedly infringing competitor opened for business); Majorca, 762 F.2d at 8 (plaintiff waited 7 months after commencing action to move for preliminary injunction); New Dana Perfumes Corp. v. The Disney Store, Inc., 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (even considering delay of two months before sending cease and desist letter and five months before moving for injunction, "plaintiffs' delay, alone, precludes a finding of irreparable harm"). As noted in a recent case decided in the Southern District of Florida:

> Furthermore, a plaintiff's delay in seeking an injunction in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement. Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.

Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc., 188 F. Supp. 2d 1350, 1355-56 (S.D. Fla. 2002) (citations and quotations omitted) (noting that 3-month difference between last communications between parties regarding settlement and filing of suit "undercuts any sense of urgency"). In short, "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." New Dana, 131 F. Supp. 2d at 630 (quoting Gidatex, S.R.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998)).

Acushnet's obvious and protracted delay compels denying this preliminary injunction motion. Although Acushnet knew about Nitro's refurbishing process at least by July 2001, and possibly as early as October 2000, Acushnet waited **more than nine months** (at a minimum) to file its preliminary injunction motion. Acushnet also waited **more than three months** after

filing its Complaint in this action to move for a preliminary injunction.  These facts compel the conclusion that there is no basis for Acushnet's contention that Nitro's actions are causing irreparable injury.

Acushnet's own pleadings and conduct in the parties' litigation is dispositive of this issue. For example, the record indicates the following:[20]

- Acushnet retained the Greenberg Traurig firm for this matter in July 2001. (Lewin Decl. ¶ 3.)

- Acushnet apparently purchased large quantities of Nitro refurbished golf balls in July 2001 and thereafter.  (Arnold Decl. ¶¶ 3-4, 15-34.)

- Acushnet's private investigator visited the Nitro facility in August 2001 and was made privy to the details of Nitro's refurbishing process and, in fact, admitted that he noticed that the brand names had been stripped from the balls he observed.  (Arnold Decl. ¶¶ 6-14.)

- Acushnet obtained the complaint letter about Nitro's refurbished golf balls from Ms. Hasenstaub in July 2001.  (V. Hasenstaub Decl. Ex. C.)

- Acushnet originally filed its action against Nitro on January 15, 2002 (*i.e.*, nearly 3 1/2 months before moving for a preliminary injunction).

Furthermore, Nitro started mass selling Titleist refurbished golf balls in October 2000; at that time, Nitro was in hundreds and hundreds of retail stores throughout the United States, including stores where Acushnet sold its products (*e.g.*, K-Mart).  (Khoury Decl. ¶ 18.)

Especially significant is the fact that, by late 2001 (notwithstanding that it had yet to file any legal action and that it never sent Nitro a cease and desist communication), Acushnet had been telling retailers who re-sold Nitro's products that they were illegal and counterfeit in an effort to dissuade them from dealing with Nitro.  (See Khoury Decl. ¶¶ 16, 24-25.)  In any case, in light of Acushnet's conduct, it cannot claim that it just occurred to Acushnet in April 2002 to put a stop to Nitro's sale of refurbished golf balls because Acushnet was already telling people in 2001 that Nitro was allegedly infringing Acushnet's marks.  (Id.)

---

[20]  It is important to note that these are the facts that Acushnet is admitting in its papers.  It may be that there is additional conduct by Acushnet that occurred before July 2001 that Acushnet has selectively omitted from its papers.

## 2. The Coexistence of Other Titleist/Pinnacle Refurbishers Militates Against a Finding of Irreparable Harm.

The failure to take action against others who are or were engaged in the same or similar alleged violation of the Lanham Act demonstrates a lack of irreparable harm. Warner-Lambert Co. v. McCrory's Corp., 718 F. Supp. 389, 393-94 (D.N.J. 1989). Here, that argument is even stronger in light of the 1996 consent judgment in the Birdie case. In Birdie, after the Court refused to enter a preliminary injunction that would go as far as stopping the stripping and reapplication of Acushnet's trademarks (as long as the balls were also stamped as being used and refinished), Acushnet entered into a consent judgment which allowed the defendant to sell Titleist and Pinnacle balls that were stripped of trademarks and later reapplied or reaffixed. Nitro's practice is consistent with the permitted practice in Birdie. Six years later, Acushnet can hardly have grounds to complain that Nitro has engaged in similar conduct.

There are third parties currently engaged in golf ball refurbishing of Titleist golf balls. The sales of these third-party products have been substantial and are well-known in the industry. (Khoury Decl. ¶¶ 20-21.) Acushnet has knowingly allowed third parties, including Birdie, to engage in the refurbishing of golf balls for years without taking further action against those companies, which is a constructive admission that Nitro's refurbishing does not cause irreparable injury to Acushnet. (See id.)

## C. Nitro Would Be Irreparably Harmed If a Preliminary Injunction Were Entered.

This is a classic case of "David versus Goliath." As indicated in Nitro's pleadings, the focus of Acushnet's efforts is to destroy Nitro as a competitor in the marketplace. A preliminary injunction would significantly help Acushnet accomplish that goal. Acushnet has already intimidated Nitro customers; a preliminary injunction may well put the final nail in the coffin.

Because Nitro is not violating any right of Acushnet, there is no reason to unduly penalize Nitro. See supra on likelihood of success on the merits. If the Court grants the injunction, Nitro's survival will be threatened. As indicated in the Declaration of Amin Khoury: refurbished Titleist golf balls are Nitro's primary product; refurbished golf balls have the highest profit margins; and, if Nitro is forced to stop selling the refurbished products during the pendency of the litigation, it will likely be forced to go out of business and lay off its employees. (Khoury Decl. ¶ 26.) Such a potentially adverse impact is sufficient to warrant denial of a

preliminary injunction. <u>See</u> <u>Computer Currents Publ'g Corp. v. Jaye Communications, Inc.</u>, 968 F. Supp. 684, 689-90 (N.D. Ga. 1997).

### D. The Public Interest Does Not Favor a Preliminary Injunction.

Acushnet contends (Acushnet Mem. at 15) that the public interest weighs in favor of granting the injunction because the public has a right to be free of confusion. This is patently disingenuous given the absence of any consumer confusion. In reality, the thrust of Acushnet's argument is that *Acushnet*--not the public--would benefit from a preliminary injunction. In fact, the public interest would be *harmed* by the issuance of a preliminary injunction.

Nitro is not creating confusion in the marketplace (<u>see</u> *supra* on likelihood of success on the merits). To the contrary, the public interest favors free and fair competition, which is what Nitro is doing in this case, and offering goods to customers at low prices. <u>See</u> <u>Alltel Corp. v. Actel Integrated Communications, Inc.</u>, 42 F. Supp. 2d 1265, 1274 (S.D. Ala. 1999). In addition to giving consumers choice, these competitive prices open the door to people who otherwise could not afford brand new, unused golf balls. <u>See</u> <u>Farberware, Inc. v. Mr. Coffee, Inc.</u>, 740 F. Supp. 291, 304 (D. Del. 1990) (noting that injunction would deprive consumers of less expensive alternative product). It is indisputable that the Nitro refurbished products are not a danger to the health and safety of the public (which may be the case in other trademark cases where the public interest is protected by an injunction). Furthermore, in today's environmentally conscious society, it is difficult to fathom why continued recycling and refurbishment would not be in the interest of the public.

### II.   ACUSHNET'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED AS TO THE PATENT CLAIMS.

#### A.   Acushnet's Motion Should Be Denied Because It Fails to Satisfy Acushnet's Burden to Offer a Claim Construction and Establish that Any of the Six Asserted Patents Covers Any of Nitro's "Reconstructed" Golf Balls.

Acushnet asserts that "Reconstructed Nitro golf balls" violate Acushnet's patents.[21] That argument is wholly without merit. Acushnet summarily states that Nitro is somehow infringing

---

[21]   Acushnet defines those "Reconstructed" balls as those where Acushnet alleges that Nitro removes the entire exterior cover of existing golf balls (leaving only the core) and replaces it with a new cover with Nitro's own trademark. (Acushnet Mem. at 7.) As Acushnet itself indicates, Acushnet's patent arguments do not apply to those golf balls that are described in its trademark claim.

21

U.S. Patents Nos. 5,609,535 (the "'535 Patent"), 4,846,910 (the "'910 Patent"), 4,546,980 (the "'980 Patent"), 4,692,497 (the "'497 Patent"), 4,770,422 (the "'422 Patent"), and 5,000,459 (the "'459 Patent") (collectively, the "Asserted Patents"), but it offers *no* extrinsic evidence that the Asserted Patents read on the accused golf balls. Acushnet's only "evidence" is a self-serving declaration by a Senior Vice President of Acushnet that proffers no credible evidence of any infringing activities by Nitro.

Acushnet's own memorandum acknowledges the standard which Acushnet fails to meet: "The determination of infringement is a two-step process. First, the language of the patent claims must be interpreted; and second, the accused device or process must be compared to the claim language as properly interpreted." (Acushnet Mem. at 16 (citing Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*).) Notwithstanding Acushnet's bold statement that "Acushnet's *Strong Showing Of Validity And Infringement* Entitles It To A Presumption Of Irreparable Harm" (Acushnet Mem. at 19 (emphasis added)), Acushnet provides neither any claim interpretation nor a comparison of the accused products to any claim interpretation. Simply stated, Acushnet has failed to make any showing of infringement as it is required to do.

Acushnet's summary statements fail to propound any argument that Nitro infringes any of the Asserted Patents. It is well-settled that an analysis of infringement *must* be made on a claim-by-claim, element-by-element basis. See Amazon.com, 239 F.3d at 1351 ("whether performed at the preliminary injunction stage or at some later stage in the course of a particular case, infringement and validity analyses must be performed on a claim-by-claim basis"). The burden of proving such infringement falls on the patent owner. Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000) ("Literal infringement requires *the patentee* to prove that the accused device contains *each limitation* of the asserted claim(s)."(emphasis added)), cert. denied, 531 U.S. 993 (2000). Acushnet has offered no explanation of the myriad technical terms in each of the claims asserted against Nitro. See Amazon.com, 239 F.3d at 1351 ("Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention.") (citations omitted). Furthermore, Acushnet's "analysis" consists only of unsupported statements by an Acushnet Senior Vice President. (See, e.g., Morgan Decl. ¶ 52(f).)

22

Even a cursory examination of the claims "asserted" by Acushnet quickly demonstrates Acushnet's whitewashing tactics. For example, claim 1 of the '422 Patent states:

> In the manufacture of a golf ball product by cross-linking polybutadiene with about 25 to 40 parts zinc diacrylate by weight per 100 parts by weight polybutadiene, the improvement comprising the use of about 0.2 to 0.8 parts by weight per 100 parts by weight polybutadiene of peroxide free radical initiator. ('422 Patent at col. 4, lines 57-62 (Morgan Decl. Ex. C).)

Acushnet's only support for its claim of infringement states: "[t]he construction, composition and/or method of manufacture of golf balls having these cores are the subject [of] numerous Acushnet patents, including claim 1 of the '422 patent." (Morgan Decl. ¶ 52(f).) This is hardly proof of every limitation of this claim, which requires certain amounts of zinc diacrylate, polybutadiene, and something called a "peroxide free radical initiator."

Similarly, Acushnet asserts the '535 Patent with the summary statement that "[t]he diversity among these cores, the presence of two cover layers and the common dimple pattern collectively demonstrate that Nitro uses the '535 patent[]." (Morgan Decl. ¶ 52(g).) However, the '535 Patent claims are very specific. None of them is demonstrated by Acushnet. Claim 1 of the '535 Patent states:

> A method of treating a golf ball having an exterior surface of a predetermined diameter, a core, and a cover composed of cover material having a predetermined thickness and dimples and indicia on said exterior surface comprising:
> (a)  removing the entire exterior surface material of said cover and all said dimples and indicia to reduce the thickness of said cover and provide a dimple free and indicia free intermediate cover surface; and
> (b)  adding to said intermediate cover surface a layer of cover material including dimples which is substantially equal in thickness to the material removed in step (a). ('535 Patent at col. 2, lines 22-34 (Morgan Decl. Ex. A).)

On its face, this claim requires specific steps to be taken in a specific order ("which is substantially equal in thickness to the material *removed in step (a)*"), yet Acushnet has proffered no evidence of what steps were taken or how they meet the limitations of the claim. Nor has Acushnet proffered definitions of such terms as "exterior surface," "predetermined diameter," "core," "cover," "predetermined thickness," "dimples," "indicia," "exterior surface material," "reduce," "dimple free," "indicia free," "intermediate cover surface," "adding," and "substantially equal in thickness." Obviously, absent a proffer of a possible definition of these terms, Acushnet failed to show how each limitation created by such definitions might be found in

the Nitro products.  Because Acushnet has failed to make even a *de minimis* showing of infringement, this motion must be denied.

**B.     Acushnet's Motion Should Be Denied Because Acushnet's "Insides of the Golf Ball" Theory of Patent Infringement Is Factually and Legally Baseless.**

Aside from the fact that Acushnet has failed to satisfy even the lowest standards a patent owner must meet to make out a presumptive claim for a preliminary injunction, Acushnet's motion should be denied for several other reasons.

**1.     Nitro Does Not Use Acushnet Cores to Make Nitro Brand Golf Balls.**

Nitro is not manufacturing the alleged "reconstructed" golf balls that are the subject of Acushnet's motion.  (Khoury Decl. ¶¶ 27-28.)  Therefore, the motion for a preliminary injunction as to the patent claims must be denied because there is no alleged objectionable activity to enjoin.  See Wilson Sporting Goods Co. v. Head Sports, Inc., Case No. 98 C 1315, 1999 U.S. Dist. Lexis 1614 (N.D. Ill. 1999) (preliminary injunction not warranted where no irreparable harm could be established in light of the fact that the defendant had stopped selling allegedly infringing tennis rackets).  This, alone, should dispose of Acushnet's motion, although there are many other reasons, as explained below, to deny the motion.[22]

**2.     Acushnet's Arguments Concerning the "Composition and Process Patents" Lack Merit.**

Acushnet's attempt to obtain injunctive relief based on the '910, '980, '497, '422 and '459 Patents is nothing but a baseless anti-competitive attempt to intimidate, burden and destroy Nitro.  Acushnet asserts these five patents to prevent Nitro from using Acushnet's golf ball "cores," which Acushnet's Mr. Morgan refers to as the "insides" of a golf ball.  Only the "insides," not the "covers," are at issue,  "…everything below this replaced layer or 'skin' [*i.e.*, the golf ball cover] was made by Acushnet, and those original Acushnet compositions and processes are covered by various claims of the five Acushnet Golf Ball Composition and Process Patents in suit."  (Acushnet Mem. at 17.)  It is significant that Acushnet has asserted no claims which allegedly read on the entire golf ball (including the combination of the cover and the core) from which Nitro took the core and replaced its cover.  It is also significant that it is undisputed that Nitro no longer makes balls by putting new covers on existing cores.  But even if Nitro did,

---

[22] Notwithstanding that Acushnet's motion states that Acushnet "conferred" with Nitro regarding the issues in its motion, it never "conferred" regarding the alleged patent issues.  Had it done so, and realized that the practice to which it objected was not occurring, it would not have had any reason to file any motion on the patent issues.

Acushnet's motion concerning these five patents should be denied for several reasons, including: (1) the fact that Acushnet failed to provide any evidence showing that any of the claims of these five patents reads on any of the cores Nitro used; (2) Acushnet has failed to allege or provide any evidence that the covers (as distinguished from the cores) infringed any of the patents asserted by Acushnet; (3) although Acushnet asserts the '459 Patent titled "Golf Ball Cover," Acushnet has neither alleged that Nitro's covers used in making "Reconstructed" golf balls infringe this patent nor provided any evidence that they infringe; and (4) as discussed below, Acushnet cannot enforce patent rights enjoining consumers' uses of the product after Acushnet sells its patented product, and, in any event, Nitro would be permitted to repair golf balls with damaged covers.

### 3. Once Acushnet Sold Its Golf Balls, It Cannot Complain About How the Owner Uses the Balls.

Acushnet's motion should be denied as a matter of law because Acushnet has exhausted its patent rights in these golf ball cores when it sold the Acushnet golf balls which Nitro recovered. See, e.g., Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993) ("The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent...."), cert. denied, 510 U.S. 1092 (1994); Brandt Consol., Inc. v. Agrimar Corp., 801 F. Supp. 164, 173 (C.D. Ill. 1992) ("An incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it.  The purpose of the patent law is thus fulfilled with respect to any particular article once the patentee has received the reward for the use of his invention by selling the article.  Once that purpose is realized, the patent law affords no basis for restraining the use and enjoyment of the thing sold.").  When Nitro eventually became the owner of those used golf balls, Nitro had the right to use them and their components as it saw fit.  As the owner of the patented invention (i.e., the golf ball's core), Nitro had the right to replace the spent covers surrounding the core with another cover which infringed no Acushnet patents and resell the golf ball with a new cover.  Acushnet cites no authority to the contrary.

### 4. Acushnet's Argument that Nitro Cannot Even Permissibly Repair Golf Balls Is Unavailing.

Notwithstanding Acushnet's assertions, Nitro's balls which did use alleged patented cores were, at a minimum, "repaired," not "remanufactured," which is expressly allowed by well-established precedent.  For example, in Aro Mfg. Co. v. Convertible Top Replacement Co., 365

U.S. 336 (1961), the United States Supreme Court held that replacement of convertible top material on patented automobile convertible top frames was a non-infringing "repair." The Supreme Court stated that "replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property." 365 U.S. at 346.[23]

The two cases relied upon by Acushnet to argue that Nitro's now-discontinued use of golf ball cores is infringing conduct in fact support Nitro's denial that it infringes any Acushnet patent. The facts in <u>Aktiebolag v. E. J. Co.</u>, 121 F.3d 669 (Fed. Cir. 1997), were significantly different than even what is alleged here. In <u>Aktiebolag</u>, the defendant re-created the drill bit tip, which was specifically claimed in the patent. The Court held that the defendant's actions "are effectively a re-creation of the patented invention after it is spent." 121 F.3d at 673. Unlike the drill bit tip in <u>Aktiebolag</u>, which the defendant re-created, Nitro never "re-created" the golf ball cores or did anything to them except install new covers on them to replace spent covers about which Acushnet alleges no patent infringement. Because the cover Nitro replaced is not claimed by Acushnet to be protected by any Acushnet patent, <u>Aktiebolag</u> supports Nitro's denial that recovering existing cores is non-infringing activity.

The primary case upon which Acushnet relies *reversed* a determination that the alleged infringers' refurbishment of Fuji Film's used, single-use cameras ("LFFPs") infringed Fuji's patents. In <u>Jazz Photo Corp. v. International Trade Comm'n</u>, 264 F.3d 1094, 1101 (Fed. Cir. 2001), the alleged infringers opened spent Fuji LFFPs by removing the cover, cutting at least one weld to open the camera body, replacing the film winding wheel apparatus, replacing the flash battery, resetting the film counter, and installing new unexposed film on the spool before resealing the cameral body and installing a new cover. The International Trade Commission

---

[23] This was consistent with the Supreme Court's earlier ruling in <u>Wilson v. Simpson</u>, 50 U.S. 109 (1850), holding that a purchaser of a patented device has the right to replace parts in a manner which does not infringe the patent owner's right to make or renew the entire device. More recent cases protect the right of the owners of golf balls such as Nitro to replace golf ball covers on Acushnet golf ball cores. <u>See, e.g.</u>, <u>Wilbur-Ellis Co. v. Kuther</u>, 377 U.S. 422, 425 (1964) (refurbishing patented fish-canning machines by purchaser of used machines which involved extensive refurbishment including modification and resizing of six separate parts, was repair, not reconstruction, because it extended the useful life of original machine, even though it involved more than repairing of spent parts); <u>General Elec. Co. v. United States</u>, 572 F.2d 745, 780-86 (Ct. Cl. 1978) (non-infringing repair includes disassembly and cleaning of patented articles accompanied by replacement of unpatented parts that had become worn or spent to preserve usefulness for which patented article was intended); <u>Dana Corp. v. American Precision Co.</u>, 827 F.2d 755, 759 (Fed. Cir. 1987) (no infringement by defendants that acquired discarded and worn clutches which they disassembled, cleaned, installed replacement parts on, and reassembled).

determined that this constituted infringing "reconstruction."  The appellants argued that the LFFPs had a longer useful life than the single life prepared by Fuji; Fuji's patent rights were exhausted because of the "first sale" doctrine; and Fuji had no right to prohibit them from refitting the cameras with new film, resetting the mechanism, and installing new covers.  The Federal Circuit agreed and reversed, noting that "[i]f the claimed [patented] component is not replaced, but simply is reused, this component is neither repaired nor reconstructed." 264 F.3d at 1107.  Acushnet's motion should be denied for the same reason because Acushnet's "claimed" component, the golf ball core, was simply being reused by Nitro.

In sum, because Acushnet failed to satisfy its burden to show that any golf ball sold by Nitro infringes a claim in the six patents asserted by Acushnet, Acushnet's arguments about irreparable injury caused by Nitro's sale of "Reconstructed" balls, the manufacturing of which terminated at least 18 months ago, are moot.  See Wilson Sporting Goods Co. v. Head Sports, Inc., Case No. 98 C 1315, 1999 U.S. Dist. Lexis 1614 (N.D. Ill. 1999).  Finally, as mentioned above, it should be noted that Acushnet's motion on the patent issues is only directed to those balls which Acushnet alleges Nitro uses Acushnet ball cores to make Nitro brand balls and does not apply to the balls that Acushnet refers to as being "refurbished" or "remanufactured" and stamped with the "Titleist" name, as those balls do not involve a process by which the balls' dimples are removed.

**CONCLUSION**

For the foregoing reasons, Acushnet's Motion for Preliminary Injunction must be denied.  In sum, Acushnet's motion is an attempt to perpetuate its strategy of hindering Nitro (a smaller competitor) in its efforts to continue as a going concern.  Rather than concentrate on its business, Nitro has been forced to divert its resources to defend itself against Acushnet's baseless claims (first in California and now before this Court), not to mention the damage that has been done by Acushnet in disparaging Nitro in the marketplace.

As indicated above, Acushnet's motion has absolutely no merit.  Acushnet's trademark claims are an affront to well-established Supreme Court precedent as well as a prior ruling in this District.  As to the patent claims, Acushnet seeks to enjoin unnecessarily a process that is no longer occurring and that, in any event, would be legal under the applicable patent law, in

27

addition to the fact that Acushnet falls far short of the legal standards for claiming patent infringement.

McDERMOTT, WILL & EMERY

By: _____
Steven E. Siff
Florida Bar No.  352330
e-mail: *ssiff@mwe.com*
Bryan T. West
Florida Bar No. 0083526
e-mail: *bwest@mwe.com*
201 S. Biscayne Boulevard; 22nd Floor
Miami, Florida  33131
Telephone:      305-358-3500
Facsimile:      305-347-6500

William Barrett (D.C. Bar No. 954,131)
Craig P. Seebald (D.C. Bar No. 438,968)
John J. Dabney (N.Y. Bar No. 519,413)
McDermott, Will & Emery
600 13th Street, N.W.
Washington, DC  20005
(202) 756-8000
(202) 756-8087 (facsimile)

*Attorneys for Nitro Leisure Products, LLC*

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via Federal Express this 15th day of May, 2002, on L. Martin Reeder, Jr., Esq., Greenberg, Traurig, P.A., 777 South Flagler Drive, Suite 300-East, West Palm Beach, Florida 33401 and Harley I. Lewin, Esq., Greenberg, Traurig, P.A., 885 Third Avenue, New York, New York 10022.

Steven E. Siff

29