IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 02-14008-CIV-MIDDLEBROOKS

FILED

JUN 1 2 2002

IN RE:  NITRO LEISURE PRODUCTS, L.L.C.

_____/

CLERK, USDC / SDFL / WPB

## ACUSHNET'S NOTICE OF FILING DECLARATIONS
## IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Acushnet Company gives notice that it has filed with the Court the following

declarations in support of its Motion for Preliminary Injunction:

1.      Declaration of Robert S. Dubiel;

2.      Supplemental Declaration of David L. Felker;

3.      Declaration of Roland Giroux;

4.      Declaration of Colleen Kelly;

5.      Supplemental Declaration of William E. Morgan; and

6.      Declaration of Frank Thomas.

GREENBERG TRAURIG, P.A.
777 South Flagler Drive, Suite 300-East
West Palm Beach, FL  33401
Telephone:  (561) 650-7900
Facsimile:   (561) 655-6222

By:     _____
L. Martin Reeder, Jr.
Florida Bar No. 308684

Case No. 02-14008-CIV-MIDDLEBROOKS
Page 2

Harley I. Lewin, Esquire
GREENBERG TRAURIG, P.A.
885 Third Avenue
New York, New York   10022
Telephone:  (212) 801-2100
Facsimile:  (212) 801-6480

*Counsel for Acushnet Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing Notice of Filing Declarations, together with the

listed declarations in Support Acushnet's Motion for a Preliminary Injunction were served this

12th day of June,  2002 by First Class Mail, postage-prepaid, upon the following:

Steven E. Siff, Esq.
McDermott, Will & Emery
201 South Biscayne Blvd.
22nd Floor
Miami, FL  33131-4336

Robert W. Zelnick, Esq.
John J. Dabney, Esq.
McDermott, Will & Emery
600 13th Street N.W.
Washington, DC   20005

Paul Kim, Esquire
Ryan Mark Patch, Esquire
Mark Yocca, Esquire
19900 MacArthur Boulevard
Suite 650
Irvine, California  92612

*Counsel for Nitro Leisure Products, LLC*

L. Martin Reeder, Jr.

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

ιLED

JUN 1 2 2002

( -RK, USDC / SDFι / '·'

NITRO LEISURE PRODUCTS, L.L.C. d/b/a
GOLFBALLSDIRECT.COM and SECOND
CHANCE,

                    Plaintiffs,

                                                    Case No. 02-14008-CIV
vs.                                                 MIDDLEBROOKS

ACUSHNET COMPANY,

                    Defendant and Cross
                    Claim Plaintiff,
vs.

NITRO LEISURE PRODUCTS, INC. d/b/a LEISURE
PRODUCTS, INC. and NITRO GOLF,

                    Cross Claim Defendant.
_____ /


DECLARATION OF ROBERT S. DUBIEL IN SUPPORT OF ACUSHNET
COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION


        I, ROBERT S. DUBIEL, declare and state as follows:

        1.  From 1985 to 2000, I was employed by, and held various executive positions at,

Acushnet Company ("Acushnet") and its related divisions.

        2.  I was President of Acushnet Rubber Division, a Division of Acushnet, at the time of

John W. Jepson's ("Jepson") separation from Acushnet.  As President of Acushnet Rubber

Division, I was responsible for oversight of the Division and the various executives including

Jepson, Executive Vice President of the Acushnet Rubber Division, who reported directly to me.

        3.  As President, I was fully aware of the circumstances and events leading to Acushnet's

termination of Jepson's employment in October 1989, including company records relating to

Jepson's performance as Executive Vice President. While Mr. Jepson's separation agreement with Acushnet states that his employment status would be officially a "leave of absence, with pay," from October 1989 to December 31, 1990, this language was the result of negotiations with Jepson's attorney in finalizing the separation agreement. Due to his length of employment and the position he had attained with Acushnet, the company agreed to publicly state that the reason for Jepson's separation from Acushnet was that he had elected early retirement, effective as of January 1, 1990.

4. In fact, Jepson failed to discharge his duties and obligations and his employment was terminated for various improprieties and performance related reasons. While he did serve as Executive Vice President and General Manager of the Titleist Golf Division of Acushnet from 1982-1984, because of unsatisfactory performance in that position, he was demoted to the position of Executive Vice President and General Manager of the Acushnet Rubber Division, a much smaller portion of the company, in 1984.

5. A review of the Rubber Division's financial records revealed Jepson's gross failure to promptly, accurately report the financial status of the Division for the fourth quarter of 1988. In mid-December, 1988, Jepson reported to management that the Division expected a profit of over $200,000 for that period. When the results for that period were finally calculated, the Division actually sustained a loss of over $1,000,000. As a result of this and other improprieties, I was given responsibility of the Rubber Division in the position of President thereof and Jepson's responsibilities were further reduced. When Jepson failed to adequately discharge those limited duties, his employment with Acushnet was terminated.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed this 11th day of June, 2002, at Dartmouth, Massachusetts.

ROBERT S. DUBIEL

2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

NITRO LEISURE PRODUCTS, L.L.C.,
d/b/a GOLFBALLSDIRECT.COM and
SECOND CHANCE,

                Plaintiffs,

vs.

ACUSHNET COMPANY,

                Defendant and Cross
                Claim Plaintiff,

vs.

NITRO LEISURE PRODUCTS, L.L.C.,
d/b/a NITRO GOLF AND NITRO
GOLF.COM,

                Cross Claim Defendant.

FILED

**JUN 1 2 2002**

CLERK, USDC / SDFL

Case No. 02-14008-CIV-
MIDDLEBROOKS

## SUPPLEMENTAL DECLARATION OF DAVID L. FELKER IN SUPPORT OF ACUSHNET COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION

DAVID L. FELKER, declares as follows:

1.      I am the same David L. Felker who submitted a declaration dated April 19, 2002, in this matter.  I have reviewed the materials submitted by Nitro Leisure Products, L.L.C., Nitro Leisure Products, Inc. and Nitro Golf (collectively, "Nitro") in opposition to Acushnet Company's ("Acushnet") Motion For Preliminary Injunction, including Nitro's Opposition To Acushnet's Motion For Preliminary Injunction, the Declaration of Peter J. Piotrowski ("Piotrowski") and the Declaration of John W. Jepson ("Jepson").  I understand that my declaration is being submitted in support of Acushnet's Reply Memorandum in Further Support of Acushnet's Motion for Preliminary Injunction.

2.      Nitro challenges the reliability of the methodology as well as the results of the test I designed and conducted to determine what, if any, effects Nitro's remanufacturing process has on golf balls labeled as TITLEIST brand golf balls.

3.      Nitro challenges my testing methodology, claiming that:  (1) the test supposedly does not account for differences in humidity, wind conditions, and topography; (2) the use of the Iron Byron mechanical golfer is an unrealistic means for testing golf balls; (3) the Iron Byron was "manipulated" to generate a swing speed that "is manifestly not the average swing speed of Nitro's consumers;" and (4) I did not sufficiently record cleaning of the club head.[1]

4.      Nitro also challenges my conclusions, claiming they are "unreliable, unprofessional and nonsensical."  Nitro distorts the test results upon which my conclusions are based, however, to support their argument.

---

[1] Nitro's Opposition Brief ("Nitro Br."), pp. 12-14; and declaration of Peter J. Piotrowski, dated May 13, 2002 ("Piotrowski Dec."), ¶15.

5.      Nitro next claims that my test does not measure what it should measure, namely, the effects of Nitro's "refurbishing" process on the used golf ball (as compared to the new golf ball).

6.      Finally, Nitro claims that, even assuming the legitimacy of my test, the difference between a Remanufactured TITLEIST golf ball and a Washed TITLEIST golf ball in total distance is less than 3%, a purportedly insignificant amount.

7.      As discussed in detail below, the assertions and conclusions offered by Nitro, as well as by Piotrowski and Jepson, are without merit.

**1.      TEST METHODOLOGY**

**A.      The Test Does Account For Differences
In Humidity, Wind Conditions And Topography**

8.      While I performed my testing to reflect the actual conditions of a golf course, I employed the randomized-block test design -- a design, accepted in both the scientific and mathematical communities, for controlling extraneous sources of variability[2] -- to account for the differences, not only with respect to humidity, wind conditions and topography (areas of the ground to which the test balls were hit), but also for differences in outdoor temperature and club head speed and direction .

9.      "Block" means that the golf balls were tested in small groups, each group having the same number of each model of ball. "Random" refers to the order of testing of the balls within each block. For example, in testing the PRO V1 model of balls, each group consisted of two new PRO V1 golf balls, two Washed PRO V1 golf balls, and two

_____

[2] Declaration of David L. Felker, dated April 19, 2002 ("Felker Dec."), ¶ 22.

Remanufactured PRO V1 golf balls. These small groups ensured that the conditions within each block would be virtually identical.[3] Moreover, the balls within each block were randomly selected and randomly tested within that block to further account for outside factors.[4]

10.     In my opinion, it would not be scientifically sound to employ Nitro's suggested ideal test parameters, namely, testing in zero wind conditions, steady humidity, and on perfectly flat grounds, as these conditions are not consistent with conditions typically experienced by golfers. My test was designed to replicate realistic playing conditions.

**B.     The Iron Byron Mechanical Golfer Is A Long-Used Standard For Testing Golf Balls**

11.     Nitro contends that the Iron Byron does not "reflect marketplace conditions because... the average golfer (and certainly a below average golfer who might be buying Nitro's products) does not swing in the same perfect way every time, always hitting the ball in the 'sweet spot.'"[5] Nitro fails, however, to suggest an alternative testing method, or submit tests using an alternative method. Nitro also fails to define the "average golfer" or the "below-average golfer" who purportedly comprise Nitro's customer base.

12.     The concerns raised by Nitro regarding use of the Iron Byron are misplaced. The Iron Byron is the most well-accepted and frequently used instrument for

---

[3] Declaration of Colleen Kelly, dated June 11, 2002 ("Kelly Dec."), ¶ 10.

[4] Felker Dec.. ¶ 22; Kelly Dec.. ¶10.

[5] Nitro Br. at 12-13; Piotrowski Dec., ¶12; Jepson Dec., ¶37.

testing golf ball and golf club performance in the industry.[6]  In my opinion, using actual golfers, as suggested by Piotrowski and Jepson, would unnecessarily complicate the testing and analysis by introducing major sources of variation (*e.g.*, the inconsistency of the single golfer and the differences between the performance of golfers).

13.     Moreover, contrary to Nitro's purported concerns, varying the swing speed will not eliminate, or even significantly alter, the fact that Nitro's Remanufactured golf balls are of lesser quality, *i.e.*, traveling less distance, flying more errantly, offering less desirable trajectory, failing to conform with the United States Golf Association's size and weight standards, and possessing poor aesthetic qualities.

## C.     The Swing Speed Of The Iron Byron Is Standard In The Industry

14.     Nitro next questions the reliability of my testing, claiming that I "manipulated the Iron Byron mechanical golfer to generate a swing speed of 109 miles per hour,"[7] which is purportedly above the average-swing speed of Nitro's customers. Nitro does not offer what the average swing-speed of its customers are or how it would arrive at such a number.  Nitro claims this increased swing speed maximizes any performance differences between the balls,[8] yet as before, Nitro has failed to come forth with a test of its own to prove that its statement is true.

15.     It is well known in the golf industry, and particularly among golf ball designers, that there is no such average swing speed of an "average golfer."  While different manufacturers may have arrived at their own definition of the "average golfer"

---

[6] See also Declaration of Frank W. Thomas, dated June 11, 2002 ("Thomas Dec."), ¶ 7.

[7] Nitro Br. at 12.

[8] *Id.*

for their model and brand of ball, this is not an agreed-upon standard in the Industry, and as such would not be appropriate in the type of test I performed in this case.

16.     Relevant to my testing, the USGA Iron Byron settings are not set for the "average golfer" because no such setting has been determined or can be determined on a reliable basis.[9] There are, however, many golfers who possess an "average" handicap that generate swing speeds at or in excess of 109 mph.[10]

17.     Moreover, in my opinion, higher swing speeds do not in general maximize performance differences between the golf balls. There are so many more parameters that influence the performance of a golf ball relative to another that singling out the swing speed is improper. For example, in my opinion, if we were to select conditions of higher ball spin -- as is found among slower swing-speed golfers -- the difference between the performance of the Remanufactured golf balls and the authentic TITLEIST golf balls could be greater. The fact is that the Remanufactured balls are so negatively altered, I do not believe there are any conditions where they would perform better than the authentic TITLEIST golf balls.

**D.     Cleaning Of The Club Head Did Was Properly Considered In The Testing**

18.     Nitro next challenges the reliability of my testing claiming that because "debris that accumulates on the club head will affect the flight of the ball, I should have

_____

[9] Thomas Dec., ¶8.

[10] Thomas Dec., ¶¶ 8-10.

instituted a systematic cleaning procedure that included recording the cleaning interval."[11]

19.     I agree that debris on the club head may affect the flight of the ball. That is why I systematically -- every 30-70 hits -- cleaned the clubface of the driver. While I did not specifically record this act, it is accounted for in the randomized-block testing format in that any changes in protocol only took place before or after a test block. This ensured that within each block, any outside influences -- including debris on the club head -- were as uniform as possible.

## 2.     TEST CONCLUSIONS

20.     Nitro also challenges my conclusions on several fronts, claiming they are "unreliable, unprofessional and nonsensical."[12] Nitro's statement demonstrates that it does not have an understanding of the nature of my testing procedures or the proper statistical analysis of data. Just as the proper method is to perform the test in randomized blocks, the proper analysis is to compare performance within the randomized blocks. This ensures that extraneous factors such as wind, humidity, and surface differential are taken into account.

21.     For example, Nitro's claim that according to my test, 15-20% of certain models of Washed TITLEIST golf balls perform worse in terms of overall distance than the average Remanufactured TITLEIST golf ball[13] is misleading because Nitro

---

[11] Piotrowski Dec., ¶16.

[12] Nitro Br. at 13.

[13] Nitro Br. at 13, fn.12.

improperly compared the most extreme washed balls, without regard for which block they were tested in, with the overall average distance of refurbished balls. Using Nitro's same flawed analysis with respect to other of my test results, Nitro would have discovered that approximately 79.8% of the Washed TITLEIST golf balls performed better in terms of overall distance than the average Remanufactured TITLEIST golf balls.

22.    Using the proper analysis (comparing the balls within a block to each other), in 39 of the 42 blocks (93% of the time), Washed TITLEIST golf balls traveled on average farther than their Remanufactured counterparts. In addition, in those circumstances where the Washed TITLEIST balls traveled farther, they did so at an average of 8.3 extra yards. In contrast, on the 3 occasions where the Remanufactured balls traveled farther, they only averaged 5 extra yards over their washed counterparts. This analysis demonstrates the significant differential between Washed TITLEIST golf balls and Nitro's Remanufactured TITLEIST golf balls.

23.    Nitro's claim that my test results showed that approximately 20% of Remanufactured DT 2-piece golf balls flew farther than the average New TITLEIST DT 2-piece golf ball is equally misleading. Again, applying Nitro's same flawed reasoning to complete that analysis, Nitro would discover that 76% of New TITLEIST DT 2-piece golf balls traveled farther than the average of their Remanufactured counterparts. In addition, the shortest distance a New TITLEIST DT 2-piece traveled was 9.7 yards farther than the shortest distance the Remanufactured counterparts traveled; and the longest distance a New TITLEIST DT 2-piece traveled was 7.4 yards farther than the longest distance a Remanufactured Nitro ball traveled.

24.     Also, if Nitro had used the proper analysis (comparing the balls within a block to each other), Nitro would have discovered that out of the 50 blocks tested, in 40 of the blocks (80%) the new TITLEIST golf balls traveled farther than the Remanufactured TITLEIST DT 2-piece.

25.     Finally, Nitro's claim that 5% of new DT 2-piece golf balls had such errant flight trajectories that they traveled off the test range is equally misleading. First, Nitro fails to note that this is compared with 20% of the Remanufactured DT 2-piece golf balls having such errant flight trajectories that they traveled off the test range.

26.     Nitro also failed to note that in the tests of TITLEIST PRO V1 golf balls, none of the new golf balls traveled off the range while 12% of Remanufactured PRO V1 golf balls did so. Finally, Nitro did not note that in testing of Nitro's Remanufactured DT 100 golf balls, 14% of those balls traveled off the range while only 2.6% of all new DT golf balls similarly traveled off the range. In other words, Nitro cherry-picked aberrant results which were not characteristic of the overall test results.

**TEST PURPOSE**

27.     Next, Nitro claims that my test results did not compare the proper class of washed balls with Nitro's Remanufactured counterparts since their Remanufactured golf balls that are ultimately "refurbished" to look like new are supposedly so bad in performance and looks when they reach Nitro that they can not be merely washed and resold.[14] In my opinion, Nitro's concern about this comparison highlights the heart of the problem with its activities. First, that Nitro "refurbishes" the worst golf balls and sells

them as like-new balls is misleading to consumers. Second, golf balls have a useful life, which when expired will not be revived with a fresh coat of paint. As the test results indicate, Nitro's remanufacturing process results in an essentially non-TITLEIST golf ball product having dramatically worse performance characteristics than the original golf ball.

## SIGNIFICANCE OF TEST RESULTS

28.    Finally, Nitro claims that the test results are statistically insignificant,[15] stating that they "show an insignificant change in performance . . . represent[ing] a 2.2-2.8% difference."[16] In terms of yards in the game of golf, a 2.2 − 2.8% is hardly insignificant, translating into approximately a seven yard difference in distance between the Remanufactured golf ball and the merely washed, used golf ball. When it comes to distance and golf balls, a difference of as little as one to seven yards is seen as significant and golf ball manufacturers will tout this difference in their advertisements.[17] Moreover, an average golfer, regardless of how low their performance expectations, would be very upset by missing the green or finding a hazard as a result of a 7 yard variance resulting from a poorly remanufactured golf ball. Unfortunately, not every golfer, including "Nitro's consumers," would be capable of determining that the cause of their dissatisfaction was the remanufacturing process and not the original golf ball manufacturer whose name has been reapplied to the ball.

---

[14] Nitro Br. at 12.

[15] Nitro Br. at 13.

[16] Piotrowski Dec., ¶ 20.

[17] *See* declaration of George Sine dated April 24, 2002, ¶8.

659500v2                                    10

29.     Similarly, Nitro attempts to discount the fact that its balls are far more likely to hook or slice by making the remarkable statement that "Nitro's customers do not expect that the refurbished golf ball is always going to perform as well as a new golf ball . . . ."[18] In my opinion, golfers of all skill levels strive to avoid hooks and slices. In fact, beginner golfers may actually take more pleasure in hitting fairways and greens than more experienced golfers because with respect to beginner golfers, it occurs less frequently. When this happens it is a moment of pride and joy, and it reinforces the beginning golfer's interest in trying to learn the game. I seriously doubt that even beginner golfers would purchase Nitro's Remanufactured golf balls if they knew that the balls were likely to dramatically decrease their level of performance and subsequent enjoyment of the game of golf.

I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _11th_ day of June 2002 at Bonsall, California.

David L. Felker, Ph.D.

---

[18] Nitro Br. at 13, fn 13.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

. i L E D

JUN 1 2 2002

NITRO LEISURE PRODUCTS, L.L.C. d/b/a
GOLFBALLSDIRECT.COM and SECOND
CHANCE,

Plaintiffs,

vs.

Case No. 02-14008-CIV
MIDDLEBROOKS

ACUSHNET COMPANY,

Defendant and Cross
Claim Plaintiff,

vs.

NITRO LEISURE PRODUCTS, INC. d/b/a LEISURE
PRODUCTS, INC. and NITRO GOLF,

Cross Claim Defendant.

_____ /

## DECLARATION OF ROLAND GIROUX IN SUPPORT OF ACUSHNET
## COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION

I, ROLAND GIROUX, declare and state as follows:

1. I am Senior Counsel for Acushnet Company ("Acushnet") and have been employed
by Acushnet since January 1, 200, and previously by Acushnet's parent, Fortune Brands, since
February 1, 1998.

2. I understand that this declaration is being submitted in further support of Acushnet's
motion for a preliminary injunction to enjoin defendants' -- Nitro Leisure Products, L.L.C. (d/b/a
golfballsdirect.com and Second Chance) and Nitro Leisure Services, L.L.C. (d/b/a Nitro Golf
and Nitrogolf.com) (collectively, "Nitro") -- production and sale of remanufactured golf balls
that infringe Acushnet's trademarks and patents, and in reply to Nitro's Opposition thereto.

3.  As Senior Counsel, my responsibilities include, among other things, oversight and enforcement of Acushnet's Intellectual Property rights.

4.  While the pond ball industry has existed for many years, Acushnet's perception is that the primary portion of that market has been the mere retrieval, washing and reselling of balls. Acushnet has learned, however, that the practice of remanufacturing pond balls and mis-marking them with Acushnet's trademarks is a growing segment of the pond ball industry. Information regarding this practice is periodically provided to Acushnet by retail accounts or employees who receive consumer complaints or directly by customers who purchase balls purportedly manufactured by Acushnet and later realize they are not TITLEIST or PINNACLE balls or do not perform like TITLEIST or PINNACLE balls.

5.  One of the difficulties in gathering information on remanufactured golf balls is that the balls provided to Acushnet do not always bear the name of the manufacturer or distributor. In addition, consumers who have supplied suspect golf balls have not usually saved, or remembered the writing on, the packaging after buying and playing the balls.

6.  Acushnet has also received reports of problems with poor quality balls from retailers and golf pros whose information came from consumers who do not always leave their contact information. Acushnet also monitors the Internet and websites such as eBay for information on possibly remanufactured balls.  In addition, there are many different brands or labels used by the re-manufacturers, including private labels where the ball is stripped, repainted and stamped "refinished by _____." Nitro itself sells its pond balls under many different labels including Second Chance, Tour 2, USA Lake Balls, American Lake Balls, Round Two, Palm Beach Lake Balls, Nitro and Viper. Therefore, the nature of the information gathered by Acushnet has made it difficult to determine the identities of the sources of remanufactured balls on the market.

7.  When Acushnet learns of  companies misusing its trademarks or misrepresenting products as being authentic ACUSHNET products, it investigates and in appropriate circumstances take action. For instance, after receiving numerous complaints, Acushnet filed a lawsuit in January 2000 against Golfballs Unlimited USA in United States District Court,

Southern District of Texas, regarding defendants' misuse of the TITLEIST and PINNACLE trademarks. In April 2001, Acushnet filed a Motion for Summary Judgment seeking a permanent injunction and, on June 19, 2001, a Final Judgment was entered against the defendants including an injunction prohibiting stripping and repainting used golf balls.

8. Acushnet continues to monitor the market place for what appears to Acushnet to be an increasing presence of remanufactured golf balls bearing unauthorized copies of Acushnet's trademark.

9. Acushnet was not aware that Nitro was selling "refurbished" golf balls in "hundreds and hundreds of retail stores" in October 2000. In fact, Acushnet had limited knowledge of Nitro's activities. In August 2000, I was advised by Denny Smith, a golf pro at Ellsworth Meadow Golf Club, Hudson, Ohio, that a customer had found a golf ball on the golf course which was repainted and had "Nitro" printed on it. When the paint chipped off the ball, it revealed the name "Pinnacle" underneath the paint. Given the appearance of mis-marking of the product, Acushnet looked more closely at Nitro. Around that time, Acushnet also became aware that the <<golfballsdirect.com>> website was affiliated with Nitro. As of August 2000, however, Acushnet was unable to purchase "refurbished" balls directly from the website and was advised that the website was under construction and not functioning to accept on-line orders. At that time, Acushnet was also aware of only one store, Walgreen's in Boca Raton, Florida selling "recycled" balls under the "Second Chance" label.

10. Despite this information, Acushnet did not observe much NITRO branded remanufactured product in the marketplace and believed that Nitro was selling mostly rewashed balls or NITRO branded new products. There was little or no evidence that Nitro was engaging in the widespread infringing activities currently complained of in Acushnet's pending claims, and certainly nothing to suggest the level and scope of Nitro's sales and admitted infringing activity alleged in their opposition papers.

3

11. Furthermore, from January 2000 to July 2001, Acushnet was engaged in the Texas litigation mentioned above, which Acushnet desired to resolve before committing additional resources to as yet unknown infringers.

12. When Acushnet decided to revisit Nitro's activities in Summer 2001, it was becoming more aware of Nitro's expanded range of activities and increased presence in the marketplace and Acushnet, therefore, authorized investigation into Nitro's activities. See Declaration of George Arnold, dated April 18, 2002 and submitted in support of Acushnet's Motion for Preliminary Injunction.. It was only through comprehensive investigation and review of Nitro's products throughout the Fall of 2001 that Acushnet became aware of the array of infringing conduct alleged in its claims against Nitro, including the stripping, recovering and labeling with the NITRO brand. Once Acushnet became aware of Nitro's increased infringing activity and insurgence of infringing product into the marketplace, it authorized the significant testing of the golf balls which was concluded at the end of January 2002.

13. By letter dated January 11, 2002, Nitro's attorneys advised Acushnet that Nitro had filed a Complaint in this Court and that its preference was to wait to serve the Complaint on Acushnet until it had explored all reasonable opportunities to resolve this matter amicably.

14. On January 15, 2002, Acushnet filed its trademark and patent infringement action in the United States District Court, Central District of California. Shortly thereafter, counsel for both parties began discussing the parties' respective motions to dismiss or transfer the other's action, as well as possible resolution of the dispute.

15. On February 14, 2002, Acushnet's counsel advised Nitro's counsel by letter that Acushnet would be seeking preliminary injunctive relief and requested a pre-motion meeting to confer about the proposed motion as required by the Local Rules of the Central District of California. Nitro's counsel responded the next day that it could not meet until February 19.

16. The Central District Local Rules also provide a 20-day hold period (from the time of the meet and confer) during which the moving party cannot file its motion. The 20-day hold period, therefore, did not expire until March 12, 2002. On March 4, however, Judge Real

4

granted Nitro's Motion to Transfer and ordered Acushnet's California action transferred to this Court. During this time, the parties continued discussion on possible settlement of the dispute.

17. Since 1974, Acushnet has manufactured and sold several models of its "DT" golf balls, including the DT DISTANCE currently on the market, imprinted with the Model Side Stamps corresponding to the full DT model name. Many of the DT models, however, are no longer sold by Acushnet such as the DT, DT 90, DT WOUND, DT SPIN and DT 2-PIECE models. Given the huge numbers of pond balls in the market place, these previously sold DT models are likely also still being used by consumers. Nitro's admitted disregard for printing the correct DT family model name on its remanufactured balls prevents consumers from knowing which model they are purchasing and even whether that is a currently produced model.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed this 10th day of June, 2002, at New York, New York.

ROLAND GIROUX

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT PIERCE DIVISION

NITRO LEISURE PRODUCTS, L.L.C.,
d/b/a GOLFBALLSDIRECT.COM and
SECOND CHANCE,

                Plaintiffs,

vs.

ACUSHNET COMPANY,

                Defendant and Cross
                Claim Plaintiff,

vs.

NITRO LEISURE PRODUCTS, INC.,
d/b/a LEISURE PRODUCTS, INC. and
NITRO GOLF,

                Cross Claim Defendant.

_____ /

Case No. 02-14008-CIV-
MIDDLEBROOKS

ACUSHNET COMPANY,

                Plaintiff,

vs.

NITRO LEISURE PRODUCTS, L.L.C. d/b/a
GOLFBALLSDIRECT.COM and SECOND
CHANCE, and NITRO LEISURE SERVICES,
L.L.C. d/b/a NITRO GOLF and
NITROGOLF.COM,

                Defendants.

_____ /

Case No. 02-14091-CIV-
MIDDLEBROOKS

## DECLARATION OF COLLEEN KELLY IN SUPPORT OF ACUSHNET COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION

COLLEEN KELLY, declares as follows:

1.     I have been retained by the law firm of Greenberg Traurig, LLP ("GT"), counsel for Acushnet Company ("Acushnet") to provide expert analysis, opinion and testimony with respect to issues raised by the defendants in this matter concerning the accuracy and utility of the data assembled by David L. Felker ("Felker") through the tests he designed and conducted to determine the existence and scope of any differences in performance among the multiple types of golf balls tested (the "Tests").

2.     I understand that this declaration is being submitted in support of Acushnet's motion for a preliminary injunction to enjoin Nitro Leisure Products, LLC's (d/b/a Golfballsdirect.com, Second Chance, Nitro Golf and Nitrogolf.com) ("Nitro") production and sale of remanufactured golf balls, which infringe Acushnet's trademarks and patents.

3.     I graduated with a Bachelor of Arts in applied mathematics in 1986, and received a Master of Science degree in applied mathematics in 1988 from the University of California, San Diego.  In 1991, I received my Doctorate Degree (Ph.D.) in mathematics from the University of California, San Diego.

4.     Upon graduation from the doctoral program, I was employed as an Assistant Professor of Statistics at the University of Rhode Island from 1991 through 1997, until I accepted an Associate Professor of Statistics position with San Diego State University.  In addition to this position, I am also currently the Co-Director of San Diego State University's Statistical Consulting Center.

5.     I have extensive statistical consulting experience in both experimental and survey design and data analysis.  I am the author of numerous articles regarding novel

statistical methods in refereed journals, and the recipient of numerous funded research grants. A copy of my *curriculum vitae* is annexed hereto as <u>Exhibit A</u>.

6.      I am advised that Nitro has criticized the Tests. More particularly, that Nitro objects to, and claims that, various environmental conditions (e.g., wind, residual build up of golf ball debris on the golf club head, humidity, possible terrain irregularities, the club head velocity used, and the fact that the robot hit each golf ball perfectly) negatively impacted the data accumulated and the conclusions derived by Felker.

7.      Prior to conducting his experiments, Felker and I discussed these very concerns. I instructed Felker to use a randomized-block experimental design as that would eliminate each of these concerns and insure accurate and useful data.

8.      The randomized-block design dates back to Sir Ronald Fisher (*Statistical Methods for Research Workers*, Edinborough, Oliver and Boyd, 1925) and is one of the most commonly used experimental designs. It is discussed in essentially every experimental design textbook. This design is used when there is one set of comparisons and the experimenter wants to control extraneous sources of variability.

9.      I have consulted on numerous projects that have effectively used this design to compare, among other things, two drugs, the writing styles in two types of prose, soil erosion control products, the effects of weeding and other land treatments on native plant species, and the impact of a professional development program on elementary school science education. In all of my experiences, the randomized-block design has been successful.

10.     Felker's use of the randomized-block experimental design obviated each and every one of the concerns raised by Nitro. It does not matter if, for example, the

wind conditions, humidity or club conditions varied over time, because each test block (consisting of each golf ball type hit in a short period of time) had conditions that were extremely similar if not identical. Furthermore, the randomization of hitting order within each block further negated any discrepancies in environmental conditions.

11.     It is my professional opinion that the data accumulated through the Tests is reliable, accurate and useful, as well as a fair representation of any differences that may exist between the various types of golf balls tested.

I declare, under penalty of perjury that the foregoing is true and correct.

San Diego, California
Date: June 11 , 2002

_____
Colleen Kelly

NO.071   P002

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 02-14008 CIV-MIDDLEBROOKS/LYNCH

NITRO LEISURE PRODUCTS, L.L.C.,
d/b/a GOLFBALLSDIRECT.COM and
SECOND CHANCE,

FILED

Plaintiffs,

JUN 12 2002

v.

CLERK, USDC / SDFL

ACUSHNET COMPANY,

Defendant and Cross Claim Plaintiff,

v.

NITRO LEISURE PRODUCTS, L.L.C.,
d/b/a NITRO GOLF and NITROGOLF.COM,

Cross Claim Defendants.

_____/

### SUPPLEMENTAL DECLARATION OF WILLIAM E. MORGAN IN SUPPORT OF ACUSHNET COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION

WILLIAM E. MORGAN, declares as follows:

1.       I am the same William E. Morgan who submitted a moving declaration dated April 19, 2002 in this matter.  I have reviewed certain of the materials submitted by Nitro Leisure Products, L.L.C., Nitro Leisure Products, Inc. and Nitro Golf (collectively, "Nitro") in opposition to Acushnet Company's ("Acushnet") Motion For Preliminary Injunction, including Nitro's Opposition To Acushnet's Motion For Preliminary Injunction, the Declaration of Peter J. Piotrowski ("Piotrowski") and the Declaration of John W. Jepson ("Jepson").  I understand that this supplemental Declaration is being submitted in response to certain statements made by Nitro in their opposition to Acushnet's moving memoranda and declarations concerning defendants' remanufacturing process and infringement of the patents asserted by Acushnet.

## A.   Nitro's Remanufacturing And Mismarking Process

2.    Nitro admits that "[t]he high-value balls are hand-sorted by brand and (if appropriate) model." Nitro's Opposition to Acushnet's Motion for Preliminary Injunction ("Nitro Br.") at 3. Further, "Nitro re-stamps the precise model type only for those models that its customers have expressed a demand...[f]or other balls, such as the Titleist DT family (e.g., Titleist DT Two-Piece, Titleist DT Wound, Titleist DT Spin, and Titleist DT Distance), . . . the precise model type is not reapplied." *Id.*

3.    This is precisely what Acushnet is complaining about. There are significant performance differences between Acushnet's golf balls and particularly between the various DT model golf balls. Specifically, certain of the DT family of golf balls have wound cores that generate very high spin rates, while others have solid cores that generate a low spin rate. Further, certain of the DT family of golf balls employ different dimple specifications from others of the DT family. Thus, each of the various DT models performs differently. My moving declaration at ¶¶ 13-24 provides an overview of golf ball technology, including the importance of dimple patterns.

4.    The accurate marking and consumer identification of individual Acushnet golf ball models is also important because Acushnet designs each of their golf balls to perform best at the launch conditions typical of the players expected to be using them.

## B.   Acushnet's Golf Balls Are Not Meant To Be Remanufactured or Reconstructed

5.    As I explained in my moving Declaration at ¶ 50, "Acushnet's golf balls are not meant to be remanufactured." Each of the components (e.g., cover, core, etc.) of each of Acushnet's golf balls are designed to function in combination to create the performance and durability characteristics of specific Acushnet models. For example, once the exterior surface of

a golf ball made by Acushnet is spent, the useful life of that golf ball is considered to have expired, as remanufacture of such component is either impossible (e.g., replacing a spent core without destroying the remaining components), or extremely involved (e.g., replacing the exterior portion of the cover by removing the entire exterior surface layer, including dimples and indicia and applying a substitute layer including dimples and indicia). The complexity and undesirability of replacing these components explains why a market to manufacture or service the spent component has not developed.

C.  **The Defendants' Infringement Of The Patents Asserted by Acushnet**

6.  I have reviewed and understand each of the patents asserted by Acushnet. Based on my personal knowledge and Acushnet's records, I am knowledgeable about each of the constituents and processes used in the golf balls manufactured by Acushnet. In brief, I have detailed personal knowledge of how Acushnet's golf balls are manufactured and what they are made of.

7.  I am advised that Nitro contends that Acushnet has not demonstrated that the golf balls remanufactured by Nitro using what Nitro describes as "spent" Acushnet golf balls contain every element of each of the patent claims asserted by Acushnet. This is incorrect.

8.  First, as detailed in paragraphs 51 and 52 of my moving declaration, I made a close examination of certain golf balls sold under the Nitro brand name, including cross-sectioning the balls and removing the cores from some of them. I determined that Nitro had used the "insides" of golf balls made by Acushnet (Acushnet DT and Pinnacle golf balls) and other companies as the basis for a reconstructed golf ball.

9.     I further determined that the method used by Nitro met each limitation of the method of removing and replacing the entire exterior surface layer of a golf ball claimed in claims 1 and 11 of the '535 patent.

10.     I also carefully reviewed the elements of each of the patent claims being asserted by Acushnet and, based on my knowledge of how certain Acushnet golf balls are made and what they are made of, concluded that each limitation of each asserted claim had been met in the manufacture of the particular Acushnet golf balls that I referenced in paragraphs 32 and 53 of my moving declaration.

11.     In brief, the method of preparing a wound golf ball core encompassed by claims 1-4 of the '910 patent were used to prepare all Acushnet wound balls since the early 1990's and certain of the Nitro labeled golf balls contain such an Acushnet made ("DT") would core. Acushnet's Pinnacle golf balls are a golf ball product having a core made of the composition covered by claim 1 of the '422 patent and were made by the process of, among others; claims 1 and 9 of the '980 patent and claims 8, 10, 12, and 13 of the '497 patent.  Claim 1 (among other claims) of the '459 patent covers golf balls having a cover made from a certain composition made within specified ranges.  The covers on both Acushnet's Titleist DT family and Pinnacle golf balls are made using a composition that falls, respectively, within the ranges covered by the claims.  Thus, my examination showed that Nitro is using both Acushnet DT family and Pinnacle golf balls as the basis for at least some of its reconstructed golf balls and, as explained above and in paragraphs 32 and 52 of my moving declaration, the asserted claims cover golf ball models such as the Acushnet DT family and Pinnacle golf balls, respectively.

12.     The attached claim chart, annexed hereto as Exhibit A, further demonstrates that in reconstructing (removing the entire exterior surface layer, including dimples and indicia and

applying a substitute layer) golf balls originally made either by Acushnet or by other companies,
Nitro has used the method claimed in the '535 patent.

13.     The attached claim chart further confirms that each of the limitations of the
asserted claims of the Acushnet Process and Composition Patents, the '422, '910, '980, '497 and
'459 patents, are met by one or more golf balls originally manufactured by Acushnet that Nitro
later stripped of their exterior surface layer, applied a substitute exterior surface layer and then
labeled as new "Nitro golf balls."

I declare, under penalty of perjury that the foregoing is true and correct.

Fairhaven, Massachusetts
Date:  June 12, 2002


William E. Morgan
Senior Vice President
Golf ball Research and Development

**Claim Chart - U.S. Patent No. 5,609,535**

<u>Claim 1</u>

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. A method of treating a golf ball having an exterior surface of a predetermined diameter, a core and a cover composed of cover material having a predetermined thickness and dimples and indicia on said exterior surface comprising: | This claim is broadly directed to a method of replacing the entire exterior surface of a golf ball after use. An embodiment of this invention is discussed generally at Col. 1, line(s) 19-30. The terms of this claim should be given their plain meaning. "Exterior surface" means the exterior portion of the golf ball cover. A "predetermined diameter" means that the exterior surface of the ball was intended to have a particular diameter. The "cover" includes the exterior portion of the golf ball, dimples (impressions made on the external surface of the cover to provide aerodynamic qualities), and indicia (marks placed on the exterior surface of the golf ball, including make and model name). *See e.g.,* Col. 1, lines 47 – 57 and Figs. 1-3 for a preferred embodiment of this invention. | As described in my moving declaration, at ¶¶ 51-52, my examination of reconstructed Nitro golf balls showed that they were made using the method of claims 1 and 11 of this patent. Specifically, this claim describes the steps Nitro took in manufacturing its Ultimate Distance and Tour Distance Titanium golf balls. *See* Morgan Moving Declaration at ¶¶ 51-52 and Exhibits N, O, P and Q annexed thereto. As illustrated by Exhibits N, O, P and Q of my moving declaration, Nitro removed the entire original exterior surface layer of the golf ball (including dimples and indicia) and then substituted a new layer with dimples which was added to the intermediate cover surface left after removal of the exterior surface layer. I am certain of this conclusion, as all of the balls have "new" external surfaces with matching dimple patterns and indicia despite incorporating different cores and internal portions of the cover. I am also certain that the thickness of the new material is "substantially equal in thickness to the material removed," as golf balls are generally manufactured (including all of Acushnet's golf balls), like Nitro's reconstructed golf balls, to conform to USGA size standards. (These standards are set forth in ¶ 11(b) of my moving Declaration). |

1

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| 1. removing the entire exterior surface material of said cover and all said dimples and indicia to reduce the thickness of said cover and provide a dimple free and indicia free intermediate cover surface; and | The entire exterior portion of the cover is removed leaving a dimple and indicia free intermediate cover surface. *See e.g.*, Col. 1, line(s) 59-63. The "intermediate cover surface" refers to a layer of cover material positioned between the core and the exterior surface layer. | See above. |
| 2. adding to said intermediate cover surface a layer of cover material including dimples which is substantially equal in thickness to the material removed in step (a). | A new layer of cover material is added to the intermediate layer. This new layer, which has dimples, will be of a thickness that approximates the thickness of the materials removed. *See e.g.*, Col. 2, line(s) 5-8. | See above. |

**Claim 11**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  The method of claim 7. | Claim 7 broadly claims a method of removing the entire exterior surface material of a golf ball after use. *See e.g.*, Col. 1, line(s) 62-66. | See above. |
| 1. Wherein the step of adding a layer of cover material is comprised of injection molding the layer of cover material to the intermediate surface. | A new layer of cover material is added to the intermediate layer using injection molding. *See e.g.*, Col. 2, line(s) 9-10. | See above. |

2

**Claim Chart - U.S. Patent No. 4,846,910**

<u>Claim 1</u>

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  A method for preparing a wound golf ball core comprising the successive steps of: | This claim is broadly directed to a mechanized method for preparing a wound golf ball by the successive steps set forth in sub-parts a-h of the claim. | The preparation of certain of Acushnet's wound golf ball cores is accomplished with automatic machines.  Included among these wound golf ball products are the specific models discussed in ¶ 52 (e) of my moving declaration.  The elastic thread used in manufacturing wound cores varies from golf ball manufacturer to manufacturer and from model to model.  As provided in my moving declaration, I determined that the center and windings of certain of the wound cores utilized by Nitro in the manufacture of their Ultimate Distance and Tour Distance Titanium golf balls were characteristic of cores manufactured by Acushnet in accordance with the method of this claim.  Specifically, the color, dimension, surface appearance and winding pattern of the cores of these golf balls were consistent with the cores used solely by Acushnet in its Titleist DT ▲ 80, Titleist DT ▲ 90 and Titleist DT ▲ 100 golf balls, from 1995 through 1996.  I have never seen this combination used in a competitive product.  *See* ¶ 52 of my moving declaration for a more detailed discussion of the above. |

| | | |
|---|---|---|
| a. winding a portion of thread from a thread supply about a core to make a partially wound core; | Wound cores are typically made by winding an elastic thread about a frozen center. The frozen center is made from a solid rubber ball or a hollow rubber shell containing liquid which is frozen to form a small hard sphere. *See e.g.*, Col. 4, line(s) 13-15. This step of the claim involves the initial winding of a portion of thread from a thread supply about a core to make a partially wound core. | See above. |
| b. placing the partially wound core onto a winding means; | The partially wound ball is picked up and positioned on the winding means at various points during the manufacturing cycle. *See e.g.*, Col. 3, line(s) 26-28. | See above. |
| c. winding additional thread from the thread supply about the partially wound core to make a wound core; | Additional thread, from a thread supply, is wound around the core at various stages of the manufacturing cycle to make a wound core. *See e.g.*, Col. 6, line(s) 37-Col. 7, line(s) 17. | See above. |
| d. removing the wound core from the winding means by means of a mechanical hand having a plurality of mechanical fingers; | A mechanical hand with a plurality of fingers removes the wound core from the winding means. *See e.g.*, Col. 6, line(s) 57-59. | See above. |
| e. winding thread from the thread supply about the plurality of mechanical fingers; | Thread from the thread supply is wound around the mechanical fingers. *See e.g.*, Col. 6, line(s) 65 - Col. 7, line(s) 2. | See above. |

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| f. winding thread from the thread supply about the wound core; | Thread, from the thread supply, is wound around the core at various stages of the manufacturing cycle. *See e.g.*, Col. 7, line(s) 12-17. | See above |
| g. dropping the thread off of the mechanical fingers onto the wound core; and | During the manufacturing cycle, thread wound around the mechanical fingers is dropped from the fingers onto the wound core. *See e.g.*, Col. 7, line(s) 28-30. | See above. |
| h. severing the wound core from the thread supply. | The thread, from the thread supply, is severed from the wound core during the manufacturing cycle. *See e.g.*, Col. 7, line(s) 60-64. | See above. |

**Claim 2**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.   The method of claim 1. | See the method of claim 1 above. | See above. |
| 1. wherein, after step (g) but prior to step (h), the method further comprises a second step of winding the thread about the plurality of mechanical fingers. | Thread wound around the mechanical fingers, for a second time, is dropped from the fingers onto the wound core after step (g) of claim 1 but before step (h). *See e.g.*, Col. 7, line(s) 47-51. | See above. |

**Claim 3**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  A method for securing thread onto a wound | This claim is broadly directed to method for preparing a wound golf ball by the successive steps set forth in sub-parts a-e of the claim. | See above. |

5

| golf ball core comprising the successive steps of: | steps set forth in sub-parts a-e of the claim. | |
|---|---|---|
| a. grasping with a mechanical hand having a plurality of mechanical fingers a wound golf ball core attached to a thread supply; | A mechanical hand with a plurality of fingers grasps a wound core which is attached to a thread supply. *See e.g.*, Col. 5, line(s) 31-35. | See above. |
| b. winding thread from the thread supply about the plurality of mechanical fingers; | Thread, from the thread supply, is wound around the mechanical fingers during the manufacturing cycle. *See e.g.*, Col. 6, line(s) 65-Col. 7, line(s) 2. | See above. |
| c. winding thread from the thread supply about the wound core; | Thread, from the thread supply, is wound around the wound core at various stages of the manufacturing cycle. *See e.g.*, Col. 7, line(s) 12-17. | See above. |
| d. dropping the thread off of the mechanical fingers onto the wound core; and | During the manufacturing cycle, thread wound around the mechanical fingers is dropped from the fingers onto the wound core. *See e.g.*, Col. 7, line(s) 28-30. | See above. |
| e. severing the wound core from the thread supply. | The thread, from the thread supply, is severed from the wound core. *See e.g.*, Col. 7, line(s) 60-64. | See above. |

6

**Claim 4**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  The method of claim 3. | See the method of Claim 3 above. | See above. |
| a. wherein, after step (d) but before step (e), the method further comprises a step of winding the thread about the plurality of mechanical fingers. | Thread wound around the mechanical fingers is dropped from the fingers onto the wound core after step (d) of claim 3 but before step (e).  *See e.g.*, Col. 7, line(s) 47-51. | See above. |

7

**Claim Chart - U.S. Patent No. 4,770,422**

**Claim 1**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In the manufacture of a golf ball product by crosslinking polybutadiene with about 25 to 40 parts zinc diacrylate by weight per 100 parts by weight polybutadiene, the improvement comprising | This claim is broadly directed to the manufacture of a golf ball product wherein polybutadiene is crosslinked with about 25 to 40 parts zinc diacrylate by weight per 100 parts by weight polybutadiene where the improvement comprises the use of a chemical called a peroxide free radical initiator in the range set forth in sub-part (a) of claim 1. The term "polymer" means a complex molecule formed by the linkage of simple molecules. The term "monomer" means a simple molecule that is capable of combining with a number of like or unlike molecules to form a polymer. "Polybutadiene" is a carbon based polymer widely used in golf ball construction. "Zinc diacrylate" is the metal salt of an unsaturated carboxylic acid. *See e.g.*, Col. 1, line(s) 9-67. Carboxylic acids refer to the chemical group –COOH in an organic molecule. The term "unsaturated" refers to an organic compound that does not contain only single carbon-carbon bonds between its linked carbon atoms. Crosslinking is a widely used process for strengthening polymers through increasing or creating chemical bonding. *See, e.g.*, Col. 2, line(s) 41-44, and line(s) 50-53. | Non-wound cores used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls, including Acushnet's Pinnacle Gold. The construction, composition, and/or method of manufacture of golf balls having these cores are the subject of numerous Acushnet patents, including claim 1 of the '422 patent. See ¶¶ 32 and 52 of my moving declaration for a more detailed discussion. |

8

| a. the use of about 0.2 to 0.8 parts by weight polybutadiene of peroxide free radical initiator. | The crosslinking of polybutadiene by zinc diacrylate is completed with the use of about 0.2 to 0.8 parts by weight polybutadiene of a peroxide free radical initiator. An "initiator" is a compound with a weak covalent bond often used to start a chemical reaction. "Free radicals" are reactive molecules having an odd number of electrons (hence one unpaired electron) often employed in the synthesis of organic compounds. *See e.g.*, Col. 1, line(s) 64-Col. 2, line(s) 1, line(s) 10-13, line(s) 17-24, line(s) 34-40 and line(s) 42-45. | Acushnet's Pinnacle golf ball cores are made by the process and within the ranges of ingredients specified in claim 1 of this patent. |

9

**Claim Chart - U.S. Patent No. 4,546,980**

Claim 1

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In the method of making a golf ball product from an admixture of polybutadiene and a metal salt of an unsaturated carboxylic acid the improvement comprising | This claim is broadly directed to a method of making golf ball products whereby polybutadiene is mixed with a metal salt of an unsaturated carboxylic acid, wherein the improvement comprises the steps described in the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for a definition of the terms "carboxylic acids," "unsaturated," "polybutadiene," "initiator," and "free radical." | Non-wound cores used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls, including Acushnet's Pinnacle Gold. The construction, composition, and/or method of manufacture of golf balls having these cores are the subject of numerous Acushnet patents, including claims 1, 9, 19 and 22 of the '980 patent. *See* ¶ 52 of my moving declaration for a more detailed discussion. Specifically, Acushnet's Pinnacle golf ball products contain compositions that met the limitations (are made with ingredients within the ranges specified in) of each of claims 1, 9, 19 and 22. |
| 1. the use of at least two free radical initiators, one said free radical initiator having a half life at 320° F. which is longer than the half life at 320° F. of the other said free radical initiator, the two free radical initiators being present in the ratio of about 1:9 to about 9:1. | One free radical initiator having a half life at 320° F. which is longer than the half life at 320° F. of the other free radical initiator are used. The two free radical initiators are present in a ratio of about 1:9 to about 9:1. The term "half life" means the time it takes for half of the amount of the chemical in question to degrade. *See e.g.,* Col. 2, line(s) 11-15, line(s) 37-40, and line(s) 43-46, and Col. 3, line(s) 16-18. | See above. |

10

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| 2. the two free radical initiators being sufficiently different in half life to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either one of said initiators alone. | The two free radical initiators used have sufficiently different half lives to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either of the two free radical initiators alone. *See e.g.*, Col. 5, line(s) 30-50. | See above. |

**Claim 9**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. A golf ball product formed from a mixture comprising polybutadiene and a metal salt of an unsaturated carboxylic acid | This claim is broadly directed to a process of making a golf ball product from a mixture comprising polybutadiene and a metal salt of an unsaturated carboxylic acid by the steps set forth in the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "carboxylic acids," "unsaturated," and "polybutadiene". *See e.g.*, Col. 3, line(s) 28-41. | See above. |
| 1. said mixture having been cured with at least two free radical initiators, | The mixture comprising polybutadiene and a metal salt of a unsaturated carboxylic acid is cured with at least two free radical initiators. *See e.g.*, Col. 2, line(s) 11-15, and line(s) 37-40. | See above. |
| 2. one said free radical initiator having a half life at 320° F. which is longer than | The two free radical initiators have different reactivities, one free radical initiator having a half life at 320° F. which is longer than the half life at | See above |

11

| | | |
|---|---|---|
| the half life at 320° F. of the other said free radical initiator, the two free radical initiators being present in the ratio of about 1:9 to about 9:1, | 320° F. of the other free radical initiator. The two free radical initiators are present in a ratio of about 1:9 to about 9:1. *See e.g.,* Col. 2, line(s) 43-46, and Col. 3, line(s) 16-18. | |
| 3.  the two free radical initiators being sufficiently different in half life to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either one of said initiators alone. | The two free radical initiators have sufficiently different half lives to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either of the two free radical initiators alone. *See e.g.,* Col. 5, line(s) 30-50. | See above. |

**Claim 19**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  A golf ball product formed from an admixture of polybutadiene and a metal salt of an unsaturated carboxylic acid | This claim is broadly directed to a process of making golf ball products whereby polybutadiene is mixed with a metal salt of an unsaturated carboxylic acid, wherein the improvement is set forth in the steps described in the remainer of the claim.  *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for a definition of the terms "carboxylic acids," "unsaturated," and "polybutadiene." *See e.g.,* Col. 1, line(s) 62-63, and line(s) 28-41. | See above. |

12

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| 1. the improvement comprising the use of at least two free radical initiator, | The improvement comprises the following. At least two free radical initiators are used. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "initiator" and "free radicals" and definitions presented in connection with the claim construction of claim 1 of the '980 patent for the definition of "half life." *See e.g.*, Col. 2, line(s) 11-15. | See above. |
| 2. one said free radical initiator having a half life at 320° F. which is at least three times longer than the half life at 320° F. of the other said free radical initiator, | The two free radical initiators have different reactivities, one free radical initiator having a half life at 320° F. which is longer than the half life at 320° F. of the other free radical initiator. *See e.g.*, Col. 2, line(s) 43-46 and line(s) 5-10. | See above. |
| 3. the two free radical initiators being present in the ratio of about 1:9 to about 9:1 and the total amount of free radical initiator being from about 0.2 to 10 parts by weight of the polybutadiene. | The two free radical initiators are present in the ratio of about 1:9 to about 9:1. The total amount of free radical initiator present is from about 0.2 to 10 parts by weight of the polybutadiene. *See e.g.*, Col. 3, line(s) 16-18 and line(s) 10-12. | See above. |

**Claim 22**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  A golf ball product formed from an admixture of polybutadiene and a metal salt of an unsaturated carboxylic acid | This claim is broadly directed to a process of making golf ball products whereby polybutadiene is mixed with a metal salt of an unsaturated carboxylic acid, wherein the improvement comprises the steps described in | See above. |

13

| | | |
|---|---|---|
| | the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for a definition of the terms "carboxylic acids," "unsaturated," and "polybutadiene." *See e.g.*, Col. 1, line(s) 62-63, and Col. 3, line(s) 28-41. | |
| 1. the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "initiator" and "free radicals" and definitions presented in connection with the claim construction of claim 1 of the '980 patent for the definition of "half life." *See e.g.*, Col. 2, line(s) 11-15, and line(s) 37-40, and line(s) 43-46, Col. 3, line(s) 16-18, and Col. 2, line(s) 5-10. | See above. |
| 2. the two free radical initiators being in sufficient quantity and being sufficiently different in half life and being in a ratio which yields a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either one of said initiators alone. | The two free radical initiators used have sufficiently different half lives to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either of the two free radical initiators alone. *See e.g.*, Col. 5, line(s) 30-50. | See above. |

14

**Claim Chart - U.S. Patent No. 4,692,497**

<u>Claim 8</u>

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In a product formed from an admixture of a polymer formed from a diene monomer at least a portion of which is polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms | This claim is broadly directed to a product formed from an admixture of polymer formed from a diene monomer at least a portion of which is polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the steps described in the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "unsaturated", "carboxylic acids," "monomer," "polymer," and "polybutadiene". The term "diene" means a compound having two carbon-carbon double bonds. The term "ethylenically unsaturated" means an unsaturated compound in which there are one or more double bonds between carbon atoms. The terms "alpha" and "beta" refers to the orientation of certain carbon-carbon double bonds on a compound. *See e.g.,* Col. 3, line(s) 26-36. | Non-wound cores used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls including Acushnet's Pinnacle Gold. The construction, composition, and/or method of manufacture of golf balls having these cores are the subject of numerous Acushnet patents, including claims 8, 11, 12 and 13 of the '497 patent. *See* ¶¶ 32 and 52 of my moving declaration for a more detailed discussion. Specifically, such Acushnet Pinnacle golf balls contain a composition which is made by a process which meets each limitation of each of these claims of the '497 patent. |
| 1. the improvement comprising the use of at least two free radical initiators, | The improvement comprises the following. At least two free radical initiators are used. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "free radical" and "initiator." *See e.g.,* Col. 2, line(s) 14-19. | See above. |

15

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| 2. one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. *See e.g.*, Col. 2, line(s) 40-43 and line(s) 46-49. | See above. |
| 3. the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content. *See e.g.*, Col. 3, line(s) 13-15. | See above. |
| 4. and being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.*, Col. 3, line(s) 19-21. | See above. |

**Claim 10**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In a product formed from an admixture of polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms | This claim is broadly directed to a product formed from a mixture of polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the steps described in the remainder of the claim. *See* the definitions above for claim 8. *See e.g.*, Col. 3, line(s) 26-36. | See above. |

16

| Claim Language | Claim Construction | Infringing Golf Balls |
| --- | --- | --- |
| 1. the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "initiator" and "free radicals" and definitions presented in connection with the claim construction of claim 1 of the '980 patent for the definition of "half life." *See e.g.*, Col. 2, line(s) 11-15. | See above. |
| 2. one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320° F., | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. *See e.g.*, Col. 2, line(s) 37-40 and line(s) 43-46, Col. 3, line(s) 16-18 and Col. 2, line(s) 5-10. | See above. |
| 3. the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content. *See e.g.*, Col. 3, line(s) 13-15. | See above. |
| 4. and being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.*, Col. 3, line(s) 19-21. | See above. |

**Claim 11**

| Claim Language | Claim Construction | Infringing Golf Balls |
| --- | --- | --- |
| Preamble. In a product formed from an admixture comprising polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated | This claim is broadly directed to a product formed from a mixture of polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the | See above. |

17

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| carboxylic acid having 3 to 8 carbon atoms | steps described in the remainder of the claim. *See e.g.*, Col. 3, line(s) 26-36. | |
| 1.  the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See e.g.*, Col. 2, line(s) 11-15. | See above. |
| 2.  one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320° F. | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. *See e.g.*, Col. 2, line(s) 37-40 and line(s) 43-46 and line(s) 5-10. | See above. |
| 3.  the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content and | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content. *See e.g.*, Col. 3, line(s) 13-15. | See above. |
| 4.  being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.*, Col. 3, line(s) 19-21. | See above. |

## Claim 12

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In a product formed from an admixture comprising polybutadiene and zinc acrylate or zinc diacrylate | This claim is broadly directed to a method for producing a golf ball product formed from an admixture comprising polybutadiene and zinc acrylate or zinc diacrylate.  *See* definitions for claim 8 above and those in the claim construction of claim 1 of the '422 patent for the definition of the terms "carboxylic acids," "unsaturated," | See above. |

18

| | | Infringing Golf Balls |
|---|---|---|
| | "crosslinking," "polymers," "monomers," and "polybutadiene" *See e.g.*, Col. 3, line(s) 26-36 and Col. 4, line(s) 4-19. | |
| 1. the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See e.g.*, Col. 2, line(s) 11-15. | See above. |
| 2. one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320° F. | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. *See e.g.*, Col. 2, line(s) 37-40, line(s) 43-46 and line(s) 5-10. | See above. |
| 3. the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content. *See e.g.*, Col. 3, line(s) 13-15. | See above. |
| 4. and being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.*, Col. 3, line(s) 19-21. | See above. |

## Claim 13

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In a product formed from an admixture comprising polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated | This claim is broadly directed to a method for producing a golf ball product from an admixture comprising polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the steps set forth in the | See above. |

19

| | |
|---|---|
| carboxylic acid having 3 to 8 carbon atoms | remainder of the claim. *See* definitions set forth in claim 8 above and in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "carboxylic acids," "unsaturated," "crosslinking," "polymers," "monomers," and "polybutadiene". *See e.g.,* Col. 3, line(s) 26-36. | |
| 1. the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See e.g.,* Col. 2, line(s) 11-15. | See above. |
| 2. one said free radical initiator having a half life of less than about 1 minute at 320° F. | One of the free radical initiators has a half life of less than about 1 minute at 320° F. *See e.g.,* Col. 2, line(s) 54-Col. 3, line(s) 1. | See above. |
| 3. and the other said free radical initiator having a half life of greater than about 10 minutes at 320° F. | The other free radical initiator has a half life of greater than about 10 minutes at 320° F. *See e.g.,* Col. 3, line(s) 6-11. | See above. |
| 4. the free radical initiators being present in the ratio of about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.,* Col. 3, line(s) 19-21. | See above. |

20

**Claim Chart - U.S. Patent No. 5,000,459**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In a golf ball having an ionomer resin cover | This claim is broadly directed to directed to a golf ball product having an ionomer resin cover.  *See e.g.*, Col. 2, line(s) 27-28.  The term "ionomer resin" means a polymer that has ethylene as the major component, but contains both ionic and covalent bonds. | Many of the golf ball covers used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls including Acushnet's Pinnacle Gold.  The construction, composition, and/or method of manufacture of golf balls having these golf ball covers are the subject of numerous Acushnet patents, including claims 1 and 7 of the '459 patent.  *See* ¶¶ 32 and 52 of my moving declaration for a more detailed discussion.  Specifically, such Pinnacle golf balls contain a composition that was made by the process (and within the range of ingredients) specified in claims 1 and 7 of the '459 patent). |
| 1.  the improvement comprising said ionomer resin cover comprising at least about 50 phr of lithium ionomer resin | The Ionomer resin cover comprises as least about 50 phr of a type of resin known as lithium ionomer resin which is further described below.  The term "phr" means parts by weight based on 100 parts by weight of resin.  *See e.g.*, Col. 2, line(s) 8-18 and Col. 2, line(s) 27-30. | See above. |
| 2.  which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by | The lithium ionomer resin is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid.  The | See above. |

21

| | | |
|---|---|---|
| weight of the copolymer of acrylic or methacrylic acid | term "copolymer" means the product of polymerization of two or more substances at the same time. *See e.g.*, Col. 2, line(s) 30-33. | |
| 3.  in which about 10% to about 90% of the acid groups are neutralized by lithium; | The acid groups are neutralized by lithium. *See e.g.*, Col. 2, line(s) 33, lines 41-49 and line(s) 60-64. | See above. |
| 4.  and about 10 to about 50 phr of sodium ionomer resin which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by sodium. | About 10 to about 50 phr of sodium ionomer resin, which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups, are neutralized by sodium. *See e.g.*, Col. 2, line(s) 35-40. | See above. |

## Claim 7

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In a golf ball product comprising a core and a cover the improvement comprising | This claim is broadly directed to a golf ball product comprising a core and a cover, wherein the improvement comprises the steps described in the remainder of the claim. *See e.g.* Col. 3, line(s) 29-34, and Col. 4, line(s) 7-29. | See above. |
| 1.  at least 90% by weight of said cover being made from a blend of ionomer resins | At least 90% by weight of said cover is made from a blend of ionomer resins. *See e.g.*, Col. 3, line(s) 14-19. | See above. |

22

| 2. said blend comprising: (i) at least about 50 phr of a lithium ionomer resin | The blend of ionomer resins comprises at least about 50 phr of a lithium ionomer resin. *See e.g.*, Col. 2, line(s) 8-18. *See* definitions presented in connection with the claim construction of claim 1 of the '459 patent for the definition of "phr." | See above. |
| 3. which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by lithium; and | The lithium ionomer resin is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by lithium. *See e.g.*, Col. 2, line(s) 30-34, line(s) 60-64 and line(s) 41-44. | See above. |
| 4. about 10 to about 50 phr of a sodium ionomer resin which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by sodium; and | About 10 to about 50 phr of a sodium ionomer resin which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups, are neutralized by sodium. *See e.g.*, Col. 2, line(s) 35-40. | See above. |

23

| | | |
|---|---|---|
| 5. up to about 10% by weight of said cover comprising one or more additional ingredients selected from the group consisting of other ionomers, other resins, titanium dioxide, dyes, UV absorbers and optical brighteners. | The cover additional comprises up to about 10% by weight, of one or more additional ingredients selected from the group consisting of other ionomers, other resins, titanium dioxide, dyes, UV absorbers and optical brighteners. *See e.g.*, Col. 3, line (s) 14-26. | See above. |

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION**

NITRO LEISURE PRODUCTS, L.L.C.,
d/b/a GOLFBALLSDIRECT.COM and
SECOND CHANCE,

                Plaintiffs,

vs.

ACUSHNET COMPANY,

                Defendant and Cross
                Claim Plaintiff,

vs.

NITRO LEISURE PRODUCTS, INC.,
d/b/a LEISURE PRODUCTS, INC. and
NITRO GOLF,

                Cross Claim Defendant.

_____ /

ACUSHNET COMPANY,

                Plaintiff,

vs.

NITRO LEISURE PRODUCTS, L.L.C. d/b/a
GOLFBALLSDIRECT.COM and SECOND
CHANCE, and NITRO LEISURE SERVICES,
L.L.C. d/b/a NITRO GOLF and
NITROGOLF.COM,

                Defendants.

_____ /

**FILED**

**JUN 1 2 2002**

RK. USDC / SDFL

Case No. 02-14008-CIV-
MIDDLEBROOKS

Case No. 02-14091-CIV-
MIDDLEBROOKS

## DECLARATION OF FRANK THOMAS IN SUPPORT OF ACUSHNET
## COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION

FRANK THOMAS, declares as follows:

1.      I have been retained by the law firm of Greenberg Traurig, LLP ("GT"), counsel for Acushnet Company ("Acushnet") to provide expert analysis, opinion and testimony with respect to the United States Golf Association's ("USGA") rules and policies governing golf ball construction, as well as the testing of golf ball performance utilizing the "Iron Byron" mechanical golfer.

2.      I understand that this declaration is being submitted in support of Acushnet's motion for a preliminary injunction to enjoin Nitro Leisure Products, LLC's (d/b/a Golfballsdirect.com, Second Chance, Nitro Golf and Nitrogolf.com) ("Nitro") production and sale of remanufactured golf balls, which infringe Acushnet's trademarks and patents.

3.      I completed all the prerequisites, at Kalamazoo College in 1966, for entry to Medical School.  I was rejected, but accepted into to Dental School.  I changed my major and attended Western Michigan University where I studied Mechanical Engineering and graduated in 1968 with a BS in Mechanical Engineering and Technology.

4.      I have been employed in the golf industry and administration since 1966, first with Shakespeare Sporting Goods Company where I invented the graphite golf club shaft while functioning as the company's Chief Design Engineer.

5.      From 1974 to 2000, I was employed by the USGA as its technical director. In this position, I was responsible for, among other things, setting and enforcing the USGA's equipment standards designed to preserve the integrity of the game of golf. Specifically, I wrote for adoption the USGA's rules and policies governing golf ball and club design and performance.

6.      With the assistance of a highly skilled group of engineers, I designed the Overall Distance Standard for golf balls adopted by the USGA in 1976 to enforce its rules.  During my tenure with the USGA, I used the Iron Byron on a regular basis for measuring, among other things, a golf ball's compliance with the USGA's rules governing performance.  I believe the Iron Byron provides an excellent means for observing and quantifying a golf ball's overall performance (e.g., carry, distance, trajectory, accuracy, etc.), as well as a valuable tool for comparing these qualities with those of various other golf balls.

7.      I am advised that Nitro objects to David L. Felker's ("Felker") use of the Iron Byron, and Felker's adjusting of Iron Byron to the settings established and utilized by the USGA for testing golf ball compliance because Nitro alleges that: (a) such settings unfairly effect the results by accentuating the aerodynamic differences between Nitro's remanufactured golf balls and Acushnet's genuine counterparts; and (b) the disputed settings are not representative of the average golfer.  I disagree.  The Iron Byron is a device used to launch golf balls in a manner similar to how a golfer would launch a golf ball.  Golfers vary so much in their launch conditions that one cannot establish an average to encompass all golfers launch conditions.  If one is trying to determine whether there are differences in performance between balls any set of launch conditions within the range of the mechanical golfer "Iron Byron" will be within the range of golfers and therefore not a condition which outside of that which will be experienced in the game of golf.

8.      The USGA Iron Byron settings are not set for the "average golfer" because no such setting has been determined or can be determined on a reliable basis.

658358v4

3

9.     While a particular golfer's skill level is often judged by the golfer's handicap (a number derived through the averaging of such player's scores, considering certain other factors including the difficulty of the courses played in accumulating these same scores), this value is <u>not</u> a proper gauge for establishing the swing dynamics exhibited by the "average golfer" for testing golf balls.  Specifically, the average handicap is currently somewhere between 16 and 17.  However, a 17 handicapper could theoretically drive a golf ball 280 or more yards, whereas another 17 handicapper may only be able to hit the same golf ball 180 yards with the same club.  Further, some players may exhibit superior skills on the putting green but inferior skills out of a bunker.  Others might not perform well when using a driver but perform very well when using long irons.  One can establish an average age for golfers as there is little dispute about the accuracy of this information, but the range in performance of golfers is so diverse that an average is almost meaningless when it comes to actual performance.

10.     Indeed, the range  is so large that it is very likely that there are a significant number of 17 handicap level golfers who are able to generate club head velocities equal to or greater than 109 mph.  Further, the same may be held true for professionals.  For instance, while Tiger Woods swings up in excess of 125 mph, there are a number of professionals that generate club head velocities considerably less than 109 mph.

I declare, under penalty of perjury that the foregoing is true and correct.

Chester, New Jersey
Date: June _10_, 2002

Frank Thomas

658358v4                                 4