IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 02-14008-CIV-MIDDLEBROOKS

IN RE:  NITRO LEISURE PRODUCTS, L.L.C./



## DEFENDANT/COUNTERCLAIMANT'S PROPOSED FINDINGS
## OF FACT AND CONCLUSIONS OF LAW



1

Defendant/Counterclaimant, Acushnet Company hereby submits its proposed findings of fact and conclusions of law in the above-captioned matter.

## I.
## FINDINGS OF FACT

### A.      The Parties

1.   Plaintiff/Counterclaim Defendant, Nitro Leisure Products, L.L.C. ("Nitro"), is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business in Stuart, Florida. *See* Declaration of Amin C. Khoury, dated May 15, 2002 ("Khoury Dec.") ¶ 2. Nitro also does business under the names golfballsdirect.com, Nitro and Second Chance. *See* Acushnet's Amended Answer, Affirmative Defenses and Counterclaims, ("Amended Counterclaims"), ¶ 99; and Nitro's Answer and Affirmative Defenses to Amended Counterclaims ("Answer to Amended Counterclaims"), ¶ 99.

2.   Defendant/Counterclaimant, Acushnet Company ("Acushnet") is a corporation organized and existing under the laws of the State of Delaware. *See* Amended Counterclaims, ¶ 98.

### B.      Procedural History

3.   Nitro filed the instant action on January 10, 2002 for, *inter alia*, claims alleging violations under the false advertising, product disparagement, and unfair competition laws of the United States and for related claims alleging violations under Florida statutory and common law. *See* Verified Complaint.

4.   Acushnet filed its Counterclaims on March 19, 2002 for patent infringement, trademark infringement, trademark dilution, unfair competition and unjust enrichment seeking preliminary and permanent injunctive relief and damages relating to Nitro's (1) infringement and counterfeiting of Acushnet's trademarks; and (2) infringement of Acushnet's patents. *See* Defendant's Answer to Complaint, Affirmative Defenses, Counterclaims and Cross Claims.

5.   Nitro served and filed its Amended Complaint on April 26, 2002, adding claims alleging antitrust violations under Section 2 of the Sherman Act, 15 U.S.C. §2.

6. Acushnet served and filed its Amended Answer, Affirmative Defenses and Counterclaims on June 3, 2002.

7. Nitro served and filed its Answer to Counterclaims on June 9, 2002. *See* Nitro's Amended Answer to Counterclaims.

**Golf Ball Construction and The Golf Industry**

8. "A golf ball's performance dwarfs that of any other ball in sport." The golf ball is the most technologically-advanced ball of any sport and contains "high technology materials engineered into high precision airframes with high performance flight capabilities." Declaration of George E. Sine, dated April 12, 2002 ("Sine Dec."), ¶4, Ex. A; *see also* Declaration of William E. Morgan, dated April 19, 2002 ("Morgan Dec."), ¶¶ 14-24.

9. Golf balls -- depending on whether they are of one, two or three-piece (*i.e.*, wound or solid multi-component) design -- have two or more of the following components: (a) the core (sometimes comprising of an inner and outer core); (b) the casing or windings (inside layer around the core); (c) the cover; (d) the dimple design; and (e) a highly specialized coating (collectively, the "components"). Morgan Dec., ¶¶ 14, 15.

10. The slightest variance in either composition or application of any one of these golf ball components can create measurable differences in golf ball flight and otherwise substantially affect a golf ball's performance characteristics, including distance, spin, feel, dispersion, control, flight qualities (*e.g.*, trajectory), roll and durability. Morgan Dec., ¶¶ 15, 16, 17, 19, 20, 22, 23, 24, 38.

11. For example, dimple patterns and coating systems are two golf ball components that are so significant to a golf ball's performance that many golf ball manufacturers, including Acushnet, research and develop patented dimple patterns and coating systems to achieve superior golf ball performance and gain a competitive advantage in the marketplace. Morgan Dec., ¶¶ 20, 21, 22, 24, 38.

12. Slight changes in the dimple pattern or in the composition or application of coatings (paint and/or clear coat) covering the dimples will affect a golf ball's

performance and aesthetics and may affect whether a golf ball conforms to United States Golf Association ("USGA") rules.  Morgan Dec., ¶¶ 22, 23, 24, 38.

13. If a model of golf ball does not meet USGA rules relating to golf ball construction -- such as weight, size, spherical symmetry, initial velocity and overall distance standard -- it can be declared non-conforming and stricken from tournament play.  Morgan Dec., ¶¶ 9-12.

14. Today, a wide variety of golf balls are available to meet the needs and desires of golfers. While each golfer seeks specific golf ball performance characteristics depending on the type of swing, style of play, golf course type and weather conditions, virtually all golfers look first and foremost for distance (and related flight qualities such as trajectory) and then feel, spin and roll (often referred to, collectively, as "control"). Morgan Dec., ¶¶ 13-18; Sine Dec., ¶¶ 5-6 and 8; and Declaration of John W. McNamara, dated April 14, 2002 ("McNamara Dec."), ¶¶ 7-9, 11 and Ex. C.

15. The number one sought-after golf ball performance characteristic is distance. McNamara Dec., ¶¶ 7-9 and 11.  The distance a golf ball travels is so critical to the success of a golf ball model that the golf industry allocates millions of dollars in advertising to tout the distance of a golf ball. Sine Dec., ¶¶ 6, 8, Exs. C, E, G-I, L; and McNamara Dec., ¶¶ 7-9 and 11.

16. After distance, most consumers believe that control -- which includes feel, spin and roll -- of a golf ball is the most important characteristic. *See* McNamara Dec., ¶¶ 7-9 and 11; Sine Dec., ¶ 8, Exs. C, E, G, H, I, L.

17. When it comes to a golf ball's distance, a difference of as little as one yard can be seen as significant. Sine Dec., ¶ 7 and Exs. H, J, K.

18. To sustain sales, the golf ball must also be seen as consistent in performance, durable and having a good cosmetic appearance. McNamara Dec., ¶¶ 8 and 11.

19. Because brands communicate a certain level of performance and consistency in performance to consumers, brand preferences, and perceptions about the manufacturer, are extremely strong motivators, *i.e.*, a strong brand and brand loyalty drives golf ball sales. Sine Dec., ¶¶ 9-12, Ex. M; and McNamara Dec., ¶¶ 8, 12, Exs. A, D.

4

20. Maintaining brand loyalty becomes more critical in the current golf ball market, where: (1) roughly 33-40% of golf product consumers are price sensitive and look for less expensive golf ball products, particularly if those balls have patented technology that can only be found in more expensive, higher-end (*i.e.*, Titleist) balls; and (2) expansion in the golf market appears to be limited. In recent years, new golf ball sales increased only minimally. From 2000 to 2001 -- the most recent years for which statistics are available -- there was an increase in unit sales of only 3.7%. During that same period of time, golf ball sales, as measured in dollars, decreased from $795.7 million (wholesale dollars) in 2000 to $791.9 million in 2001. Based on the National Golf Foundation's projection that the number of golfers and the rounds played will increase only 1% to 2% annually over the next decade, the market is not likely to significantly increase in the near future. Sine Dec., ¶¶ 26,27 and 42; and McNamara Dec., ¶12.

### Acushnet's Manufacture and Sale of Titleist and Pinnacle Golf Balls

21. Acushnet's founders began making golf balls with the goal of producing a better performing, more consistent product for themselves and the public. Since that time -- almost 70 years ago -- Acushnet has continued its commitment to live up to these exacting standards. As a result, Acushnet has consistently been the technological leader in its product lines and is known for selling golf balls that consistently perform within a given model-type. Sine Dec., ¶¶ 14 and 17; and Morgan Dec., ¶¶ 26,28.

22. Today, Acushnet is the world's leading manufacturer and supplier of golf equipment, including, in particular, golf balls marketed under the Titleist Marks (as defined in ¶ 38, *infra*). Sine Dec., ¶ 13; Morgan Dec., ¶ 25; Nitro's Opposition to Acushnet's Motion for Preliminary Injunction ("Nitro Opp.") at 1, 2, 7.

23. Acushnet has been manufacturing and selling golf balls under its federally registered Titleist Marks for almost 70 years. Acushnet has been manufacturing and selling golf balls under the TITLEIST name and trademark since 1935 and under the PINNACLE name and trademark since 1934. TITLEIST and PINNACLE golf balls have become Acushnet's best-known products. Sine Dec., ¶ 13; and Morgan Dec., ¶ 25.

24. Acushnet expends considerable resources -- including over $85 million in the last three years alone -- to market its goods and promote its reputation and goodwill. Sine Dec., ¶ 22; Nitro Opp., at 7. Acushnet's advertisements appear in the major golfing magazines, such as *Golf Magazine*, *Golf Digest*, *Golf World* and *Sports Illustrated*, general audience magazines such as *ESPN The Magazine* and newspapers, such as *USA Today*. In addition, Acushnet advertises its TITLEIST and PINNACLE golf balls on National and local television, local radio, as well as through collateral materials and trade show exhibitions. Sine Dec., ¶ 22, Ex. T.

25. As a result of its investment in superior technological innovation, the high quality of its products, and the resources expended in marketing its golf balls, Acushnet has enjoyed great success as the market leader in golf ball sales, selling approximately 25 million dozen TITLEIST and PINNACLE golf balls in 2001. Sine Dec., ¶ 23. *See also* Nitro Opp., at 7.

26. Acushnet's sales represented over 49% of the combined on-and-off-course market for new golf balls, based on dollar value, in the 12 months between February 2001 and January 2002. Sine Dec., ¶ 23, Ex. U.

27. The TITLEIST golf ball model designated PRO V1 is the most successful golf ball in all of Acushnet's (as well as the golf industry's) history, and has been the number-one selling golf ball in the United States' combined on-course and off-course channels since February 2001, following its introduction in November 2000. Amended Counterclaims, ¶ 102; Nitro's Answer and Affirmative Defenses to Amended Counterclaims, Answer to Amended Counterclaims ¶ 102; Sine Dec., ¶ 23; and Nitro Opp., at 3.

28. As of January 2002, Titleist's PRO V1 represented 14.4% of the combined on and off course market based on units sold. The next best selling golf ball was Bridgestone's MC Lady (8.3%), followed by Titleist's NXT Distance (5.0%) and Pinnacle's Gold Distance (4.9%) models. Sine Dec., ¶ 23, Ex. V.

29. This market success has considerably strengthened the Titleist Marks, including the Model Side Stamp marks, and Acushnet's good will. Golf balls bearing the Titleist Marks have earned a reputation for superior and industry-leading technological

performance, high quality, innovation, durability, reliability, value and, above all, consistency.   Specifically, as a result of Acushnet's efforts, TITLEIST brand golf balls:

- have the most wins on the Professional Golfer's Association ("PGA") Tour and the winners of 11 out of 15 events on the 2002 PGA Tour used TITLEIST Pro V1 golf balls;

- are consistently viewed among golfers as having the greatest distance and best feel (the two most important performance attributes to consumers), *see* Sine Dec., Ex. N;

- are seen as the most technologically innovative, *see* Sine Dec., Ex. N; and

- have been consistently rated number one by Golf Datatech in unaided awareness by consumers, having 91% unaided awareness in the most recent study.  (Golf Datatech Attitudes and Usage Summer 2000 Ball Report) (Sine Dec., Ex. M).

Sine Dec., ¶ 24.

30. Acushnet's investment in superior technological innovation, high-quality products and marketing has created substantial brand loyalty in the TITLEIST and PINNACLE brands, thus allowing Acushnet substantial sales and revenues from repeat customers.  For example, one study conducted at the direction of Acushnet, shows that the majority of TITLEIST DT ("DT" defining a particular model of TITLEIST golf balls) golf ball users are very committed to the model and have played these golf balls, in many cases, consistently for over ten years.  Sine Dec., ¶ 25; and McNamara Dec., ¶ 8.

31. Many of the TITLEIST DT golf ball users attributed their loyalty to the consistent performance they get from these golf balls and the level of comfort they derive knowing that the golf ball will consistently perform each time it is played.  Sine Dec., ¶ 25; McNamara Dec., ¶ 8.

32. Maintaining a positive consumer perception of the consistency of performance of Acushnet's various golf balls is essential to Acushnet's position as a market leader. Sine Dec.¶ 25.

33. Maintaining brand loyalty becomes more critical in the current golf ball market, where expansion appears to be limited.  Sine Dec., ¶ 26.

GREENBERG TRAURIG, P.A.

34. The National Golf Foundation found that new golf ball unit sales increased only .6% from 1997 to 1998, 8.3% from 1998 to 1999, 1.4% from 1999 to 2000 and 3.7% from 2000 to 2001. Golf ball industry sales increased marginally from $658 million (wholesale dollars) in 1997 to $791.9 million in 2001. Sine Dec., ¶ 26, Ex.,W.

35. Golf ball manufacturers, including Titleist, are aware of this limited market and believe that for one company to grow, it must take business from another. Sine Dec., ¶ 26. In *Golf World Business, May, 2000* article Wally Uihlein, President & CEO, Titleist states "Growth in the ball industry 'can only occur at someone else's expense. Hence we take all competition very seriously.'", and In the *Golf World Business*, June 2000 article, Eddie Binder, EVP of Spalding says "The business of golf has become a market share game. For one company to grow, it must take business from another.... Our rationale is the $700 million ball category isn't growing." Sine Dec., ¶ 26.

36. While Acushnet's TITLEIST brand has maintained its position as the market leader, its share of the market has remained between 31-32% in unit sales in the five years between 1997 and 2001. Sine Dec., ¶ 27.

37. The market is not likely to increase significantly in the near future as the National Golf Foundation projects that the number of golfers and the rounds played will increase only 1% to 2% annually over the next decade. Sine Dec., ¶ 27; Ex. X, p. 61.

38. Acushnet owns the TITLEIST, PINNACLE and ACUSHNET trademarks and trade names, and these marks, as well as Acushnet's DT trademark, are registered with the United States Patent and Trademark Office and have become incontestable. Acushnet's other trademarks, including PRO V1, DT DISTANCE, DT WOUND and NXT, are common law trademarks, which have become well-known through Acushnet's extensive and continuous use (all of Acushnet's trademarks are referred to, collectively, as the "Titleist Marks"). Golf balls bearing the PRO V1, DT DISTANCE and NXT trademarks are among the most distinct and recognizable models of TITLEIST brand golf balls offered by Acushnet. Sine Dec., ¶ 15, Exs. N, O.

39. Acushnet's research and development ("R&D") efforts are a key driving force behind the success of Acushnet and its golf balls. Acushnet has devoted and continues to devote a great deal of time and resources -- including millions of dollars and thousands of

man hours -- every year to its R&D activities to maintain its leadership role in golf ball technology. As part of this effort, Acushnet has developed and sought to protect over 100 patents relating to, among other things, novel golf ball constructions, golf ball configurations, golf ball components (including cores, coverings, windings, dimple patterns, paints and clear coats), and various methods and apparatuses for golf ball manufacture and testing. Morgan Dec., ¶¶ 26-30; and Sine Dec., ¶¶ 16 and 17.

## Acushnet's Patents

40. Acushnet has developed and protected its intellectual property rights in its technology by obtaining a substantial number of patents (over 100 patents) relating to novel golf ball constructions, golf ball configurations, golf ball components (including cores, coverings, windings, dimple patterns, paints and clear coats), and various methods and apparatuses for golf ball manufacture and testing. Morgan Dec., ¶ 32.

41. Acushnet owns the rights in the following patents (collectively, the "Acushnet Patents"), each of which have been asserted against Nitro in the present action:

    a)  U. S. Patent No. 5,609,535 (the "'535 patent" or the "Acushnet Golf Ball Restoration Patent"), entitled "METHOD OF RESTORING USED GOLF BALL." The '535 patent claims, in general, a method for removing the entire dimpled exterior of a golf ball, including all indicia, and replacing it with a new layer of cover material, including dimples, which is substantially equal in thickness to the material removed. As further explained below, Nitro has employed the method claimed in the '535 patent in recovering golf balls made by entities other than Nitro, including Acushnet, and selling them as "new" golf balls under Nitro's own label. Morgan Dec.¶ 32(a), Ex. A.

    b)  U. S. Patent No. 4,846,910 (the "'910 patent"), entitled "PREPARATION OF WOUND GOLF BALL CORES." The '910 patent claims, in general, a method for preparing a wound golf ball core (claims 1 and 2) and a method for securing thread onto a wound golf ball core (claims 3 and 4) using an automatic machine. From the early 1990's to the present, these claimed methods have been used to prepare all Acushnet wound golf balls. Morgan Dec.¶ 32(b), Ex. B.

    c)  U. S. Patent No. 4,770,422 (the "'422 patent"), entitled "COMPOSITION FOR MAKING DURABLE GOLF BALLS AND OTHER PRODUCTS." Claim 1 of the '422 patent is, generally, directed to a golf ball product with a solid core manufactured by using a certain proportion (in a specified range) of a chemical called a peroxide, free radical initiator to promote cross-linking (strengthening) of the rubber-like polymer material (polybutadiene) that makes up most of the core with a metallic organic

9

acid compound (zinc diacrylate), also used in a certain proportionate amount within a specified range.(The cores of Acushnet's Pinnacle golf balls are made using this invention. Morgan Dec.¶32(c), Ex. C.

d) U. S. Patent No. 4,546,980 (the "'980 patent"), entitled "PROCESS FOR MAKING SOLID GOLF BALL." Claims 1, 9, 19 and 22 of the '980 patent are, in general, directed to a further development in cross-linking solid golf ball core compositions -- a "dual initiator system." The claims are directed to, e.g., a golf ball product (claim 9) employing two free radical initiators, present in a ratio within a certain range, one of which has a longer half-life than the other at the same temperature, to yield golf balls having a higher initial velocity than if only one of the initiators was used alone. Morgan Dec.¶ 32(d), Ex. D.

e) U. S. Patent No. 4,692,497 (the "'497 patent"), entitled "PROCESS FOR CURING A POLYMER AND PRODUCT THEREOF." Claims 8, 10, 12 and 13 of the '497 patent (which is a divisional of, and has the same specification as, the '980 patent) are directed, in general, to solid cross-linked polymer products made using at least two free radical initiators, one having a half life that is three times longer than the other at the same temperature. The cores of Acushnet's Pinnacle golf balls are made using this invention. Morgan Dec. ¶ 32(e), Ex. E.

f) U. S. Patent No. 5,000,459 (the "'459 patent"), entitled "GOLF BALL COVER." Claim 1 (and the other claims) of the '459 patent are directed, in general, to a golf ball having a cover made of a certain lithium Surlyn® composition. The covers used on both Acushnet's Titleist DT family and Pinnacle golf balls are made using a composition that balls, respectively, within the ranges claimed in this patent. Morgan Dec.¶ 32(f), Ex. F.

42. Acushnet does not generally make a practice of licensing its golf ball technology. Acushnet does not regard patent licensing as important in driving Acushnet's revenues, but relies upon the development of innovative products and the selling of originally manufactured Acushnet golf ball products, which incorporate patented or otherwise proprietary technology, to drive its revenues. Morgan Dec., ¶ 31.

43. Acushnet has never granted a license on the '535 Golf Ball Restoration Patent or on the '910, '422 or '459 Golf Ball Composition and Process Patents. Morgan Dec., ¶ 31.

44. The indicia of patent-validity in this matter include, the tremendous commercial success experienced by Acushnet in connection with its sale of its golf balls, which incorporate the technology claimed in the patents in suit. Sine Dec., ¶¶ 16, 23, 14; Morgan Dec., ¶¶ 32, Ex. A-F.

**The Pond Ball Industry**

45. Various industry sources estimate that golfers lose -- mainly to water and other hazards on golf courses -- between three to six balls per round of golf played. Based upon the National Golf Foundation's estimate that 570 million rounds of golf were played in 2000, it follows that roughly 214 million dozen -- or 2.56 billion -- balls were lost that year alone. Many of these "Pond Balls," are reclaimed, washed and resold as used balls. Sine Dec., ¶¶ 28, 29, Ex. Y.

46. Consumers generally are familiar with Pond Balls as being reclaimed and washed, and may use them around water hazards or as a less expensive alternative to new, unused balls. Consumers who buy these washed Pond Balls, at the very least, expect that the balls will perform very similarly to the original performance characteristics they have come to expect from the brand name on the ball. Sine Dec., ¶30; *and see also* Declarations of Vickie Hasenstaub, dated April 19, 2002 ("V. Hasenstaub Dec."), Andy Hasenstaub, dated April 19, 2002 ("A. Hasenstaub Dec."), and Steven Wunderlich, dated April 12, 2002 ("Wunderlich Dec.").

**Nitro's Unauthorized Manufacture and Sale of Golf Balls**

47. Nitro is one of the largest distributors of Pond Balls in the United States, claiming to have sold over 100,000,000 "reconditioned" Pond Balls, including those originally manufactured by Acushnet and others. Sine Dec., ¶ 31, Ex. Z.

48. Nitro purchases used golf balls from various vendors who, in turn, have retrieved the balls from golf course hazards, including lakes and ponds. Khoury Dec. ¶ 5; *and see* Declaration of John W. Jepson, dated May 15, 2002 ("Jepson Dec.") ¶ 18.

49. Nitro then claims to wash the golf balls to remove materials such as mud, sticks, insects, fish, algae and golf course chemicals (Khoury Dec. ¶ 5); and sorts and categorizes the golf balls by groups of approximate value. Khoury Dec. ¶ 6; Jepson Dec. ¶ 19.

50. According to Nitro, the golf balls that are in "sufficiently good condition" are removed, repackaged and re-sold as used or "recycled" golf balls. "Recycled" golf balls are merely washed golf balls. Khoury Dec. ¶¶ 4, 8; Jepson Dec. ¶ 21.

51. Also according to Nitro, the remaining golf balls which suffer from one or more of the following detriments: scuff marks, cart path marks, tree marks, lack of clear coat or discoloration (Khoury Dec. ¶ 8; Jepson Dec. ¶ 21), are further processed as follows:

   a) Nitro removes the base coat paint and/or the clear coat from the golf balls, which also has the effect of removing the markings on the balls (Khoury Dec. ¶ 9; Jepson Dec. ¶ 22);

   b) Nitro then re-applies one or more base coats of white paint (if the ball originally had a base coat of paint) (Khoury Dec. ¶ 10; Jepson Dec. ¶ 23) (Morgan Dec., ¶ 49(a)-(c);

   c) Nitro then re-stamps the golf balls with what they deem to be "appropriate" markings. Khoury Dec. ¶ 10; Jepson Dec. ¶ 23. The re-stamped markings purportedly appear in the same font, size, and type as they appeared on the golf balls before the remanufacturing process. Khoury Dec. ¶ 10;

   d) Following the re-stamping, Nitro re-applies the clear coat. Khoury Dec. ¶ 13; Jepson Dec. ¶ 25.

Nitro then labels these golf balls as "Refurbished." Khoury Dec., ¶ 11; Jepson Dec., ¶ 24.

52. Nitro re-stamps the model type only for some of the models, such as the Pro V1 model of golf ball. Khoury Dec., ¶ 10; Jepson Dec., ¶ 23. On other models of golf balls, such as the Titleist DT family *(e.g.,* Titleist DT 2-Piece, Titleist DT Wound, Titleist DT Spin, and Titleist DT Distance), the model type is not reapplied. Khoury Dec., ¶ 10; Jepson Dec., ¶ 23.

53. Nitro routinely markets Refurbished or "Remanufactured"golf balls in the marketplace with substantial disregard for the model designation and integrity, miss-marking or failing to mark the Refurbished or Remanufactured golf balls, which allows the consumer, with genuine TITLEIST golf balls, to identify the golf ball with the characteristics that consumer is seeking. Morgan Dec. ¶¶ 49, 50.

54. These remanufactured golf balls are then labeled as "refurbished" golf balls ("Remanufactured TITLEIST golf balls"). Khoury Dec. ¶ 11; Jepson Dec. ¶ 24.

GREENBERG TRAURIG, P.A.

55. Finally, Nitro sells a third type of golf ball which is labeled as a new "Nitro" brand ball. Nitro "manufactures" these golf balls by removing the exterior outer face layer, including dimples and trademarks from golf balls made by companies other than Nitro, including golf balls made by Acushnet. Nitro then applies with new cover material, including a new dimpled surface. Nitro then sells these golf balls under the Nitro trademarks (including Nitro's "Ultimate Distance" and "Tour Distance Titanium") as "new" ("Reconstructed Nitro golf balls"). Sine Dec., ¶ 32; *and see* Morgan Dec., ¶ 46. As further described below, these reconstructed Nitro-branded golf balls are made using the process claimed in the Acushnet '535 patent; in addition because some of these Nitro-branded golf balls have "insides" that were originals.

56. Nitro admits its "refurbishing" process transforms Pond Balls that are in such bad condition that they would have no value if they were merely washed and sold (Nitro Opp., at 12, 13) into golf balls that appear new, or at least appear as a higher grade of Pond Ball. Nitro Opp., at 2, 3, 6.

57. Nitro sells its Recycled TITLEIST golf balls, Remanufactured TITLEIST golf balls, and Reconstructed Nitro golf balls in large box stores, sporting goods stores and retail shops throughout the United States -- including K-Mart; Big Five; Wal-Mart Canada; The Sports Authority; Big Five Sporting Goods; BJ's Wholesale Clubs; JJB's Sports; and Martin Barrier. (Khoury Decl ¶ 17) -- under various brand names such as Second Chance and Tour II. Sine Dec., ¶ 31.

58. The manufacture and sale of Remanufactured TITLEIST golf balls and Reconstructed Nitro golf balls is without the consent of Acushnet. Amended Counterclaims, ¶ 170.

## Result of Nitro's Remanufacture Process on TITLEIST Golf Balls

59. Nitro's remanufacturing process results in a product that, while resembling and marketed as a genuine TITLEIST golf ball, does not have the performance characteristics or aesthetic attributes of a genuine TITLEIST golf ball manufactured by Acushnet under its strict quality control standards and thus is not a genuine TITLEIST golf ball. Morgan Dec., ¶ 49; Declaration of David L. Felker, dated April 22, 2002 ("Felker Dec."), ¶ 23 *and see* Ex. A.

60. Nitro's remanufacturing process destroys the optimized performance of the TITLEIST Pro V1 392 golf ball. The excessively thick paint and clear coat layers are responsible for the Remanufactured golf ball's higher weight and destroying the optimized aerodynamic design and performance (*e.g.*, distance, dispersion, trajectory and roll) of the authentic TITLEIST Pro V1 392 golf balls. Felker Dec., ¶ 30, Ex. A (Report/1; E; 28-29).

61. Nitro's remanufacturing process also destroys the optimized performance of the TITLEIST DT 2 Piece golf ball. The removal of part of this ball's Surlyn® cover resulted in the Remanufactured balls being lighter, smaller, lower in compression and more variable in weight and size than their Washed or New counterparts. This abrasion of the Surlyn® cover destroys the optimized geometries of the dimples and caused the Remanufactured golf balls to have shorter Carry and Total Distance, higher trajectory and more erratic flight than authentic TITLEIST DT 2 Piece golf balls. Felker Dec., ¶ 31, Ex. A (Report/1; D; 26).

62. For example, the Remanufactured TITLEIST golf balls:

a)    ascend to higher altitudes and descend more steeply than New and Washed golf balls, thereby reducing the forward momentum and reducing the golf balls' roll and total distance by as much as 30 yards or more as the same model of authentic TITLEIST golf balls ("New" golf balls) or merely washed TITLEIST Pond Balls ("Washed" golf balls); and

b)    have less accurate flight trajectories, so much so that the Remanufactured TITLEIST golf balls' final resting point ranged across 67.7 yards whereas the Washed and New golf balls were more clustered, ranging across just 36.2 and 38.6 yards, respectively.

Felker Dec., ¶¶ 23-28, Ex. 1.

63. Some of Remanufactured golf balls exceed the USGA weight allowance because of Nitro's sloppy coating and repainting. Felker Dec., ¶¶ 28, 30-32.

64. Nitro's Remanufactured golf balls had a poor aesthetic appearance. Some golf balls were dull and lacked the consistently glossy, smooth, bright and even appearance of their New and Washed genuine Titleist counterparts. Many of these golf balls had damaged covers with substantial cuts and creases that had been filled in with paint. Felker Dec., ¶¶ 28, 29, Ex. A (Report/1; D; 26). Still others had surface

14

contaminants and debris embedded in their paint and/or clear coat (e.g., dirt and tissue paper). Felker Dec., ¶¶ 29 Ex. A (Report/1; D; 26). Covers on the Remanufactured TITLEIST golf balls have peeled off and other golf balls have flaking, lumping, blistered, thick or irregular paint; foreign matter imbedded in the paint; or yellow pigments -- which were never used by Acushnet on the original manufactured TITLEIST golf balls -- in the paint. A. Hasenstaub Dec., ¶ 7; Morgan Dec., ¶ 49, Exs. G, H; and Wunderlich Dec., ¶ 6.

65. The Remanufactured TITLEIST golf balls are deceptively marked in one or more of the following ways:

      a) do not have the Model Side Stamps that all genuine TITLEIST golf balls carry to identify to the consumer what characteristics he/she should expect from the ball;

      b) have Model Side Stamps that do not correctly identify the model of the originally manufactured ball;

      c) have Model Side Stamps randomly placed on the golf ball that do not match the location of the Model Side Stamps as originally placed there by Acushnet;

      d) bear Titleist Marks, but were not originally manufactured by Acushnet; and

      e) bear trademarks of competing manufacturers, but were originally manufactured by Acushnet.

Morgan Dec., ¶49(c)(d)(e)(f), Exs. I, J, K, L.


**Acushnet's Expert Testing**

66. Acushnet is the only party that has submitted testing through its expert witness, Dr. David L. Felker. Through his tests and measurements, Dr. Felker found that Nitro's remanufacturing process, not usual wear and tear, destroyed the optimized performance of the genuine TITLEIST golf balls. Felker Dec., Ex. 1 and ¶¶ 18, 30-32.

67. Dr. Felker tested the golf balls using three (3) models of Remanufactured golf balls marked as TITLEIST brand, comparing them to the same, -- or in the case of Nitro's DT 100 model, similar -- model of new and washed TITLEIST brand balls, as shown below:

| Remanufactured Golf Balls | Washed Golf Balls | New Golf Balls |
|---|---|---|
| ProV1 392 labeled "Refurbished By SECOND CHANCE" | ProV1 392 | ProV1 392 |
| DT 2-Piece labeled "Refurbished by GOLFBALLSDIRECT.com" | DT 2-Piece | DT 2-Piece |
| DT 100 labeled "Refurbished by SECOND CHANCE" | DT 2-Piece<br>DT Distance<br>DT Wound 100 | DT 2-Piece<br>DT Distance<br>DT Wound 100 |

Felker Dec., ¶¶ 15-16, Ex. A (Report/1; B, 7 and C; 9).

68. Because Acushnet has manufactured and sold many models in its series of "DT" golf balls, including the DT Wound 90, DT Wound 100, DT Distance, DT 2 piece and DT Spin but, since at least 1995, has not manufactured, offered for sale or sold a Titleist DT 100; for purposes of testing Nitro's Remanufactured TITLEIST brand DT 100 model golf balls, Felker compared these models with Washed and New TITLEIST golf balls in the DT 2-Piece, DT Distance and DT Wound 100 models. Felker Dec., ¶ 17, Ex. A (Report/1; C, 9).

69. Dr. Felker included the Washed golf balls in the testing as a control, to ensure that any conclusions reached with regard to the performance of the Remanufactured golf balls were not attributable to the fact that they were Pond Balls. Felker Dec., ¶ 18, Ex. A (Report/1; C, 9.)

70. Within the groups (New, Washed and Remanufactured) and models of golf balls, listed above, Dr. Felker compared:

    a)  performance attributes, including total distance, total dispersion, carry distance, carry dispersion, roll, trajectory and rear trajectory;

    b)  static qualities, including weight, compression and size; and

    c)  visual appearance.

Felker Dec., ¶ 19, Ex. A (Report/1; C; 9).

71. Within the groups (New, Washed and Remanufactured) and models of golf ball,

Dr. Felker purchased the New TITLEIST ProV1 392 golf balls at the golf pro shop of the Morgan Run Resort & Club located in Rancho Santa Fe, California; received certain of the Remanufactured DT 2-Piece golf balls and, Remanufactured and Washed ProV1 392 golf balls, as well as New DT 2-Piece, New DT Distance, New DT Wound golf balls from Acushnet; and received Washed and/or Remanufactured ProV1 392, DT 2-Piece, DT 100, DT Distance and DT Wound golf balls from counsel for Acushnet or directly from investigators. Felker Dec., ¶ 20.

72. Dr. Felker measured and compared the following golf ball performance attributes as between the same or similar models of New, Washed and Remanufactured balls:

> a) *total distance* meaning the distance from the point of club impact to where to golf ball comes to rest ("Total Distance");
>
> b) *carry distance* meaning the distance from the point of club impact to where the golf ball first hits the ground ("Carry Distance");
>
> c) *total dispersion* meaning the total distance traveled by the golf ball right or left of the imaginary centerline that runs from the point of club impact straight out to the imaginary point where the golf ball would have landed if it had flown perfectly straight ("Total Dispersion");
>
> d) *carry dispersion* meaning the distance right or left of the golf range's imaginary centerline at the golf ball's landing point ("Carry Dispersion");
>
> e) *rear trajectory* meaning a relative measurement of a golf ball's peak height during flight ("Rear Trajectory");
>
> f) *trajectory* meaning the flight path of a golf ball ("Trajectory"); and
>
> g) *roll* meaning the mathematical difference between the Total Distance and Carry Distance ("Roll").

Felker Dec., ¶ 21, Ex. A (Report/2; 2; appendix 2).

73. Dr. Felker carefully designed and monitored these tests to eliminate, as much as possible, any opportunity for external factors -- outdoor temperature, golf ball's temperature, golf club's head speed, wind speed and direction -- bias and/or the occurrence of random or systematic errors from affecting the test results. For example, he:

GREENBERG TRAURIG, P.A.

a) Used a "randomized-block test" design (*e.g.*, random testing of the various types and models of golf balls in discrete groups, each group having the same number of each model and type of golf ball). Report/1; C; 9.

b) Used a mechanical golfer ("True Temper" robot, also known as the "Iron Byron"), to hit each golf ball.

c) Directed the manufacture of a Titleist 975J 9.5 degree loft driver with a Dynamic Gold™ steel shaft to use in the testing.

d) Regularly cleaned the club face throughout the testing to remove any residue left behind from the prior golf ball-club impacts.

e) Prepared the mechanical golfer to approximate the conditions of the USGA Standard Driver Test, including 160 mph initial golf ball launch speed (speed the golf ball leaves the club at immediately after impact), which equates to approximately 109 mph club head speed (rate mechanical golfer set to swing club), 10 degree initial golf ball launch angle (the angle that the golf ball is launched at immediately upon impact with the club), and 2520 rpm initial golf ball backspin rate (the rotation of the golf ball caused by impact with the club).

f) Set up and calibrated the mechanical golfer using New Pinnacle Gold LS golf balls at the start of, and throughout, the testing process ("Calibration golf balls").

g) Maintained the temperature at 23 degrees Celsius for each of the golf balls tested by keeping them in an incubator at all times prior to testing.

h) Used a Geodimeter -- a standard survey tool used to accurately determine the distance between two points -- to measure the carry distance, total distance, carry dispersion and total dispersion for each golf ball tested.

i) Used Titleist's proprietary camera and computerized monitoring system to measure the rear trajectory for each golf ball. This system was calibrated and centered at the start of each day of testing.

j) Periodically recorded wind direction, wind speed, outdoor temperature and the time of measurement, noting any patterns or notable changes in the wind's behavior.

k) Randomly hit, within each block, an equal number of the appropriate model and type of randomly selected the golf balls.

l) Compared the performance data using a complete and integrated system of software -- a widely used and accepted software program available for data analysis -- that provides data management, statistical analysis and graphical presentation tools.

Felker Dec., ¶ 22, Ex. A.

74. Without submitting any testing of its own, Nitro -- through declarations of two purported expert witnesses -- attempts to have Dr. Felker's testing stricken as "unreliable." Nitro Opp., at ¶¶12, 13.

75. One of Nitro's witnesses, Mr. John W. Jepson states he retired from Acushnet, in fact, he was dismissed by Acushnet for failure to discharge his duties as an executive in his position, including his reporting a profit of approximately $200,000 for that Division when, in fact, the Division had sustained a loss of over $1 Million. Declaration of Robert Dubiel, dated June 11, 2002 ("Dubiel Dec."), ¶ 4.

76. Nitro's so-called experts' criticism is contradictory. For example, on the one hand, Nitro's experts criticize Dr. Felker's testing for not introducing the huge variations inherent in the erratic swing of the purported "average golfer" (rather than using the only widely accepted swing-speed standard in the industry); and on the other hand, they criticize Dr. Felker's testing for allegedly not taking into account the relatively minor (when compared with the variations of different golfers' swings) variations introduced by humidity and minor wind conditions. Nitro Opp., ¶ 12; Declaration of Peter J. Piotrowski ("Piotrowski Dec."), ¶¶ 11, 12; *and see* Jepson Dec., ¶ 29, 37.

77. The design of Dr. Felker's testing was developed to reduce the comparative effect of variables caused by humidity and wind conditions. While Dr. Felker performed testing to reflect the actual conditions of a golf course, he employed the randomized-block test design -- a design, accepted in both the scientific and mathematical communities, for controlling extraneous sources of variability -- to account for the differences, not only with respect to humidity, wind conditions and topography (areas of the ground to which the test balls were hit), but also for differences in outdoor temperature and club head speed and direction. Felker Dec., ¶ 22; Declaration of David L. Felker, dated June 11, 2002 ("Supp. Felker Dec."), ¶ 8.

78. "Block" means that the golf balls were tested in small groups, each group having the same number of each model of ball. "Random" refers to the order of testing of the balls within each block. For example, in testing the PRO V1 model of balls, each group consisted of two new PRO V1 golf balls, two Washed PRO V1 golf balls, and two

Remanufactured PRO V1 golf balls. These small groups ensured that the conditions within each block would be virtually identical. Declaration of Colleen Kelly, dated June 11, 2002 ("Kelly Dec."), ¶ 10. Moreover, the balls within each block were randomly selected and randomly tested within that block to further account for outside factors. Felker Dec., ¶ 22; Kelly Dec., ¶ 10; Supp. Felker Dec., ¶ 9.

79. Nitro contends that the Iron Byron does not "reflect marketplace conditions because... the average golfer (and certainly a below average golfer who might be buying Nitro's products) does not swing in the same perfect way every time, always hitting the ball in the 'sweet spot.'" Nitro Opp., at 12-13; Piotrowski Dec., ¶ 12; Jepson Dec., ¶ 37.

80. Nitro fails to suggest an alternative testing method, or submit tests using an alternative method. Nitro also fails to define the "average golfer" or the "below-average golfer" who purportedly comprise Nitro's customer base. *See generally* Nitro Opp.

81. The concerns raised by Nitro regarding use of the Iron Byron are misplaced. The Iron Byron is the most well-accepted and frequently used instrument for testing golf ball and golf club performance in the industry. See also Declaration of Frank W. Thomas, dated June 11, 2002 ("Thomas Dec."), ¶ 7.

82. Using actual golfers, as suggested by Piotrowski and Jepson, would unnecessarily complicate the testing and analysis by introducing major sources of variation (*e.g.*, the inconsistency of the single golfer and the differences between the performance of golfers). Supp. Felker Dec., ¶ 12.

83. Contrary to Nitro's purported concerns, varying the swing speed will not eliminate, or even significantly alter, the fact that Nitro's Remanufactured golf balls are of lesser quality, *i.e.*, traveling less distance, flying more errantly, offering less desirable trajectory, failing to conform with the United States Golf Association's size and weight standards, and possessing poor aesthetic qualities. Supp. Felker Dec., ¶ 13.

84. Nitro also claims that the Iron Byron mechanical golfer was manipulated to generate a swing speed of 109 miles per hour," which is purportedly above the average-swing speed of Nitro's customers. Nitro claims this increased swing speed maximizes any performance differences between the balls. Nitro Opp., at 12.

85. Nitro does not offer what the average swing-speed of its customers are or how it would arrive at such a number. *See generally* Nitro Opp.

86. It is well known in the golf industry, and particularly among golf ball designers, that there is no such average swing speed of an "average golfer." Supp. Felker Dec., ¶ 15. While different manufacturers may have arrived at their own definition of the "average golfer" for their model and brand of ball, this is not an agreed-upon standard in the Industry, and as such would not be appropriate in the type of test I performed in this case. Supp. Felker Dec., ¶ 15.

87. The USGA Iron Byron settings are not set for the "average golfer" because no such setting has been determined or can be determined on a reliable basis. Thomas Dec., ¶ 8. There are, however, many golfers who possess an "average" handicap that generate swing speeds at or in excess of 109 mph. Thomas Dec., ¶¶ 8-10.

88. In Dr. Felker's opinion, higher swing speeds do not in general maximize performance differences between the golf balls. There are so many more parameters that influence the performance of a golf ball relative to another that singling out the swing speed is improper. Supp. Felker Dec., ¶ 17.

89. Dr. Felker also believes that if higher ball spin -- as is found among slower swing-speed golfers – was used, the difference between the performance of the Remanufactured golf balls and the authentic TITLEIST golf balls could be greater. Supp. Felker Dec., ¶ 17.

90. The Remanufactured balls are so negatively altered, Dr. Felker does not believe there are any conditions where they would perform the same as the authentic TITLEIST golf balls. Supp. Felker Dec., ¶ 17.

91. Nitro also claims that Dr. Felker's testing is unreliable because "debris that accumulates on the club head will affect the flight of the ball and as such, Dr. Felker should have instituted a systematic cleaning procedure that included recording the cleaning interval." Piotrowski Dec., ¶ 16.

92. Dr. Felker agrees that debris on the club head may affect the flight of the ball. That is why he systematically -- every 30-70 hits -- cleaned the clubface of the driver.

This cleaning is accounted for in the randomized-block testing format in that any changes in protocol only took place before or after a test block. This ensured that within each block, any outside influences -- including debris on the club head -- were as uniform as possible. Supp. Felker Dec., ¶ 19.

**Actual Confusion**

93. Nitro claims that its typical consumer of refurbished golf balls <u>usually</u> cannot discern any difference in performance between a refurbished "Titleist" golf ball and a new "Titleist" golf ball. Declaration of David McMichael, dated May 5, 2002 ("McMichael Dec.") ¶ 7; Declaration of Ralph Wynn, dated May 10, 2002, ("Wynn Dec.") ¶ 8; Khoury Dec. ¶ 17; Jepson Dec. ¶ 27; Piotrowski Dec. ¶ 20.)

94. Nitro also claims it has had <u>almost no</u> complaints regarding the performance of its refurbished products. Khoury Dec. ¶ 17. Nitro claims it is unaware of any instance where any person or business believed that Nitro was affiliated with Titleist, that Titleist was selling Nitro's refurbished golf balls, or that Titleist sponsored or approved the sale of Nitro's refurbished golf balls. Khoury Dec. ¶ 19. Nitro also claims it is unaware of any instance where a customer believed that a refurbished "Titleist" golf ball was a new "Titleist" golf ball. Khoury Dec. ¶ 19.

95. Nitro finally claims that its refurbished golf balls are a tremendous value to consumers who cannot afford or are unwilling to pay full price for a new "Titleist" golf ball. Declaration of William Scott, dated May 4, 2002, ("Scott Dec."), ¶¶ 4, 5, 10; Declaration of Greg Bauer, dated May 3, 2002, ("Bauer Dec.") ¶¶ 4, 7, 9; McMichael Dec. ¶ 4,5,10,11; Declaration of Kent Sampy, ("Sampey Dec.") ¶¶ 4, 5, 9, 10; Declaration of Scott Curnen, ("Curnen Dec.") ¶¶ 4, 8; Wynn Dec. ¶¶ 4, 5, 12, 13; Jepson Dec. ¶¶ 17, 26.

96. Acushnet is aware of multiple instances of disappointed consumers of Nitro's Remanufactured TITLEIST golf balls who expected that their "Titleist" golf balls would perform differently. These consumers have directed their complaints to Acushnet, thus, further evidencing their belief that Acushnet either produced or approved of the sale of this "Titleist" product. V. Hasenstaub Dec., ¶ 8; A. Hasenstaub Dec., ¶ 10; and Wunderlich Dec., ¶ 8.

97. One instance of confusion involved a purchaser, Steven Wunderlich, who is also a United States Customs Agent. Wunderlich purchased the "Second Chance" golf balls at a Sports Authority in Boynton Beach, Florida. While he noticed the name "Second Chance" was printed on the package and on each ball, and the package stated the balls were refurbished, Wunderlich believed that by "refurbished" the balls were retrieved from various water hazards and chemically washed for re-sale. Based on the pricing, Wunderlich believed the golf balls were used, but since they looked like they were in good condition, his brother purchased the balls for him, knowing that Wunderlich liked to play TITLEIST golf balls. Wunderlich "never suspected that Sports Authority would sell repainted or refurbished balls that did not perform as they should." Wunderlich Dec., ¶ 7. When Wunderlich played the Second Chance TITLEIST balls purchased from the Sports Authority, the paint came off the balls and the black lettering "Titleist" peeled off the ball. He had never seen this happen with a TITLEIST ball before and did not expect it to happen with these balls. In addition, the balls did not feel right and did not perform the way Wunderlich had become accustomed to even used TITLEIST balls performing.   Wunderlich Dec., ¶ 6. Wunderlich contacted Acushnet.

98. A second consumer, Vicki Hasenstaub, purchased Tour 2 TITLEIST golf balls also from The Sports Authority. At the point of sale, she noticed only a nice see-through packaging with golf balls marked with "Titleist." While V. Hasenstaub saw "reconditioned" on the box, she thought, in view of their shiny new appearance, and certain other statements made on the box, that these balls were lost and found and used once maybe twice. She purchased the golf balls as a gift for her husband, believing the golf balls to be genuine TITLEIST golf balls that were slightly used. V. Hasenstaub Dec., ¶ 5.

99. The third consumer, Andy Hasenstaub, received golf balls as a present from his wife, Vicki Hasenstaub. He took them when he played golf with his friends and found that his friends were impressed that they were Titleist and wondered how he could afford Titleist golf balls. Andy Hasenstaub explained that they were used balls, but proudly pointed out that they were a matched set and looked very clean and new. While he saw "reconditioned" on the box, he thought, in view of their appearance and certain

other statements made on the box, that the balls were lost and found and used once maybe twice.  A. Hasenstaub Dec., ¶ 6.

100.     After playing the first golf ball, Andy Hasenstaub knew something was wrong because the cover of the ball was peeling off.  The same thing happened to the second ball he played and the third ball was lost to a hazard.  Ultimately, embarrassed and frustrated, Hasenstaub gave up playing these golf balls in the middle of his round, returning to the pro-shop at the golf club to purchase new golf balls.  A. Hasenstaub Dec., ¶ 7 Ex. B.

101.     It was only after V. Hasenstaub wrote Acushnet that A. Hasenstaub and V. Hasenstaub learned the golf balls V. Hasenstaub had purchased were actually remanufactured by Nitro and not golf balls authorized or inspected by Acushnet.  A. Hasenstaub Dec., ¶ 10.

**Effect of Nitro's Purported Disclaimers**

**A.     On Nitro's Website**

102.     Nitro's website originally carried the following language as a "disclaimer:"

> USED golf balls do NOT fall under the warranty for durability or performance of the original manufacturer. Refurbished balls have been refinished, in our factory, to provide a rejuvenated, pristine appearance. Each ball has been stamped "Refurbished by Second Chance Golf" in order to prevent ANY confusion between refurbished balls, and those of the original manufacturer.

Sine Dec., Ex. BB.

103.     Nitro's current website at **www.golfballsdirect.com** features the following statements:

**A. On Golfballsdirect's Website**

> Refurbished golf balls, like recycled golf balls, are a form of USED golf balls. USED golf balls do NOT fall under the warranty for durability or performance of the original manufacturer. Used/Refurbished Golf balls have no affiliation or endorsement from the original manufacturer. Refurbished balls have been refinished, in our factory, to

provide a rejuvenated, consistent appearance. Each ball has been stamped "Refurbished by Second Chance Golf' in order to prevent ANY confusion between refurbished balls, and those of the original manufacturer. Our refurbished balls come with an our 100% satisfaction assurance, and we hope that our consumers try these products, enjoy their refurbished appearance, extend the life of natural resources, and give us their feedback.

***

The Refurbished PRO VI features a new basecoat, no tinting, and no personal marks. Each ball has been carefully hand sorted several times to ensure consistent quality and a unique, excellent value. The Refurbished Pro V1 is a USED golf ball that has been refinished in our factory. All used/refurbished golf balls do not fall under the original manufacturer's warranty for durability or performance, and have no affiliation or endorsement from the original manufacturer; during processing we apply a "Refurbished by Second Chance Golf" marking to prevent ANY CONFUSION between used/refurbished products from our company, and brand new products. Please note that we have no affiliation with the original manufacturers. Golfballsdirect.com stands behind each used/refurbished product with our 100% satisfaction guarantee, so enjoy the product, and please give us your feedback.

Khoury Dec. ¶ 15, Exs. B and C.  *See also* www.golfballsdirect.com.

**B.    On EBay**

The following disclaimer appears on Ebay in connection with the sale of Nitro's golf balls:

These used & refurbished (see below*) Titleist Pro V1's have been refinished in our factory. These balls have no scuffs, no discolorations, no cart marks, and no personal marks. They have a newly applied base coat, brand/model stampings, and clear coat to give them a consistent, refurbished appearance. (See picture above for a representative example.) Each ball has a side-pole notification that says "Refurbished by Second Chance", in order to avoid any confusion between balls that have been refinished in our factory, and new balls from the original manufacturer. While we stand behind each sale with our 100% guarantee, the original manufacturers' warranty does

25

not apply, and we are not affiliated nor licensed by the original manufacturer . Used balls, including refurbished balls, can play differently from new balls.  Our wholesale division has delivered millions of these types of balls to our nation's leading retailers. Bid & Buy with Confidence! Happy golfing!

Scott Dec. ¶ 5; Curnen Dec. ¶ 5.

## C.      On Nitro's Packaging

104.    Nitro claims that the packaging for Remanufactured golf balls currently bears the following notice, the notice being changed "soon after Acushnet filed its Complaint in this matter."  (Khoury Dec. ¶ 14, Ex. A):

ATTENTION USED/REFURBISHED GOLF BALLS. The enclosed contents of used/refurbished golf balls are USED GOLF BALLS. Used/refurbished golf balls are subject to performance variations from new ones. These used/refurbished balls were processed via one or more of the following steps: stripping, painting, stamping and/or clear coating in our factory. This product has NOT been endorsed or approved by the original manufacturer and the balls DO NOT fall under the original manufacturer's warranty.

105.    In addition, the packaging contains the following markings: "REFURBISHED BALLS;" Second Chance's logo, *i.e.*, a golf ball wearing a swimming mask and flippers; and Nitro's address and telephone number.  Khoury Dec. ¶¶ 11, 14.

106.    While the packaging does not itself contain any of the original manufacturers' markings, such as TITLEIST (Khoury Dec.,  ¶ 14), Nitro does sell its Remanufactured TITLEIST golf balls as "like new" or "almost new" (Sine Dec., ¶33), in packaging consisting primarily of a clear glassine wrap, through which golf balls bearing the Titleist Marks are readily visible.  V. Hasenstaub, ¶ 5, Ex. A; A. Hasenstaub, ¶ 6, Ex. A.

107.    Nitro's prominence of the TITLEIST marks through the glassine window of the packaging uses the TITLEIST name to unfairly compete with Acushnet.  Nitro's tactics also take advantage of the consumers' knowledge and understanding that Pond Balls are merely slightly-used golf balls that have been washed. Sine Dec., ¶ 34; A. Hasenstaub Dec., ¶ 6; V. Hasenstaub Dec., ¶ 5; and Wunderlich Dec., ¶ 7.

## No Disclaimers on Nitro's Remanufactured Golf Balls

108.    No disclaimers are contained on the golf balls sold by Nitro.  Sine Dec., ¶ 36; Morgan Dec., Exs. G-I.

109.    The surface of a golf ball cannot support an adequate legend "to convey the basic changes made to" the ball.  Acushnet Reply Memorandum of Law in Support of Motion for Preliminary Injunction ("Reply Brief"), p.8; *and see* Morgan Dec., Ex. G, H, I.

110.    Nitro claims to have previously stamped the following statement on each ball: "REFURBISHED BY SECOND CHANCE" or "REFURBISHED BY GOLFBALLSDIRECT.COM." Khoury Dec. ¶ 11; Jepson Dec. ¶ 24.  After reviewing Acushnet's Complaint in this action, Nitro changed the notification to read "USED & REFURBISHED BY SECOND CHANCE" or "USED & REFURBISHED BY GOLFBALLSDIRECT.com." Khoury Dec., ¶ 11.

111.    "SECOND CHANCE" is a federally registered trademark.  Khoury Dec. ¶ 12.

112.    Nitro claims that SECOND CHANCE is well-known in the industry as designating used and refurbished golf balls (Khoury Dec., ¶ 12), but offers no evidence of such fame.

113.    A logo, which is also on the golf balls labeled "Second Chance" consists of a golf ball wearing a swimming mask and flippers (which Nitro claims emphasizes that the balls are recovered from golf course hazards), is claimed to be featured on most of the Remanufactured ("refurbished") golf balls.  Khoury Dec. ¶¶ 11, 14.

114.    Consumers buying Nitro's Remanufactured TITLEIST golf balls at the retail level and consumers who only come into contact with the Remanufactured TITLEIST golf balls after they have been taken out of the package, see only the TITLEIST name and Nitro's trademarks and logos.  *See* Scott Dec., ¶ 4; Bauer Dec., ¶ 4; McMichael Dec., ¶ 4; Sampy Dec., ¶ 4; Curnen Dec., ¶ 4; Wynn Dec., ¶ 4;  Wunderlich Dec., ¶¶ 3,4; V. Hasentaub Dec., ¶¶ 5, 6; A. Hasentaub Dec., ¶¶ 4-6.

115.    As the instances of actual consumer confusion demonstrate, the words "Refurbished by Second Chance" hardly accomplish this purpose.  To the contrary, the

mark misleads consumers.  Wunderlich Dec.,¶¶ 3,4; V.Hasentaub Dec., ¶¶ 5, 6; A.Hasentaub Dec., ¶¶ 4-6.

116.    Nitro's tactics of co-branding the golf balls with TITLEIST marks and the SECOND CHANCE trademarks and logos confuse the consumer into believing these balls are being sold by or with the permission of Acushnet.  Wunderlich Dec., ¶¶ 3,4; V. Hasentaub Dec., ¶¶ 5, 6; A. Hasentaub Dec., ¶¶ 4-6.

117.    While Pond Ball purchasers accept that the golf balls are used, they can make their own determination as to the value of the balls by the appearance of those balls, including scuff marks and discoloration.  Nitro's actions thus further deceive consumers by transforming the appearance of the admittedly worst Pond Balls to look as if they are in prime condition.  Wunderlich Dec.,¶¶ 3,4; V. Hasentaub Dec.,¶¶ 5, 6; A. Hasentaub Dec., ¶¶ 4-6.

## Reconstructed Nitro Golf Balls

118.    Nitro represents to the public that its Reconstructed Nitro golf balls are new.  Sine Dec., ¶¶ 33, 34.

119.    The Nitro Ultimate Distance golf balls are not "newly manufactured" golf balls.  Rather, they contain the "insides," *i.e.,* everything below the exterior surface layer of are various makes and models of golf balls originally manufactured and sold  by manufacturers other then Nitro, including Acushnet.  Sine Dec., ¶¶ 33, 34.

120.    During the production of Reconstructed Nitro golf balls, Nitro strips the exterior dimpled surface layer, including all indicia (trademarks) from, among others, used Acushnet-made DT and Pinnacle golf balls and then re-covers them with a substitute dimpled exterior layer on which Nitro stamps its own name.  The new cover is substantially equal in thickness of the material originally removed by Nitro.  This conclusion is readily inferred because Acushnet as well as other golf ball manufacturers produce balls whose diameter conforms to U.S.G.A. rules.  Morgan Dec., ¶¶ 51, 52(g); Sine Dec., ¶ 32.  And likewise, Nitro's reconstructed (re-covered) golf balls have a diameter of 1.680 inches or larger, as required under by USGA rules.  Morgan Dec.,¶ 11. In this manner, Nitro uses the template of a golf ball originally manufactured by others,

including Acushnet, as a basis for reconstructing a golf ball sold as "new" under Nitro's own name. Sine Dec., ¶¶ 33, 34;  Morgan Dec., ¶¶ 46, 51, 52, Exs. N-Q.

121.    Nitro readily admits to re-covering "pre-existing golf ball cores" from golf balls Nitro found in ponds and other hazards. Khoury Dec., ¶ 28; Nitro Opposition, p. 25.

122.    IN addition, Acushnet's visual inspection of the exterior of various models of Nitro golf balls, including Nitro's "Ultimate Distance" and "Tour Distance Titanium" golf balls shows that the covers are injection molded using a retractable pin injection molding cover process, as there were visible artifacts on the cover known as "pin marks." Morgan Dec., ¶ 52, Exs. N-Q.

123.    Cutting the Nitro golf balls in half (cross-sectionally), reveals that virtually every core of Nitro's Ultimate Distance and Tour Distance Titanium golf balls are different. Further, close inspection of the cross-sectioned balls demonstrates that all golf balls bearing the "Ultimate Distance" side stamp and many of the golf balls bearing "Tour Distance Titanium" side stamp have two cover layers. Morgan Dec., ¶ 52, Exs. N-Q.

124.    Many of the Nitro Ultimate Distance and Tour Distance Titanium golf balls have inner cover material that is an entirely different color than the outer white cover (e.g., yellow, orange, pink and varying shades and tones of white. Morgan Dec., ¶ 52, Exs. P, Q.

Virtually each of the Ultimate Distance golf balls had cores of different colors and sizes that were obviously formed using different processes. Some of the cores had their surfaces abraded prior to cover molding; others had not. Morgan Dec., ¶ 52, Exs. Q. And, one of these golf balls had a wound core, which, as is well known by those in the industry, is very unusual due to the fact that one cannot injection mold over a wound core because the force and temperature of the injected cover material would disintegrate the wound core during the molding process. For this reason, there are no commercial examples of golf balls with wound cores having injection molded covers. Morgan Dec., ¶¶ 52(d), (e) 53.

## Nitro's Infringement Of The '535 Patent

125.    Claim 1 of the '535 patent claims:

A method of treating a golf ball having an exterior surface of a predetermined      diameter, a core and a cover composed of cover material having a predetermined      thickness and dimples and indicia on said exterior surface comprising:

(a) removing the entire exterior surface material of said cover and all said      dimples and indicia to reduce the thickness of said cover and provide a      dimple free and indicia free intermediate cover surface; and

(b) adding to said intermediate cover surface a layer of cover material      including dimples which is substantially equal in thickness to the material      removed in step (a).

126.    Nitro's sale or offer for sale in, or importation into, the U.S. of golf balls made by the process of the '535 patent infringes claims 1 and 11 of the '535 patent under 35 U.S.C. § 271(g). Morgan Dec., ¶¶ 32(a), 52(g) and Ex. A.

127.    Nitro has employed the method claimed in the '535 patent in re-covering golf balls originally made by Acushnet, selling them as "new" golf balls under Nitro's own label. Morgan Dec., ¶ 52.

128.    The Reconstructed Nitro golf balls were made by the method claimed in at least claims 1 and 11 of the '535 patent. Claim 11 of the patent is the method of claim 7 (which follows claim 1) and provides that the new layer, which is substantially equal in thickness to the layer that was removed, is added by injection molding the cover material to the intermediate surface. Morgan Dec., ¶¶ 32(a), 52(g) and Ex. A.

129.    Nitro does not remove the entirety of the cover material from the balls. Rather, it only removes the exterior surface layer of the cover material, as taught by the method of the '535 patent. Morgan Dec., Exs. C, D, F, ¶ 52(g)(ii).

130.    Nitro has not shown that the removal of the cover material is not accomplished by any manner other than by the method of the '535 patent. *See* Nitro Opp., at 24, 25 and n. 23.

131.    The diversity among these cores, the presence of two cover layers and the common dimple pattern collectively demonstrate that Nitro uses the '535 patent's

claimed method of removing the entire exterior surface of the golf ball, including indicia, and then adding a substitute dimpled exterior surface. Morgan Dec., ¶ 52, Exs. N-Q.

132.    The Nitro Ultimate Distance golf balls are not "newly manufactured" golf balls.  Rather they were originally various makes and models of golf balls previously manufactured and sold  by manufacturers other then Nitro, including Acushnet.   Morgan Dec., ¶ 52, Exs. N-Q.

133.    As set for the above, Nitro removes the exterior surface layer, including all dimples and indicia from golf balls originally manufactured by other companies.  Nitro then substitutes a new dimpled exterior surface layer applying the new cover material to the intermediate surface formed by removal of the exterior cover layer.  Morgan Dec., ¶ 52, Exs. N-Q.

134.    The thickness of the new layer is approximately equal to that of the layer removed.  The "new" layer of cover material was added employing a retractable pin injection molding process.  The new cover, which is substantially equal to the thickness of the material originally removed, includes dimples.  Morgan Dec., ¶ 52, Exs. N-Q.

### Nitro's Infringement Of The '910, '422, '459, '497 And '980 Patents

135.    At least some of Nitro's Reconstructed golf balls are re-covered using the "insides" of  golf balls originally manufactured by Acushnet, which golf balls are covered by claims of the Acushnet Golf Ball Composition and Process Patents various of the asserted claims of the Acushnet patents specifically cover a "golf ball having" the claimed composition or having a cover or core made by the claimed process.  Everything below the substituted dimpled exterior layer, or "skin," on the Reconstructed Nitro golf balls was made by Acushnet, and a golf ball having those original Acushnet compositions and processes are covered by various claims of the five Acushnet Golf Ball Composition and Process Patents in suit.  Morgan Dec., ¶¶ 46, 51, 52, Exs. N-O; Morgan Supp. Dec. ¶¶ 6-13; Sine Dec., ¶ 32.

136.    Some of the centers and windings (thread) of the Nitro Reconstructed golf balls with wound cores is characteristic of a core manufactured by Acushnet in accordance with the process  claimed in the '910 patent.  Specifically, the color, dimension, surface appearance and winding pattern of this golf ball's core was consistent

with the cores used solely by Acushnet in its Titleist DT ▲ 80, Titleist DT ▲ 90 and Titleist DT ▲ 100 golf balls, from 1995 through 1996.  Morgan Dec., ¶¶ 32(b), 52(e); Morgan Supp. Dec. ¶¶ 8, 10, 11.

137.    Many of the non-wound cores of the Nitro Reconstructed golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls, including Acushnet's Pinnacle Gold.  The construction, composition and/or method of manufacture of golf balls having these cores are the subject of numerous Acushnet patents, including claim 1 of the '422 patent, claims 1, 9, 19 and 22 of the '980 patent and claims 8, 10, 12 and 13 of the '497 patent.  Morgan Dec., ¶¶ 32(c), (d), (e), 52, *see also* Exs., C-E; Morgan Supp. Dec. ¶¶ 6-8, 10-13.

138.    The covers used on both Acushnet's Titleist DT family and Pinnacle golf balls are made using a composition that falls, respectively, within the ranges of those covered by the '459 patent (that covers a "golf ball" having that cover material).  Morgan Dec.,¶¶ 32.  Acushnet's DT wound core and Pinnacle solid core golf balls have a lithium Surlyn® cover composition that falls within claim 1 of the '459 patent.  Morgan Dec.,¶¶ 32(f), 45, Ex. F; Morgan Supp. Dec. ¶¶ 6-8, 10-13.

139.    Acushnet's Pinnacle solid core golf balls have a core made of the compositions and by the processes claimed in the '422, '980, and '497 patents.  Morgan Dec.,¶ 32(c), (d), (e), Exs. C-E.

140.    Acushnet has shown that: (1) certain of the Reconstructed Nitro golf balls that were originally manufactured by Acushnet, were either Titleist "DT" golf balls or "Pinnacle" golf balls, and still have the original "insides" or components of those balls except for the exterior dimpled surface (including any coatings, paint, markings, etc., thereon), which have been replaced by Nitro; and (2) these golf balls are covered by various claims of the Acushnet Golf Ball Composition and Process Patents -- the '910, '422, '459, '497 and '980 Patents.  Morgan Dec., ¶¶ 32, 46, 51, 52, Exs. N-Q; Morgan Supp. Dec. ¶¶ 6-13.

141.    Acushnet's golf balls are not meant to be remanufactured.  Each of the components (e.g., cover, core, etc.) of each of Acushnet's golf balls are designed to function in combination to create the performance and durability characteristics of specific Acushnet models.  For example, once the exterior surface of a golf ball made by

Acushnet is spent, the useful life of that golf ball is considered to have expired, as remanufacture of such component is either impossible (e.g., replacing a spent core without destroying the remaining components), or extremely involved (e.g., replacing the exterior portion of the cover by removing the entire exterior surface layer, including dimples and indicia and applying a substitute layer including dimples and indicia). The complexity and undesirability of replacing these components explains why a market to manufacture or service the spent component has not developed. Morgan Supp. Dec. ¶ 5.

**Timing Of Acushnet's Request For Injunctive Relief**

142. Acushnet has not inexcusably delayed in seeking injunctive relief. Declaration of Roland Giroux, dated June 10, 2002 ("Giroux Dec.") ¶¶ 12-16.

143. From the time Acushnet first learned of the magnitude and range of Nitro's infringing activity to the time it requested the instant injunctive relief, Acushnet took reasonable and measured steps given the complexity of this type of infringement, the importance of submitting evidence to show that infringement and Acushnet's involvement in another lawsuit concerning similar issues. Giroux Dec., ¶¶ 12-16

144. While Acushnet initially filed its complaint in California in January of this year, Acushnet's request for preliminary injunctive relief could not be made until, at the earliest, March of this year because of settlement discussions, Nitro's cessation in selling the infringing product for a period of time, motions and cross-motions regarding choice of forum and procedural hold periods mandated by the California court before proceeding on a Preliminary Injunction. Giroux Dec., ¶¶ 14-16.

145. Specifically, the following is a time line leading up to the preliminary injunction in this matter:

| January 2000 | Acushnet filed a lawsuit against Golfballs Unlimited USA in United States District Court, Southern District of Texas, regarding defendants' misuse of the TITLEIST and PINNACLE trademarks. Declaration of Roland Giroux dated June 10, 2002 ("Giroux Dec."), ¶ 7. |
|---|---|
| August 2000 | Acushnet first learned of a repainted golf ball with the Nitro name and the <<golfballsdirect.com>> website. Upon closer investigation at this time, Acushnet was unable to purchase "refurbished" balls directly from the website and was advised that the website was under construction and not functioning to |

| | accept on-line orders.  At that time, Acushnet was also aware of only one store, Walgreen's in Boca Raton, Florida  selling "recycled" balls under the "Second Chance" label.  Acushnet believed at this time that Nitro was selling mostly rewashed balls or NITRO branded new products.  There was little or no evidence of Nitro's infringing activities.  Giroux Dec., ¶ 9. |
|---|---|
| April 2001 | Acushnet filed a Motion for Summary Judgment seeking a permanent injunction in the Texas lawsuit against Golfballs Unlimited.  Giroux Dec., ¶ 7. |
| June 19, 2001 | Judgment and Permanent Injunction entered in Texas Court against Golfballs Unlimited enjoining defendants from stripping and repainting used golf balls.  Giroux Dec., ¶ 7. |
| July 2001 | Acushnet retained Greenberg Traurig LLC ("GT") as attorneys to investigate what is believed to be increasing activity by Nitro.  Declaration of George Arnold dated April 18, 2002 and submitted in support of Acushnet's Motion for Preliminary Injunction ("Arnold Dec."),¶ 3. |
| July 18, 2001 | Investigator retained by GT to assist with an investigation of possible improper use by Nitro of trademarks owned by Acushnet.  Arnold Dec., ¶ 3. |
| August  2001 | Investigators employed by GT buy Nitro Remanufactured golf balls throughout the United States to assist in investigation.  Arnold Dec., ¶¶ 4,7,16-18,22. |
| September 11, 2001 | |
| October 24, 2001 | Dr. Felker retained by Acushnet to perform testing of Nitro's golf balls.   Felker Dec., ¶¶ 14, 15. |
| Fall 2001 | Acushnet becomes aware through comprehensive investigation of Nitro's products that Nitro balls contain TITLEIST cores.  Giroux Dec. § 12. |
| November/December, 2001 | Investigators collect balls for testing.  Felker consults with statisticians, searches for proper testing facility and designs testing methodology.  Felker Dec., ¶ 22; Arnold Dec., ¶¶ 22, 25, 26. |
| January 4 – 7, 2002 | Testing conducted in California at Titleist Outdoor Testing Facility, Oceanside, CA.  Felker Dec., ¶ 21 Ex. A. |
| January 11, 2002 | Robert W. Zelnick, attorney for Nitro, advised Acushnet's counsel of Nitro's filing of its complaint in the District Court in the Southern District of Florida ("Florida Action") and stating its preference to wait to serve the Complaint on Acushnet until it has explored all reasonable opportunities to resolve this matter amicably.  Declaration of Harley I. Lewin dated June 27, 2002 submitted in opposition to Nitro's motion for disqualification ("Lewin Dec."), ¶ 14. |
| January 15, 2002 | Acushnet filed with the District Court in the Central District of California a complaint on Nitro alleging various trademark and patent infringement claims (the "California Action").  Lewin |

GREENBERG TRAURIG, P.A.

| | Dec., ¶ 13. |
|---|---|
| January 17, 2002 | The complaint in the California Action was served on Nitro. Return of Service annexed as Ex. C to Lewin Dec. |
| January 18, 2002 | The complaint in the Florida Action was served by service of process through Acushnet's registered agent.  Lewin Dec., ¶ 13. |
| January 28, 2002 | Settlement discussions are broached between Zelnick and Lewin.  Lewin Dec., ¶¶ 14, 17. |
| January 29, 2002 | Without responding to GT's request to negotiate a resolution of the litigation despite Zelnick and Nitro's previously stated preference to do so, Nitro filed a motion to dismiss, stay or transfer the California action to Florida.  Lewin Dec., ¶ 15. |
| February 14, 2002 | Acushnet advises Nitro by letter that Acushnet would be seeking preliminary injunctive relief in the California action and requested a pre-motion meeting to confer about the proposed motion as required by the Local Rules of the Central District of California.  Giroux Dec., ¶ 15.  The Central District Local Rules also provide a 20-day hold period (from the time of the meet and confer) during which the moving party cannot file its motion. Giroux Dec., ¶ 16. |
| February 15, 2002 | Nitro advises it cannot meet until February 19.  Giroux Dec., ¶ 15. |
| February 19, 2002 | Meet and confer on PI motion in California action.  20-day hold period begins.  Giroux Dec., ¶ 16. |
| March 8, 2002 | An order was issued transferring the California case to Florida. Giroux Dec., ¶ 16. |
| March 12, 2002 | 20-day hold period in California would have expired.  Giroux Dec., ¶ 16. |
| April 23, 2002 | Acushnet filed its motion for preliminary injunction in this Action. |
| May 15, 2002 | Nitro submitted an opposition to the preliminary injunction motion in this Action. |
| May 29, 2002 | GT first learned from Nitro's attorneys that Nitro believed there were issues of conflict sufficient to require GT to recuse itself as attorney for Acushnet in this matter.  GT investigated the alleged circumstances to determine whether a conflict existed. Lewin Dec., ¶ 20. |
| June 12, 2002 | Acushnet filed its Reply brief in support of its motion for preliminary injunction. |
| June 17, 2002 | Order issued by this Court setting August 7, 2002 as the date for argument on the preliminary injunction motion. |
| August 7, 2002 | Hearing on preliminary injunction motion. |

**Nitro's Enforcement Efforts**

146. While the business of selling Pond Balls has been around for a very long time, the business of Remanufacturing those Pond Balls to create a more pristine appearance is relatively new. Giroux Dec., ¶ 4.

147. Acushnet first took action against Birdie Golf -- in an action entitled *Acushnet Company v. Birdie Golf Company, et al., USA*, Civil Action No. 95-7030-CIV-Gonzalez (S.D. Fla. Nov. 27, 1996) -- for placing the Titleist Marks on golf balls that were never manufactured by Acushnet and on golf balls that, while originally manufactured by Acushnet, were remanufactured by Birdie Golf. That case ended in 1996 by means of a consent judgment between the parties. Reply Brief, at 7,8.

148. Nitro next attempts to claim that the *Birdie* case, which followed *Champion*, mandates a dismissal of Acushnet's requested relief. *See Acushnet Company v. Birdie Golf Company, et al., USA*, Civil Action No. 95-7030-CIV-Gonzalez (S.D. Fla. 1995) ("*Birdie*"). The *Birdie* case largely concerned the defendant's traditional counterfeiting practices of selling golf balls that were not manufactured by Acushnet under the Titleist Marks. As to those practices, the Court entered an injunction. *See* Declaration of Steven E. Siff, dated May 15, 2002, Ex. B in support of Nitro's Br. Unlike in *Birdie*, and *Champion*, there has been a strong showing here that Nitro's remanufacturing process fundamentally alters Acushnet's genuine TITLEIST golf balls. This factual difference distinguishes the instant case from the *Birdie* case and, under *Champion* and its progeny, an injunction is mandated.

149. In January 2000, Acushnet filed an action -- entitled Acushnet Company v. Dana Jones and Sharon L. Jones, and Golf Balls Unlimited, USA, Civil Action No. H-00-0190, (S.D. Tx. 2000). -- against other third parties in Texas, including Golf Balls Unlimited, USA ("Golf Balls Unlimited") regarding the unauthorized use of the Titleist Marks. Reply Brief, at 7,8. In April 2001, Acushnet filed for Summary Judgment and permanent injunction, and on June 19, 2001, a Final Judgment was entered against the defendants in that case, including an injunction prohibiting defendants from remanufacturing golf balls. Acushnet continues to monitor the market place for what it has seen as an increasing practice of remanufacturing Acushnet's golf balls to the extent

that the characteristics of the originally-manufactured golf balls have been changed.
Giroux Dec., ¶ 8.

## Acushnet's Irreparable Harm

150.    Nitro's sale of golf balls using the Titleist Marks will irreparably harm
Acushnet's world famous reputation for reliability, performance and consistency.  Sine
Dec., ¶ 40.

151.    Acushnet's significant investments in research and development results in
successful new products, the sale of which further enables Acushnet to maintain its
commitment to bringing superior technology and performance to the market.  Sine
Dec.,¶¶ 44, 45, 46; Morgan Dec., ¶ 53.

152.    If Nitro is allowed to re-manufacture Acushnet's high performance golf
balls at less expense to be sold under the NITRO brand, it can then advertise that it offers
cutting edge technology and performance at lower prices.  Sine Dec.,¶ 46.

153.    Nitro's continued sales at low prices of its Reconstructed Nitro golf balls
labeled as if they were "new," but which in fact contain the "insides" of balls originally
made by Acushnet using Acushnet's patented technology, will detrimentally affect
Acushnet's market position by unfairly eroding prices.  Such sales have to date: (i)
substantially increased the pressure on profit margins in the value-priced segment of the
market; (ii) resulted in decreased sales and prices of Pinnacle golf balls insofar as they
will have to compete with value-priced Nitro balls containing Acushnet's superior Titleist
technology; (iii) placed unfair pressure on the profits and prices of the lower to mid-
range Titleist market; and (iv) diminished the superior image of TITLEIST brand balls,
undermining Acushnet's customer base.  Sine Dec.,¶¶ 42, 44-46.  These actions can
affect, incalculably, Acushnet's crucial research and development efforts.  Nitro has now
commoditized the patented technologies in which Acushnet has heavily invested.  Sine
Dec.,¶ 44; Morgan Dec., ¶ 53.

154.    Acushnet will be irreparably harmed by Nitro's unauthorized use of the
Titleist Marks and Acushnet's leading technology that cost Acushnet millions of dollars
and substantial effort and time to develop.  Nitro's detrimental activities, in turn, can

incalculably affect Acushnet's crucial research and development efforts and point of differentiation in the market place.  Sine Dec.,¶¶ 44, 45, 46; Morgan Dec., ¶ 53.

155.    Nitro's sale of re-covered, reconstructed balls originally made by Acushnet unfairly piggybacks on and misappropriates Acushnet's patented technology in which it invests tens of millions of dollars each year and which is the fundamental basis of its leading position in the market.  Sine Dec.,¶¶ 44, 45, 46; Morgan Dec., ¶ 53.

156.    Through its unlawful use of Acushnet's patented technology and manufacturing process, Nitro is able to market golf balls predominantly comprised of premium Acushnet (Titleist) technology under the Nitro brand in the value-priced market. Morgan Dec.,¶¶ 49-52.

157.    The irreparable harm caused by Nitro's infringement of Acushnet's patents will be further compounded by the closely associated irreparable harm to Acushnet's goodwill, reputation and brand image as a result of Nitro's sales of Remanufactured Titleist golf balls.  Sine Dec.,¶¶ 41,42.

158.    The failure to grant preliminary relief will encourage other companies to engage in similar unfair and unlawful ball re-covering and reconstruction tactics, since it will allow them to piggyback on Acushnet's industry-leading, patented technology at no cost.  Morgan Dec., ¶¶ 50,53.

159.    Absent a preliminary injunction, Acushnet will suffer irreparable harm as a result of Nitro's infringement of the Acushnet Patents.  Sine Dec.,¶¶ 41, 42, 44, 45, 46; Morgan Dec., ¶ 53.

**Balance of the Equities**

160.    There is no critical public interest which could be injured in this instance by the grant of preliminary relief.  Morgan Dec.,¶ 50.

161.    Nitro's bald assertion that its "manufacturing" of reconstructed golf balls ceased 18 months ago is the only basis Nitro provides in support of its claim that Acushnet will not suffer irreparable harm.  Nitro Opp., at 24, 27; *see also* Khoury Decl., ¶¶ 27-28.

162.    There is no persuasive evidence before the Court which shows that Nitro has stopped selling reconstructed golf balls, whether remanufactured by Nitro or by some third party for Nitro.  There is also no evidence or any assurances from Nitro that it will *not* continue or recommence selling such reconstructed golf balls.  Reply Brief, at 17-18.

163.    It is extremely difficult, if not practically impossible, for Acushnet to police Nitro's conduct in the absence of a court order since the nature of the infringing conduct involves hiding the "insides" of golf balls made by other companies within a new shell provided by Nitro, a condition that is impossible to discern without cutting the balls open.  If Nitro truly has stopped selling such reconstructed balls and will not do so in the future then they will not be harmed or even inconvenienced by an order enjoining them from doing so in any event.  Nitro Opp., at 24, 27; *see also* Khoury Dec., ¶¶ 27-28; Sine Dec., ¶¶ 44-46 and Morgan Dec., ¶ 53.

## II

## CONCLUSIONS OF LAW

### A Court's Power To Grant Preliminary Injunctive Relief

1.    The Lanham Act, 15 U.S.C.A. §§ 1051-1127, empowers a court to grant preliminary injunctive relief in instances of trademark counterfeiting, trademark infringement (including reverse passing-off) and trademark dilution.  *See* 15 U.S.C. §1116.

2.    In this Circuit, a plaintiff is entitled to a preliminary injunction in a trademark case when it demonstrates: "(1) substantial likelihood of success on the merits; (2) that it would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to the trademark owner outweighs whatever damage the injunction may cause to the alleged infringer; and (4) that the injunction, if issued, would not be adverse to the public interest."  *See Davidoff & CIE, SA and Lancaster Group US LLC v. PLD Int'l Corp.,* 263 F.3d 1297, 1300 (11th Cir.2001) ("*Davidoff II*"); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998); *see also Davidoff & CIE v. PLD Int'l Corp.*, 56 U.S.P.Q. 2d 1753, 1756 ("*Davidoff I*").

### Elements To Prove Likelihood Of Success On The Merits
### Of Trademark Counterfeiting And Infringement Claims

3.   To succeed at trial on a trademark infringement and counterfeiting claim, the party requesting relief must show that (1) it owns a valid mark, that (2) the party against whom the relief is sought used the mark in commerce without its consent and (3) that the unauthorized use was likely to deceive, cause confusion, or result in mistake. 15 U.S.C. §§1114, 1125; *Davidoff I*, 56 U.S.P.Q.2d at 1753; and *Davidoff II*, 263 F.3d at 1300-01.

4.   Ownership of incontestable, federal registrations are *conclusive evidence* of the validity of the registrant's marks and of the registrant's exclusive right to use the mark in connection with golf balls. 15 U.S.C. §1115(b).

5.   The primary issue that must be proven is whether the public is likely to be deceived or confused. *Davidoff I*, 56 U.S.P.Q. at 1757; *Dieter v. B & H Industries of Southwest Florida*, 880 F.2d 322, 326 (11th Cir.1989).

6.   The resale of genuine trademarked goods generally does not constitute infringement because consumers are not confused as to the origin of the goods: the origin has not changed as a result of the resale. *Davidoff II*, 263 F.3d at 1301.

7.   Where an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner, however, the product is not genuine and therefore its unauthorized sale constitutes trademark infringement. *Davidoff II*, 263 F.3d at 1302; *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704 (9th Cir.1999)(*"Rolex"*); *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614 (9th Cir.1993)("*Intel*"); *see also Davidoff I*, 56 U.S.P.Q.2d at 1756.

8.   "Not just any difference will cause consumer confusion.  A material difference is one that consumers consider relevant to a decision about whether to purchase a product." *Davidoff II*, 263 F.3d at 1302.

9.   "Because a myriad of considerations may influence consumer preferences, the threshold of materiality must be kept low to include even subtle differences between products." *Davidoff II*, 263 F.3d at 1302.

10. "The resale of a trademarked product that has been altered, resulting in physical differences in the product, can create a likelihood of consumer confusion.  Such

alteration satisfies the material difference exception and gives rise to a trademark infringement claim." *Davidoff II*, 263 F.3d at 1302.

11. Courts have readily granted injunctive relief, not only to prevent consumer deception but also to protect the trademark owner's reputation and good will. This is because "one of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *Caterpillar, Inc. v. Nationwide Equipment*, 877 F. Supp. 611, 615 (M.D.Fla.1994); *El Greco Leather Prod. Co., Inc. v. Shoe World, Inc.*, 806 F. 2d 392, 395 (2d Cir.1986), *cert. denied*, 484 U.S. 817 (1987); *see also Davidoff I*, 56 U.S.P.Q.2d at 1753; *Davidoff II*, 263 F.3d at 1297; *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991).   Protection of this right is essential to a trademark owner's reputation and good will among consumers.

12. This Circuit has *specifically* addressed the type of confusion inherent in a product that is substantially changed (through remanufacturing or other process) from the original product but continues to bear the trademarks of the original product, noting that:

> 'Every product is composed of a bundle of special characteristics.' Consumers who purchase a particular product expect to receive the same special characteristics every time.  The Lanham Act protects these expectations by excluding others from using a particular mark and making consumers confident that they can purchase brands without being confused or misled....
>
> The Lanham Act also protects trademark owners.  A trademark owner has spent time, energy and money in presenting a product to the public and building a reputation for that product.  The Lanham Act prevents another vendor from acquiring a product that has a different set of characteristics and passing it off as the trademark owner's product. This would potentially confuse consumers about the quality and nature of the trademarked product and erode consumer goodwill.

*Davidoff II*, 263 F.3d at 1301 (internal citations omitted).

**Disclaimers Are Not Sufficient**

13. Where the evidence shows that the "reconditioning or repair" is "so extensive or so basic" it is "a misnomer to call the article by its original name, <u>even if the words</u>

'used' or 'repaired' were added." *See Champion Spark Plug, Co. v. Sanders*, 331 U.S.
125, 129, 67 S.Ct.1136 (1947) (emphasis added).

14. Courts have routinely found that the use of a disclaimer aggravated rather than
alleviated confusion over brands. *See University of Georgia Athletic Ass'n v. Laite*, 756
F.2d 1535 (11th Cir.1985); *E & J Gallo Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d 1657
(E.D.Cal.1989), *modified on other grounds, aff'd*, 955 F.2d 1327 (9th Cir. 1992); *National
Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.* 532 F.Supp 651
(W.D.Wash.1982); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.* 832 F.2d
1311, 1315-16 (2d Cir.1987); *Toys "R" Us Inc., v. Abir*, 45 U.S.P.Q.2d 1944, 1948
(S.D.N.Y. 1997) (the court held that a disclaimer posted on the "TOYSAREUS.COM"
website owned by defendant would not cure any possible confusion); *Planned
Parenthood Federation of America Inc. v. Bucci*, 42 U.S.P.Q.2d 1430(S.D.N.Y.1987)
(Due to the nature of Internet use, defendant's appropriation of plaintiff's mark as a
domain name and home page address cannot adequately be remedied by  a  disclaimer.
Defendant's domain name and home page address are external labels that, on their face,
cause confusion among Internet users and may cause Internet users who seek plaintiff's
web site to expend time and energy accessing defendant's web site."); *Pebble Beach Co.
v. Tour* 18 I, Ltd., 942 F. Supp.  1513, 1552 (S.D.Tex.1996), *aff'd*, 155 F.3d 526, 48
U.S.P.Q.2d 1065 (5th Cir.  1998)(Golfers are likely to be confused by defendant's
advertisements and that confusion cannot be dispelled by full disclosure in disclaimers
posted at the tee-off spot at defendant's golf course. "[T] he Lanham Act is violated
whenever there is confusion in the buying process . . . . This is still true even if the
purchaser's confusion is later dispelled through use or familiarization with the product.");
*International, Inc. v. Big Bite, Inc.*, 576 F. Supp. 816 (S.D.Ohio 1983) (court still issued
an absolute preliminary injunction not permitting a disclaimer despite a finding that
defendant's television commercial parodying competitors' trademark characters Colonel
Sanders, Ronald McDonald, and Little Wendy was "rather clever" and "mildly
entertaining").

15. No amount of disclaimer (even if there was room) is adequate to cure the
infringement caused by using the manufacturer's trademarks. *See Rolex Watch*, 179 F.3d
at 709-710.

**Types of Confusion**

16. Confusion can be determined at the time of initial encounter even where post-sale inspections negate or cure initial confusion. *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 796 F.2d 254, 256 (9th Cir.1986); and *Pam Media, Inc. v. American Research Corporation, et. al.*, 889 F. Supp. 1403, 1407 (D.Co 1995).

17. Confusion is actionable where there is initial-interest but no sales are made because the consumer corrects the confusion prior to sale. *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1122 (S.D.N.Y. 1981).

18. Confusion is also actionable post-sale, *i.e.*, confusion on the part of someone other than the purchaser who, for example, simply sees the golf balls after they have been purchased, can establish the required likelihood of confusion under the Lanham Act. *Karl Storz Endoscopy-America, Inc. v. Surgical Technologies, Inc.*, 2002 WL 501101*5 (9th Cir. April 4, 2001).

19. While actual confusion is not necessary for a finding of likelihood of confusion, it can be the best such evidence. *See E. Remy Martin & Co. v. Shaw-Ross Intern. Imports*, 756 F.2d 1525, 1529-30 & 1532 (11th Cir.1985); *see also Scan Design of Florida, Inc. v. Scan Design Furniture, Inc.*, 2001WL 599146, *16 (S.D.Fla. May 18, 2001) (Middlebrooks, J.)

20. Because evidence of actual confusion is often difficult to obtain, the case law holds that "actual confusion by a few is evidence of likelihood of confusion by many." *Scan Design of Florida*, 2001 U.S. Dist. LEXIS 7945, at *16 (*citing Freedom Savings and Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir.1985)).

21. Even one instance of point-of-sale confusion can be sufficient to support a finding of actual confusion. *Varitronics Sys. v. Merlin Equip.*, 682 F.Supp. 1203 (S.D.Fla.1988); *see also Glen Raven Mills, Inc. v Ramada Int'l., Inc.*, 852 F.Supp. 1544, 1547-48 (M.D. Fla.1994).

**Nitro's Claim That It Is Not Aware Of Any Confusion
Does Not Rebut The Showing Made By Acushnet**

22. Likelihood of confusion is presumed where -- as here -- compared to the senior use, the accused use is an identical designation used on identical goods. *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir. 1994).

23. To succeed on a claim of infringement, the senior user need only show that an appreciable number of consumers are confused. The fact that other consumers may not be confused is irrelevant. *See Ambrit, Inc. v. Kraft, Inc.*, 805 F.2d 974, 988, n. 69 (11th Cir. 1986).

24. The fact that consumers may not realize they are confused does not preclude a finding of likelihood of confusion.  That is because this type of confusion equally erodes consumer confidence that they can purchase brands without being confused or misled and, unless stopped, allows an infringer to trade upon the goodwill of the senior user, two harms the Lanham Act seeks to prevent. *See e.g., Ambrit, Inc.*, 805 F.2d at 987; *Davidoff II*, 263 F.3d at 1301 (internal citations omitted).

25. This type of confusion erodes consumer confidence that they can purchase brands without being confused or misled and, unless stopped, allows an infringer to trade upon the goodwill of the senior user -- two harms the Lanham Act seeks to prevent. *See Ambrit,* 805 F.2d at 974, 987, *see also Davidoff II*, 263 F.3d at 1301 (internal citations omitted).

26. While case law, such as that cited by Nitro, urges survey evidence in borderline cases -- *i.e.*, where the marks are not identical, the senior user's mark is non-registered and descriptive trademark, the products are different, there are no instances of actual confusion and/or junior user has come forth with a survey showing no likelihood of confusion -- it follows that a survey, which is not one of the enumerated likelihood-of-confusion factors considered in this or any District, is not necessary where the marks are identical, the senior user's mark is strong and registered, the products are the same, there are instances of actual confusion and the junior user has not come forth with any survey. *See e.g., Essence Communications, Inc. v. Singh Industries, Inc.*, 703 F.Supp. 261 (S.D.N.Y.1988); and *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J.1985); *see also* Nitro Opp., at 16.

GREENBERG TRAURIG, P.A.

**Neither The Decision In The *Birdie* Case Nor The Judgment On Consent Is Applicable To The Instant Case**

27. The *Birdie* Final Judgment on Consent has no binding effect on the parties in this action. *See Federal Trade Commission v. Wilcox,* 926 F.Supp. 1091, 1101-1103 (S.D.Fla.1995).

28. It is well-settled law that statements made for purposes of settlement negotiations are inadmissible. Rule 408 of the Federal Rules of Evidence extends the exclusion to completed compromises when offered against the compromiser. Federal Rules of Evidence 408; *see also* Final Judgment on Consent at 6, ¶10; *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F. Supp. 414, n.10, 206 U.S.P.Q. 70 (S.D.N.Y.1980).

29. Acushnet's settlement with Birdie Golf does not establish what a court would have decided had the parties proceeded to trial. As the court in *Playboy* found:

> A host of factors may affect a litigant's decision to settle. Nor should hindsight be the guide in assessing the wisdom of plaintiff's settlement. Plaintiff might have made a mistake in not pursuing its rights with appropriate zeal against [the defendant], but this does not preclude it from protecting its mark from future confusion....

*Playboy*, 486 F. Supp. 414, n. 10.

**Submission of Empirical Evidence**

30. Expert testimony may be admitted into evidence if -- relevant to the issues raised here by Nitro -- the methodology by which the expert reaches his/her conclusions is sufficiently reliable. *See* Fed. R. Evid. 702; *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2794-95 (1993).

31. Whether conclusions are deemed sufficiently reliable is a flexible inquiry, which may include "whether [the theory or technique at issue] can be (and has been) tested"; whether it "has been subjected to peer review and publication"; the "known or potential rate of error" of the technique, as well as the "existence and maintenance of standards controlling [its] operation"; and the degree to which the relevant scientific community accepts the theory or technique as reliable. *Daubert* at 113 S. Ct. at 2797;

GREENBERG TRAURIG, P.A.

*Daubert,* 509 U.S. 579; *Allapattah Services, Inc. v. Exxon Corp.,* 61 F.Supp2d 1335, 1338 (S.D.Fla.1999).

32. A trial court has "broad latitude" in determining reliability, and it is not the general acceptance of the methodology that is relevant, but the "reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data obtained, to draw a conclusion regarding the particular matter to which the expert testimony [is] directly relevant." *Allapattah Services,* 61 F.Supp.2d at 1340.

33. Where experts engage in nothing more than conclusory commentary that is misleading, unreliable and insufficient to rebut an expert's testing, which clearly is reliable under well-settled legal standards, such evidence is insufficient as rebuttal much less that able to stand on its own. *Daubert,* 509 U.S. at 589; and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1998); *see also* Fed. R. Evid. 702.

34. Under the principles of *Champion,* the only reliable, indeed the only, empirical evidence submitted in this case supports a finding of infringement. *Champion I,* 156 F.2d at 490.

### Acushnet Is Likely To Succeed On The Merits Of Its Reverse Palming Off Claim

35. The Lanham Act prohibits, in connection with the sale of goods, any false designation of origin "which is likely to cause confusion, or to cause mistake, or to deceive . . . as to [their] origin." 15 U.S.C. §1125(a)(1). The Act not only prohibits "palming off" goods as if they were made by someone else, but also "reverse palming off," which is the misappropriation of the goods of another as one's own.

36. Reverse passing-off occurs when, as here, one party modifies another's product and sells it under a different name. *Del Monte Fresh Produce Company v. Dole Food Co., Inc.,* 136 F.Supp.2d 1271, 1284 (S.D.Fla.2001).

### Acushnet Is Likely To Succeed On The Merits Of Its Trademark Dilution Claim

37. The factors considered in determining whether a mark is famous are: (1) degree of the mark's inherent or acquired distinctiveness; (2) duration and extent of the mark's use; (3) duration and extent of advertising and publicity using the mark; (4) degree of recognition of the mark in the trading areas and channels of trade used by the

marks' owner and the person against whom the injunction is sought; (6) use of the same or similar marks by third parties; and (8) whether the mark is registered. *See* 15 U.S.C. §1125 (c)(1) (1996). *See Victoria's Cyber Secret Limited v. V Secret Catalogue, Inc.*, 161 F.Supp.2d 1339, 1353-54 (S.D.Fla. 2001); *Nailtiques Cosmetics Corp. v. Salon Sciences, Corp.* 1997 WL 244746 *4, (S.D.Fla. Jan. 10, 1997). ("*Nailtiques*").

38. Long duration and great extent of use, advertising, and publicity of the trademarks indicate fame. *Wawa, Inc. v. Haaf*, 40 U.S.P.Q.2d 1629, 1631 (E.D.Pa.1996), *aff'd.*, 116 F.3d 471 (3d Cir.1997); *American Express Co. v. CFK, Inc.*, 947 F. Supp. 310, 312 (E.D.Mich.1996).

39. Use or modification of a mark by a party other than the mark's owner raises "the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Clinique Lab. v. Dep Corp.*, 945 F. Supp. 547, 562 (S.D.N.Y.1996), *quoting Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994) (emphasis added) (other citations omitted); *see also* 15 U.S.C. § 1127 (1996); and *Nailtiques*, 1997 WL 244746 at *4 (S.D.Fla.1997). *Victoria's Cyber Secret Limited*, 161 F.Supp.2d at 1355; *Steinway & Sons v. Demars & Friends*, 210 U.S.P.Q. 954, 961 (C.D.Cal.1981); *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.1991); *Deere & Co.*, 41 F.3d at 45.

## Acushnet Will Be Irreparably Harmed If No Injunction Is Issued

40. Once a plaintiff makes a sufficiently strong showing of likelihood of success on its trademark claims, irreparable injury is presumed. *E. Remy Martin & Co. v International Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir.1985); *see also Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 17 U.S.P.Q.2d 1117, 1123 (3rd Cir.1990).

41. This is because a plaintiff will lose control of its reputation where that reputation rests upon the quality of the defendant's activities as a result of a likelihood of confusion of purchasers. *Opticians Ass'n.*, 17 U.S.P.Q.2d at 1122.

## Nitro's Delay Defense Fails To Rebut Presumption Of Irreparable Harm

42. In the cases cited by Nitro, the courts denied preliminary injunctive relief only upon proof by the alleged infringer that the delay was inexcusable. *See e.g., Kaisha s/b/a Seiko Corp. v. Swiss Watch International, Inc.,* 188 F.Supp.2d 1350, 1356 (S.D.Fla.2002).

43. Inexcusable delay is measured from the day when "the likelihood of confusion looms large." *Tri-Star Pictures, Inc. v. Kurt Unger*, 14 F.Supp.2d 339, 361 (S.D.N.Y.1998), *quoting, Schieffelin & Co. v. The Jack Company of Boca, Inc.*, 850 F. Supp. 232 (S.D.N.Y.1994); and *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F. Supp. 866, 881 (E.D.N.Y.1978).

44. A modest encroachment is one thing, a sudden thrust into the public awareness is quite another; and "a reasonable businessman should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue." *Miss Universe, Inc. v. Patricelli,* 271 F. Supp. 104, 110 (D.Conn.), *aff'd,* 386 F.2d 997 (2d Cir.1967) *(per curiam)*; *Olay Co. v. Cococare Products, Inc.* 218 U.S.P.Q. 1028 (S.D.N.Y.1983); and *Parrot Jungle, Inc. Corp. of Florida v. Parrot Jungle, Inc., Corp of New York*, 512 F.Supp. 266, 270 (S.D.N.Y.1981); *Schieffelin & Co., v. The Jack Co. of Boca, Inc.*, 850 F. Supp. 232, 252 (S.D.N.Y.1994) *quoting Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 366 (6th Cir. 1985), *cert. denied,* 476 U.S. 1158 (1986).

**Nitro's Co-existence Defense Fails to Rebut Irreparable Harm**

45. Acushnet's actions clearly do not rise to the conscious inattention to infringing third-party use found by the court in Nitro's cited case, *Warner-Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389 (D.N.J.1989), where the trademark owner consciously failed to take any action for six years against any third-party users of so-called infringing trade dress.

46. "A trademark owner is not bound to take on more than one infringer at a time," (*Cuban Cigar Brands N.V. v. Upmann International, Inc.*, 457 F. Supp. 1090, n. 28 (S.D.N.Y.1978)) and further, is not "obligated to "police every conceivable related use… in order to protect a definable area of primary importance." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F. Supp. 414 (S.D.N.Y.1980).That other

additional third parties may also be selling Remanufactured TITLEIST brand golf balls does not and should not alleviate the imminent irreparable harm caused by Nitro because Nitro "cannot rely upon the wrongdoing of others to exculpate itself from its own infringing activities." *Counsel of Better Business Bureaus, Inc. v. Better Business Bureau, Inc.*, 1978 U.S. Dist. LEXIS 15903 at *34, 200 U.S.P.Q. 282 (S.D.Fla.1978).

## The Balance Of The Hardships And Public Interest Factors

47. A party defending a motion for preliminary injunction must do more than rely on unsupported statements of hardship, particularly where, as here, the preliminary injunction sought only prevents the party from benefiting from its infringing acts. *Bulova Corp., v. Bulova Do Brasil Com. Rep. Imp. & Exp. Ltda.*, 144 F.Supp.2d 1329, 1332 (S.D.Fla.2001); *E. Remy Martin & Co. v. Shaw-Ross International Imports, Inc.*, 756 F.2d 1525, 1534 (11th Cir.1985); *Unisource Worldwide, Inc., Plaintiff, v. South Central Alabama Supply, LLC*, No.CIV.A. 01-D-1000, 2001 WL 1868805 (M.D.Ala.,Dec.14, 2001); *Ty, Inc. v. Jones Group, Inc.*,237 F.3d 891, 902-04 (7th Cir.2001).

48. "[T]he public interest is served by preventing consumer confusion in the marketplace." *Davidoff II*, 263 F.3d at 1304. "In a trademark or unfair competition case, a third party, the consuming public, is present and its interests are paramount." *Scan Design*, 2001 U.S. Dist. LEXIS 7945, *19 (quoting *BellSouth Advertising & Publishing Corp. v. Real Color Pages, Inc.*, 792 F.Supp. 775, 780 (M.D.Fla.1991)).

## Nitro's Patent Infringement Should be Preliminarily Enjoined

49. Courts are empowered to grant injunctions in accordance with the principals of equity to prevent the violation of any rights secured by patents, on such terms as the court deems reasonable. *See* 35 U.S.C. 283.

50. A patentee is entitled to a preliminary injunction to restrain patent infringement when there exists: (1) a reasonable likelihood of success on the merits; (2) the threat of irreparable harm absent injunctive relief; (3) a balance of equities favoring injunctive relief; and (4) the granting of injunctive relief will not adversely affect public interest. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988);

*Nutrition 21 v. U.S.*, 930 F.2d 867, 869 (Fed.Cir.1991).

51. The district court must "weigh and measure each factor against the other factors and against the form and magnitude of the relief requested," and, to prevail, the plaintiff must show a likelihood of success on the issues of infringement, validity and irreparable harm, but irreparable harm is *presumed* if the plaintiff makes a clear showing of likelihood of success on infringement and validity. *Amazon.com, Inc v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir. 2001).

## Legal Standard for Showing Patent Infringement

52. The unauthorized use of a patented process in the United States is infringing, as is the unauthorized sale of a patented product. *See* 35 U.S.C. §271(a).

53. It is an act of infringement for an unauthorized party to sell or offer to sell a product in the United States made by a patented process (whether the process is carried out here or abroad). *See* 35 U.S.C. §271(g).

54. The determination of infringement is a two-step process. First, the language of the patent claims must be interpreted; and second, the accused device or process must be compared to the claim language as properly interpreted. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (*en banc*).

55. Claim construction is a matter of law exclusively for the Court and may be preliminary in nature. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996); *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1220 (Fed.Cir.1996).

56. In construing the asserted patent claims, the Court is to focus in particular on the "intrinsic" evidence, *i.e.*, the claims, the specification and the prosecution history of the patent. *Dow Chemical Co. v. Sumitomo Chemical Co.*, 257 F.3d 1364, 1372 (Fed.Cir.2001).

57. The analytical focus during claim construction must begin and remain centered on the language of the claims themselves which the patentee chose to use to particularly point out and distinctly claim the subject matter the patentee regards as his invention. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331

GREENBERG TRAURIG, P.A.

(Fed.Cir.2001).

58. "The construction of the claims that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

### The Acushnet Patents Are Valid

59. The Acushnet Patents are presumed valid under 35 U.S.C. § 282.

60. In assessing the patentee's likelihood of success on the issue of validity on a motion for a preliminary injunction, a determination of validity must be made "in the context of the presumptions and burdens that would enter at trial on the merits." *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384 at 388 (Fed.Cir.1987); *New England Braiding Co., Inc. v. A. W. Chesterton Co.*, 970 F.2d 878, 882 (Fed.Cir.1992).

61. At trial, Nitro will bear the burden of proving invalidity by clear and convincing evidence. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1571 (Fed.Cir.1986).

62. Nitro has not met the heavy burden, established by the Federal Circuit, to present a substantial and persuasive challenge to the validity of the patent claims in issue. *See Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 (Fed.Cir.1985).

63. A court must also assess the objective evidence of non-obviousness or "secondary considerations" of non-obviousness in its consideration of the issue of patent validity. *See, e.g., Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1555 (Fed. Cir.), *reh'g denied, en banc suggestion declined* (1995); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535, 1538-39 (Fed.Cir.1983).

64. The indicia of patent-validity in this matter include: (1) the tremendous commercial success of Acushnet's golf balls containing the technology claimed in the patents in suit. *See e.g., Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1576 (Fed.Cir.1984).); and (2) Nitro's having copied the claimed subject matter of the patents by (a) using precisely the golf ball reconstruction method claimed in the '535 patent and (b) using the "insides" of golf balls originally manufactured by Acushnet and

covered by claims of the Acushnet Golf Ball Composition and Process Patents. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981 (Fed.Cir. 1988).

65. The silence of Nitro's opposition brief on the issue of validity to any of the asserted Acushnet golf ball patents amounts to a concession of validity as to each asserted claim of each patent-in-suit.

66. Accordingly, Acushnet has an overwhelming likelihood of success on validity.

**Nitro's Infringement of the Acushnet '535 Patent**

67. The claim terms of the Morgan '535 patent are straightforward. The Court adopts the construction of claims 1 and 11 set for the in Acushnet's proposed construction. Morgan Supp. Dec., Ex. A.

68. For the reasons set forth above, Acushnet has shown that it has an extremely high likelihood of success in proving at trial that Nitro's sale, offer to sell, manufacture, use and importation of the Nitro Reconstructed golf balls infringes under 35 U.S.C. § 271(a) and/or § 271(g) at least claims 1 and 11 of the '535 patent. *See* 35 U.S.C. § 271(a) & (g).

**Nitro's Infringement of the Acushnet golf ball Composition and Process Patents**

69. The claim terms of the asserted claims of the Acushnet golf ball Composition and Process Patents are also straightforward and have their plain meaning. The Court adopts the construction of the asserted claims as set forth in the claim construction chart which is attached as Exhibit A to the Morgan Supplemental Declaration. Morgan Supp. Dec., Ex. A.

70. For the reasons set forth above, Acushnet has shown that it has an extremely high likelihood of success in proving at trial that Nitro's sale, offer to sell, manufacture, use and importation of the Nitro Reconstructed golf balls infringes under 35 U.S.C. § 271(a) and/or § 271(g) of the Acushnet golf ball Composition and Process Patents. *See* 35 U.S.C. § 271 (a) &(g).

## Nitro's Reconstruction of Original Acushnet Golf Balls is Not a "Permissible Repair"

71. Nitro asserts that it does not infringe the Acushnet golf ball Composition and Process Patents, contending that its allegedly infringing activities amount to no more than a permissible repair.

72. The burden of establishing the affirmative defense of permissible repair, which is a question of law, rests on the party, Nitro in this case, raising the defense. *See Jazz Photo Corp. v. International Trade Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir.), *reh'g and reh'g en banc denied* (2001).

73. The right to make the original patented article remains with the patentee. *See e.g., Jazz Photo Corp.*, 264 F.3d at 1102.

74. In general, the purchaser of a patented product has the right to repair it although the rights of ownership do not include the right to construct an essentially new article on the template of the original. *Jazz Photo Corp.*, 264 F.3d at 1102.

75. An impermissible reconstruction occurs when the part replaced and/or reconstructed is not a readily replaceable, was not manufactured to be replaceable, and was not intended or expected to have a life of temporary duration in comparison to the remaining parts. *Husky Injection Molding Systems Ltd. V. R&D Tool & Engineering Co.*, No. 01-1346, 2002 U.S.App. LEXIS 9514, at *17-18 (Fed.Cir.May 17, 2002).

76. The Court finds that Acushnet has a high likelihood of success in proving infringement under the golf ball Composition and Process Patents. Nitro is unlikely to be able to carry its burden of proving that its unlawful reconstruction is a permissible repair. *See Jazz Photo Corp.*, 264 F.3d at 1102.

77. Plainly, Nitro stripped off the dimpled exterior surface of the TITLEIST golf balls, and used the template of the original Acushnet-made golf balls for its Reconstructed Nitro golf balls. By removing the outer cover layer and substituting an entirely new dimpled surface on these balls, repainting and re-coating them, Nitro has manifestly "recreated" and "reconstructed" the golf ball product claimed in Acushnet's patents. Nitro's own conduct acknowledges and confirms this conclusion, since Nitro has

labeled and promoted its Reconstructed Nitro golf balls as if they were 'new' products. Sine Dec. ¶¶ 32, 41, 42, 46. Acushnet never intended for the exterior surface of its TITLEIST golf balls to be replaced or repaired, since such a product would not pass Acushnet's strict quality controls. Nitro has not born its burden of proving that such reconstruction is somehow a permissible repair.

78. Nitro asserts that Acushnet has not provided a sufficient construction of the relevant claim terms and that Acushnet has not proven that each limitation of the relevant claims is met by one or more models of golf balls made by Acushnet. Acushnet provides ample competent evidence that various golf balls made by Acushnet were made or contain compositions covered by the asserted claims of the Acushnet Golf Ball Process and Composition Patents. See Morgan Dec. at ¶¶ 13-24, 32, 51-52, Ex. A.

79. Nitro fails to proffer any evidence or claim construction whatsoever of its own indicating that Acushnet's construction is wrong and that Acushnet does not in fact use the claimed methods and compositions in producing various of their own golf balls.

80. Nitro is not free "re-use" the "insides" of Acushnet-made balls in order to make a ball with a new exterior surface that is labeled as a new Nitro ball. Nitro misstates the language of the patent claims and governing case law. Nitro contends (Nitro Br. at 24) that: "Acushnet has asserted no claims which allegedly read on the entire golf ball (including the combination of the cover and core) . . . ." This is incorrect, as the following representative claims demonstrate:

> In a golf ball having an ionomer resin cover the improvement comprising said ionomer resin cover comprising . . . .['459 patent claim 1]
>
> *     *     *
>
> In a golf ball comprising a core and a cover, the improvement comprising: . . . ['459 patent claim     7]
>
> *     *     *
>
> In the manufacture of a golf ball product by cross-linking polybutadiene . . . ." ['422 patent claim     1]
>
> *     *     *
>
> In a method of making a golf ball product from an admixture of polybutadiene and     a metal salt  of an unsaturated carboxylic acid . . . .['980 patent, claim 1]
>
> *     *     *

GREENBERG TRAURIG, P.A.

A golf ball product formed from a mixture comprising polybutadiene and a metal         salt . . . .[980   patent, claim 9].
Morgan Dec., Exs. F, C & D, respectively.

81. Each of the above illustrative claims claim "a golf ball" with having in part a certain composition or made in part by a certain process.

82. Nitro incorrectly attempts to argue that the subject matter of a patent claim that only covers a core can not be reconstructed if the core itself is not remanufactured but is only sheathed by a new cover. One problem with this contention is that not the entire cover material is removed by Nitro from the balls but only the exterior surface layer of the cover material (as per the method of the '535 patent). See Morgan Dec. at ¶ 52(g)(ii). Accordingly, Acushnet has asserted the '459 patent which is titled "Golf Ball Cover." Acushnet does argue the new exterior surface layer applied by Nitro infringes that patent, but rather that the golf ball which Nitro recreated has within it cover material that was made by Acushnet and which is covered by the '459 patent (which covers a "golf ball" having that cover material).

83. A number of the claims specifically cover a "golf ball" having a certain cover or core material. Accordingly, the subject matter of the claim is not just a chemical composition, but rather a "golf ball" whose cover or core is made of a certain material or by a certain process, and Nitro is clearly reconstructing the golf ball which is the subject matter of the claim. Morgan Dec. ¶ 52.

84. Nitro does not have the "right to replace the spent covers surrounding the core with another cover which [new cover material] infringed no Acushnet patents and resell the golf ball with a new cover." Nitro Br. 26, n. 23. Nitro contends the "[m]ore recent cases protect the right of the owners of golf balls such as Nitro to replace golf ball covers on Acushnet golf ball cores." The Court is unaware of any repair/reconstruction case dealing with golf balls.

85. Nitro's attempt to distinguish the Aktiebolag case is unavailing as it is based on the following false assertion:

In Aktiebolag, the defendant re-created the drill bit tip, which was specifically claimed in the patent. Nitro Opp., at 26.

86. In fact, the claim at issue in *Aktiebolag* was directed to a drill having several components, including the drill bit. The court specifically stated that "[t]he drill tip is <u>not</u> separately patented" (emphasis added). *Akteibolag v. E.J. Company,* 121 F.3d 669, 670. In the case at hand, the claims similarly cover a combination, e.g., a "golf ball" having a cover or core of a certain composition or made in a certain manner. *See* Morgan Dec. at ¶34, 50 and 33-45 generally.

87. Recent decisions note that the line between repair and reconstruction is sometimes difficult but that a repair will exist if the part being repaired is a "readily replaceable part." *Jazz Photo Corp.,* 264 F.3d at 1102. The Federal Circuit commented that it had found that retipping the drill in the *Aktiebolag* case was an impermissible reconstruction because the drill bit in question was not a readily replaceable part, it was not manufactured to be a replaceable part and was not intended or expected to have a life of temporary duration in comparison to the drill shank. *Husky Injection Molding Systems Ltd.,* at \*17-18.

88. The facts of the instant case parallel those of *Aktiebolag* and support the same result. The entire exterior surface layer of an Acushnet made golf ball is not readily replaceable, was not manufactured with any intention of being replaced and was not anticipated to have a shorter life span than the rest of the golf ball. *See* Morgan Dec. at ¶34, 50 and 33-45 generally; *see also* Morgan Supplemental Dec. at ¶ 5-13 .

89. For these reasons, Nitro, which at trial will have the burden of proving as an affirmative defense that it has engaged in only a permissible repair (*Jazz Photo Corp.,*264 F.3d at 1102 ), has failed to rebut Acushnet's showing of likelihood of success in proving infringement under one or more claims of the Acushnet Golf Ball Composition and Process Patents.

## Irreparable Harm Relating to Acushnet's Patent Infringement Claims

90. A clear showing of likelihood of success on the merits entitles Acushnet to the benefit of the presumption of irreparable harm. *Smith Int'l., Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied*, 464 U.S. 996 (1983).

91. Acushnet is entitled to a presumption of irreparable harm in view of its strong

Greenberg Traurig, P.A.

showing of validity and infringement. *Smith Int'l., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied*, 464 U.S. 996 (1983); *see also Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001) (*citing Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed.Cir.1997)); *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363(Fed.Cir.2001) .

92. A presumption of irreparable harm will not be overcome absent a finding clearly negating irreparable harm, such as finding that future infringement was no longer likely, that the patentee was willing to forgo its right to exclude by licensing the patent, or that the patentee had delayed in bringing suit. *See Polymer Technologies, Inc. v. Bridwell, H.A.*, 103 F.3d 970, 975 (Fed. Cir. 1996).

93. The very nature of a patent is to provide the right to exclude to the patentee; such that infringement of a valid patent inherently causes irreparable harm in the absence of a clear negation of irreparable harm. *See Polymer Technologies, Inc.*, 103 F.3d at 975.

94. Under well established principles of patent law, a presumption of irreparable harm cannot be rebutted in the face of a showing of a threat to a movant's market position in the absence of preliminary injunctive relief. *Polymer Technologies*, 103 F.3d at 975-76, *citing PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566-67 (Fed.Cir.1996); *see also Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233; *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed.Cir.1988).

95. Nitro's continued sales at low prices of its Reconstructed Nitro golf balls labeled as if they were "new," but which in fact contain the "insides" of balls originally made by Acushnet using Acushnet's patented technology, will detrimentally affect Acushnet's market position and profitability by unfairly eroding prices and placing increased pressure on profit margins and profitability, which in turn can affect, incalculably, Acushnet's crucial research and development efforts. *See e.g., Purdue Pharma L.P.*, 237 F.3d at 1368; *Bio-Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed.Cir.) *reh'g denied; suggestion for reh'g in banc denied* (1996); *Bell & Howell Documents Mgmt. Products Co. v. Altek Systems*, 132 F.3d 701, 708 (Fed. Cir.1997) *reh'g denied* (1998); *Progressive Games, Inc. v. Shuffle Master, Inc.*, 69 F.Supp.2d 1276, 1287 (D. Nev. 1999). The failure to grant preliminary relief will only

encourage other companies to engage in similar unfair and unlawful ball re-covering and reconstruction tactics, since it will allow them to piggyback on Acushnet's industry-leading, patented technology at no cost.  Sine Dec., ¶¶44-46; Morgan Dec., ¶53; *see e.g., A&E Products Group v. California Supply Co.*, 28 U.S.P.Q.2d 1041, 1048 (C.D.Cal.1993).

96. The irreparable harm caused by Nitro's infringement of Acushnet's patents will be further compounded by the closely associated irreparable harm to Acushnet's goodwill, reputation and brand image as a result of Nitro's sales of Remanufactured Titleist golf balls. *See Oakley, Inc. v. Sunglass Hut Int'l*, 2001 WL 1683252, at *11-12 (C.D.Cal. 2001); *see also, CVI/Beta Ventures v. Custom Optical Frames, Inc.*, 893 F.Supp. 508, 524 (D. Md. 1995); *U.S. Surgical Corp. v. Origin Medsystems, Inc.*, 27 U.S.P.Q.2d 1526, 1530 (N.D. Cal. 1993); *Medco Research, Inc. v. Fujisawa USA, Inc.*, 1994 WL 719220, at *13-14 (N.D. Ill. Dec., 21, 1994).

97. Acushnet commenced this case in January 2002, less than three months after it discovered that Nitro was using the "insides" of Acushnet made balls in their reconstructed Nitro labeled balls. Giroux Dec. at ¶ 12.  The Federal Circuit has held that longer periods, including four months, is not undue delay. *Polymer Technologies, Inc. v. Bridwell , H.A.*, 103 F.3d 970, 976 (Fed. Cir. 1996).

98. Despite Nitro's assertion its "manufacturing" of reconstructed golf balls ceased 18 months ago, (Nitro Br. at 24, 27, citing Khoury Decl. ¶¶ 27-28), the threat of irreparable harm  posed by Nitro to Acushnet remains real. It is extremely difficult, if not impossible, to police Nitro's conduct in the absence of a court order.  Since Nitro has stopped selling such reconstructed balls and will not do so in the future, they will not be harmed or even inconvenienced by an order enjoining them from doing so in any event. The case law fully supports this position. *See  Genentech, Inc. v. Wellcome Foundation Ltd.*, 826 F.Supp. 828, 830 (D.Del. 1993) (The fact that the defendant has stopped infringing is generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that further infringement will not take place); citing *W.L. Gore Assoc. Inc.v. Garlock Inc.*, 842 F.2d 1275, , 1281-82 (Fed.Cir.1985); *Burger King Corp. v. Weaver*, 33 F. Supp.2d 1037, 1039 (S.D. Fla.1998); *Patsy's Brand,*

*Inc. v. I.O.B. Realty, Inc.*, 2001 WL 170672 , *4 (S.D.N.Y.2001) ("a party may not defeat an adversary's right to an injunction by a representation that it will voluntarily refrain from engaging in infringing conduct . . . . [T]he 'test for mootness in cases such as this is a stringent one.' The reason that the defendant's conduct, in choosing to voluntarily cease some wrongdoing, is unlikely to moot the need for injunctive relief is that the defendant could simply begin the wrongful activity again."); *Clayton v. Howard Johnson Franchise Systems, Inc.*, 730 F. Supp. 1553, 1558 (M.D.Fla.1988).

99. Nitro has offered no rebuttal to the evidence of actual irreparable harm proffered by Acushnet. See Acushnet Br. at 19-20, Sine Dec. ¶¶ 44-46 and Morgan Dec. ¶ 53.

**The Balance of the Equities Plainly Favors Acushnet's Motion to Preliminarily Enjoin Nitro's Patent Infringement**

100.    The balance of the equities plainly favors Acushnet. Nitro's sale of re-covered, reconstructed balls originally made by Acushnet unfairly piggybacks on and misappropriates Acushnet's patented technology in which it invests tens of millions of dollars each year and which is the fundamental basis of its leading position in the market. Absent a preliminary injunction, Acushnet will suffer irreparable harm as a result of Nitro's infringement.

**The Public Interest Will Be Furthered by the Entering of a Preliminary Injunction**

101.    The public interest is furthered through the protection of patents, upon which there is a strong public policy that is advanced by the granting preliminary injunctive relief. *H.H. Robertson Company v. United Steel Deck*, 820 F.2d at 391; *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1578 (Fed.Cir.1983).

102.    There is simply no critical public interest which could be injured in this instance by the grant of preliminary relief. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1458 (Fed.Cir. 1988).

Respectfully submitted:

GREENBERG TRAURIG, LC
885 Third Avenue
New York, New York 10022
Telephone:  (212) 801-2100
Facsimile:  (212) 688-2449

Harley I. Lewin
  lewinh@gtlaw.com
Daniel A. Ladow
  ladowd@gtlaw.com
G. Roxanne Elings
  elingsr@gtlaw.com
 Todd Sharinn
   sharinnt@gtlaw.com
          and

REEDER & REEDER P.A.
675 W. Indiantown Road, Suite 201
Jupiter, Florida 33458
Tel: 561-575-9750
Fax: 561-575-9765

By: _____
    L. Martin Reeder, Jr., Esq.
    Florida. Bar No. 308684
    Denise G. Reeder
    Florida Bar No. 0774080

*Attorneys for Acushnet Company*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendant/Counterclaimant Acushnet Company's Proposed Findings of Fact and Conclusions of Law was served by Federal Express this 5th day of August, 2002 on Steven E. Siff, McDermott, Will & Emery, 201 South Biscayne Boulevard, 22nd Floor, Miami, Florida 33131-4336 and by U.S. Mail on Mark W. Yocca, Yocca Patch & Yocca, LLP, 19900 MacArthur Boulevard, Suite 650, Irvine, California 92612.

GREENBERG TRAURIG, P.A.
885 Third Avenue
New York, New York 10022
Telephone: (212) 801-2100
Facsimile: (212) 688-2449

Harley I. Lewin
  lewinh@gtlaw.com
Daniel A. Ladow
  ladowd@gtlaw.com
G. Roxanne Elings
  elingsr@gtlaw.com
Todd S. Sharinn
  sharinnt@gtlaw.com

and

REEDER & REEDER P.A.
675 W. Indiantown Road, Suite 201
Jupiter, Florida 33458
Tel: 561-575-9750
Fax: 561-575-9765

By: _____
  L. Martin Reeder, Jr., Esq.
  Florida. Bar No. 308684
  Denise G. Reeder
  Florida Bar No. 0774080

*Attorneys for Acushnet Company*

This is Exhibit C to Morris's Supplemental Declaration, incorporated by reference into Proposed Findings and Conclusions, and included as separate document on disk.

**Claim Chart - U.S. Patent No. 5,609,535**

| Claim 1 | | |
|---|---|---|
| Claim Language | Claim Construction | Infringing Golf Balls |
| Preamble. A method of treating a golf ball having an exterior surface of a predetermined diameter, a core and a cover composed of cover material having a predetermined thickness and dimples and indicia on said exterior surface comprising: | This claim is broadly directed to a method of replacing the entire exterior surface of a golf ball after use. An embodiment of this invention is discussed generally at Col. 1, line(s) 19-30. The terms of this claim should be given their plain meaning. "Exterior surface" means the exterior portion of the golf ball cover. A "predetermined diameter" means that the exterior surface of the ball was intended to have a particular diameter. The "cover" includes the exterior portion of the golf ball, dimples (impressions made on the external surface of the cover to provide aerodynamic qualities), and indicia (marks placed on the exterior surface of the golf ball, including make and model name). See e.g., Col. 1, lines 47 – 57 and Figs. 1-3 for a preferred embodiment of this invention. | As described in my moving declaration, at ¶¶ 51-52, my examination of reconstructed Nitro golf balls showed that they were made using the method of claims 1 and 11 of this patent. Specifically, this claim describes the steps Nitro took in manufacturing its Ultimate Distance and Tour Distance Titanium golf balls. See Morgan Moving Declaration at ¶¶ 51-52 and Exhibits N, O, P and Q annexed thereto. As illustrated by Exhibits N, O, P and Q of my moving declaration, Nitro removed the entire original exterior surface layer of the golf ball (including dimples and indicia) and then substituted a new layer with dimples which was added to the intermediate cover surface left after removal of the exterior surface layer. I am certain of this conclusion, as all of the balls have "new" external surfaces with matching dimple patterns and indicia despite incorporating different cores and internal portions of the cover. I am also certain that the thickness of the new material is "substantially equal in thickness to the material removed," as golf balls are generally manufactured (including all of Acushnet's golf balls), like Nitro's reconstructed golf balls, to conform to USGA size standards. (These standards are set forth in ¶11(b) of my moving Declaration). |

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| 1. removing the entire exterior surface material of said cover and all said dimples and indicia to reduce the thickness of said cover and provide a dimple free and indicia free intermediate cover surface; and | The entire exterior portion of the cover is removed leaving a dimple and indicia free intermediate cover surface. *See e.g.*, Col. 1, line(s) 59-63. The "intermediate cover surface" refers to a layer of cover material positioned between the core and the exterior surface layer. | See above. |
| 2. adding to said intermediate cover surface a layer of cover material including dimples which is substantially equal in thickness to the material removed in step (a). | A new layer of cover material is added to the intermediate layer. This new layer, which has dimples, will be of a thickness that approximates the thickness of the materials removed. *See e.g.*, Col. 2, line(s) 5-8. | See above. |

**Claim 11**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.   The method of claim 7. | Claim 7 broadly claims a method of removing the entire exterior surface material of a golf ball after use. *See e.g.*, Col. 1, line(s) 62-66. | See above. |
| 1.  Wherein the step of adding a layer of cover material is comprised of injection molding the layer of cover material to the intermediate surface. | A new layer of cover material is added to the intermediate layer using injection molding. *See e.g.*, Col. 2, line(s) 9-10. | See above. |

2

**Claim Chart - U.S. Patent No. 4,846,910**

## Claim 1

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. A method for preparing a wound golf ball core comprising the successive steps of: | This claim is broadly directed to a mechanized method for preparing a wound golf ball by the successive steps set forth in sub-parts a-h of the claim. | The preparation of certain of Acushnet's wound golf ball cores is accomplished with automatic machines. Included among these wound golf ball products are the specific models discussed in ¶ 52 (e) of my moving declaration. The elastic thread used in manufacturing wound cores varies from golf ball manufacturer to manufacturer and from model to model. As provided in my moving declaration, I determined that the center and windings of certain of the wound cores utilized by Nitro in the manufacture of their Ultimate Distance and Tour Distance Titanium golf balls were characteristic of cores manufactured by Acushnet in accordance with the method of this claim. Specifically, the color, dimension, surface appearance and winding pattern of the cores of these golf balls were consistent with the cores used solely by Acushnet in its Titleist DT ▲ 80, Titleist DT ▲ 90 and Titleist DT ▲ 100 golf balls, from 1995 through 1996. I have never seen this combination used in a competitive product. *See* ¶ 52 of my moving declaration for a more detailed discussion of the above. |

| | | |
|---|---|---|
| a. winding a portion of thread from a thread supply about a core to make a partially wound core; | Wound cores are typically made by winding an elastic thread about a frozen center. The frozen center is made from a solid rubber ball or a hollow rubber shell containing liquid which is frozen to form a small hard sphere. *See e.g.*, Col. 4, line(s) 13-15. This step of the claim involves the initial winding of a portion of thread from a thread supply about a core to make a partially wound core. | See above. |
| b. placing the partially wound core onto a winding means; | The partially wound ball is picked up and positioned on the winding means at various points during the manufacturing cycle. *See e.g.*, Col. 3, line(s) 26-28. | See above. |
| c. winding additional thread from the thread supply about the partially wound core to make a wound core; | Additional thread, from a thread supply, is wound around the core at various stages of the manufacturing cycle to make a wound core. *See e.g.*, Col. 6, line(s) 37-Col. 7, line(s) 17. | See above. |
| d. removing the wound core from the winding means by means of a mechanical hand having a plurality of mechanical fingers; | A mechanical hand with a plurality of fingers removes the wound core from the winding means. *See e.g.*, Col. 6, line(s) 57-59. | See above. |
| e. winding thread from the thread supply about the plurality of mechanical fingers; | Thread from the thread supply is wound around the mechanical fingers. *See e.g.*, Col. 6, line(s) 65 - Col. 7, line(s) 2. | See above. |

4

| | Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|---|
| f. winding thread from the thread supply about the wound core; | | Thread, from the thread supply, is wound around the core at various stages of the manufacturing cycle. *See e.g.*, Col. 7, line(s) 12-17. | See above |
| g. dropping the thread off of the mechanical fingers onto the wound core; and | | During the manufacturing cycle, thread wound around the mechanical fingers is dropped from the fingers onto the wound core. *See e.g.*, Col. 7, line(s) 28-30. | See above. |
| h. severing the wound core from the thread supply. | | The thread, from the thread supply, is severed from the wound core during the manufacturing cycle. *See e.g.*, Col. 7, line(s) 60-64. | See above. |

**Claim 2**

| | Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|---|
| Preamble. The method of claim 1. | | See the method of claim 1 above. | See above. |
| 1. wherein, after step (g) but prior to step (h), the method further comprises a second step of winding the thread about the plurality of mechanical fingers. | | Thread wound around the mechanical fingers, for a second time, is dropped from the fingers onto the wound core after step (g) of claim 1 but before step (h). *See e.g.*, Col. 7, line(s) 47-51. | See above. |

**Claim 3**

| | Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|---|
| Preamble. A method for securing thread onto a wound | | This claim is broadly directed to method for preparing a wound golf ball by the successive | See above. |

| golf ball core comprising the successive steps of: | steps set forth in sub-parts a-e of the claim. | |
|---|---|---|
| a.  grasping with a mechanical hand having a plurality of mechanical fingers a wound golf ball core attached to a thread supply; | A mechanical hand with a plurality of fingers grasps a wound core which is attached to a thread supply. *See e.g.,* Col. 5, line(s) 31-35. | See above. |
| b.  winding thread from the thread supply about the plurality of mechanical fingers; | Thread, from the thread supply, is wound around the mechanical fingers during the manufacturing cycle. *See e.g.,* Col. 6, line(s) 65-Col. 7, line(s) 2. | See above. |
| c.  winding thread from the thread supply about the wound core; | Thread, from the thread supply, is wound around the wound core at various stages of the manufacturing cycle. *See e.g.,* Col. 7, line(s) 12-17. | See above. |
| d.  dropping the thread off of the mechanical fingers onto the wound core; and | During the manufacturing cycle, thread wound around the mechanical fingers is dropped from the fingers onto the wound core. *See e.g.,* Col. 7, line(s) 28-30. | See above. |
| e.  severing the wound core from the thread supply. | The thread, from the thread supply, is severed from the wound core. *See e.g.,* Col. 7, line(s) 60-64. | See above. |

6

**Claim 4**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. The method of claim 3. | See the method of Claim 3 above. | See above. |
| a. wherein, after step (d) but before step (e), the method further comprises a step of winding the thread about the plurality of mechanical fingers. | Thread wound around the mechanical fingers is dropped from the fingers onto the wound core after step (d) of claim 3 but before step (e). *See e.g.*, Col. 7, line(s) 47-51. | See above. |

7

**Claim Chart - U.S. Patent No. 4,770,422**

**Claim 1**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In the manufacture of a golf ball product by crosslinking polybutadiene diacrylate by weight per 100 parts by weight polybutadiene, the improvement comprising | This claim is broadly directed to the manufacture of a golf ball product wherein polybutadiene is crosslinked with about 25 to 40 parts zinc diacrylate by weight per 100 parts by weight polybutadiene where the improvement comprises the use of a chemical called a peroxide free radical initiator in the range set forth in sub-part (a) of claim 1. The term "polymer" means a complex molecule formed by the linkage of simple molecules. The term "monomer" means a simple molecule that is capable of combining with a number of like or unlike molecules to form a polymer. "Polybutadiene" is a carbon based polymer widely used in golf ball construction. "Zinc diacrylate" is the metal salt of an unsaturated carboxylic acid. *See e.g.*, Col. 1, line(s) 9-67. Carboxylic acids refer to the chemical group —COOH in an organic molecule. The term "unsaturated" refers to an organic compound that does not contain only single carbon-carbon bonds between its linked carbon atoms. Crosslinking is a widely used process for strengthening polymers through increasing or creating chemical bonding. See, e.g., Col. 2, line(s) 41-44, and line(s) 50-53. | Non-wound cores used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls, including Acushnet's Pinnacle Gold. The subject of numerous Acushnet patents, including claim 1 of the '422 patent. See ¶¶ 32 and 52 of my moving declaration for a more detailed discussion. |

9

| | | |
|---|---|---|
| a. the use of about 0.2 to 0.8 parts by weight polybutadiene of peroxide free radical initiator. | The crosslinking of polybutadiene by zinc diacrylate is completed with the use of about 0.2 to 0.8 parts by weight polybutadiene of a peroxide free radical initiator. An "initiator" is a compound with a weak covalent bond often used to start a chemical reaction. "Free radicals" are reactive molecules having an odd number of electrons (hence one unpaired electron) often employed in the synthesis of organic compounds. *See e.g.*, Col. 1, line(s) 64-Col. 2, line(s) 1, line(s) 10-13, line(s) 17-24, line(s) 34-40 and line(s) 42-45. | Acushnet's Pinnacle golf ball cores are made by the process and within the ranges of ingredients specified in claim 1 of this patent. |

**Claim Chart - U.S. Patent No. 4,546,980**

**Claim 1**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In the method of making a golf ball product from an admixture of polybutadiene and a metal salt of an unsaturated carboxylic acid the improvement comprising | This claim is broadly directed to a method of making golf ball products whereby polybutadiene is mixed with a metal salt of an unsaturated carboxylic acid, wherein the improvement comprises the steps described in the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for a definition of the terms "carboxylic acids," "unsaturated," "polybutadiene," "initiator," and "free radical." | Non-wound cores used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls, including Acushnet's Pinnacle Gold. The construction, composition, and/or method of manufacture of golf balls having these cores are the subject of numerous Acushnet patents, including claims 1, 9, 19 and 22 of the '980 patent. *See* ¶ 52 of my moving declaration for a more detailed discussion.  Specifically, Acushnet's Pinnacle golf ball products contain compositions that met the limitations (are made with ingredients within the ranges specified in) of each of claims 1, 9, 19 and 22. |
| 1.  the use of at least two free radical initiators, one said free radical initiator having a half life at 320° F. which is longer than the half life at 320° F. of the other said free radical initiator, the two free radical initiators being present in the ratio of about 1:9 to about 9:1. | One free radical initiator having a half life at 320° F. which is longer than the half life at 320° F. of the other free radical initiator are used. The two free radical initiators are present in a ratio of about 1:9 to about 9:1.  The term "half life" means the time it takes for half of the amount of the chemical in question to degrade. *See e.g.*, Col. 2, line(s) 11-15, line(s) 37-40, and line(s) 43-46, and Col. 3, line(s) 16-18. | See above. |

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| 2. the two free radical initiators being sufficiently different in half life to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either one of said initiators alone. | The two free radical initiators used have sufficiently different half lives to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either of the two free radical initiators alone. *See e.g.*, Col. 5, line(s) 30-50. | See above. |

**Claim 9**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. A golf ball product formed from a mixture comprising polybutadiene and a metal salt of an unsaturated carboxylic acid | This claim is broadly directed to a process of making a golf ball product from a mixture comprising polybutadiene and a metal salt of an unsaturated carboxylic acid by the steps set forth in the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "carboxylic acids," "unsaturated," and "polybutadiene". *See e.g.*, Col. 3, line(s) 28-41. | See above. |
| 1. said mixture having been cured with at least two free radical initiators, | The mixture comprising polybutadiene and a metal salt of a unsaturated carboxylic acid is cured with at least two free radical initiators. *See e.g.*, Col. 2, line(s) 11-15, and line(s) 37-40. | See above. |
| 2. one said free radical initiator having a half life at 320° F. which is longer than | The two free radical initiators have different reactivities, one free radical initiator having a half life at 320° F. which is longer than the half life at | See above. |

11

the half life at 320° F. of the other said free radical initiator, the two free radical initiators being present in the ratio of about 1:9 to about 9:1,

320° F. of the other free radical initiator. The two free radical initiators are present in a ratio of about 1:9 to about 9:1. *See e.g.*, Col. 2, line(s) 43-46, and Col. 3, line(s) 16-18.

| | | |
|---|---|---|

3.  the two free radical initiators being sufficiently different in half life to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either one of said initiators alone.

The two free radical initiators have sufficiently different half lives to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either of the two free radical initiators alone. *See e.g.*, Col. 5, line(s) 30-50.

See above.

**Claim 19**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  A golf ball product formed from an admixture of polybutadiene and a metal salt of an unsaturated carboxylic acid | This claim is broadly directed to a process of making golf ball products whereby polybutadiene is mixed with a metal salt of an unsaturated carboxylic acid, wherein the improvement is set forth in the steps described in the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for a definition of the terms "carboxylic acids," "unsaturated," and "polybutadiene." *See e.g.*, Col. 1, line(s) 62-63, and line(s) 28-41. | See above. |

12

**Claim 22**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. A golf ball product formed from an admixture of polybutadiene and a metal salt of an unsaturated carboxylic acid | This claim is broadly directed to a process of making golf ball products whereby polybutadiene is mixed with a metal salt of an unsaturated carboxylic acid, wherein the improvement comprises the steps described in | See above. |
| 1. the improvement comprising the use of at least two free radical initiator, | The improvement comprises the following. At least two free radical initiators are used. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "initiator" and "free radicals" and definitions presented in connection with the claim construction of claim 1 of the '980 patent for the definition of "half life." *See e.g.,* Col. 2, line(s) 11-15. | See above. |
| 2. one said free radical initiator having a half life at 320° F. which is at least three times longer than the half life at 320° F. of the other said free radical initiator, | The two free radical initiators have different reactivities, one free radical initiator having a half life at 320° F. which is longer than the half life at 320° F. of the other free radical initiator. *See e.g.,* Col. 2, line(s) 43-46 and line(s) 5-10. | See above. |
| 3. the two free radical initiators being present in the ratio of about 1:9 to about 9:1 and the total amount of free radical initiator being from about 0.2 to 10 parts by weight of the polybutadiene. | The two free radical initiators are present in the ratio of about 1:9 to about 9:1. The total amount of free radical initiator present is from about 0.2 to 10 parts by weight of the polybutadiene. *See e.g.,* Col. 3, line(s) 16-18 and line(s) 10-12. | See above. |

13

| | | |
|---|---|---|
| 1.   the improvement comprising the use of at least two free radical initiators, | the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for a definition of the terms "carboxylic acids," "unsaturated," and "polybutadiene." *See e.g.*, Col. 1, line(s) 62-63, and Col. 3, line(s) 28-41. | See above. |
| | At least two free radical initiators are used. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "initiator" and "free radicals" and definitions presented in connection with the claim construction of claim 1 of the '980 patent for the definition of "half life." *See e.g.*, Col. 2, line(s) 11-15, and line(s) 37-40, and line(s) 43-46, Col. 3, line(s) 16-18, and Col. 2, line(s) 5-10. | |
| 2.   the two free radical initiators being in sufficient quantity and being sufficiently different in half life and being in a ratio which yields a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either one of said initiators alone. | The two free radical initiators used have sufficiently different half lives to yield a golf ball product having an initial velocity at least 0.5 foot per second higher than the initial velocity of the same golf ball product made with either of the two free radical initiators alone. *See e.g.*, Col. 5, line(s) 30-50. | See above. |

14

**Claim Chart - U.S. Patent No. 4,692,497**

**Claim 8**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In a product formed from an admixture of a polymer formed from a diene monomer at least a portion of which is polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms | This claim is broadly directed to a product formed from an admixture of polymer formed from a diene monomer at least a portion of which is polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the steps described in the remainder of the claim. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "unsaturated", "carboxylic acids," "monomer," "polymer," and "polybutadiene". The term "diene" means a compound having two carbon-carbon double bonds. The term "ethylenically unsaturated" means an unsaturated compound in which there are one or more double bonds between carbon atoms. The terms "alpha" and "beta" refers to the orientation of certain carbon-carbon double bonds on a compound. *See e.g.*, Col. 3, line(s) 26-36. | Non-wound cores used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls including Acushnet's Pinnacle Gold. The construction, composition, and/or method of manufacture of golf balls having these cores are the subject of numerous Acushnet patents, including claims 8, 11, 12 and 13 of the '497 patent. *See* ¶¶ 32 and 52 of my moving declaration for a more detailed discussion. Specifically, such Acushnet Pinnacle golf balls contain a composition which is made by a process which meets each limitation of each of these claims of the '497 patent. |
| 1. the improvement comprising the use of at least two free radical initiators, | The improvement comprises the following. At least two free radical initiators are used. *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "free radical" and "initiator." *See e.g.*, Col. 2, line(s) 14-19. | See above. |

**Claim 10**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In a product formed from an admixture of polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms | This claim is broadly directed to a product formed from a mixture of polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the steps described in the remainder of the claim.  *See* the definitions above for claim 8.  *See, e.g.,* Col. 3, line(s) 26-36. | See above. |
| 4. and being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1.  *See, e.g.,* Col. 3, line(s) 19-21. | See above. |
| 3.  the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content.  *See, e.g.,* Col. 3, line(s) 13-15. | See above. |
| 2.  one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F.  *See, e.g.,* Col. 2, line(s) 40-43 and line(s) 46-49. | See above. |

16

**Claim 11**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| 1.  the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used.  *See* definitions presented in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "initiator" and "free radicals" and definitions presented in connection with the claim construction of claim 1 of the '980 patent for the definition of "half life."  *See e.g.,* Col. 2, line(s) 11-15. | See above. |
| 2.  one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320° F., | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F.  *See e.g.,* Col. 2, line(s) 37-40 and line(s) 43-46, Col. 3, line(s) 16-18 and Col. 2, line(s) 5-10. | See above. |
| 3.  the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content.  *See e.g.,* Col. 3, line(s) 13-15. | See above. |
| 4.  and being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1.  *See e.g.,* Col. 3, line(s) 19-21. | See above. |
| Preamble.  In a product formed from an admixture comprising polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated | This claim is broadly directed to a product formed from a mixture of polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the | See above. |

17

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| carboxylic acid having 3 to 8 carbon atoms | steps described in the remainder of the claim. *See e.g.,* Col. 3, line(s) 26-36. | |
| 1.  the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See e.g.,* Col. 2, line(s) 11-15. | See above. |
| 2.  one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320° F. | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. *See e.g.,* Col. 2, line(s) 37-40 and line(s) 43-46 and line(s) 5-10. | See above. |
| 3.  the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content and | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content. *See e.g.,* Col. 3, line(s) 13-15. | See above. |
| 4.  being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.,* Col. 3, line(s) 19-21. | See above. |

**Claim 12**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In a product formed from an admixture comprising polybutadiene and zinc acrylate or zinc diacrylate | This claim is broadly directed to a method for producing a golf ball product formed from an admixture comprising polybutadiene and zinc acrylate or zinc diacrylate. *See* definitions for claim 8 above and those in the claim construction of claim 1 of the '422 patent for the definition of the terms "carboxylic acids," "unsaturated," | See above. |

18

**Claim 13**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In a product formed from an admixture comprising polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated | This claim is broadly directed to a method for producing a golf ball product from an admixture comprising polybutadiene and a metal salt of an alpha, beta ethylenically unsaturated carboxylic acid having 3 to 8 carbon atoms, wherein the improvement comprises the steps set forth in the | See above. |
| 1. the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See e.g.*, Col. 2, line(s) 11-15. | See above. |
| | "crosslinking," "polymers," "monomers," and "polybutadiene" *See e.g.*, Col. 3, line(s) 26-36 and Col. 4, line(s) 4-19. | |
| 2. one of the free radical initiators having a half life which is at least three times greater than the half life of another of the free radical initiators at 320° F. | One of the free radical initiators used has a half life which is at least three times greater than the half life of another of the free radical initiators at 320°F. *See e.g.*, Col. 2, line(s) 37-40, line(s) 43-46 and line(s) 5-10. | See above. |
| 3. the two free radical initiators being present in the amount of from about 0.2 to about 10 parts by weight of the polymer content | The two free radical initiators are present in the amount of from about 0.2 to about 10 parts by weight of the polymer content. *See e.g.*, Col. 3, line(s) 13-15. | See above. |
| 4. and being present in a ratio of from about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.*, Col. 3, line(s) 19-21. | See above. |

19

| | | |
|---|---|---|
| carboxylic acid having 3 to 8 carbon atoms | remainder of the claim. *See* definitions set forth in claim 8 above and in connection with the claim construction of claim 1 of the '422 patent for the definition of the terms "carboxylic acids," "unsaturated," "crosslinking," "polymers," "monomers," and "polybutadiene". *See e.g.*, Col. 3, line(s) 26-36. | |
| 1. the improvement comprising the use of at least two free radical initiators, | At least two free radical initiators are used. *See e.g.*, Col. 2, line(s) 11-15. | See above. |
| 2. one said free radical initiator having a half life of less than about 1 minute at 320° F. | One of the free radical initiators has a half life of less than about 1 minute at 320° F. *See e.g.*, Col. 2, line(s) 54-Col. 3, line(s) 1. | See above. |
| 3. and the other said free radical initiator having a half life of greater than about 10 minutes at 320° F. | The other free radical initiator has a half life of greater than about 10 minutes at 320° F. *See e.g.*, Col. 3, line(s) 6-11. | See above. |
| 4. the free radical initiators being present in the ratio of about 1:9 to about 9:1. | The two free radical initiators are present in a ratio of from about 1:9 to about 9:1. *See e.g.*, Col. 3, line(s) 19-21. | See above. |

20

**Claim Chart - U.S. Patent No. 5,000,459**

**Claim 1**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble. In a golf ball having an ionomer resin cover | This claim is broadly directed to directed to a golf ball product having an ionomer resin cover. *See e.g.*, Col. 2, line(s) 27-28. The term "ionomer resin" means a polymer that has ethylene as the major component, but contains both ionic and covalent bonds. | Many of the golf ball covers used by Nitro in the construction of their Ultimate Distance and Tour Distance Titanium golf balls were originally manufactured and sold by Acushnet as a component of various Acushnet golf balls including Acushnet's Pinnacle Gold. The construction, composition, and/or method of manufacture of golf balls having these golf ball covers are the subject of numerous Acushnet patents, including claims 1 and 7 of the '459 patent. *See* ¶¶ 32 and 52 of my moving declaration for a more detailed discussion. Specifically, such Pinnacle golf balls contain a composition that was made by the process (and within the range of ingredients) specified in claims 1 and 7 of the '459 patent). |
| 1. the improvement comprising said ionomer resin cover comprising at least about 50 phr of lithium ionomer resin | The ionomer resin cover comprises as least about 50 phr of a type of resin known as lithium ionomer resin which is further described below. The term "phr" means parts by weight based on 100 parts by weight of resin. *See e.g.*, Col. 2, line(s) 8-18 and Col. 2, line(s) 27-30. | See above. |
| 2. which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by | The lithium ionomer resin is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid. The | See above. |

21

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| weight of the copolymer of acrylic or methacrylic acid | term "copolymer" means the product of polymerization of two or more substances at the same time. *See e.g.*, Col. 2, line(s) 30-33. | See above. |
| 3.  in which about 10% to about 90% of the acid groups are neutralized by lithium; | The acid groups are neutralized by lithium. *See e.g.*, Col. 2, line(s) 33, lines 41-49 and line(s) 60-64. | See above. |
| 4.  and about 10 to about 50 phr of sodium ionomer resin which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by sodium. | About 10 to about 50 phr of sodium ionomer resin, which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups, are neutralized by sodium. *See e.g.*, Col. 2, line(s) 35-40. | See above. |

**Claim 7**

| Claim Language | Claim Construction | Infringing Golf Balls |
|---|---|---|
| Preamble.  In a golf ball comprising a core and a cover the improvement comprising | This claim is broadly directed to a golf ball product comprising a core and a cover, wherein the improvement comprises the steps described in the remainder of the claim. *See e.g.* Col. 3, line(s) 29-34, and Col. 4, line(s) 7-29. | See above. |
| 1.  at least 90% by weight of said cover being made from a blend of ionomer resins | At least 90% by weight of said cover is made from a blend of ionomer resins.  *See e.g.*, Col. 3, line(s) 14-19. | See above. |

22

| | | |
|---|---|---|
| 2.  said blend comprising:  (i) at least about 50 phr of a lithium ionomer resin | The blend of ionomer resins comprises at least about 50 phr of a lithium ionomer resin. *See e.g.*, Col. 2, line(s) 8-18. *See* definitions presented in connection with the claim construction of claim 1 of the '459 patent for the definition of "phr." | See above. |
| 3.  which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by lithium; and | The lithium ionomer resin is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by lithium. *See e.g.*, Col. 2, line(s) 30-34, line(s) 60-64 and line(s) 41-44. | See above. |
| 4.  about 10 to about 50 phr of a sodium ionomer resin which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups are neutralized by sodium; and | About 10 to about 50 phr of a sodium ionomer resin which is a copolymer comprising 95 to 80 parts by weight of copolymer of ethylene and 5 to 20 parts by weight of the copolymer of acrylic or methacrylic acid in which about 10% to about 90% of the acid groups, are neutralized by sodium. *See e.g.*, Col. 2, line(s) 35-40. | See above. |

23

| | | |
|---|---|---|
| 5. up to about 10% by weight of said cover comprising one or more additional ingredients selected from the group consisting of other ionomers, other resins, titanium dioxide, dyes, UV absorbers and optical brighteners. | The cover additional comprises up to about 10% by weight, of one or more additional ingredients selected from the group consisting of other ionomers, other resins, titanium dioxide, dyes, UV absorbers and optical brighteners. *See e.g.,* Col. 3, line (s) 14-26. | See above. |

24