UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO.  02-14008-CIV-MIDDLEBROOKS

IN RE NITRO LEISURE PRODUCTS, L.L.C.

_____/

NIGHT BOX
FILED

JUN 18 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

---

**APPENDIX VOLUME I
TO
ACUSHNET COMPANY'S MOTION FOR SANCTIONS
BASED UPON CONDUCT OF NITRO'S COUNSEL
DURING DEPOSITION OF AMIN KHOURY**

---

CHRIS S. COUTROULIS
Florida Bar No. 300705
ROBERT L. CIOTTI
Florida Bar No. 333141
CARLTON FIELDS, P.A.
One Harbour Place
777 S. Harbour Island Blvd.
Tampa, FL  33602-5730
Telephone:  (813) 223-7000
Facsimile:  (813) 229-4133

STEVEN J. BRODIE
Florida Bar No. 333069
JEFFREY MICHAEL COHEN
Florida Bar No. 091495
MICHELLE GERVAIS
Florida Bar No. 173827
CARLTON FIELDS, P.A.
4000 Bank of America Tower
100 SE Second Street
Miami, FL  33131-9101
Telephone:  (305) 530-0050
Facsimile:  (305) 530-0055

TPA#1835330.1

INDEX
TO
ACUSHNET COMPANY'S MOTION FOR SANCTIONS
BASED UPON CONDUCT OF NITRO'S COUNSEL
DURING DEPOSITION OF AMIN KHOURY

| TAB NO. | | VOLUME NO. |
|---|---|---|
| 1 | Acushnet's Fourth Amended Notice of Taking Videotaped Corporate Deposition and Exhibit A | I (antitrust) |
| 2 | Acushnet's Fourth Amended Notice of Taking Videotaped Corporate Deposition and Exhibit A | I (intell. property) |
| 3 | Email from Gary Betensky | I |
| 4 | Responses of Nitro Leisure Products, LLC to Acushnet's First Set of Interrogatories | I |
| 5 | Deposition Transcript of Amin Khoury dated May 28, 2003 | II (antitrust) |
| 6 | Deposition Transcript of Amin Khoury dated May 29, 2003 | III (intell. property) |

TPA#1835330.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 02-14008-CIV-MIDDLEBROOKS

**IN RE NITRO LEISURE PRODUCTS, L.L.C.**
_____/

## ACUSHNET'S FOURTH AMENDED NOTICE OF TAKING VIDEOTAPED CORPORATE DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)

TO:   Gary S. Betensky
      Richman Greer Weil Brumbaugh Mirabito & Christensen, P.A.
      One Clearlake Centre - Suite 1504
      250 Australian Avenue, South
      West Palm Beach, FL 33401

      Mark W. Yocca
      Yocca Patch & Yocca LLP
      19900 Mac Arthur Boulevard #650
      Irvine, CA 92612

PLEASE TAKE NOTICE that Defendant Acushnet Company (Acushnet"), by its undersigned attorneys, pursuant to Fed. R. Civ. P. 30(b)(6), will take a deposition upon oral examination of the corporate representative of Nitro Leisure Products, LLC ("Nitro"). The deposition shall commence at **9:00 a.m., on May 28, 2003**, and 9:00 a.m. to 1:00 p.m. on May 29, 2003 and continuing thereafter on a date to be agreed upon, if necessary, and will take place at the offices of **Carlton Fields, P.A., Esperante, 222 Lakeview Avenue, Suite 1400, West Palm Beach, Florida 33401**, before a court reporter or another officer duly authorized by law to take depositions in the State of Florida. The deposition shall be videotaped in accordance with Federal Rules.

Nitro shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf, with respect to each of the matters set forth in Exhibit A,

ATTACHMENT / EXHIBIT /

attached.  The person so designated shall testify as to matters known or reasonably available to Nitro, and, for each person so designated, Nitro shall set forth the matters on which the person will testify.

The deposition is being taken for the purpose of discovery, for use at trial, or both of the foregoing, or for all other such other purposes as are permitted under the applicable Rules of Court.  You are invited to attend and cross-examine.

CARLTON FIELDS, P.A.
4000 Bank of America Tower
100 SE Second Street
Miami, FL  33131-9101
Telephone:     (305) 530-0050
Facsimile:     (305) 530-0055

By: _____

STEVEN J. BRODIE, ESQ.
Florida Bar No. 333069
*sbrodie@carltonfields.com*
JEFFREY MICHAEL COHEN
Florida Bar No. 091495
*jmcohen@carltonfields.com*
MICHELLE GERVAIS, ESQ.
Florida Bar No. 173827
*mgervais@carltonfields.com*
- and -
ROBERT CIOTTI
Florida Bar No. 333141
*rciotti@carltonfields.com*
Carlton Fields, P.A.
One Harbour Place
777 S. Harbour Island Blvd.
Tampa, FL  33602-5730
Telephone:     (813) 223-7000
Facsimile:     (813) 229-4133

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was furnished via Facsimile / U.S.

Mail delivery to the above-named addressees on May ___, 2003.

_____
Attorney

## EXHIBIT A

### Matters on Which Oral Examination will be Taken

1.     Nitro's monthly, quarterly and annual sales of golf balls (including new, recycled and refurbished balls) – on a unit or dollar basis – in each of the years 1997, 1998, 1999, 2000, 2001, and 2002.  This should include such sales through any particular channel of distribution such as on-course golf shops, off-course golf shops, sporting goods stores, other retailers, by mail order, or over the internet.

2.     Any projections prepared by or for Nitro of its gross sales revenues, costs, or net profits with respect to its recycled and refurbished golf balls for any period of time beginning with the year 1997 and for any period thereafter, as well as the actual gross sales revenues, costs, or net profits for such balls, on a monthly, quarterly and annual basis, during each of the years 1997, 1998, 1999, 2000, 2001, and 2002.

3.     Any projections or goals prepared by or for Nitro relating to the number of on-course golf shops, off-course golf shops, sporting goods stores, and other retailers that would be selling its recycled and refurbished golf balls for any period of time beginning with the year 1997 and for any period thereafter, as well as the actual number of and specific on-course golf shops, off-course golf shops, sporting goods stores, and other retailers which have sold its recycled and refurbished balls during the years 1997, 1998, 1999, 2000, 2001 and 2002.

4.     Any projections or goals prepared by or for Nitro regarding its share (on a unit or dollar basis) of the domestic market for recycled or refurbished golf balls for any period of time beginning with the year 1997 and for any period thereafter, as well as Nitro's actual share (on a unit or dollar basis) of the domestic market for recycled or refurbished golf balls in each of the years 1997, 1998, 1999, 2000, 2001, and 2002.

5.      Nitro's allegation that it is the largest seller of used golf balls.

6.      Any plans, projections or goals prepared by or for Nitro regarding its development of business relationships with any person or entity involved in the sale, distribution and advertisement of golf balls, including but not limited to golf ball retailers.

7.      Any efforts engaged in by Nitro to develop business relationships with any person or entity involved in the sale, distribution and advertisement of golf balls, including but not limited to golf ball retailers.

8.      Any projections or goals prepared by or for Nitro regarding its share of the domestic golf ball market – including for any market segment Nitro believes exists of the domestic golf ball market and in which it competes or intends to compete – for any period of time beginning with the year 1997 and for any period thereafter, as well as Nitro's actual share of the domestic golf ball market (or any such market segment thereof) in each of the years 1997, 1998, 1999, 2000, 2001, and 2002.

9.      The volume or percentage of Nitro's sales – on a unit and dollar basis – accounted for by each manufacturer's refurbished and recycled golf balls, and by each particular model of golf ball.

10.     Nitro's efforts to promote its recycled or refurbished golf balls, including without limitation, any incentives it provides to golf professionals, on-course or off-course golf shops, or any retail establishments to display such balls.

11.     Any efforts of any golf ball manufacturer to promote its new golf balls, including, without limitation, as alleged in Nitro's complaint, any incentives provided to golf professionals to display their balls, and any payments to members of the PGA Tour, LPGA Tour, and Senior Tour to play their balls.

12.     Acushnet's market share or alleged monopoly or market power in what Nitro describes as the premium golf ball market; as well as Acushnet's market share or alleged market power in what Nitro describes as the mid-price golf ball market.

13.     Nitro's allegation that Acushnet has focused on what Nitro describes as a "mid-price price market" as an area in which it wants to grow.

14.     The effect or possible effect of recycled or refurbished golf balls on the domestic market for new golf balls or any segment of that market that Nitro believes exists, including without limitation the markets for new premium golf balls and for mid-price golf balls.

15.     Nitro's allegation that there is strong consumer demand for refurbished and recycled Titleist golf balls.

16.     Nitro's allegations that (1) there is or has been a "flourishing market" for refurbished Titleist Pro V1 golf balls purchased by golfers who otherwise would have bought non-premium balls, (2) there is strong consumer demand for refurbished and recycled Pro VI golf balls, and (3) that Nitro's recycled and refurbished Pro VI golf balls compete primarily against what Nitro describes as Acushnet's mid-price brands.

17.     Nitro's allegations that (1) for decades, Acushnet has been closely monitoring the success of used golf balls, (2) Acushnet considers used golf balls to be competition for its new golf balls, and (3) Acushnet has sought to eliminate competition from used golf balls.

18.     Nitro's allegations that (1) Acushnet considers Nitro to be one of its competitors, and (2) Acushnet has sought to eliminate Nitro as a competitor.

19.     Nitro's allegations that Acushnet has:

        a.   Stated to Nitro's customers that Acushnet intended to commence litigation against Nitro on account of Nitro's use of 'Titleist' and 'Pinnacle' in connection with its

advertising, promotion, sale and distribution of refurbished 'Titleist' and 'Pinnacle' golf balls;

b. Led Nitro's customers to believe that if Nitro's customers sell Nitro's refurbished golf balls, Acushnet may commence legal action against them;

c. Threatened Nitro's customers and potential customers that, if they sell Nitro's recycled or refurbished golf balls, Acushnet will cease supplying Titleist golf balls to those customers;

d. Threatened Nitro's customers and potential customers that, if they sell Nitro's recycled or refurbished golf balls, Acushnet will cease supplying Acushnet's mid-price and low-priced golf balls to those customers;

e. Published false, misleading, disparaging or defamatory statements about Nitro or Nitro's products;

f. Complained to retailers about the price at which Nitro's golf balls are priced;

g. Made statements that would cause actual or potential customers of Nitro, or the public, to believe that its golf balls are "illegal and counterfeit;" or

h. Made statements that would cause actual or potential customers of Nitro, or the public, to believe that Nitro, Second Chance and Golfballsdirect.com are "dishonest, disreputable, and unlawful businesses."

20.    Nitro's allegation that all or any of the matters listed in 19(a) through (h) above were made by Acushnet with knowledge of their falsity or with the sole intent to cause injury to Nitro.

21.    Each retailer, sporting goods store, or on-course or off –course golf shop (hereinafter, "customer or potential customer"), who Nitro alleges refused to do business with it, dropped it as a supplier, cancelled any order with it, or declined to continue doing business with it, as a result

of any alleged illegal conduct by Acushnet, and the facts and circumstances upon which Nitro is relying for this allegation.

22.     Each golf ball channel of distribution from which Nitro believes it has been excluded as a result of any alleged illegal conduct by Acushnet, the facts and circumstances upon which Nitro is relying for this allegation, the participants (both sellers and buyers) in that channel of distribution during each of the years 1997, 1998, 1999, 2000, 2001 and 2002, any prior sales by Nitro into that channel of distribution, and any plans or efforts by Nitro to enter (or re-enter) that channel of distribution that Nitro believes were or have been thwarted by Acushnet's alleged illegal conduct.

23.     Any impact Nitro believes any alleged illegal conduct by Acushnet has had on its business, including without limitation any impact on Nitro's goodwill, reputation, and sales, including the volume of alleged lost sales (including by units and dollars), if any, and lost profits. If Nitro believes the impact includes lost sales or lost profits, this matter includes:

> a. Nitro's lost sales (and profits on sales) to on-course golf shops, off-course golf shops, sporting goods stores, other retailers, by mail order, or over the internet; and
>
> b. Nitro's lost sales (and profits on sales) of specific golf ball models or manufacturers (as a whole, and within specific channels of distribution).

24.     Nitro's allegation that Acushnet's alleged illegal conduct has resulted in actual injury to competition and restrained, foreclosed and eliminated competition from efficient and effective competitors; including without limitation the facts and circumstances upon which Nitro is relying for this allegation including the identity of and manner in which any particular competitor has

been restrained, foreclosed and eliminated from the competition as a result of Acushnet's alleged illegal conduct.

25.    Nitro's allegations that Acushnet's alleged illegal conduct has caused the:

       a.  Prices of golf balls to be higher than they otherwise would be;

       b.  Output of golf balls, or any particular type or model of golf ball, to be less than it otherwise would be;

       c.  Quality of golf balls to be poorer than it otherwise would be.

26.    Any complaint or instance of a customer or consumer having purchased a recycled or refurbished ball sold by Nitro believing it to have been a new Titleist or Pinnacle ball.

27.    Any complaint regarding the quality or performance of the golf ball sold by Nitro.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 02-14008-CIV-MIDDLEBROOKS

IN RE NITRO LEISURE PRODUCTS, L.L.C.

_____/

### ACUSHNET'S FOURTH AMENDED NOTICE OF TAKING VIDEOTAPED CORPORATE DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)

TO:   Gary S. Betensky
      Richman Greer Weil Brumbaugh Mirabito & Christensen, P.A.
      One Clearlake Centre - Suite 1504
      250 Australian Avenue, South
      West Palm Beach, FL  33401

      Mark W. Yocca
      Yocca Patch & Yocca LLP
      *Attorneys for Nitro*
      19900 Mac Arthur Boulevard
      Suite 650
      Irvine, CA  92612

PLEASE TAKE NOTICE that Defendant Acushnet Company (Acushnet"), by its undersigned attorneys, pursuant to Fed. R. Civ. P. 30(b)(6), will take a deposition upon oral examination of the corporate representative of Nitro Leisure Products, LLC ("Nitro").  The deposition shall commence at **2:00 p.m., on May 29, 2003**, and 9:00 a.m. to 5:00 p.m. on May 30, 2003 and continuing thereafter on a date to be agreed on, if necessary, and will take place at 'the offices of **Carlton Fields, P.A., Esperante, 222 Lakeview Avenue, Suite 1400, West Palm Beach, Florida 33401**, before a court reporter or another officer duly authorized by law to take depositions in the State of Florida.  The deposition shall be videotaped in accordance with Federal Rules.

Nitro shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf, with respect to each of the matters set forth in Exhibit A,



ATTACHMENT / EXHIBIT  2

TPA#1814258.5

attached.  The person so designated shall testify as to matters known or reasonably available to Nitro, and, for each person so designated, Nitro shall set forth the matters on which the person will testify.

The deposition is being taken for the purpose of discovery, for use at trial, or both of the foregoing, or for all other such other purposes as are permitted under the applicable Rules of Court.  You are invited to attend and cross-examine.

CARLTON FIELDS, P.A.
4000 Bank of America Tower
100 SE Second Street
Miami, FL  33131-9101
Telephone:     (305) 530-0050
Facsimile:      (305) 530-0055

By: _____
STEVEN J. BRØDIE, ESQ.
Florida Bar No. 333069
sbrodie@carltonfields.com
JEFFREY MICHAEL COHEN
Florida Bar No. 091495
jmcohen@carltonfields.com
MICHELLE GERVAIS, ESQ.
Florida Bar No. 173827
mgervais@carltonfields.com
     - and -
ROBERT CIOTTI
Florida Bar No. 333141
rciotti@carltonfields.com
Carlton Fields, P.A.
One Harbour Place
777 S. Harbour Island Blvd.
Tampa, FL  33602-5730
Telephone:     (813) 223-7000
Facsimile:      (813) 229-4133

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was furnished via Facsimile / U.S.

Mail to the above-named addressees on May 2ℓ, 2003.

_____
Attorney

## EXHIBIT A

### Definition of Terms

A.      The term "Plaintiff," or "Nitro" as used herein, shall mean Nitro Leisure Products, Inc., its officers, employees, agents, counsel, associates, accountants, servants, assignees, heirs, personal representatives, and all other persons or entities acting or purporting to act on behalf of Nitro in this action.

B.      The term "Defendant," or "Acushnet" as used herein, shall refer to Acushnet Company, as well as to any officers, employees, agents, counsel, associates, accountants, servants, assignees, heirs, personal representatives, and all other persons or entities acting or purporting to act on behalf of Acushnet in this action.

C.      The "Acushnet Patents" shall mean patents identified in the Complaint, including United States Patent Nos. 5,609,535; 4,846,910; 4,546,980; 4,692,497; 4,770,422 and 5,000,459.

D.      The Acushnet Trademarks shall mean all trademarks and commercial styles, logo types, side stamps and service marks of any type or kind owned by Acushnet, including without limitation, ACUSHNET, TITLEIST, TITLEIST #1 BALL IN GOLF, DT, DT DISTANCE, DT WOUND, PROFESSIONAL, PINNACLE, PRO V1 and their respective logo types, designs and commercial styles, including without limitation the marks identified in the Complaint and those registered as United States Trademark Nos. 929,942; 516,729; 316,118; 1,601,034; 1,112,381; 1,165,697; and 1,974,304 and applications Serial Nos. 76/143,347 and 76/320,324.

E.      The term "Acushnet Product" shall mean any golf ball that is manufactured, fabricated, advertised, marketed, sold or offered for sale by Acushnet.

F.      The term "Relevant Nitro Product" shall mean any golf ball, new or used, that has been acquired, manufactured, fabricated, refurbished, remanufactured, repaired, recycled,

refinished, re-washed, advertised, marketed, sold or offered for sale by or on behalf of Nitro, which product is either (i) created, derived or otherwise produced in any way from, in whole or in part, any Acushnet Product, (ii) embodies or at any time embodied the technology claimed in any claim of any Acushnet patent, or (iii) which bears or at any time bore an Acushnet Trademark or any trademark similar thereto.

G.     The term "including" preceded by a general term and followed by a list of examples shall be construed to include the examples without limitation to the scope of the general term.

H.     The terms "concern", "concerning", "relate", "relating" and similar terms and phases, as used with respect to a request for documents and a subject (e.g., "documents relating to a subject") means all documents relating to or that are related to the subject, including, without limitation, all documents and things that are, refer to, are referred to by, explain, are explained by, comprise, are comprised of, evidence, tend to evidence, contradict, tend to contradict, mention, are mentioned by, reflect or are reflected by, the subject.

## Matters on Which Oral Examination will be Taken

1.     The operation, structure and history of Nitro, or any predecessor or related organization, that was involved in any way with the recycling, refurbishment, manufacture, sale or distribution of an Acushnet product.

2.     All allegations set forth in paragraphs 7 through 135 of Nitro's First Amended Complaint.

3.     Nitro's admissions or denials set forth in the Answer contained within Nitro's Answer and Affirmative Defenses to Amended Counterclaims.

4.     Nitro's allegations set forth in any of the Affirmative Defenses or Counterclaims to Nitro's Answer and Affirmative Defenses to Amended Counterclaims.

5.     Nitro's allegation that "Acushnet's conduct has caused Acushnet's alleged trademarks to lose any significance as symbols of equal quality."

6.     Nitro's allegation that Nitro relied on Acushnet's "failure to object to Nitro's allegedly unlawful conduct."

7.     Nitro's allegation that "Nitro has been severely prejudiced by Acushnet's failure to timely object to Nitro's conduct."

8. ·    Nitro's allegation that "Acushnet has engaged in a wide variety of inequitable conduct directly relating to the claims it has asserted against Nitro."

9.     Nitro's allegation that the "public is not deceived or misled by Nitro's truthful, non-misleading use of Acushnet's alleged trademarks."

10.     Nitro's allegations of misleading advertisements published by Acushnet.

11.     Nitro's allegations of false or misleading statements published by Acushnet.

12.     Persons with whom Nitro has a commercial relationship alleged to have been interfered with by Acushnet.

13.     Nitro's allegation that Nitro does not "dilute, infringe, unfairly compete with or otherwise violate any of Acushnet's rights."

14.     Nitro's allegation that "Neither Nitro nor any of Nitro's products infringe, either directly, indirectly, literally, or under the doctrine of equivalents any claim of any of Acushnet's patents."

15.     Nitro's allegation that "Acushnet's patents which it alleged that Nitro has infringed, and each claim thereof, are invalid."

16.     Nitro products, labels, packages, tags, brochures, advertisements, promotional items, information literature, contribution lists, stationery, invoices, and business card on which any name or mark comprised of or including the word(s) of an Acushnet Trademark, appears or has appeared.

17.     Nitro's use in any manner anywhere, denominatively or otherwise, of any name or mark comprised of or including the word(s) of an Acushnet Trademark, or any phonetically or visually similar variation thereof, by Nitro and/or its licensees.

18.     The methods or manner by which Nitro and/or its licensees have advertised or promoted the sale or distribution of products in association with any name or mark comprised of or including the word(s) of an Acushnet Trademark, or any phonetically or visually similar variation thereof.

19.     Expenditures made by Nitro to advertise, solicit or promote the sale or distribution of any refurbished, recycled or manufactured golf ball.

20.     Investigations or studies made of Acushnet's business or activities at any time by Nitro.

21.     Any surveys that have been conducted to evaluate whether the use of any name or mark including in whole or part the word(s) of an Acushnet Trademark, or any phonetically or visually similar variation thereof, is likely to cause confusion with any other mark.

22.     Nitro's efforts, if any, to avoid likelihood of confusion with respect to any Acushnet Trademark.

23.     Nitro's sales, distribution, marketing or promotion of any refurbished, recycled or remanufactured golf ball derived in whole or in part from any Acushnet product.

24.     Actual disputes or potential disputes of which Nitro is aware, between Nitro and any person other than Acushnet, concerning sale, offer for sale or use of any golf ball or process for making a golf ball, including without limitation notices of infringement and unfair competition, infringement investigations, and court and agency proceedings of any type (such as infringement actions, unfair competition actions, oppositions, cancellations and government charity related investigations) in any country.

25.     Revenues collected by Nitro or any related companies or entities as a result of its sales, distributing, marketing or promoting any refurbished, recycled or remanufactured golf ball derived in whole or in part from any Acushnet product, Nitro's overhead costs and expenses diminishing said revenue, and the net revenue realized by Nitro and identify all documents related thereto.

26.     Confusion between any Acushnet product and any golf ball sold by Nitro.

27.     Nitro's knowledge or awareness of Acushnet's use or registration of any Acushnet Trademark.

28.     Nitro's selection, adoption, use or alteration of any name or mark comprised of or including the word(s) of an Acushnet Trademark, or any phonetically or visually similar variation thereof.

29.     Nitro's or its licensees' marketing, growth, and expansion plans related in any way to use or sale of any product including any name or mark comprised of or including the word(s) of an Acushnet Trademark, or any phonetically or visually similar variation thereof, including but not limited to documents referring or relating to products, channels of trade, or geographic scope of promotion or solicitation.

30.     The performance or quality of Nitro's golf balls.

31.     Complaints regarding the performance or quality of Nitro's golf balls.

32.     Research, investigation, consumer or market survey or test undertaken by Nitro (or on behalf of Nitro), including but not limited to search reports and investigation reports prepared by or for Nitro, which refer to, relate to, or comment upon any of the issues in this litigation.

33.     Relevant Nitro Products.

34.     Any opinion from counsel, whether or not such counsel was employed by Nitro, concerning Nitro's right to use any Acushnet Trademark, and all documents and things referring or relating to any action taken by Nitro following any such opinion.

35.     Nitro's first receipt of notice of Acushnet's use of the mark Acushnet Trademarks.

36.     Nitro's unit and dollar sales associated with the sale of any golf ball derived from an Acushnet product or any product bearing any Acushnet Trademark.

37.     Measures taken by Nitro to monitor the quality of its services or goods rendered or supplied bearing any Acushnet Trademark.

38.     Nitro's policy with respect to retention of documents, including business records.

39.     The organization and configuration of computers, networks and electronic records maintained by or on behalf of Nitro, including all e-mails, word processing documents and web site content, and including backups and records created therefrom.

40.     Nitro's processes for refurbishing golf balls

41.     Nitro's processes for manufacturing its "Nitro Titanium" golf balls.

42.     Nitro's processes for removing any portion of the outer cover of a golf ball.

43.     Nitro's processes for applying any outer covering or coating to a golf ball.

44.     Nitro's processes for applying any printed material to the surface of a golf ball.

45.     Material applied by Nitro to the exterior of a golf ball.

46.     Dimple patterns applied by Nitro to golf balls.

47.     Quality control procedures, if any, employed by Nitro in connection with refurbishing of golf balls.

48.     Disclaimers used by Nitro, now or in the past, identifying when and how such disclaimers were conveyed to the public.

49.     Specifications and standards used by Nitro, now or in the past, applying to golf balls refurbished or manufactured by Nitro.

50.     Standards used to determine whether a ball is to be recycled or refurbished.

51.     Every version of every Nitro web site.

52.     The Acushnet Patents.

53.     Test results or other documentation of performance of Nitro's golf balls, including tests as to distance, spin, feel, dispersion, control, flight qualities, roll characteristics, durability and appearance.

54.     Market share of Nitro's golf balls in the domestic market for new golf balls.

55.     Market share of Nitro's golf balls in the domestic market for used golf balls.

56.     Market share of Nitro's golf balls in the domestic market for refurbished golf balls.

57.     Market share of Nitro's golf balls in the domestic market for new golf balls.

58.     Sales or re-sales of Acushnet golf balls, whether new or used.

59.     Refurbished, re-manufactured, recycle, refinished, re-washed, repaired or otherwise used golf balls.

60.     Nitro's processes or methods of painting or clear coating golf balls.

61.     Differences or similarities between different models of Acushnet DT brand golf balls.

62.     Packaging for Nitro's Products.

63.     Advertising of Nitro's Products.

64.     Nitro's allegations that golfers and other members of the relevant consuming public are aware and know that companies such as Nitro sell refurbished, re-manufactured, repaired, recycled, refinished, re-washed or otherwise used golf balls, including used "Titleist" and "Pinnacle" golf balls, and that Nitro and other such resellers are not connected or associated with the original golf ball manufacturer, including any documented instances of customer confusion or consumer complaints received by Acushnet.

65.     The prices of Nitro's Products, and other refurbished, re-manufactured, repaired, recycled, refinished, re-washed or otherwise used golf balls.

66.     The used golf ball industry, including the refurbishing, recycling, re-washing, re-manufacturing, refinishing and reselling of used golf balls.

67.     Nitro's sales representatives, including any sales representatives that may have communicated to any person regarding the performance or quality of any Nitro product that is created, in whole or in part, from a product originally manufactured by Acushnet.

68.     Any charge, assertion or allegation against Nitro by any person of trademark infringement, trademark counterfeiting, unfair competition, false designation of origin, federal false advertisement and product disparagement, federal trademark dilution, state statutory and common law trademark and trade name infringement, state statutory trademark dilution, state statutory unfair competition, and unjust enrichment.

69.     Consumer confusion with regard to Acushnet's Products, or any consumer complaints received by Nitro concerning Acushnet's Products.

70.     Gross sales revenues, costs and net profits associated with Nitro's Products.

71.     Any poll, survey, market research, focus group, consumer awareness study, or other research, whether formal or informal, relating to Nitro, Nitro's Products, Nitro's marks, or otherwise related to Nitro's advertising, distribution and/or sale of used golf balls.

72.     Distribution and marketing of refurbished re-washed or recycled golf balls.

73.     Evaluations, reviews, studies, or analysis of the prior art or potential prior art relating to the subject matter of Acushnet's Alleged Patents.

74.     All Documents referring or relating to the date and circumstances upon which Nitro first had knowledge of any Acushnet Patent.

75.     Nitro's allegations regarding noninfringement or invalidity of the Acushnet Patents, in particular:

a.  the conception, design, and development of the matters and/or methods claimed in Acushnet Patents;

b.  the inventorship of the matters and/or methods claimed in an Acushnet Patent;

c.  the claim that Nitro has infringed or is infringing an Acushnet Patent;

d.  the claim that Nitro has willfully infringed or is willfully infringing an Acushnet Patents;

e.  the state of the art relating to the matters and/or methods claimed in an Acushnet Patent at the time the claimed matters and/or methods were conceived and/or reduced to practice; or

f.  the validity and/or enforceability of an Acushnet Patent.

76.     Purchase or acquisition of Acushnet golf balls by Nitro or its agents.

77.     Wound golf ball cores made, used, sold, imported by or offered for sale by Nitro.

78.     The composition of golf ball materials made, used, sold, imported by or offered for sale by Nitro.

79.     Processes for making solid golf balls made, used, sold, imported by or offered for sale by Nitro.

80.     The composition of golf ball covers made, used, sold, imported by or offered for sale by Nitro.

81.     The composition of golf ball paint, labels and clear coatings applied to balls by Nitro.

82.     Processes for curing a diene polymer in connection with the fabrication of a golf ball that is employed by, or from which products therefrom are made, used, sold, imported by or offered for sale by Nitro.

83.     Removal by Nitro of golf ball covers.

84.     Addition of new layer of material to a golf ball whose cover, or portion thereof, had been removed.

85.     Agreements, representations, warranties, covenants or promises, or relating to any communications, between Nitro and any licensor, licensee, vendor, distributor or customer with respect to the design, manufacture, research, development, testing, use, advertising, promotion, sale or distribution of Nitro's golf balls.

86.     Supplies, molds, machines, or other instruments used in the design, research, testing, manufacture, development or sale of Nitro's golf balls.

87.     Nitro appearance at trade shows.

88.     Actual and forecast sales, by Nitro, or any distributor or vendor, of Nitro's golf balls.

89.     Research and development done by or on behalf of Nitro with respect to Nitro's golf balls.

90.   Nitro's allegations that Acushnet has for many years knowingly allowed third parties to engage in the unauthorized use of Acushnet's trademarks in connection with the advertising, promotion and sale of refurbished, recycled and used golf balls.

91.   Nitro's allegations that Acushnet has engaged in uncontrolled licensing of its trademarks to third parties in connection with the advertising, promotion and sale of refurbished, recycled and used golf balls.

92.   Nitro allegations that it has been damaged by conduct of Acushnet, and the detailed factual basis therefor.

93.   Nitro's allegations that Acushnet's trademarks have lost significance as a symbol of equal quality or as a source of origin, including, without limitation, that Acushnet's own conduct has been responsible for that alleged loss.

94.   Any damages caused to Acushnet by Nitro's conduct, and the detailed factual basis therefor.

**Ciotti, Robert L.**

| | |
|---|---|
| **From:** | Coutroulis, Chris S. |
| **Sent:** | Friday, May 23, 2003 8:26 PM |
| **To:** | 'Gary S. Betensky' |
| **Cc:** | Brodie, Steven J. |
| **Subject:** | RE: Nitro - Acushnet |

Gary -- Thanks for your response to my e mail.

As to the total time for the deposition, we understand, but do not agree with, your position that we are limited to three days with Mr. Khoury, whether as a 30(b)(6) witness or individually.  Of course, whether or not that proves to be an issue can only be determined once next week's sessions are concluded, so let's leave it at that for now.  We each have reserved our rights.

As to the location of the deposition, we have a strong preference for our WPB office.  It is my understanding that, as set for last week, the Khoury depositions were to proceed in your office.  But all that has now changed, as part of your cancelling those sessions and the comprehensive and interrelated discussions that I understand you have had with Steve Brodie and others regarding discovery, including the location of certain Acushnet witness depositions to be held in Florida even though the witnesses reside in Massachusetts.  If you are insistent that Mr. Khoury be deposed at Richman, Greer, please contact Steve to discuss the matter, since I have not been part of your negotiations and discussions, and do not wish to interject myself in those issues at this late stage.  You may reach Steve over the long weekend if you like on his cell phone:  305 205 6005.  I am sure you and Steve will be able to reach a satisfactory and fair arrangement.

I will be out of town until Tuesday.  Have a good weekend.

CSC

-----Original Message-----
From: Gary S. Betensky [mailto:gbetensky@richmangreer.com]
Sent: Friday, May 23, 2003 6:36 PM
To: Coutroulis, Chris S.
Cc: Brodie, Steven J.
Subject: RE: Nitro - Acushnet


Chris: It was previously agreed that the Nitro 30(b)(6)depositions were to take place at Richman Greer West Palm Beach. Your latest amended notices changed the location yet again, to your WPB office. The deposition will proceed here, as agreed, or at Nitro's office in Stuart, pursuant to law.

Also, as we advised Steve and Jeff yesterday, you have a maximum of three 7 hour days next week for the 30(b)(6) and Amin Khoury individually. He will not be produced again short of a court order.

Gary S. Betensky
Richman Greer Weil Brumbaugh
 Mirabito & Christensen, P.A.
One Clearlake Centre - Suite 1504
250 Australian Avenue South
West Palm Beach, Florida 33401
Tel:   (561) 803-3500
Fax:   (561) 820-1698
E-mail: gbetensky@richmangreer.com


-----Original Message-----
From: Coutroulis, Chris S. [mailto:CCoutroulis@CarltonFields.com]
Sent: Friday, May 23, 2003 3:37 PM
To: Gary S. Betensky

ATTACHMENT / EXHIBIT _3_   1

Cc: Ciotti, Robert L.
Subject: Nitro - Acushnet


Dear Gary:

We are in receipt of the objections Nitro has served to the 30(b)(6)
deposition notice (the one set to commence on May 28, 2003).  I am writing
this to you assuming you will share it with Mark Yocca, whom I understand is
in Florida.

Acushnet respectfully disagrees with your objections.  Each of the
categories in the 30(b)(6) notice relates directly to the allegations and
claimed damages of Nitro in this litigation.  It is not our intention to
elicit privileged information, and we of course will abide by the
confidentiality agreement.  Accordingly, we stand by the notice and, in
accordance with the rules, we will proceed to take Nitro's testimony in each
of the noticed categories subject to your objections.

We look forward to seeing you on Wednesday.

Chris S. Coutroulis
CARLTON FIELDS
Celebrating Over 100 Years of Service
-----------
ccoutroulis@carltonfields.com
Phone: 813 223-7000
Fax: 813 229-4133

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 02-14008-CIV-MIDDLEBROOKS

## IN RE:  NITRO LEISURE PRODUCTS, LLC

_____/

## RESPONSES OF NITRO LEISURE PRODUCTS, LLC TO ACUSHNET'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff

Nitro Leisure Products, LLC ("Nitro") responds to Acushnet Company's ("Acushnet") First

Set of Interrogatories.

## PRELIMINARY STATEMENT

Nitro has not fully completed its investigation of the facts relating to this case,

has not yet fully completed discovery in this action, and has not completed preparation for

trial.  All the responses contained herein are based solely upon such information and

documents which are presently available to and specifically known to Nitro. It is anticipated

that further discovery, independent investigation, and legal research and analysis will supply

additional facts, add meaning to known facts, as well as establish entirely new factual

Nitro\Acushnet Discovery\Acushnet's Discovery\030320 Resp Rogs =pd   **ATTACHMENT / EXHIBIT**

conclusions, all of which may lead to substantial additions, changes, and/or variations to responses herein set forth.

The following responses are given without prejudice to Nitro's right to produce evidence and any subsequently discovered fact or facts which Nitro may later recall. Accordingly, Nitro reserves the right to change any and all responses herein as additional facts are ascertained, analyses are made, legal research is completed, and contentions are made.  The responses contained herein are made in good faith to supply as much factual information as is presently known, but should in no way be used to the prejudice of Nitro in relation to further discovery, research, or further analysis.

## GENERAL OBJECTIONS

These responses are made solely for the purposes of this action.  Each response is subject to all objections as to relevance, materiality, over breadth, vagueness, ambiguousness, propriety, admissibility, privilege, and any and all other objections and grounds which would require the exclusion of any response, all of these objections and grounds are reserved and may be interposed at the time of trial.

Nitro objects on the grounds that Acushnet has not complied in good faith with any of Nitro's discovery, which now has been outstanding for nearly six months.

Furthermore, Acushnet has not even complied with the initial disclosure requirements set forth in Rule 26 of the Federal Rules of Civil Procedure. As such, Acushnet should not be permitted at this time to proceed with any discovery against Nitro.

The above preliminary statement and general objections shall apply to each and every response given herein, and shall be incorporated by reference as though fully set forth in all of the Interrogatories.

## INTERROGATORY NO. 1:

Identify every individual answering or otherwise providing information regarding these Interrogatories.

## RESPONSE TO INTERROGATORY NO. 1:

Nitro incorporates its preliminary statement and general objections set forth above as if fully set forth herein. Nitro objects to this Interrogatory on the basis that it is premature because Acushnet has not yet conducted a Rule 26(f) exchange, which is a prerequisite to any discovery under 26(d) of the Federal Rules of Civil Procedure. Nitro further objects to this Interrogatory because it may violate the attorney-client privilege and work product doctrine. Notwithstanding the above objections, and without waiving those objections, Nitro responds as follows: in addition to information learned through the privileged investigation of counsel, Amin C. Khoury of Nitro Leisure Products, LLC.

**INTERROGATORY NO. 2:**

Identify every individual interviewed, or with whom a discussion has been held in regard to this lawsuit, or from whom a statement (whether written, oral or otherwise recorded) has been taken, relating to this lawsuit, including answers to all pleadings and discovery. For each such individual, state the substance of each such interview.

**RESPONSE TO INTERROGATORY NO. 2:**

Nitro incorporates its preliminary statement and general objections set forth above as if fully set forth herein. Nitro objects to this Interrogatory on the basis that it is premature because Acushnet has not complied with Rule 26 of the Federal Rules of Civil Procedure, which is a prerequisite to any discovery, and therefore this interrogatory is premature. Nitro further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work product doctrine. Nitro will not reveal information relating to individuals with whom its attorneys have spoken to or interviewed for this lawsuit, because such information is *prima facie* work product and not discoverable. Nitro further objects to this Interrogatory because it is over broad, burdensome, oppressive, and compound.

**INTERROGATORY NO. 3:**

Explain with particularity and describe the detailed factual basis for Nitro's claims and defenses in this lawsuit, including without limitation, identification of all evidence, persons, acts and documents that support or tend to contradict Nitro's claims set forth in its Complaint, as amended, or that either support or tend to contradict Nitro's denials of allegations or defenses as set forth in its Reply, as amended, and further including without limitation, identification of all persons who have knowledge regarding Nitro's claims, denials and defenses.

## RESPONSE TO INTERROGATORY NO. 3:

Nitro incorporates its preliminary statement and general objections set forth above as if fully set forth herein.  Nitro objects to this Interrogatory on the basis that it is premature because Acushnet has not complied with Rule 26 of the Federal Rules of Civil Procedure, which is a prerequisite to any discovery, and therefore this interrogatory is premature.  Nitro further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work product doctrine.  Nitro further objects to this Interrogatory because it is over broad, burdensome, oppressive, and compound, as Acushnet is asking for Nitro to lay out its entire case in answering this interrogatory. Accordingly, Nitro will attempt to respond below in good faith, but cannot be expected, in the context of this complex case, to recite herein each and every evidentiary fact that is known or under investigation.  Notwithstanding the above objections, and without waiving the above objections, Nitro responds as follows: Nitro, unlike Acushnet, has already disclosed the documents and witnesses with information relevant to its claims and defenses pursuant to its Rule 26 disclosure.

Acushnet has engaged in a pattern and practice of utilizing its market dominance, threats explicit or otherwise, product disparagement, artificial brand and trademark proliferation and other unlawful tactics to put a halt to the refurbished golf ball industry and companies like Nitro. Acushnet monitored Nitro's progress, by Acushnet's own admission, for years.  Only when Nitro began to become successful, Acushnet began an unlawful campaign to devastate Nitro and its business prospects.  For example, Acushnet issued a press release containing false and disparaging comments regarding Nitro's products as a public warning to any company that would dare to do business with Nitro.  Acushnet also directly contacted retailers to make false claims regarding Nitro's products and implicitly threaten retribution should the retailers purchase Nitro's refurbished product.

Acushnet has utilized its monopoly control of the golf ball market to artificially inflate prices and exclude competition. Traditionally, Acushnet would only sell its premium segment Titleist merchandise to on- and off-course pro shops, and it would deny such product to off-course retailers such as mass merchandisers and mass sporting goods retailers. Recently, however, it appears that Acushnet has begun to flood the value retail market with lower priced "practice," "x-out" and "logo overrun" models at reduced prices. Although the balls for the large part appear identical to the premier product, the balls are sold at artificially low prices as a further attempt to force Nitro and other golf ball refurbishers out of business. In fact, retailers that have complied with Acushnet's pressure tactics and tacitly agreed to a group boycott of Nitro's refurbished product have been rewarded with such product and other inducements and benefits.

Acushnet's campaign against the refurbished golf ball industry goes back for years and includes attacks against other companies such as Birdie Golf and Players Choice. Even though Acushnet knows full well that refurbishing golf balls is a completely legal practice, Acushnet filed frivolous litigation and utilized scorched earth litigation tactics in an effort to destroy the typically much smaller refurbished golf ball companies.

Acushnet's tactics also have included false advertising of its products in order to increase "shelf space" and push smaller competitors out of the marketplace. Acushnet has utilized a strategy of artificial proliferation of brands and trademarks. As just one example, Acushnet has sold for years various DT models with deceptively crafted side model stamps. Acushnet claims that the side model stamps indicate that the various models have differing performance characteristics. According to Acushnet's own evidence in this case, there are no such performance differences. Further, Acushnet's compression stamping is and has been deceptive and false. According to Acushnet's own evidence, the side model compression stamp bears little if any relation to the actual internal compression of the subject golf balls.

According to Acushnet's evidence in this case, Acushnet has spent millions of dollars attempting to convince the public that the side model stamps actually mean something, but from all evidence so far available, they do not. Nitro is informed and believes that Acushnet now utilizes a variation of this strategy in regard to the "practice," "x-out" and "logo overrun" versions of golf balls, in addition to other Acushnet brands.

Acushnet's trademark infringement and dilution claims against Nitro cannot succeed. Under the law, used and refurbished product is lawful as long as appropriate disclaimers are used to ensure that the original manufacturer is not identified with the refurbished product. The only exception involves where the change to the product is so material that utilizing the original manufacturer's name would be a misnomer. Here, the golf balls at issue are merely refurbished through the procedures described herein below and in Nitro's previous court filings. Nitro painstakingly sorts the balls to ensure that any mistakes are kept to an absolute minimum or eliminated entirely. Nitro properly notifies consumers of the nature of the product, and that Acushnet is not responsible for the refurbishment process in any way. Nitro's golf ball's initial success in the marketplace demonstrates the quality of Nitro's processes and procedures, as well as its truthful advertising. Differences in performance are expected with such used product, and are immaterial from a trademark law standpoint. In any event, Nitro is informed and believes that Acushnet's internal testing data will evidence that much of any perceived difference in performance results from defects in Acushnet's own products or otherwise from expected wear and tear. For these reasons, the Court in this case denied Acushnet's Motion For Preliminary Injunction, and did not find any showing of improper conduct on Nitro's part.

Acushnet's patent claims similarly fail. In regard to the '535 patent, the patent is invalid. The patented process is obvious and does not reflect a true invention by Acushnet. Indeed, Acushnet did not invent the refurbishment process identified, and prior art exists to

demonstrate that fact, which are believed to be in the files of Sunset Golf. Nitro is investigating whether there was a fraud on the patent office in this regard. In any event, Nitro does not currently utilize any process that involves removing all or a portion of the outside cover of the golf balls. A process that was discontinued long ago did involve the removal of the cover, but the process so utilized did not read upon the claims of the '535 patent. Moreover, Acushnet failed to provide any notice of the patent on packaging or otherwise directly to Nitro. Thus, any claim for monetary relief is barred.

In regard to the various other patents in suit, no process ever utilized by Nitro reads upon the claims of any of those patents at issue. Nitro did not at any time disturb the cores or utilize any manufacturing process so identified. Moreover, any repairs performed by Nitro would fall squarely within the doctrine of permissible repair.

Nitro's claims and defenses have been further described and identified in Nitro's court filings in this case including its Complaint, Answer, Opposition to Motion for Preliminary Injunction, and other such pleadings and filings. All such matter is incorporated herein by this reference. Discovery and investigation are continuing.

**INTERROGATORY NO. 4:**

Describe in detail Nitro's marketing and/or sales strategies that have been considered and/or implemented that relate to any refurbished, remanufactured, repaired, recycled, refinished, re-washed or otherwise used golf balls.

**RESPONSE TO INTERROGATORY NO. 4:**

Nitro incorporates its preliminary statement and general objections set forth above as if fully set forth herein. Nitro objects to this Interrogatory on the basis that it is premature because Acushnet has not complied with Rule 26 of the Federal Rules of Civil

Procedure, which is a prerequisite to any discovery, and therefore this interrogatory is premature. Nitro further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work product doctrine. Nitro further objects to this Interrogatory because it is over broad, burdensome, oppressive, and compound, and is not limited to any time period. Nitro further objects to this Interrogatory to the extent that it seeks Nitro's trade secrets and/or Nitro's proprietary business information. Nitro further objects to this Interrogatory because it is irrelevant and not calculated to lead to the discovery of admissible evidence in this lawsuit.

Notwithstanding the above objections, and without waiving those objections, Nitro responds as follows: Nitro's "sales and/or marketing" strategy for refurbished golf balls involves selling to buyers at retail locations and direct sales over the Internet to end users. Nitro's business strategy focused on refurbished golf balls as its core product. Nitro invested an enormous amount of money, other resources and time to develop processes and techniques to refurbish used golf balls in an extremely professional manner to deliver a desirable product to the consumer. Nitro intended to sell premier brand name refurbished golf balls to the large, value retailers, which traditionally cannot receive such product from Acushnet and other premier brand name manufacturers. Because the goods are recycled (lawfully and effectively), the golf balls represent an excellent value to the consumers, and healthy profits to the retailers and Nitro alike. Nitro also focuses extensively on customer satisfaction, and to that end carefully ensures that any purchaser will not be confused about the used and refurbished nature of the product.

Until Acushnet began to exert pressure on retailers through its market dominance, and offer rewards to retailers that boycott Nitro's products, Nitro's business strategy was a smashing success. The superior and consistent quality of Nitro's refurbished golf balls convinced some of the most discerning buyers in the marketplace that Nitro's

refurbished golf balls presented an extremely valuable product for their customers, which would result in substantial profits to both the retailers and to Nitro. Once Nitro's refurbished product became established with the large and mid-sized retailer such as K-mart, The Sports. Authority, Target and others, Nitro would then be presented with the opportunity to sell ancillary product. The trend in the industry is for large retail chains to focus on only a handful of vendors. Accordingly, a vendor with an extremely desirable product, like Nitro's, is then provided with the opportunity to sell various other products to such retailers. As Nitro's product gained substantial market acceptance success in the marketplace, however, Acushnet, using its tools of market dominance, trade disparagement, tacit agreements with retailers and artificial proliferation of brands and trademarks, was able to derail and destroy Nitro's business opportunities.

## INTERROGATORY NO. 5:

Identify each Relevant Nitro Product and describe in detail how such product is or has been acquired, manufactured, fabricated, refurbished, remanufactured, repaired, recycled, refinished, re-washed, or some other process which is advertised, marketed, sold or offered for sale by Nitro, including without limitation, identification of all acts and documents related thereto and persons having knowledge with respect thereto, identification of the amount and nature of all revenues received with respect thereto.

## RESPONSE TO INTERROGATORY NO. 5:

Nitro incorporates its preliminary statement and general objections set forth above as if fully set forth herein. Nitro objects to this Interrogatory on the basis that it is premature because Acushnet has not complied with Rule 26 of the Federal Rules of Civil Procedure, which is a prerequisite to any discovery, and therefore this interrogatory is premature. Nitro further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work product doctrine. Nitro further objects

to this Interrogatory because it is over broad, burdensome, oppressive, and compound, and is not limited to any time period.  Nitro further objects to this Interrogatory to the extent that it seeks Nitro's trade secrets and/or Nitro's proprietary business information.  Nitro further object to this Interrogatory because it is irrelevant and not calculated to lead to the discovery of admissible evidence in this lawsuit. Nitro further objects on the grounds this interrogatory is intentionally over broad in order to create unnecessary burden and expense on Nitro. Acushnet consistently has maintained that only the refurbished golf balls of Nitro are currently objectionable to Acushnet.   Therefore, inquiring regarding other product is intentionally designed to cause unnecessary burden and expense, especially in light of the continuing and ongoing variations in processes and procedures and the various historical procedures that are no longer utilized. Accordingly, Nitro responds below in regard to the primary process that appears most relevant to this action.

Notwithstanding the above objections, and without waiving those objections, Nitro responds as follows: The relevant "Nitro Products", as Nitro understands the term, are all Acushnet Refinished or refurbished models. Nitro's relevant processes have been described in substantial detail in connection with Nitro's evidence submitted in opposition to Acushnet's Motion for Preliminary Injunction.  In addition, Nitro will produce non-privileged, non-objectionable documents within its possession, custody or control which are responsive to this interrogatory.

As detailed in evidence previously filed with the Court, the refurbishing processes at Nitro have not been static over the years, and Nitro has consistently attempted to improve and hone its processes and procedures. Further, Nitro will modify its processes and procedures in certain respects, depending on customer need, the nature of the balls to be refurbished and other factors. The primary processes involved in the refurbishment of golf balls can be summarized as follows: To a substantial degree, all of the relevant product are

acquired and refurbished in several stages. Initially, the balls are acquired as raw material (Pond Run). This material comes in batches from dive companies or ball companies, Nitro's vendors. Some incoming balls arrive clean and sorted (a small percentage). On most occasions, Nitro nevertheless will wash all balls following their arrival. The balls (as batches) get sorted into ten basic categories. This is sort number one, and called the front end sort. The balls are then graded, and an incoming batch grade sheet is prepared.

The balls that enter the HiRepro/Hipro WIP category (one of the byproducts of the first sort) have the potential to be refurbished. Balls in the HiRepro/Hipro WIP category, as stated just above, are then roughly sorted into manufacturer and model sub groups. This is the second sort, and generally results in a highly specific groupings of golf balls. For instance, all of the Pro V1's are placed together. They are not separated into all of the Pro V1 sub-models at this point. For example, the Pro V1 Family includes the following: Pro V1, Pro V1 Improved, Pro V1 Practice, Pro V1 X-Out, Pro V1 Star, Pro V1 Star Practice, Pro V1 X-Out, etc.

Nitro's second sort groups these balls into one category called Pro V1. The categories/sorts that result from this process again have just the potential to be refurbished. Next, Pro V1's will proceed to the next sort, the third sort. At this point all of the sub categories are grouped. Balls that are identified into categories to be sold as recycled, are not sorted any further. They are packaged and sold.

Balls that are identified for refurbishment, are sorted one last time (the fourth) to be sure that no mistakes have occurred in the preceding sort, or the ones before that. Each sort, from the first, pulls any balls that appear to be damaged/cut.

From the fourth sort, balls are placed into a closed container. Then the balls get pressure washed with aluminum media until the clear coat, paint, (which contains the markings), and markings are removed. As part of this process the balls are washed thoroughly and allowed to dry after the washing.

The balls are then painted with two light coats of paint, stamped with ink, and clear coated. From this point the balls are sorted in a final QC Stage. Sampling of weight, compression, roundness, are implemented. Each ball is checked for its paint job to be sure that it is of excellent quality. Next, the balls are packaged.

In terms of revenue from refurbished product, Nitro's damages were outlined in its FRCP Initial Disclosure document, and documents setting forth the available information will be produced.

Persons with knowledge of the above would, of course, include all past and present employees. Numerous such persons were identified in Nitro's FRCP 26 Disclosure.

## INTERROGATORY NO. 6:

As to each person listed on Plaintiff's Witness List served on May 6, 2002, please set forth their full address and telephone number; their job designation; a complete description of the information they are believed to possess; and state whether the person has given a verbal or written statement to you. If any person has given a verbal or written statement, please describe the statement, give the date of the statement and state the name and address of the person to whom the statement was given.

## RESPONSE TO INTERROGATORY NO. 6:

Nitro incorporates its preliminary statement and general objections set forth above as if fully set forth herein. Nitro objects to this Interrogatory on the basis that it is premature because Acushnet has not complied with Rule 26 of the Federal Rules of Civil Procedure, which is a prerequisite to any discovery, and therefore this interrogatory is premature. Nitro further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work product doctrine. Nitro further objects to this Interrogatory because it is over broad, burdensome, oppressive, and compound, and is not limited to any time period. Nitro further objects to this Interrogatory to the extent that it seeks Nitro's trade secrets and/or Nitro's proprietary business information. Nitro further object to this Interrogatory because it is irrelevant and not calculated to lead to the discovery of admissible evidence in this lawsuit. Notwithstanding the above objections, and without waiving the above objections, Nitro responds as follows: Nitro has already disclosed all of the names, addresses, telephone numbers and anticipated content of testimony of witnesses to the extent known by Nitro, pursuant to its Rule 26 disclosure. Nitro has no further information to disclose at this time, and Nitro knows of no non-privileged statements of witnesses that may testify in this action. Discovery and investigation are continuing.

## INTERROGATORY NO. 7:

After May 6, 2002, have you become aware of any other person(s) who have knowledge concerning the issues in the case? If so, please set forth their full address and telephone number; their job designation; a complete description of the information they are believed to possess; and state whether the person has given a verbal or written statement to you. If any person has given a verbal or written statement, please describe the statement, give the date of the statement and state the name and address of the person to whom the statement was given.

## RESPONSE TO INTERROGATORY NO. 7:

Nitro incorporates its preliminary statement and general objections set forth above as if fully set forth herein.  Nitro objects to this Interrogatory on the basis that it is premature because Acushnet has not complied with Rule 26 of the Federal Rules of Civil Procedure, which is a prerequisite to any discovery, and therefore this interrogatory is premature.  Nitro further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and work product doctrine.  Nitro further objects to this Interrogatory because it is over broad, burdensome, oppressive, and compound, and is not limited to any time period.  Nitro further objects to this Interrogatory to the extent that it seeks Nitro's trade secrets and/or Nitro's proprietary business information.  Nitro further object to this Interrogatory because it is irrelevant and not calculated to lead to the discovery of admissible evidence in this lawsuit.  Nitro will not reveal information relating to individuals with whom its attorneys' have spoken to or interviewed for this lawsuit, because such information is *prima facie* work product and not discoverable.  Notwithstanding the

above objections, and without waiving those objections, Nitro responds as follows: Nitro incorporates its response to Interrogatory No. 6 as if fully set forth herein.

DATED: March 20, 2003

YOCCA PATCH & YOCCA LLP

By: _____

Paul Kim
California State Bar No. 157608
19900 MacArthur Boulevard, Suite 650
Irvine, California 92612
Telephone:     (949) 253-0800
Facsimile:     (949) 253-0870

RICHMAN GREER WEIL BRUMBAUGH
MIRATITO & CHRISTENSEN
Gary S. Betwnsky
Florida Bar No. 434302
250 Australian Avenue, South
West Palm Beach, Florida 33401
Telephone: (561) 803-3500
Facsimile: (561) 820-1608

Attorneys for Nitro Leisure Products, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **RESPONSES OF NITRO LEISURE PRODUCTS, LLC TO ACUSHNET'S FIRST SET OF INTERROGATORIES,** was served via regular U.S. Mail this 20th day of March, 2003, on Jeffrey M. Cohen, Esq., Carlton Fields, P.A., 100 S.E. Second Street, Suite 4000, Miami, Florida 33131 and Robert L. Ciotti, Jr., Esq., Carlton Fields, P.A., 777 S. Harbour Island Boulevard, Tampa, Florida 33602.

Paul Kim

NITRO LESIURE PRODUCTS, LLC

By: _____
Amin C. Khoury, President

STATE OF FLORIDA        :
COUNTY OF *Palm Beach* :

BEFORE ME, the undersigned authority, personally appeared AMIN C. KHOURY,

PRESIDENT of NITRO LESIURE PRODUCTS, LLC, who being by me first duly sworn, states

that he executed the foregoing answers to Interrogatories and that they are true and correct to the

best of his knowledge and belief.

Sworn to and subscribed before me this ___20___ day of March, 2003.

_____
Notary Public, State of Florida

_____
Print, Type or Stamp Name of Notary Public

My Commission Expires:



STACEY A. JONES
MY COMMISSION # CC 831935
EXPIRES: April 27, 2004
Bonded Thru Notary Public Underwriters