UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 02-14008-CIV-MIDDLEBROOKS

**NIGHT BOX FILED**

JUL 02 2003

CLARENCE MADDOX
CLERK, USDC / SDF

IN RE NITRO LEISURE PRODUCTS, L.L.C.

_____/

**DEFENDANT/COUNTER-PLAINTIFF, ACUSHNET COMPANY'S
REPLY TO PLAINTIFF/COUNTER-DEFENDANT, NITRO LEISURE
PRODUCTS, LLC'S OPPOSITION TO ACUSHNET'S MOTION TO
COMPEL INSPECTION OF NITRO'S FACILITIES AND FOR SANCTIONS**

Defendant/Counter-Plaintiff Acushnet Company ("Acushnet"), hereby submits its reply to Plaintiff/Counter-Defendant Nitro Leisure Products LLC's ("Nitro") opposition to the motion to compel inspection of Nitro's facilities and for sanctions.

I.     **Nitro Denied Acushnet Critically Important Inspection Rights**

Nitro incorrectly asserts that Acushnet was able to inspect "Acushnet golf balls (Titleist and Pinnacle) during all phases of Nitro's refurbishment process (except for clear coating) . . . (Plaintiff's opposition at 3)." In fact, *no Acushnet balls whatsoever* were seen at all in the critically important phases of "pressure cleaning," painting operation, and final quality control.[1] Although Acushnet balls were apparently in the pad printing stage, this was the stage at which Nitro's conduct effectively prevented actual inspection of the golf balls. (Declaration of S. Brodie ¶¶11-12). Additionally, although Acushnet balls were interspersed with other manufacturer's balls in the raw pond run and sorting stages, no refurbishment of any balls had

---

[1] Though Nitro's motion states that Acushnet balls were available at all stages (p. 3), the declaration of Mr. Yocca in part states that "there was Acushnet product at seven of the ten processes inspected the next day" (Declaration of M. Yocca at ¶ 4). Both Nitro and its counsel fail to mention that the three stages at which no Acushnet product whatsoever was to be found were the critically important stages during which the actual stripping and recoating occur.

taken place through those sorting (as opposed to actual refurbishing) stages, making the presence of Acushnet balls meaningless for inspection and testing purposes. (Supplemental Declaration of Steve Brodie at ¶¶ 2-3).

The importance of Nitro's misrepresentation on this point cannot be overstated, since it conceals the crux of Acushnet's complaint with regard to the inspection, i.e., that Nitro appears to have designed the inspection to *prevent*, rather than *provide* a meaningful opportunity to determine what happens to an Acushnet ball when subjected to the Nitro process.[2] For instance:

- Had Acushnet balls been present at the "pressure cleaning" (sand blasting) stage, the balls could have been weighed prior to sand blasting, then weighed again after sand blasting, with these figures then being comparable to *known* coated and un-coated weights for Acushnet balls. That would have revealed how much material is actually removed by Nitro's sand blasting (and whether more than just coating is being removed). Nitro denied Acushnet that opportunity.

- Had Acushnet balls been present at the painting operation, a direct comparison between the evenness of paint application *on Acushnet balls* would have been possible. Nitro denied Acushnet that opportunity.

- Had Acushnet balls been present at the final quality control stage (the *only* quality control stage after actual refurbishment has taken place), a direct comparison could have been made between Nitro's quality control for products bearing Acushnet marks, and Acushnet's quality control for products bearing its marks. Nitro denied Acushnet that opportunity.

---

[2] At each of these stripping and recoating stages, only competitors' balls, *not Acushnet balls*, were present. However, there were Acushnet balls both before and after these stages. Thus, the logical conclusion to be drawn is that Nitro designed the inspection so as to preclude Acushnet from being able to review these critical stages. (Supplemental Declaration of Steve Brodie at ¶¶ 2-3).

Nitro asserts that Acushnet seeks to track a single ball through the entire process, but Nitro well knows its assertion is not true. What Acushnet is entitled to, and what Acushnet had to seek Court intervention to try to obtain, is the right to inspect Nitro's *actual refurbishment operations* being performed on Acushnet's products. In other words, Acushnet seeks to inspect the very operations that are at the heart of this matter.

When the parties reached the pad printing room, hundreds of Titleist ProV1 golf balls which had already been painted and pad printed lay in milk crates along the wall. (Acushnet was permitted to retain only approximately six balls from among these, rather than the sample of fifty which was requested and which had been provided at each previous station (note those samples were, of course, non-Acushnet balls). Given Nitro's own statements about the length of its process, these Acushnet balls appear clearly to have undergone the critically important sand blasting and painting stages only days before, at a time when Acushnet's emergency motion for inspection was already pending. Yet these balls sat stationary during the inspection, and when Acushnet's expert Dr. Felker tried to complete his inspection of the pad printing process in operation, he was prevented from so doing by counsel for Nitro.[3] Thus, at the *only actual refurbishment stage* at which Acushnet balls were seen – the only actual refurbishment stage at which the set up of the inspection itself did not prevent inspection of Acushnet balls – Nitro's counsel's conduct prevented actual inspection.

It is important to understand exactly how Acushnet was prevented from fully inspecting Nitro's painting procedures.[4] First, it should be noted that the three tests the parties agreed to on

---

[3] Nitro does not, and cannot, deny that its counsel grabbed Dr. Felker, but merely asserts that it was not done in an intimidating manner. However, it was done. It was intemperate and improper.

[4] Nitro suggests that Acushnet's "disappointment" with the results of its testing is the reason for Acushnet's motion. Nitro's assertion carries no weight. While Acushnet's experts may well be able to use some of the data they were able to collect, though that data was limited primarily to MaxFli, rather than Acushnet balls, Acushnet has a right to inspect refurbishment *of its own golf balls*, not just its competitors' golf balls.

the record, weighing, ball ring testing, and UV light testing, are of little or no value if they are performed in a vacuum. Meaningful use of these procedures is only possible when a comparison can be made between a known measurement and a measurement taken after the object has undergone a procedure, such as painting. Thus, in order meaningfully to use these tests, it is essential *either* that painting be performed on a known quantity (such as an Acushnet ball or one of the colored balls the experts brought with them) *or* that whatever balls are actually to be painted are measured *before* and *after* the process.

Second, Nitro's citation of the bland proposition that "[a] party may not be required to conduct any special testing operations devised by the other side," ignores two important facts: (1) painting of colored balls is a standard procedure for professionals inspecting golf ball painting facilities, and (2) when Acushnet accepted Nitro's refusal to allow the colored balls to be painted and proposed an alternative method of acquiring the appropriate information (measuring balls before and after the process), Nitro imposed conditions on that method which made it impossible. See Declaration of D. Felker, ¶3.6. Nitro asserts that it "allowed" this second kind of testing but that "for reasons unknown [Nitro's counsel]," Acushnet declined. The reason Acushnet declined, however, was made clear to counsel for Nitro at the time and stated again in Acushnet's motion. Nitro insisted that if pre-measured balls were to be painted, Acushnet personnel would under no circumstances be permitted to move on and inspect the rest of the facility and then return once the balls were substantially dry in order to conduct the post-painting measurement. See Declaration of D. Felker, ¶3.6. Thus, Acushnet personnel would have been forced to wait several hours, literally watching paint dry, and losing any opportunity to inspect the remaining areas of the facility, including pad printing and final quality control.

CARLTON FIELDS, P.A.
4000 International Place - 100 Southeast Second Street - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2256804.1                                           4

Accordingly, Acushnet was unable to conduct the agreed upon testing not because of any decision it made, but because of the conditions imposed by Nitro. Nitro's limitations presented Acushnet with a Hobson's choice and rendered actual testing on the painting process a practical impossibility. Moreover, it preserved "plausible deniability," allowing Nitro to make exactly the assertion it has, that it allowed testing which "for reasons unknown" Acushnet declined.

II. **Further Points in Reply**

  A. **Nitro Counsel's Conduct Toward Dr. Felker**

Nitro asserts that its unprofessional conduct toward Dr. Felker was somehow justified on the ground that Dr. Felker "compromised the cleanliness and integrity of the evidence, [and] clearly violated the grounds rules that both sides had agreed to." See Declaration of M. Yocca, ¶15. Those assertions are baseless for the following reasons:

- Throughout the course of the inspection everyone present, *including counsel for Nitro and Nitro's own principal Mr. Khoury*, handled balls with their bare hands, *including balls to be preserved as evidence.*

- The pad print room employee wore gloves for a clearly discernible reason: she was handling balls on the *other side* of the pad printer, balls which had just been printed with hot, wet, and toxic ink. Dr. Felker never went near the balls on that side of the machine.

- No "ground rule" had ever been discussed with regard to wearing gloves or with regard to any difference whatsoever between the pad print room and any other part of the facility.

  B. **Nitro's Claim That Acushnet's Experts and Counsel Sought to Interrogate Nitro's Employees**

Nitro suggests that Acushnet is complaining about not being permitted to "question" Nitro employees and that Acushnet violated Florida Bar Rule 4-4.2 by attempting to do so. Nitro's Opposition at 6. These assertions are baseless for the following reasons:

- Acushnet does not complain that its experts were not permitted to speak to Nitro employees, even to ask the routine questions common in such inspections, as Acushnet directed its experts to comply as soon as Nitro requested that their inquiries be referred to Nitro's counsel. Acushnet's complaint is with the way its experts were subsequently treated *by Nitro's counsel when complying with that request*. Nitro was entitled to require Acushnet's experts to speak to Nitro's counsel rather than employees, but it was not entitled to use that opportunity to harass and intimidate the experts and frustrate their efforts to inspect the facility.

- Nitro's counsel and Nitro's employees, Mr. Khoury and Mr. Hanover, also initiated discussions with Acushnet's counsel and experts. If such conduct violated Rule 4-4.2 in Nitro's estimation, the violation would clearly have gone both ways.

C. **The Timing of the Inspection**

Nitro asserts that Acushnet unreasonably refused to permit a lunch break. Nitro declines that mention that the sole reason this was necessary was that, when asked, counsel for Nitro made absolutely clear that Acushnet personnel would not be permitted to remain on the premises *one minute* beyond the close of business if the lunch break prevented the inspection from being completed by that time.[5] (Supplemental Declaration of Steve Brodie at ¶¶ 4). It was only this unreasonable refusal to agree to any accommodation whatsoever which necessitated working

---

[5] This after Nitro had already insisted that Acushnet personnel remain outside the building for thirty minutes that morning before being allowed to commence the inspection.

CARLTON FIELDS, P.A.
4000 International Place - 100 Southeast Second Street - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2256804.1　　　　　　　　　　6

through lunch. Furthermore, it should be noted that Nitro kept Acushnet outside its facility for at least 30 minutes before the Acushnet team was permitted to start the inspection.

Nitro asserts that Acushnet has declined to fulfill its agreement to pay for the balls Nitro now retains as evidence. Acushnet stands ready to pay for those balls but was not presented any bill for them, formal or informal, either at the time of the inspection or since. Had even Nitro's response to the motion contained a tally of the amount owed, Acushnet would have already written a check. However, at the hearing on which inspections terms were agreed to, there was no discussion of payment for balls to be retained as evidence. Nitro's experts have now had ample time to inspect the balls they retained as evidence. If Acushnet pays for the balls, Acushnet should be entitled to possession of the balls, which, in all likelihood, will need to be presented as evidence in support of Acushnet's claims.[6]

## Conclusion

As Acushnet's motion makes clear, Nitro willfully frustrated Acushnet's inspection rights, prevented critical aspects of the testing it had agreed to on the record just the day before, and engaged in unprofessional conduct toward Acushnet's experts. For the reasons set forth in its motion, and for the reasons set forth herein, Acushnet respectfully requests that its motion, and the relief sought therein, be granted.

## CERTIFICATE OF SERVICE

---

[6] Because both Acushnet and Nitro made videotaped records of the inspection, such as it was, the Court will be able to determine for itself whether Dr. Felker did what Nitro and its counsel accuse him of, whether Nitro's counsel verbally abused and physically accosted Dr. Felker, etc. The parties agreed to exchange copies of these videotapes on June 30, 2003. Despite Nitro's counsel's insistence that its videographer make a sound recording of the proceedings, the videotape initially produced by Nitro to Acushnet has been altered to eliminate the sound. Acushnet has requested that Nitro provide a copy with sound included, and believes Nitro has agreed to do so.

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was provided by facsimile and U.S. mail this ___ day of July, 2003 to:

Gary S. Betensky, Esquire
Richman Greer Weil Brumbaugh
  Mirabito & Christensen, P.A
One Clearlake Centre - Suite 1504
250 Australian Avenue, South
West Palm Beach, FL 33401

Mark W. Yocca, Esquire
Yocca Patch & Yocca LLP
*Attorneys for Nitro*
19900 Mac Arthur Boulevard
Suite 650
Irvine, CA 92612

>Respectfully submitted,
>
>CARLTON FIELDS, P.A.
>*Attorneys for Acushnet Company*
>4000 Bank of America Tower
>100 SE Second Street
>Miami, FL 33131-9101
>Telephone: (305) 530-0050
>Facsimile: (305) 530-0055
>
>By: _____
>STEVEN J. BRODIE, ESQ.
>Florida Bar No. 333069
>*sbrodie@carltonfields.com*
>JEFFREY MICHAEL COHEN
>Florida Bar No. 091495
>*jmcohen@carltonfields.com*
>MICHELLE GERVAIS, ESQ.
>Florida Bar No. 173827
>*mgervais@carltonfields.com*
>
>and
>
>ROBERT L. CIOTTI
>Florida Bar No. 333141
>*rciotti@carltonfields.com*

CARLTON FIELDS, P.A.
4000 International Place - 100 Southeast Second Street - Miami - Florida 33131-9101 - (305) 530-0050

MIA#2256804.1                    8

CONSOLIDATED CASE NO. 02-14008-CIV-MIDDLEBROOKS

>Carlton Fields, P.A.
>One Harbour Place
>777 S. Harbour Island Blvd.
>Tampa, FL  33602-5730
>Telephone:	(813) 223-7000
>Facsimile:	(813) 229-4133

CARLTON FIELDS, P.A.
4000 International Place - 100 Southeast Second Street - Miami - Florida  33131-9101 - (305) 530-0050

MIA#2256804.1                              9

```
                                                                    [vdkttext]


                                  Case Selection
Dkt type: cv    Case Number: 2 -14008      Division: 2   Ft. Pierce

Transaction: rply resp m/show/comp - -
                                  History Record
Occurrence date:     07/02/03        Service date :          ID#  5803763
                                  Document Record
Document number:      269       -1   Document type :m         -
Date filed : 06/20/03                Date disposed :        Term # :
Date req :                           Time req :             Flag :
Requested Amt :
+--------------------------------------------------------------+
 REPLY by Acushnet Company  to Nitro Leisure Products'
 opposition response to [269-1] motion to compel production
 of tangible things


+editing docket text--------------------------------------+


 Command mode (? for commands)
```

Attached to D.E. # 299