IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH

IN RE: NITRO LEISURE PRODUCTS, L.L.C.

_____/

NIGHT BOX FILED

NOV 25 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

DECLARATION OF JAY HANOVER IN SUPPORT OF NITRO LEISURE
PRODUCTS LLC'S OPPOSITION TO ACUSHNET
COMPANY'S MOTION FOR SUMMARY JUDGMENT

496

## DECLARATION OF JAY HANOVER IN SUPPORT OF NITRO LEISURE PRODUCTS LLC'S OPPOSITION TO ACUSHNET COMPANY'S MOTION FOR SUMMARY JUDGEMENT

I, JAY HANOVER, declare as follows:

1. I am the Executive Vice President of Sales and Marketing for Plaintiff/Counter-Defendant Nitro Leisure Products, LLC ("Nitro"). I have held that position from December 2000 to January 2002 and from December, 2002 to the present. As the Executive Vice President of Sales and Marketing, I oversee all aspects of Nitro's sales and marketing, including but not limited to, merchandising, developing price structures, product development, packaging development, vendor contacts, etc. I offer this Declaration based upon personal knowledge and belief and information provided to me.

## BACKGROUND

2. I have over twenty-five years of experience in all aspects of retail sales and merchandising, and have held virtually every position in this field. I started at the age of eighteen working for Gold Medal Sporting Goods, the largest chain of sporting goods stores in Philadelphia, Pennsylvania. I started as a floor salesperson and progressed my way up through the company to Vice President of all merchandising. I worked at Gold Medal Sporting Goods for approximately eleven to twelve years.

3. I then went to work for TSS Seedmans in New York, one of the largest independently owned mass merchants in North America. I was the Divisional Manager for wide array of departments, including sporting goods, athletic wear, athletic footwear, luggage and bicycles. I had a staff of three buyers who reported directly to me.

4. After a successful tenure at TSS Seedmans, I was recruited by Jack Smith the Chief Executive Officer of The Sports Authority ("TSA"), a start-up sporting goods company. I was initially hired as a buyer. Initially, TSA had approximately five to six employees, including myself. As such, I was one of the first people that helped TSA grow. Through hard work and vision, the employees and officers at TSA, including myself, built up that company from virtually nothing to the world's largest sporting goods retailer with over two hundred stores and sales in excess of 1.5 billion dollars. During my thirteen years at TSA, I held virtually every position in merchandising, from buyer of golf products, to Divisional Merchandise Manager, to Vice President of Merchandising and ultimately Senior Vice President General Merchandise

Manager. While at TSA, I had a sales and merchandising staff of three Vice Presidents, twelve buyers, and over twenty assistants and replenishers (people who re-order inventory). The staff was responsible for sales, gross profit, gross profit return on investment, inventory turn, aged inventory, marketing, plan-o-grams, assortment planning, product development and all major aspects of sales and merchandising.

5. While at TSA, I established numerous relationships with various vendors, including golf product manufacturers such as Acushnet. My primary contact at Acushnet while working at TSA was Marc Goldstein, Acushnet's National Sales Representative.

6. After leaving TSA, I performed some consulting work for Sportcraft, a manufacturer of recreational sporting goods.

7. My extensive and diverse background provided me with a full understanding of all the intracacies of sales and merchandising. Most importantly, through my experience I have gained significant knowledge concerning how line structures are put together, how buyers make decisions, how the approval process works, and overall what is needed to successfully implement a winning sales/merchandising program. The combination of both retail and wholesale experience has allowed me to establish wonderful relationships and successful programs with some of the largest and finest retailers in the world.

8. In or about December 2000, I went to work for Nitro as its Executive Vice President of Sales and Marketing. Nitro at the time was the leader in the used golf ball industry. Nitro was one of the first used ball companies to separate its used golf balls by model and manufacturer. Moreover, Nitro was one of the first used ball companies to sell its used golf balls in packaging similar to new golf balls, unlike the prior method of selling used golf balls in large barrels or see-through clam shells. At that time, Nitro had begun its sales and marketing of its refurbished golf balls. Nitro's refurbished golf balls looked better than the majority, if not all of the other refurbished golf balls in the market. Nitro had received a great deal of interest from a number of large sporting goods and golf product retailers concerning its refurbished golf balls. In fact, Nitro received numerous orders and commitments for its refurbished golf balls. Through the early party of 2001, Nitro's sales were increasing dramatically. However, as discussed in detail below, due to Acushnet's anti-competitive conduct, including its defamatory and false remarks concerning Nitro and its products, Nitro's business began to suffer.

9. By the end of 2001 and early 2002, as a result of Acushnet's actions, Nitro's sales were at paltry levels. As such, Nitro had no alternative but to lay off the majority of their employees, including myself. I left Nitro on January 2002.

10. After I left Nitro, I went to work for Onyx, which eventually became Wizard Inc., another golf ball recycler as its Executive Vice President of Sales and Marketing. Due to differences of opinion between myself and Wizard's principal, I left Wizard on or about December 2002 and went back to Nitro.

11. I returned to Nitro as its Executive Vice President of Sales and Marketing. I understand from speaking with Amin C. Khoury, Nitro's President, that after Nitro's success on Acushnet's motion for preliminary injunction, Nitro was able to stay open by making modest re-acquisitions of some accounts. As such, there was a position available for me to return to Nitro. Based on Acushnet's conduct and the damage levied on Nitro, my sales and merchandising staff during my second stint at Nitro was almost non-existent. In fact, Amin Khoury, Helen Martin and myself are basically doing all of the sales and marketing for Nitro at this time. Although we are making some "head way" with retailers on our refurbished product, there are still a number of retailers who absolutely refuse to deal with Nitro because of Acushnet.

## INTERFERENCE

### The Sports Authority ("TSA")

12. Based on my prior working relationship with TSA, I have a complete and thorough understanding of how merchandising works at TSA. I am also familiar with TSA's standard operating procedures and who is responsible for certain details and who has the authority to sign off on programs and documents. The buyers at TSA do not work in a vacuum and all contracts are signed off or approved by a member or several layers of senior management.

13. Nitro had a healthy growing business and an exceptional relationship with TSA up until the first quarter of 2001. The buyer at TSA at that time was Julie Donovan. We had a great working relationship with Ms. Donovan. Our net sales to TSA for the year 2000 were $761,735. Our projections and commitment from TSA for 2001 were $1,325.000. This growth was based upon an expanded line structure and the addition of two "skus"[1] of refurbished golf balls.

---

[1] The term "sku" refers to Stock Keeping Units.

14. Throughout the first quarter of 2001, order flow from TSA became slow and purchases fell well behind projections. It became apparent that something was wrong, but TSA would not provide any explanations. At this time, Ms. Donovan had been let go by TSA for some unknown reason. Her replacement was Gail Silverstein. I tried to talk to Ms. Silverstein several times to ascertain TSA's complete turnabout on Nitro's products. However, I was unable to because Ms. Silverstein was overwhelmed and was basically trying to maintain the department. Ms. Silverstein was eventually replaced by Kevin Chapman. When Mr. Chapman became the new buyer, virtually all communication stopped, as did much of our order flow. Repeated phone calls to discuss our concerns went un-answered by Mr. Chapman. Two different e-mails and letters dated August 17, 2001 and October 24, 2001 were sent with no action taken by TSA to address the problem. It was not until Amin Khoury called Marty Hanaka the present Chief Executive Officer at TSA that some communication started again. However, to this day, Nitro never received a response as to why TSA refused to honor its commitment.

15. TSA's decision to stop carrying Nitro's product, including Nitro Titanium 18 pack golf balls (sku # 24900821) did not make economic sense. Nitro's products out sold every Titleist and Pinnacle Product TSA carried. Moreover, TSA's gross profit margin on Nitro's product was significantly higher (34%) than most of Acushnet's new products. I did not understand TSA's conduct because based on my substantial experience in sales and merchandising, and in particular, my experience with how TSA works, higher sales and higher margins do not normally equate to loss of shelf space.

16. After reviewing documents produced by TSA and/or Acushnet in this action, including TSA's merchandise style summary reports, it became apparent why TSA did what it did. TSA always wanted to carry a large volume of Titleist golf balls and Titleist logo overruns but was never able to do so. However, on or about the same time that TSA dramatically reduced purchasing Nitro's products, Acushnet started to offer TSA large volumes of logo overruns including the 12-pack logo overruns (sku # 26548412). Moreover, at or around this same time period, Acushnet began to offer TSA new Titleist golf balls including the HVC, which TSA always wanted but which Acushnet never made available. In addition, after reading the deposition of Julie Donovan, I became aware that Acushnet had disparaged our products and threatened Ms. Donovan about TSA carrying Nitro's products. Indeed, the reason Ms. Donovan was terminated from TSA was due to her support of Nitro and its products.

17. As a result of what transpired above, Nitro's sales to TSA declined in 2001 to $525,000.00. At one point in time, TSA stopped ordering any products from Nitro altogether. Despite substantial time and effort expended by Nitro to regain TSA's business, all of Nitro's efforts were unsuccessful.

18. It was not until late 2002 (4th quarter) that TSA finally started to buy some Nitro product and then only recycled product. Nitro's 2002 sales to TSA were at an all time low of $53,000.00

19. The downward trend got worse in 2003. Despite meeting with TSA, Nitro's sales to TSA are still dreadful. As of October 2003, Nitro's year to date sales to TSA is less than $25,000.00.

**Wal-Mart Canada**

20. Nitro's relationship with Wal-Mart Canada began after I met with Chris Corcoran, the buyer and Derek Rau the merchandise manager in late January 2001 at the PGA show in Orlando, Florida. Mr. Corcoran was very impressed and excited about Wal-Mart Canada carrying Nitro's products, including its refurbished golf balls. As excited as Mr. Corcoran was, Mr. Rau was even more so. Wal-Mart Canada's initial purchase was quite sizeable for the amount of stores they had. Wal-Mart Canada purchased 20,000 packs for approximately 100 stores. In consideration for such support, Nitro developed proprietary bi-lingual packaging for Walmart Canada. Mr. Corcoran loved Nitro's product, because of its consistent appearance, packaging and price value relationship. I had monitored the sales of Wal-Mart Canada very closely. It was a huge success with approximately a 90% sell through. We had sold them a 15 pack of refurbished pro golf balls with approximately 80% of those balls being Titleist.

21. Then on or about September 19, 2001, I had a meeting with Mr. Corcoran to discuss Nitro's current and future relationship with Wal-Mart Canada. During our meeting, we first reviewed the current performance of the product, and the basics such as new store growth and promotional opportunities and trends. At this time Mr. Corcoran indicated that while the program was successful he had concerns over the legality of Nitro's product, and told me that "sources" informed him that the product was indeed not legal. When I pressed him for who the "sources" were, he refused to tell me. I assured him that there were no issues, took him though the conception of our refurbished product, including Nitro's due diligence into researching the

legality of its products. I further stated that I would send him all of the information in writing concerning the legality of the balls. At this point, Mr. Corcoran said "okay," and appeared satisfied and that part of the discussion was over. In taking him through the proposed line structure, Mr. Corcoran was most interested in two products. The current 15 ball pro refurbished pack and a 15-ball store line pack. He was particularly interested in the new packaging concepts that were being approved by Debra Warner, the buyer for Wal-Mart in the United States. In addition to these two in line products, Mr. Corcoran also asked us to develop an entry level promotional 36 pack for him, which we did. There was not a doubt in my mind when I left that meeting that we were going to be doing significant business with Wal-Mart Canada. Based upon our conversation, I sent him a letter two days or so after our meeting discussing the legality of Nitro's golf balls. In addition, we put together a proposed line structure of both refurbished and recycled product, and sent Mr. Corcoran additional samples.

22. However, in late 2001 and early 2002, after repeated efforts over the next few weeks to wrap up the program with Mr. Corcoran, I could not get a return phone call. Finally Mr. Corcoran called me to tell me that the only product that Wal-Mart Canada would be carrying would be the promotional 36-ball pack of recycled practice balls, which was to be a give a way to help Wal-Mart Canada and strengthen our partnership. When I asked Mr. Corcoran what had happened, he simply told me that he was not going to do refurbished balls, and that Nitro would not be considered for the recycled balls. After pushing him to find out why the drastic change in direction since our meeting, he only reiterated that they would only do recycled balls.

23. I am informed that based on documents produced by Wal-Mart Canada and Acushnet, the reason why Wal-Mart Canada refused to carry Nitro's products was because Acushnet had threatened to withhold product from Wal-Mart Canada if it insisted on carrying Nitro's golf balls and/or offered Wal-Mart Canada golf balls which were previously unavailable.

**Martin's Golf and Tennis**

24. In or about later 2001, I received a telephone call from Michael Shaw, one of Nitro's sales representatives. Mr. Shaw informed me that he just had a visit from Martin Barrier, the owner of Martin's Golf and Tennis. Mr. Barrier told Mr. Shaw that Acushnet was spreading rumors that Nitro's refurbished golf balls were not what they were supposed to be. In addition, Mr. Barrier told Mr. Shaw that "Nitro better watch out."

**Edwin Watts – Atlanta**

25. At or about the same time period, Mr. Shaw and myself met with Rodney Frazier of Edwin Watts in Atlanta. Mr. Frazier was in charge of all three stores in Atlanta and made all of the purchasing decisions. Mr. Shaw had a long business relationship with Mr. Frazier over the years. After our formal presentation to Mr. Frazier that emphasized Nitro's refurbished product, Mr. Frazier was very interested in the Pro-line and Premium refurbished products because his stores cater to a higher end customer. Moreover, Mr. Frazier liked the price value relationship, product, packaging and the idea that Edwin Watts would make over a 40% gross profit margin. We left him several samples and he indicated that orders would be forth coming.

26. Unfortunately, Mr. Frazier never placed any orders. Mr. Frazier told Mr. Shaw that he just decided that he did not want to carry our products. I further learned from Mr. Shaw that Mr. Frazier did not want to carry our product because he was fearful of jeopardizing his relationship with Titleist.

**Edwin Watts Corporate**

27. I went to see Edwin Watts Corporate in December of 2001 with our sales representative Joe Schact. Our appointment was with Ted Hanson, the Vice President of Edwin Watts. We made a full presentation to Mr. Hanson on all of Nitro's products, including new Nitro golf balls, recycled and refurbished golf balls and golf clubs. It was without a doubt one of the best meetings I have ever been involved with in my sales career. Mr. Hanson indicated that his stores had carried some recycled balls in the past, mostly non-packaged from local vendors. Mr. Hanson said that they were consistently left with bad balls at the end, and that they had a high shrink (i.e. balls disappearing). As a matter of fact he had asked if we could sell him some of our mesh bags as a way to package his loose balls.

28. Mr. Hanson loved Nitro's refurbished golf balls. Mr. Hanson stated that he has never seen used balls look this way, segregated by brand and model, and in great packaging. He was most interested in the refurbished premium and pro-line products. He did inquire as to the legality of the product. However, after I explained the creation process, which included Nitro's due diligence, Mr. Hanson was more than satisfied on this issue. Our meeting lasted about ninety minutes. I left about a half dozen samples of the refurbished balls because Mr. Hanson was

excited and wanted to show them to Edwin Watts, the owner himself. Prior to leaving I asked him when I should follow up and he said to give him a few days.

29. After returning to Nitro, I sent a follow up letter to Mr. Hanson with all the action points from our meeting. Thereafter, I had placed several calls to Mr. Hanson to follow-up on our meeting. Finally, Mr. Hanson called me back and left a message stating that he had good news and bad news. When I returned his call, he said that he wanted to proceed with the development of a private label brand of golf clubs. However he also stated that he was not going to purchase any golf balls. When I questioned him as to what had happened after such a positive meeting, he stated that the balls were sitting in his office when Mark Goldstein, Acushnet's National Sales Representative came into his office. Mr. Goldstein saw the product and said: "You're not really going to carry this are you? The balls are not legal, how do you know they are what they say they are. They could be counterfeit. I am not happy about this." After hearing this from Mr. Goldstein, Mr. Hanson told me that he discussed this matter with Mr. Watts. Thereafter the decision was made that they could not carry Nitro's golf balls because it would disturb their relationship with Acushnet. Mr. Hanson's exact words to me were: "Jay they are our largest vendor, and we are not going to upset this relationship, so you boys will have to work this out." Not only did we not get to sell Edwin Watts our refurbished balls, but they would not entertain our recycled balls either.

30. I had another meeting with Mr. Hanson on February 11, 2003. During this meeting I once again showed Mr. Hanson both recycled and refurbished balls in our new conceptual packaging. Mr. Hanson made it very clear to me that Edwin Watts would not consider any refurbished products. His exact statement to me once again was: "let me know when you boys work it out." He was however very interested in the club line, new Nitro balls and recycled balls. Pursuant to his direction Nitro worked on a prepaid freight program that would ship recycled products directly to his stores, with proprietary merchandising fixtures. After numerous attempts to follow up and sending out additional samples I was told by Mr. Hanson that he did not have the time to address this issue and that the samples had not even been opened. As such, Nitro has not been able to sell Edwin Watts even its recycled golf balls. Interestingly, when I worked at Wizard, in between my tenures at Nitro, I was able to sell Edwin Watts recycled golf balls. Apparently, it was Edwin Watt's potential relationship with Nitro that was bothering Acushnet.

**Meijer Corp**

31. During this same time period, I had made a presentation to Brian Byrnes at Meijer Corp. Nitro's sales representative Ray Leach had an excellent relationship with all the executives at Meijer, including Mr. Byrnes. Mr. Byrnes was a well-seasoned buyer and avid golfer. I presented both refurbished and recycled products. During the presentation, Mr. Byrnes asked if the product was legal. I informed him that it was and took him through the evolution of the product, including Nitro's due diligence. Nitro's refurbished golf balls impressed Mr. Byrnes. As such, I left several samples of Nitro's refurbished golf balls.

32. After following up with a recap letter, and confident that we would secure the business, Mr. Byrnes contacted Mr. Leach to inform him that he still had concerns over the legality of Nitro's refurbished golf balls due to rumors that he had heard in the industry that Nitro's balls were not what they were represented to be. After hearing this from Mr. Leach, I called Mr. Byrnes to inquire where he had heard this rumor. However, Mr. Byrnes would not divulge his source. Thereafter, Amin Khoury spoke with Mr. Byrnes directly and followed up with a letter. Based upon that discussion, Meijer gave Nitro basically a test run, the smallest of the golf ball skus but not the program or line structure that we had been working on. Though Nitro had a superior looking product, better packaging and pricing, Meijer would not commit to the program or line structure that Mr. Byrnes was so enthusiastic about just a few short weeks ago. Moreover, due to the fact that Acushnet's conduct had decimated Nitro's work force, Nitro could not even ship to Meijer this small order.

**Gart Sports**

33. Also at or about this same time period, Bill Madden, Nitro's account executive for this vendor and Nitro's sales representative David Cooley made a presentation to Kevin Whalen, the buyer at Gart Sports. Initially, Mr. Whalen indicated to Mr. Madden and Mr. Cooley that he was not interested in refurbished balls because he had heard rumors that they were not legal. Once again after pressing the matter, Mr. Whalen would not divulge the source of the rumors. However, after Mr. Madden and Mr. Cooley explained Nitro's refurbishing process as well as Nitro's due diligence concerning the legality of refurbished golf balls, Mr. Whalen appeared to be satisfied.

34. Eventually, Nitro was able to get a commitment from Gart Sports on our refurbished and recycled products. Nitro was going to be the vendor of record for Gart Sports on used and refurbished balls. Unfortunately, that commitment was never honored. When we inquired as to Mr. Whalen's reasoning, he responded by stating that Gart Sports was staying with its current supplier of recycled golf balls, PGSI. However, four months later, Gart Sports purchased recycled golf balls from Onyx/Wizard, while I worked there.

### Discussions With Marc Goldstein of Acushnet

35. In or about early 2002, after hearing all these rumors regarding the alleged illegality of Nitro's products, I decided to call Marc Goldstein to ask him if Acushnet was spreading these rumors. I had known Mr. Goldstein very well since he was the Acushnet sales representative when I worked at TSA. In addition, I had got to know Mr. Goldstein on a personal level. In fact, Mr. Goldstein attended one of my children's bar mitzvah.

36. After exchanging pleasantries, I told Mr. Goldstein that there are rumors going around that Titleist is "badmouthing" Nitro and its products. In response, Mr. Goldstein stated that he did not know what I was talking about or who I was even working for at the time. I then asked him "are you telling me that you are not even aware of the rumors floating around out there that Nitro's products are illegal." In response, Mr. Goldstein expressly stated "the only thing that I can tell you is that Titleist will fight tooth and nail to protect its mark." That's where we ended the conversation.

### Dick's Sporting Goods

37. On or about March 2003, I engaged in an email discussion with Joe Beauseignor, the buyer at Dicks. I was attempting to get Dicks as a customer for Nitro. In response to my emails, Mr. Beauseignor stated that he was not interested in Nitro's refurbished products because: (1) it brings the average ticket price down; (2) Dicks wants to lower the number of skus; (3) Nitro is not a name recognizable to our customers; and (4) there is pressure from its vendors.

38. I am informed that according to Mr. Beauseignor's deposition testimony, Mr. Beauseignor did not recall what exactly he meant or which vendor he was referring to when he said that "he was getting pressure from his vendors." However, the other three reasons offered by Mr. Beauseignor for not purchasing Nitro's refurbished products proved to be false. First, Mr. Beauseignor was aware that Nitro's product would not bring his average ticket price down

because Nitro could and would have packaged a multi-ball product with a high-ticket price. Second, Mr. Beauseignor's statement that Dick's did not want to sell products that its customers did not recognize is also incorrect because Dicks was continuing to sell obscure golf balls such as "Intech" and "Ativa." Finally, Mr. Beauseignor's statement that he wanted to reduce the number of skus is directly refuted by the fact that in that past year, his number of skus from Acushnet has actually increased.

39. In view of the fact that Marc Goldstein was the Titleist sales representative for Dicks, there was apparently another reason for Mr. Beauseignor's refusal to do business with Nitro.

**Dunham Sporting Goods**

40. In or about June, 2003, Justin Sigler, Nitro's sales representative and I had a meeting with Scott Lotts, the buyer at Dunham Sporting Goods. At the meeting, Mr. Lotts expressed great interest in Nitro's products, including its refurbished golf balls. After leaving the meeting Mr. Lotts requested that we send additional samples and confirm the few action points left open. Both Mr. Sigler and I felt that orders from Dunham were impending and we fully expected to ship products within the next six to eight weeks.

41. However, I later received a telephone call from Mr. Sigler informing me that Dunham was not going to place any orders with Nitro. According to Mr. Sigler, Mr. Lotts stated that his supervisor received a telephone call from either Acushnet or Acushnet's attorneys. As a result of that telephone call, Dunham decided that it could not do business with Nitro. Unfortunately, Mr. Lotts would not disclose to either myself or Mr. Sigler what was said by Acushnet or its counsel during that telephone conversation with Mr. Lotts.

**Golfsmith**

42. On or about July 18, 2003, John Lookabaugh, Nitro's sales representative and I met with Chris Hargett, the buyer at Golfsmith. We had a great meeting and Mr. Hargett really liked the Nitro's Premium refurbished balls in our Tour 2 packaging, as this product is perfect for his upscale consumer.

43. However, although Mr. Hargett was really interested and impressed by our product, he told me openly that he could not buy our products. According to Mr. Hargett, one of the largest sellers and fastest growing part of Golfsmith's golf ball business is their logo overrun and x-out balls. So, although Nitro's product is more readily available and provided better profit

margins, Mr. Hargett openly told me that he could not do business with Nitro because "he did not want to risk his logo over run business with Titleist or hurt his relationship with them." When I reiterated that the balls are legal, and that Titleist is not going to do anything to him, his reply was "who are you kidding, you know exactly what they will do. I will not get any more logo overruns and I will not be the first to receive new products from Titleist. I cannot take that risk."

### Acushnet's Power Over Large Retailers

44. Based on what I had witnessed, it became apparent that Acushnet has such market dominance and power that it can dictate to any retailer how to conduct its business. This is not just with smaller retail accounts, but with industry leaders such as Walmart (leading retailer in the world), Golfsmith (industry leader of golf specialty stores), Edwin Watts (industry leader of golf specialty stores) and The Sports Authority (leader in sporting goods sales). Despite the prestige and prominence of these large retailers, they have all succumbed to the demands and threats of Acushnet.

I declare under penalty of perjury of the laws of the State of Florida and of the United States that the foregoing is true and correct to the best of my knowledge, information and belief. Executed at Palm Beach, Florida, this 23rd day of November 2003.

Jay Hanover

08/16/2003  19:21  19547523459  RANDI HANOVER  PAGE 02