UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO.: 02-14008-CIV-MIDDLEBROOKS/LYNCH

IN RE NITRO LEISURE PRODUCTS, L.L.C.

_____/

NIGHT BOX
FILED
DEC - 5 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

### ACUSHNET'S MOTION TO STRIKE THE DECLARATION OF MICAHEL P.C. SHAW IN SUPPORT OF NITRO LEISURE PRODUCTS, LLC'S OPPOSITION TO ACUSHNET COMPANY'S MOTION FOR SUMMARY JUDGMENT AND COMBINED MEMORANDUM OF LAW

Defendant/Counter-Plaintiff, Acushnet Company ("Acushnet"), by and through its undersigned attorneys and pursuant to Federal Rule of Civil Procedure 56, moves this Court to strike the declaration of Michael P.C. Shaw ("Shaw") filed by Nitro Leisure Products, LLC ("Nitro") in its opposition to Acushnet's Motion for Summary Judgment (the "Shaw Declaration"). This Court should strike the Shaw Declaration because it consists primarily of inadmissible hearsay and statements which are clearly inconsistent with the established record. Moreover, it contains numerous statements that are not based on Shaw's personal knowledge, but, rather, are based solely on conjecture and speculation. In support of its motion, Acushnet states as follows:

### INTRODUCTION

Acushnet served its Motion for Summary Judgment on October 23, 2003. Nitro's Memorandum of Law in Opposition to Acushnet's Motion for Summary Judgment (the "Opposition") was served on November 24, 2003, along with numerous declarations which purportedly support the Opposition. The Shaw Declaration, which is attached hereto as Exhibit



MIA#2283399.2

"A," is one such declaration.[1] Nitro relies upon this declaration in its Opposition to support its argument that Acushnet interfered with the business relations between Nitro and Martin Barrier ("Barrier") by telling Barrier it had purchased some counterfeit balls of Nitro's from his store. See Opposition at 7, n. 49. Furthermore, because Barrier testified in a way adverse to Nitro, Nitro has been forced to elicit hearsay declaration testimony of its own employee, Shaw, to attempt to create genuine issues of material fact and save its claims. Nitro improperly relies upon the Shaw Declaration, however, as it is riddled with inadmissible hearsay, lacks personal knowledge, is speculative and is inconsistent with other portions of the record. The Shaw Declaration clearly violates the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the dictates of this Court.[2]

## ARGUMENT

Federal Rule of Civil Procedure 56(e) requires that affidavits used to oppose summary judgment motions "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The Shaw Declaration sets forth numerous statements that would not be admissible in evidence, as such statements are based on speculation and constitute inadmissible hearsay and, in some instances, double hearsay.

The Shaw Declaration is presented by Nitro for the sole purpose of creating a fact issue in an effort to avoid summary judgment in Acushnet's favor. The law, however, does not tolerate such gamesmanship. Because Shaw's statement's are conclusory, self-serving, and consist

---

[1] Acushnet has attached a copy of the Shaw Declaration to the instant motion and has underlined all objectionable hearsay statements, rather than reproduce what would amount to most of the declaration within this document. See Shaw Decl.

[2] Acushnet files this motion to strike in order to prevent the development of a confused and inaccurate record in this case. As Acushnet's moving papers establish, Acushnet is entitled to summary judgment whether the declarations on which Nitro's Opposition depends are stricken or not. While, as this motion demonstrates, Mr. Shaw's improper declaration testimony should be stricken or disregarded by the Court, Acushnet's Motion for Summary Judgment is in no way dependent on the grant or denial of this motion.

largely of inadmissible hearsay and speculation, the court should not consider them in ruling on Acushnet's Motion for Summary Judgment.

### A. Shaw's Declaration Should Be Stricken Because it Is Riddled with Inadmissible Hearsay

Many of the paragraphs within the Shaw Declaration contain hearsay and double hearsay. See Fed. R. Civ. Pro. 801(c) ("Hearsay is a statement, other than one made by the declarant while testifying in a trial or hearing, offered into evidence to prove the truth of the matter asserted."); see also Fed. R. Civ. Pro. 805 (requiring that each instance of hearsay meet one of the exceptions to the hearsay rule in order to be admissible). Specifically, paragraphs 13 through 15, 17, and twenty through 26 all contain objectionable hearsay or double hearsay. See Shaw Decl. ¶¶ 13-15, 17, 20-26.

The specific hearsay and double hearsay statements do not fall within any hearsay exception enumerated in the Federal Rules of Evidence and are, therefore, inadmissible. The Shaw Declaration is, thus, in direct conflict with the well-established principle that affidavits submitted in opposition to a summary judgment motion must set forth facts that would be admissible in evidence. See Macuba v. Deboer, 193 F.3d 1299, 1308 (11th Cir. 1999). Inadmissible hearsay cannot be considered on a motion for summary judgment. Id.

Following this principle, courts in this circuit have routinely excluded affidavits opposing motions for summary judgment because they contained inadmissible hearsay. See, e.g., Macuba v. Deboer, 193 F.3d 1299, 1308 (11th Cir. 1999) (court excluded statements of a summary judgment affidavit because: (1) it was rank hearsay; (2) the statements did not fall under any exception to Rule 802 of the Federal Rules of Evidence and (3) even though the statements might be admissible to impeach the affiant, they would not be admissible as substantive evidence); see also Watson v. Adecco Empl. Servs., 252 F. Supp. 2d 1347 (M.D. Fla. 2003) (portions of

plaintiff's deposition testimony were not to be considered on summary judgment because the contested portions included inadmissible hearsay which did not fall into one of the hearsay exceptions of the Federal Rules of Evidence); Pritchard v. Southern Co. Serv., 92 F.3d 1130 (11th Cir. 1996) (challenged statements in deposition were disregarded because they were inadmissible hearsay and there was nothing to indicate that the testimony, based on statements of unknown co-workers would lead to admissible evidence).

The statements in the Shaw Declaration are made in an attempt to defeat Acushnet's Motion for Summary Judgment. For example, Shaw claims that "[a]ccording to Mr. Barrier, a Titleist representative told him that he bought Nitro's refurbished Titleist golf balls from one of Martin's stores and that the Titleist representative cut open nineteen (19) golf balls marked as Titleist brand golf balls and found out that the golf balls were non-Titleist brand golf balls." Shaw Decl. at 8, ¶ 24. Such statements are inherently unreliable and should be disregarded.[3] This Court should strike the Shaw Declaration, or at the very least, those paragraphs containing inadmissible hearsay. Home Oil Co. v. Sam's E., Inc., 252 F. Supp. 2d 1302 (M.D. Ala. 2003) (statements in plaintiff's affidavits contained inadmissible hearsay and were not considered in ruling upon defendant's motion for summary judgment).

**B.    Shaw's Declaration Should Be Stricken Because some of the Paragraphs Contain Improper Speculation**

Finally, the Shaw Declaration contains improper and inadmissible speculation. He states that "Nitro's refurbished brand name golf balls created a buzz at the show." Shaw Decl. at 5, ¶

---

[3] The further one gets from the source of a statement the less reliable the statement becomes. This statement by Shaw illustrates the inherent untrustworthiness of hearsay. While Shaw attributes this statement to Barrier, who allegedly attributed it to a Titleist Representative, Barrier denies that he ever made this statement to Shaw or that a Titleist Representative ever made this assertion to him. See Dep. of Barrier at 21-22, 25-26, 39. For this reason, if Nitro had really wanted for the Court to know what Barrier actually said, it should have cited to and attached Barrier's deposition, rather than the Shaw Declaration, to its Opposition.

17. And, "[b]ased upon my sales in 2001 and the positive reaction from the golf ball retailers in the industry to the Nitro refurbished golf ball product I estimated my sales of Nitro's refurbished golf balls for 2002 would be at least one ($1,000,000) million dollars." Shaw Decl. at 7, ¶ 21. These statements are improper speculation, and this Court should strike them accordingly. See Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); see also Pace v. Capobianco, 283 F.3d 1275 (11th Cir 2002) (district court erred in considering the statements in an affidavit based on belief rather than personal knowledge); Niland v. Delta Recycling Corp., 2003 WL 21939781 (S.D. Fla. 2003) (court refused to consider affidavit based on speculative claims and unsubstantiated by personal knowledge in ruling upon a motion for summary judgment).

## CONCLUSION

WHEREFORE, for the reasons set forth above, Acushnet moves for the entry of an order granting its motion to strike the declaration of Michael P.C. Shaw.

## CERTIFICATE OF COUNSEL

Pursuant to S.D. Fla. L.R. 7.1A.3., the undersigned counsel certify that they have conferred with counsel for Nitro in an attempt to resolve the dispute raised by Nitro's objections but have been unable to reach an agreement.

Respectfully submitted,

CARLTON FIELDS, P.A.
*Attorneys for Acushnet Company*
Bank of America Tower at International Place
100 Southeast Second Street, Suite 4000
Miami, Florida 33131-9101
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

By: /s/ Steven J. Brodie
STEVEN J. BRODIE
Florida Bar Number: 333069
E-Mail: sbrodie@carltonfields.com
JEFFREY MICHAEL COHEN
Florida Bar Number: 091495
E-Mail: jmcohen@carltonfields.com
JOHN A. CAMP
Florida Bar Number: 848115
E-Mail: jcamp@carltonfields.com

*and*

ROBERT CIOTTI
Florida Bar Number: 333141
E-Mail: rciotti@carltonfields.com
One Harbour Place
777 S. Harbour Island Boulevard
Tampa, Florida 33602-5730
Telephone: (813) 223-7000
Facsimile: (813) 229-4133

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion for the Entry of an Order Enlarging the Time Within Which It May Respond to Nitro's Motion to Strike Acushnet Company's Answer, Affirmative Defenses and Counterclaims to Nitro's Third Amended Complaint was furnished by U.S. Mail this 5th day of December, 2003 to GERALD F. RICHMAN, ESQUIRE/GARY S. BETENSKY, ESQUIRE, RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A., Attorneys for Nitro Leisure, 250 Australian Avenue, Suite 1504, West Palm Beach, Florida 33401; and MARK W. YOCCA, ESQUIRE, YOCCA PATCH & YOCCA, LLP, Attorneys for Nitro Leisure, 19900 MacArthur Boulevard, Suite 650, Irvine, California 92612.

CARLTON FIELDS, P.A.
*Attorneys for Acushnet Company*
Bank of America Tower at International Place
Suite 4000
100 Southeast Second Street
Miami, Florida 33131-9101
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

By: /s/ Steven J. Brodie
STEVEN J. BRODIE
Florida Bar Number: 333069
E-Mail: sbrodie@carltonfields.com
JEFFREY MICHAEL COHEN
Florida Bar Number: 091495
E-Mail: jmcohen@carltonfields.com
JOHN A. CAMP
Florida Bar Number: 848115
E-Mail: jcamp@carltonfields.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH

IN RE NITRO LEISURE PRODUCTS, L.L.C.
_____/

# DECLARATION OF MICHAEL P. C. SHAW IN SUPPORT OF NITRO'S OPPOSITION TO ACUSHNET'S MOTION FOR SUMMARY JUDGMENT

I, Michael P. C. Shaw, hereby declare and state as follows:

1. I am a former professional golfer and golf professional. I became a professional golfer at age 18 in England on January 1, 1974 at which time I signed a golf-playing contract with Slazenger, a golf equipment manufacturer. From 1975 to 1976 I played in professional golf events as a professional golfer. During that period of time I played on the South African Golf Tour against players such as Lee Trevino, Gary Player, Tom Watson, Tom Weiskopf and Tony Jacklin. Although I made the professional golf cut for the tournaments that I played in more times than not, I realized despite my dream of playing professional golf as a full time means for employment that I would not be able to make a living doing so.

2. From March 1974 through September 1976, when I was not playing in professional golf events, I worked as a golf professional teaching golf at Downshire Golf Course in England. I was the Assistant Golf Pro to Roger Mace at the Downshire Golf Club. Mr. Mace was also an instructor to the PGA player schools. Mr. Mace taught me how to teach the game of golf to recreational players, as well as how to merchandise golf products and operate a golf course.


EXHIBIT A

- 2 -

3. In 1976 I was invited to the United States as a guest of Doug Sanders, then a professional golfer on the United States PGA Tour, as well as the Golf Pro at The Woodlands Country Club in Houston Texas. Mr. Sanders invited me to the United States to show me the golf game at the club level in the United States. After obtaining a work permit I worked as a teaching Golf Professional at The Woodlands Country Club where I began teaching members and guests the game of golf. I also played on the Arizona Professional Mini Golf Tour.

4. In 1977 I left The Woodlands Country Club for the lure of California and eventually became the teaching Golf Professional at Brookside Municipal Golf Course in Reno Nevada. I worked at Brookside until 1979 and taught recreational players and celebrities the game of golf, including Don Rickels, James Garner, Andy Williams and Ed McMahon.

5. In 1980, I along with two others acquired a golf course in Northern California known as Mallard Lake. I operated and taught golf at the golf course through 1982, when the course was sold.

6. Following the sale of Mallard Lake golf course, I accepted an offer of employment from Dunlop Sports Corporation as a sales representative in Los Angeles, California. I was employed at Dunlop for approximately a year and a half. While at Dunlop I reported to Joseph White, Dunlop's then Product and Marketing Director. At Dunlop I play tested prototype golf balls, learned how golf balls were manufactured and sold, reviewed proposed golf ball dimple patterns, and sold golf products to retail establishments.

7. On or about May 1983, Mr. White left Dunlop to go to Yamaha Golf Club Company to become its president. Mr. White recruited me to join him as Yamaha's Vice President of Sales, which I did. I worked at Yamaha for two years. After Yamaha, I went into

business for myself as an independent sales representative for various manufacturers of golf apparel, golf bags, golf clubs, golf shoes, and golf gloves.

8. In 1987, while continuing as an independent sales representative, I moved to England and set up sales organizations overseas for United States companies that wanted to expand their golf products into the Europe golf market. In 1988, while continuing to work in England as an independent sales representative for golf products, a golf shoe company called Stylo UK wanted to gain a foothold in the United States for their golf shoes. Stylo U.K. approached me to set up operations for sales of their products within the United States. In the fall of 1989 I moved backed to the United States to set Stylo U.S.

9. In 1989 I set up the Stylo's United States operations in New York and then moved it to South Carolina. I hired and trained a 38 person sales force and distributed Stylo shoes nation wide. In 1993 Stylo UK closed its US operations due to financial issues overseas.

10. As a result I, along with two other people, formed at that time a golf shoe company called International Golf Footwear in New Hampshire. The company manufactured and sold nationwide golf shoes, including golf shoes for Stylo U.K.

11. In 1996 I left International Golf Footwear and accepted an offer from Dunlop Maxfli Sports Corporation as its Eastern Regional Sales Manager. In that position I had substantial responsibility for the company's sales of new golf balls. I continued on my own time to sell part time golf apparel as an independent sales representative. In 1998 I left Dunlop when it started to downsize. At that time I began pursuing selling golf products full time as an independent sales representative.

## MY INTRODUCTION TO NITRO'S USED GOLF BALLS

12. In 1999 I attended the West Coast Golf Show in Las Vegas, Nevada as a representative for some of the golf companies for which I was an independent sales representative. Although the show was not well attended I saw that there was one booth at the show generating a lot of buzz among the exhibitors and show attendees. I walked up to the booth to see what the product was that was causing a stir among the show attendees. When I arrived at the booth I saw Mr. Edwin Watts of Edwin Watts Golf and Jack Dillon, retailer responsible for 120 family golf centers. The booth was promoting the sale of used rewashed golf balls and the exhibitor was a company called Nitro Leisure Products, LLC ("Nitro").

13. I know both Edwin Watts and Jack Dillon from my years in the golf industry and have sold golf products to each of their stores. When I arrived at the Nitro booth Mr. Edwin Watts and Mr. Dillon said, "These guys have a great product you need to pick up this line -- you could make a killing in the Carolinas with it (Nitro rewashed golf balls)." I reviewed the product line at the booth, which at that time consisted of used rewashed premium brand name golf balls and Nitro brand new golf balls. I also reviewed Nitro's product packaging and found it excellent from a presentation perspective.

14. I told the Nitro representative at the booth that I believe I could assist them through my contacts with selling Nitro's product line. The Nitro representatives at the booth told me that Nitro would be expanding its product line in mid to late 2000 to include refurbished premium brand name golf balls. The representatives told me that the Nitro refurbished golf ball product would be a brand name golf ball such as a Titleist brand that had been refurbished through Nitro's refurbishment process. The Nitro representatives thanked me for my interest, but did not take me up on my offer to represent their golf products.

-4-

15. Thereafter I followed up with Nitro regarding my assistance in Nitro's sales of their product lines. At the same time I spoke with some of my contacts in the golf industry, including Kevin McDermott of Pro Golf Of America, which had at the time over 170 franchise stores that sold golf products. Within a week of my first contact with Pro Golf Of America I was able to obtain an invitation for Nitro's products to be presented as a "preferred vendor" at the 1999 Pro Golf Of America Show in Palm Springs, California. I then followed up with Nitro and told them I was able to get them into the Pro Golf Of America Show and asked them to consider again the value I could add to their sales. As a result, Nitro agreed to have me act as an independent sales representative for their products. Nitro, however, refused to pay my standard ten (10) percent commission. I accepted a five (5) percent commission due to my belief that the Nitro product lines would be a high volume item.

16. Nitro's products sold well at the 1999 Pro Golf Of America Show and Nitro was invited back to the show in 2000 to present its product line. I attended the 2000 Pro Golf Of America Show held in Atlanta, Georgia on behalf of Nitro.

17. At the 2000 Pro Golf Of America Show I displayed Nitro's soon to be released refurbished Titleist golf balls. Nitro's refurbished brand name golf balls created a buzz at the show. The golf balls were consistent and uniform in appearance and look like grade "AAA" premium golf balls with a Nitro/Second Chance refurbished logo on them. I took orders for the Nitro refurbished golf balls for late 2000 delivery. The response from the attendees at the show was that the refurbished golf ball product was very attractive from both a price and appearance perspective. Nitro was also invited to the 2001 Golf Of America Show held in Atlanta, Georgia, again as a preferred vendor, to display Nitro's product line including the Nitro refurbished premium brand name golf balls.

18. In late 2000 to first part of 2001 I was selling Nitro's refurbished brand name golf balls to my customers, including but not limited to the following:

1. Pro Golf Hilton Head (off course shop);
2. Pro Golf Raleigh (off course shop);
3. Pro Golf Greenville's South Carolina;
4. Nevada Bob's Chattanooga;
5. Golf Head Quarters Charleston;
6. Colorado Ski and Golf, (Denver);
7. Summerville Country Club (where I am a 13 year private member and teaching Pro);
8. Kings Grant Country Club Charleston;
9. Ralph Philips- President Santee Products; and
10. Las Vegas Golf and Tennis Golf Course.

19. Many of the customers listed in paragraph 17 above were selling the Nitro refurbish golf ball at twice of what they were paying Nitro for the product. The following are some of the customers that I solicited to purchase Nitro refurbished golf balls, but initially refused to purchase the Nitro refurbished golf ball product from me:

1. Edwin Watts Golf Shops (Atlanta location-Rodney Fraser (770) 416-0258 and Tom Hall Orlando location);
2. Specialty Golf;
3. Martins Golf and Tennis located in South Carolina (Martin Barrier is a significant customer of mine with whom I sell 4 to 5 product lines to on an annual basis).

20. In February 2001 I again solicited Martin's Golf and Tennis in the Carolinas to purchase Nitro refurbished golf balls. Mr. Martin Barrier, president of Martins Golf and Tennis and a bell weather leader for golf products, declined to purchase stating he already had a used rewashed golf product and did not have a need for another used product. I solicited Mr. Barrier again in March of 2001 and he again said no. I told Mr. Barrier he was making a mistake as the refurbished golf ball product was taking off at my other accounts. Mr. Barrier called me back the following day and said he had reconsidered and wanted to try the refurbished golf balls.

Mr. Barrier then placed his first order with me for approximately $30,000 to $40,000 dollars worth of refurbished golf balls.

21. By Mid 2001 to September 2001 I noticed substantial increase in interest from retailers for Nitro refurbished golf balls. In late 2001, I even received a phone call from Rodney Fraser at Edwin Watts' Atlanta store concerning Nitro's refurbished golf balls. Mr. Fraser stated he was now interested in carrying Nitro's refurbished golf balls and requested I stop by in early January to take an order. Tom Hall in Edwin Watts' Orlando store also called me in the fall of 2001 and requested I come by his store in January 2002 for an order. Another customer who had initially declined to carry Nitro's refurbished golf balls by the name of Specialty Golf called in mid 2001 and also stated they had changed their minds and placed an order for Nitro's refurbished golf balls. Based upon my sales in 2001 and the positive reaction from the golf ball retailers in the industry to the Nitro refurbished golf ball product I estimated my sales of Nitro's refurbished golf balls for 2002 would be at least one ($1,000,000) million dollars.

## ACUSHNET'S STATEMENT TO MR. BARRIER AT MARTIN'S GOLF AND TENNIS

22. On Thursday January 2, 2002, I called Martin Barrier to follow up on his golf needs for the 2002 spring selling season, which is where I get half of the business orders for the coming year from Mr. Barrier. At that time Mr. Barrier told me that I should be aware of potential trouble brewing as Acushnet was going to sue Nitro/Second Chance. Mr. Barrier told me that Acushnet planned to serve the papers on Nitro at the upcoming PGA Show. I asked Mr. Barrier what the issue was about and he told me that Acushnet believed that Nitro's refurbished Titleist brand golf balls were not Titleist golf balls, but actually another vendor's brand.

23. I asked Mr. Barrier if he has ever come across any "mis-marked" golf balls in all of the refurbished golf balls that I sold him on behalf of Nitro? Mr. Barrier told me no. I then asked him who specifically was making the statement and Mr. Barrier would not identify the source and requested that I not involve him in any litigation between Nitro and Acushnet. Mr. Barrier told me that he hoped the accusations and rumors were not true as he really like Nitro's refurbished golf ball product as it was a good seller for him at good margins. Mr. Barrier declined, however, to place an order for Nitro refurbished golf ball product at the time.

24. I again followed up with Mr. Barrier in January and February 2002, when Mr. Barrier to inquire why he still had not ordered Nitro refurbished golf balls as his inventory was almost down to no product. During that time I pressed Mr. Barrier for the reason he was not buying Nitro refurbished golf balls. According to Mr. Barrier, a Titleist representative told him that he bought Nitro's refurbished Titleist golf balls from one of Martin's stores and that the Titleist representative cut open nineteen (19) golf balls marked as Titleist brand golf balls and found out that the golf balls were non-Titleist brand golf balls.

25. I asked Mr. Barrier if the Titleist sales representative showed him the actual cut open golf balls he claimed as "mis-marked?" Mr. Barrier said no. I told Mr. Barrier that Acushnet was out to ruin Nitro's reputation and that it was not fair that the Titleist sales representative could make such a statement to him and not back it up by showing Martin the actual golf balls that he claims were mis-marked. I told Mr. Barrier that at a minimum if he wasn't going to buy Nitro's refurbished golf balls that he should at least make Titleist show him the nineteen (19) "mis-marked" golf balls that the sales representative claimed to have found.

26. Thereafter I continued to press Mr. Barrier for business on Nitro's refurbished golf balls, as did Nitro's president, Mr. Khoury. At the end of March 2002 Mr. Barrier finally

- 8 -

agreed to purchase Nitro's refurbished golf balls again. Mr. Barrier told me he asked to see the nineteen (19) mis-marked Titleist golf balls, but that the Titleist representative never showed him the balls

I declare under penalty of perjury of the laws of the State of South Carolina and of the United States that the foregoing is true and correct. Executed at Summerville, S.C. this 24th day of November 2003.

Michael P.C. Shaw