DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No.02-14008-CIV-MIDDLEBROOKS/LYNCH

NITRO LEISURE PRODUCTS, LLC, a
Delaware Limited Liability Company, d/b/a
GOLFBALLSDIRECT.COM and
SECOND CHANCE,

　　　　　　　Plaintiff,

v.

ACUSHNET COMPANY,
a Delaware Corporation,

　　　　　　　Defendant.

_____/

## DEFENDANT ACUSHNET'S PROPOSED FINAL JURY INSTRUCTIONS

Defendant/Counterclaimant Acushnet ("Acushnet"), by its undersigned counsel, hereby

submits the following proposed final jury instructions and requests that they be given at trial.

Each should be considered as a separate request, and a separate ruling is requested for each

instruction.  Acushnet will subsequently submit such additional instructions as may be suggested

by the presentation of evidence during the trial, the filing of Nitro's proposed instructions, and

any rulings by the Court on the parties' respective motions for summary judgment, at the

Markman hearing, or at trial.

Acushnet submits these proposed jury instructions in the light of the prior orders and

rulings of this Court and the Federal Circuit (both as to law and evidence) on certain of these

issues and in the light of the absence of any ruling on its Motion to Bifurcate.  Acushnet

preserves its previously stated positions on those issues, and does not waive its objections and

positions raised prior to and during the trial of this case or its right to have the jury instructed in

accordance with Acushnet's legal position on those issues, including in particular its pending motions for summary judgment and the pending briefing for the Markman hearing.

Acushnet will separately file the instructions it believes the jury should be given on the issues resolved by the Federal Circuit decision that is currently binding on this Court. Likewise, by submitting proposed jury instructions regarding Nitro's claims and defenses, Acushnet does not concede that any such claim or defense has been properly pled or proven by Nitro, or that any issues relating to that claim or defense can or should be properly submitted to the jury. In addition, although Acushnet submits some instructions that reference evidence Nitro relies on, Acushnet does not waive its objections to the admissibility that evidence at trial.

Furthermore, Acushnet reserves the right to submit supplemental instructions on damages given that Nitro's damages expert has submitted multiple supplemental expert reports and is only being deposed as of the date of the filing of these instructions.

Moreover, Acushnet submits the following requested jury instructions on punitive damages without prejudice to, or waiver of, its contentions that, among other things, Nitro is not entitled to punitive damages against Acushnet as a matter of Florida law; that any verdict against Acushnet, particularly one resulting from the Court's reliance upon the Florida Standard Jury Instructions (Civil) entitled, "PD, Punitive Damages," or the appended model verdict form, would violate Acushnet's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, and Acushnet's rights under article 1, section 2 (Basic Rights), article I, section 9 (Due Process), article I, section 17 (Excessive Punishments), and article 1, section 21 (Access to Courts) of the Florida Constitution; and that the proper standard of proof is "clear and convincing evidence." Fla. Stat. § 768.725.

Further, in light of the United States Supreme Court's decision in State Farm Ins. Co. v. Campbell, 123 S. Ct. 1513 (U.S. Fla. 2003), it is clear that the Florida Standard Jury Instructions

2

on punitive damages are insufficient to satisfy due process and must be modified to satisfy the

constitutional mandates of <u>State Farm</u>.  The attached proposed instructions are necessary to meet

the due process requirements of the United States and Florida Constitutions.

<div style="margin-left:50%">

CHRIS COUTROULIS
Florida  Bar No.300705
ccoutroulis@carltonfields.com
ROBERT L. CIOTTI
Florida Bar No.333141
rciotti@carltonfields.com
CARLTON FIELDS, P.A.
One Harbour Place
777 S. Harbour Island Blvd.
Tampa, FL  33602-5730
Telephone:        (813) 223-7000
Facsimile:        (813) 229-4133
and

STEVEN J. BRODIE
Florida Bar No.333069
sbrodie@carltonfields.com
JEFFREY MICHAEL COHEN
Florida Bar No.091495
jcohen@carltonfields.com
CARLTON FIELDS, P.A.
4000 Bank of America Tower
100 S.E. Second Street
Miami, FL  33131-9101
Telephone:        (305) 530-0050
Facsimile:        (305) 530-0055

</div>

Attorneys for Acushnet

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was telecopied and

mailed on this ____ day of _December_, 2003 to:

Gerald F. Richman, Esquire
Gary S. Betensky, Esquire
Richman Greer Weil Braumbaugh
  Mirabito & Christensen, P.A.
*Attorneys for Nitro*
250 Australian Avenue South
Suite 1504
West Palm Beach, FL  33401

Mark W. Yocca, Esquire
Yocca Patch & Yocca LLP
*Attorneys for Nitro*
19900 Mac Arthur Boulevard
Suite 650
Irvine, CA  92612


CARLTON FIELDS, P.A.
*Attorneys for Acushnet*
4000 Bank of America Tower
100 SE Second Street
Miami, FL  33131-9101
Telephone:    (305) 530-0050
Facsimile:    (305) 530-0055

By: _____ #869899

CHRIS COUTROULIS
  Florida  Bar No.300705
  ccoutroulis@carltonfields.com
ROBERT L. CIOTTI
  Florida Bar No.333141
  *rciotti@carltonfields.com*
CARLTON FIELDS, P.A.
  One Harbour Place
  777 S. Harbour Island Blvd.
  Tampa, FL  33602-5730
  Telephone:(813) 223-7000
  Facsimile: (813) 229-4133

and

STEVEN J. BRODIE
  Florida Bar No.333069
  sbrodie@carltonfields.com
JEFFREY MICHAEL COHEN
  Florida Bar No.091495
  jcohen@carltonfields.com

4

CARLTON FIELDS, P.A.
4000 Bank of America Tower
100 S.E. Second Street
Miami, FL  33131-9101
Telephone:(305) 530-0050
Facsimile: (305) 530-0055
Attorneys for Acushnet

**<u>Defendant's Proposed Final Jury Instruction No. 1</u>**

**INTRODUCTION**

Members of the Jury:

  I will now explain to you what we call "jury instructions," the rules of law that you must follow and apply in deciding this case. When I read the allegations and defenses of the parties to you, I am not commenting on the truth of those allegations. I am merely describing the claims and defenses made by the parties in this case.

  When I have finished you will go to the jury room and begin your discussions –– what we call your deliberations.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

_____ _____

Authority:  Adapted from Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 1.

6

**Defendant's Proposed Final Jury Instruction No.2**

**Consideration Of The Evidence**
**Duty To Follow Instructions**
**Corporate Party Involved**

In deciding the case you must follow and apply all of the law as I explain it to you, whether you agree with that law or not; and you must not let your decision be influenced in any way by sympathy, or by prejudice, for or against anyone.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for any of the acts and statements of its employees that are made within the scope of their duties as employees of the company.

In your deliberations you should consider only the evidence — that is, the testimony of the witnesses and the exhibits I have admitted in the record — but as you consider the evidence, both direct and circumstantial, you may make deductions and reach conclusions which reason and common sense lead you to make. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances tending to prove, or disprove, any fact in dispute. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Remember that anything the lawyers say is not evidence in the case.  And, except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your decision concerning the facts.  It is your own recollection and interpretation of the evidence that controls.

<div align="right">

Given  _____

Given as Modified  _____

Denied  _____

Withdrawn  _____

</div>

---

Authority:     Adapted from Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 2.1.

## <u>Defendant's Proposed Final Jury Instruction No. 3</u>

### General Instructions
### Credibility of Witnesses

Now, in saying that you must consider all of the evidence, I do not mean that you must accept all of the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying concerning any particular dispute is not controlling. You may decide that the testimony of a smaller number of witnesses concerning any fact in dispute is more believable than the testimony of a larger number of witnesses to the contrary.

In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions: Did the person impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:   Adapted from Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 3 (modified).

**Defendant's Proposed Final Jury Instruction No. 4**

**Impeachment**

You should also ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact; or whether there was evidence that at some other time the witness said or did something or failed to say or do something which was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or to remember other things inaccurately.

So if a witness has made a misstatement, you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Adapted from Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 4.1 (modified)

<u>**Defendant's Proposed Final Jury Instruction No.5**</u>

**Expert Witnesses**
**When Expert Witness Fees Represent A**
**Significant Portion of the Witness' Income**

When knowledge of a technical subject matter might be helpful to the jury, a person having special training or experience in that technical field is permitted to state an opinion concerning those technical matters.

Merely because such a witness has expressed an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it is up to you to decide whether to rely upon it.

When a witness has been or will be paid for reviewing and testifying concerning the evidence, you may consider the possibility of bias and should view with caution the testimony of such witness where the court testimony is given with regularity and represents a significant portion of the witness' income.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:     Adapted from Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 5.2.

11

## Defendant's Proposed Final Jury Instruction No. 6

### Claims and Defenses

For ease of reference in these instructions, I will refer to Plaintiff/Counterdefendant Nitro Leisure Products LLC, which does business as GOLFBALLSDIRECT.COM and Second Chance, as "Nitro." I will refer to Defendant/Counterclaimant Acushnet Company as "Acushnet." The claims and counterclaims in this case, and the corresponding defenses thereto, are as follows:

### NITRO'S CLAIMS

**I –    Violations of Section 43(a) of the Federal Lanham Act**

Nitro alleges that Acushnet engaged in false advertising and disparagement of Nitro's products, and unfair competition, in violation of the Federal Lanham Act.

**II –    Product Disparagement in Violation of Florida Law**

Nitro alleges Acushnet made false and misleading statements about Nitro's practices and products, and that this constituted product disparagement in violation of Florida law.

**III –    Unfair Competition in Violation of Florida Law**

Nitro alleges Acushnet made false and misleading statements about Nitro's practices and products, and that this constituted unfair competition in violation of Florida law.

**IV –    False and Misleading Advertising in Violation of Florida Law**

Nitro alleges Acushnet engaged in false and misleading advertising of Nitro's products and practices, in violation of Florida law.

**V -    Tortious Interference with Advantageous Business Relationships and Prospective Business Relationships in Violation of Florida Law**

Nitro alleges that Acushnet has intentionally and unjustifiably interfered with the business relationships between Nitro and [name] and with prospective business relationships between [name] by making knowingly false and misleading statements regarding Nitro and Nitro's products and by engaging in illegal and wrongful conduct, in violation of Florida law.

**VI - Defamation in Violation of Florida Law**

Nitro alleges that Acushnet knowingly made false, misleading, disparaging and defamatory statements of fact about Nitro, Nitro's business operations and practices, and Nitro's products, in violation of Florida law.

**VII – Cancellation of Acushnet's Federally Registered Trademarks**

Nitro seeks the cancellation of each of the federally registered trademarks that Acushnet has asserted is infringed and/or diluted by Nitro. Nitro alleges that Acushnet knowingly allowed widespread unauthorized use of Acushnet's trademarks and engaged in uncontrolled licensing of its trademarks, causing them to lose all commercial significance, and that Acushnet thereby abandoned its federally registered trademarks.

**VIII – Monopolization and Attempted Monopolization in Violation of the Federal Antitrust Laws.**

Nitro alleges that Acushnet has willfully maintained monopoly power in what Nitro contends to be a "super-premium" golf ball relevant market in the United States, and it further alleges that Nitro's golf balls compete in a meaningful way in that market. Nitro asserts that Acushnet has used its alleged monopoly power in that "super-premium" golf ball market to foreclose competition. Nitro further alleges that Acushnet has attempted to monopolize that relevant market by illegal and anti-competitive conduct.

**IX – Violation of the Florida Deceptive and Unfair Trade Practices Act**

Nitro alleges that Acushnet made false and misleading statements about Nitro's practice of stripping and repainting golf balls and the quality of Nitro's golf balls, and that this constituted a deceptive and unfair trade practice, in violation of Florida law.

**X - Federal False Advertising in Violation of the Federal Lanham Act**

Nitro alleges that Acushnet has willfully engaged in false advertising with respect to the sale of Acushnet's Titleist and Pinnacle golf balls, in violation of the Federal Lanham Act.

## ACUSHNET'S DEFENSES TO NITRO'S CLAIMS

**I.      Unclean Hands**

Acushnet alleges that Nitro has engaged in wrongful conduct directly relating to the claims that it has asserted against Acushnet, and that Nitro's claims are therefore barred by its unclean hands.  Among other things, Acushnet alleges that, although Nitro asserts that in engaging in its stripping and re-painting practices, it relied upon the Birdie Golf consent decree, which was entered pursuant to those parties' settlement of the Birdie Golf lawsuit, Nitro does not comply in all respects with that decree.  Furthermore, its practices are prohibited by the International Golf consent decree, of which Nitro had actual knowledge when it acquired IGI's assets.

**II.      Equitable Estoppel**

Acushnet alleges that Nitro's claims are barred under the doctrine of equitable estoppel.

**III.      Privilege as Patent and Trademark Owner**

Acushnet alleges that its conduct was legally justified in all respects and that, in particular, its conduct was privileged as a legitimate protection of its economic interests and its rights and duties as a patent and trademark owner.

**IV.      Free Speech and Noerr-Pennington Immunity for Antitrust Claims**

Acushnet alleges that the right to free speech and access to courts guaranteed under the First Amendment of the United States Constitution bars Nitro's antitrust claims to the extent they are based upon Acushnet's law suits against Nitro and other golf ball refurbishers.

**V.      Consent Decrees Enforcing Trademarks Do Not Abandon the Trademarks**

Acushnet alleges that consent decrees enforcing its trademarks in settlement of Acushnet's trademark infringement case do not operate to destroy Acushnet's rights in its trademarks and that there has been no abandonment of Acushnet's trademarks by those consent decrees.

## VI.     True Statements

Acushnet alleges that any statements made by Acushnet regarding Acushnet's patent and trademarks and regarding Nitro or its products were substantially true statements and are therefore protected speech under the First Amendment of the United States Constitution.  As such, they cannot be a basis for any of Nitro's claims in this case.

## VII.    Opinions

Acushnet alleges that any statements made by Acushnet regarding Nitro or its products were expressions of opinion protected under the First Amendment of the United States Constitution, and as such, they cannot be the basis for any of Nitro's claims in this case.

## VIII.   Business Interests Privilege

Acushnet alleges that any statements made by Acushnet regarding Nitro or its products were made to further Acushnet's legitimate business interests and were therefore privileged statements that cannot be the basis for any of Nitro's claims in this case.

## IX.     Lack of Actual Knowledge of Falsity

Acushnet alleges that Nitro is a limited public figure and that, in addition, Acushnet's alleged statements were made with respect to a legitimate public controversy.  Acushnet alleges that it did not make any objectively false statements with actual knowledge of their falsity, and that its alleged statements accordingly cannot be the basis for any of Nitro's claims in this case.

## X.      Conduct Outside the U.S.

Acushnet alleges that Nitro's antitrust claims cannot be based upon any conduct occurring outside of the United States or affecting commerce outside of the United States, or upon any conduct of independent, affiliated companies.

## ACUSHNET'S COUNTERCLAIMS

**I –      Federal Trademark Infringement**

Acushnet alleges that Nitro is not entitled to use Acushnet's federally registered trademarks on Nitro's stripped and repainted golf balls because Nitro's practices change the design, paint, and surface of Acushnet's golf balls in a basic way.  Acushnet further alleges that Nitro is not entitled to use Acushnet's federally registered trademarks on Nitro's stripped and repainted golf balls because Nitro did not, at certain times, provide any disclaimers at all on those balls and the packaging for them, and its subsequent disclaimers did not fully and truthfully disclose the true nature and performance characteristics of these balls.  In addition, Acushnet alleges that Nitro failed to provide any disclaimers at all on its clear-coated "recycled" balls and its packaging for them at certain times, and that, to the extent they were subsequently provided, Nitro failed to fully and truthfully disclose the true nature of those balls on the balls and this packaging, and that Nitro is accordingly not entitled to use Acushnet's federally registered trademarks on Nitro's clear-coated "recycled" golf balls.

**II -      Trademark Counterfeiting in Violation of the Federal Lanham Act**

Acushnet alleges that Nitro engaged in trademark counterfeiting in violation of the Federal Lahnam Act by the following practices:  (1) putting Acushnet's federally registered trademarks on golf balls manufactured by companies other than Acushnet and then sold by Nitro as "used" or "refurbished" TITLEIST golf balls; (2) clear-coating what Nitro calls its "recycled" golf balls without disclosing that fact to the consumer; (3) stripping and repainting Acushnet golf balls and remarking those balls with one of Acushnet's federally registered trademarks; and (4) stripping and repainting Acushnet golf balls and marking those balls with a model side stamp trademark that was not on the original ball manufactured by Acushnet.

### III - Unfair Competition and False Designation of Origin in Violation of Federal Law

Acushnet alleges that, by using Acushnet's trademarks in the manner just described, Nitro misrepresents and falsely describes to the general public the source or sponsorship of the golf balls, and thereby creates a likelihood of confusion as to both the source and sponsorship of those golf balls, in violation of Federal law.

### IV – False Advertising and Product Disparagement Under the Federal Lanham Act

Acushnet alleges that Nitro places false and misleading statements on its packaging and on its website regarding its stripped and repainted golf balls and its "recycled" golf balls, and thereby misleads consumers about them, in violation of the Federal Lanham Act.

### V - Patent Infringement in Violation of Federal Law

Acushnet alleges that Nitro's sale of its "remanufactured" golf balls, including Titanium-brand golf balls, infringed, and induced infringement of, one of more of the claims of the Acushnet patents, in violation of Federal Patent Law.

### VI – Trademark Dilution in violation of Florida Law

Acushnet alleges that Nitro's practices and products at issue in this case have tarnished and diluted the distinctiveness of Acushnet's trademarks, in violation of Florida law.

### VII – Unfair Competition in Violation of Florida Law

Acushnet alleges that Nitro's practices and products at issue in this case constitute unfair competition with Acushnet, in violation of Florida law.

### VIII – Unjust Enrichment

Acushnet alleges that Nitro's practices and products at issue in this case improperly uses Acushnet's trademarks and patents, as well as Acushnet's valuable goodwill associated with its trademarks and patents, and that this results in unjust enrichment to Nitro, in violation of Florida law.

### IX –   Trademark Infringement in Violation of Florida Law

Acushnet alleges that, by Nitro's products and practices at issue in this case, Nitro trades on the good will associated with Acushnet's trademarks and misleads and deceives the public about Nitro's stripped and repainted golf balls, its "clear-coated" golf balls, in violation of Florida law.

### NITRO'S DEFENSES TO ACUSHNET'S COUNTERCLAIMS

### I -   Abandonment

Nitro alleges that Acushnet knowingly allowed widespread unauthorized use of Acushnet's trademarks and engaged in uncontrolled licensing of its trademarks, and that Acushnet thereby abandoned its trademarks.

### II -   Laches, Equitable Estoppel and Acquiescence

Nitro alleges that Acushnet has known about stripped and repainted golf balls and other used golf balls for many years, but failed to object to them until it filed this lawsuit on January 15, 2002.  Nitro alleges that it relied on Acushnet's failure to object to such practices and activities, to Nitro's detriment.

### III -   Unclean Hands

Nitro alleges that Acushnet has engaged in inequitable conduct directly relating to the claims that it has asserted against Nitro, and that Acushnet's claims are therefore barred by its unclean hands.

### IV -   Fair Use Doctrine

Nitro alleges that it simply restores used golf balls to their original condition, so far as possible, by stripping and re-painting them, and that it is accordingly entitled to use Acushnet's trademarks on those stripped and re-painted balls.  Nitro further alleges that it uses Acushnet's trademarks in a truthful and non-misleading manner, with proper disclosures and disclaimers, and that the public is not deceived or misled by Nitro's use of Acushnet's trademarks.

**V -      Estoppel and Stare Decisis**

Nitro alleges that Acushnet acknowledged, and the court held, in the <u>Birdie Golf</u> consent

decree that the advertising, promotion and sale of stripped and repainted golf balls is lawful, and

that Acushnet's trademark claims against Nitro are accordingly barred by the <u>Birdie Golf</u> consent

decree.

**VI -     Non-Infringement**

Nitro alleges that it has not infringed any of Acushnet's trademarks or patents, or violated

any other legal rights of Acushnet.

**VII -    Patent Invalidity**

Nitro alleges that Acushnet's patents '535, '910, '980, '497, '422, and '459 claim

inventions that lack novelty and that would have been obvious to one of ordinary skill in the art

at the time the inventions were made, and that, in addition, those patents fail to comply with the

written description, enablement, best mode and definiteness requirements of federal patent law.

Nitro alleges that those patents are accordingly invalid under Federal Patent Law.

**VIII -  Inequitable Conduct**

Nitro alleges that Acushnet and/or its agents violated the duty of candor and good faith to

the U.S. Patent and Trademark Office by failing to disclose non-cumulative prior art material or

patentability, and that Acushnet's patents '535, '910, '980, '497, '422, and '459 are therefore

unenforceable under Federal Patent Law.

**IX -     Patent and Trademark Abuse**

Nitro alleges that Acushnet is using its trademarks and patents to monopolize or attempt

to monopolize what Nitro alleges to be a "super-premium" golf ball relevant market in the

United States, in which Nitro alleges its golf balls meaningfully compete.

**X -      Lack of Likelihood of Confusion**

Nitro alleges that there is no likelihood of confusion as to the source and sponsorship of Nitro's stripped and re-painted golf balls.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:  Nitro's Third Amended Complaint; Acushnet's Answer to Third Amended Complaint, Affirmative Defenses and Counterclaims; Nitro's Reply and Affirmative Defenses to Amended Counterclaims.

## Defendant's Proposed Jury Instruction No. 7

### Burden of Proof

The party asserting a claim or defense generally has the responsibility to prove every essential part of the claim or defense.  This is sometimes called the "burden of proof" or the "burden of persuasion."  In this case, there are two different burdens of proof that will apply, depending on the claim or defense you are considering: the "preponderance of the evidence" burden of proof and the "clear and convincing evidence" burden of proof.

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that a claim or contention is more likely true than not true.  By comparison, "clear and convincing evidence" is more compelling and persuasive.  "Clear and convincing evidence" is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.

I will specifically instruct you as to when you should apply the "preponderance of the evidence" burden of proof and when you should apply the "clear and convincing evidence" burden of proof.

You should consider each claim and each defense separately, but in deciding whether any fact has been proved by the applicable burden of proof standard, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.  If the proof fails to establish any essential part of a claim or a defense by the appropriate burden of proof, you should find against the party making that claim or defense.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:    Adapted from Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 6.2 (modified); Fla. Standard Jury Instructions (Civil), PD1(a)(2)(b)(2003)

<u>**Defendant's Proposed Jury Instruction No. 8**</u>

**Rights of Patent Holder and Trademark Owner
Legitimate Public Controversy/Limited Public Figure**

In determining the claims and defenses in this case, you are to consider the rights afforded to patent holders such as Acushnet under the federal patent laws. The patent laws of the United States give a patent holder the right to give notice to the public of its patent rights. Patents are presumed to be valid, and Acushnet was entitled to make statements about its patent rights and Nitro's alleged infringement of those patents based on the presumption that Acushnet's patents are valid.

Before a patent holder may be held liable for statements in support of its patents and, thus, be deprived of its right to make statements about potential infringement of its patents, it must be proven by clear and convincing evidence that Acushnet's alleged statements were false and were made in bad faith. To prove bad faith, Nitro must prove by clear and convincing evidence that, at the time Acushnet made the alleged statements about its patents, Acushnet knew it was enforcing an invalid or unenforceable patent, or that Acushnet had no reasonable basis to believe that Nitro had infringed Acushnet's patents.

You are also instructed that, under the United States trademark laws, Acushnet had the right to make statements in an effort to assure that its trademarks continued to represent that which they purported to represent. The owner of a trademark cannot permit unauthorized use of its trademarks without risking claims that the trademarks were abandoned or that their strength was diluted.

Furthermore, the subject matter of all of Acushnet's alleged statements has been determined by the Court to relate to a legitimate public controversy and a limited public figure. Therefore, in order for any of those statements to be a basis for any of Nitro's claims, Nitro must prove by clear and convincing evidence that those alleged statements were objectively false and

were made by Acushnet with actual knowledge of their falsity at the time they were made, or with reckless disregard. A party acts with reckless disregard when it has serious doubts as to the truth of the statements or has a high degree of awareness of their probable falsity at the time the statements are made. It is not enough for Nitro to prove that Acushnet was negligent or lacked reasonable grounds when it made the alleged statements.

If you find that Nitro has not proven by clear and convincing evidence that Acushnet made false statements, in bad faith, with respect to its patent or trademark rights or that, apart from its statements with respect to its patent and trademark rights, Acushnet made objectively false statements of fact with respect to Nitro and its products, with actual knowledge of the falsity of those statements, then the statements cannot be the basis for any of Nitro's claims. If, however, you find that Nitro has proven those facts by clear and convincing evidence, then such statements should be considered by you in determining the claims and defenses in this case.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:   35 U.S.C. § 287 (2001); <u>Zenith Elec. Corp. v. Exzec, Inc.</u>, 182 F.3d 1340, 1353 (Fed. Cir. 1999); <u>Hunter Douglas, Inc. v. Harmonic Design, Inc.</u>, 153 F.3d 1318, 1336-37 (Fed. Cir. 1998), <u>overruled on other grounds by</u> <u>Midwest Indus., Inc. v. Karavan Trailers, Inc.</u>, 175 F.3d 1356 (Fed. Cir. 1999); <u>Golan v. Pingel Enter., Inc.</u>, 310 F.3d 1360, 1371 (Fed. Cir. 2002).

**Defendant's Proposed Jury Instruction No. 9**

**Lanham Act - False Advertising**
**Nature and Elements of Claim**

As Nitro's first claim, Nitro alleges that Acushnet violated the Federal Lanham Act by making false or misleading statements in its advertisements and promotional materials that misrepresent the nature, characteristics, or qualities of Nitro's products.  The Lanham Act provides that a party can be liable for making false or misleading statements of fact in its commercial advertising or promotions that misrepresent the nature, characteristics, or qualities of another's products.  There are four specific facts that Nitro must prove by a preponderance of the evidence in order to prevail on this claim:  (1) Acushnet made false or misleading statements of fact concerning Nitro's products in Acushnet's commercial advertisements or promotional materials; (2) actual deception of consumers; (3) those statements were material -- that is, they would likely influence the deceived consumers' purchasing decisions; and, (4) there is a causal link between those statements and actual harm to Nitro.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

_____

Authority:  Lanham Act § 43(a), 15 U.S.C., § 1125 (1998); Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, 185 F.3d 606, 613 (6th Cir. 1999); Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242 (11th Cir. 2002); Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc., 915 F. Supp. 360, 366 (S.D.Fla. 1996), aff'd, 136 F.3d 139 (11th Cir. 1998).

## Defendant's Proposed Jury Instruction No. 10

### Lanham Act - False Advertising
### Advertising or Promotional Materials

On its Lanham Act claim, Nitro must first prove that Acushnet made false or misleading statements of fact about Nitro's products in Acushnet's commercial advertising or promotional materials. In order to determine whether the statements Acushnet allegedly made about Nitro's products were "commercial advertising or promotion," you must determine whether the statements constitute commercial speech. Commercial speech is a communication that involves only the commercial interests of the speaker and the audience.

In this regard, you must determine whether Acushnet communicated false or misleading statements widely to the purchasing public for which Nitro and Acushnet are in competition, and whether it made the statements for the purposes of influencing the purchase of its goods and services. Isolated or sporadic statements do not create Lanham Act liability. In other words, were Acushnet's statements aimed at a large number of customers for which Acushnet and Nitro are competing.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:   Fane v. Edenfield, 945 F.2d 1514, 1517 (11th Cir. 1991); Fuente Cigar, Ltd. v. Opus One, 985 F. Supp. 1448 (M.D. Fla. 1997); BellSouth Adver. & Publ'g. Corp. v. Lambert Publ'g, 45 F. Supp. 2d 1316 (S.D. Ala. 1999); Gordon Breach Science Publishers S.A. v. Am. Inst. of Physics, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994); Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996); Garland Co. v. Ecology Roof Sys. Corp., 895 F. Supp. 274, 277 (D. Kan. 1995); Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc., 880 F. Supp. 1005, 1019-20 (S.D.N.Y.1994); Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561-62, 65 L.Ed.2d 341, 100 S.Ct. 2343 (1980); United States v. Edge Broad., 509 U.S. 418, 426, 125 L.Ed.2d 345, 113 S.Ct. 2696 (1993).

**Defendant's Proposed Jury Instruction No. 11**

**Lanham Act - False Advertising**
**Statement of Fact**

Nitro must also prove by a preponderance of the evidence that Acushnet made false or misleading statements of fact, not merely statements of its opinion, in its commercial advertising or promotional materials.  In order to be a statement of fact, the statement must be capable of being proven false.

Statements of pure opinion are not statements of fact.  Pure opinion occurs when a statement is made based on facts which are set forth with the opinion or which are otherwise known or available to the reader or listener as a member of the public.  In determining whether a statement is a statement of fact or pure opinion, you must examine the statement in the context in which it was made and consider all of the circumstances surrounding the statement.

Statements made by non-lawyers regarding the legality or illegality of another's conduct are pure opinion statements, not statements of fact, unless there is controlling law or court decision at the time that conclusively establishes the legality or illegality of such conduct.  As I will instruct you more fully later, neither a court's ruling or order on a motion for a preliminary injunction nor a consent decree entered by a court based on the parties' settlement of a lawsuit constitute controlling law or a court decision conclusively establishing the legality or illegality of the conduct at issue in that lawsuit.

If you find that the statements made by Acushnet are pure opinion, then your verdict should be for Acushnet on this claim.  If you find that the statements are not pure opinion, then you should consider whether they are mixed expression of opinion.

A mixed expression of opinion is a statement that implies the existence of undisclosed facts as the basis of the opinion.  In order to determine whether a statement is pure opinion or mixed opinion, you must look at the totality of the statement, the context in which is was

published, and the words used.

If you find that the statements made by Acushnet are mixed expressions of opinion, then your verdict should be for Acushnet on this claim.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

---

Authority:   <u>Gen. Cigar Holdings, Inc. v. Altadis, S.A.</u>, 205 F. Supp. 2d 1335, 1357 (S.D. Fla. 2002); <u>Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery</u>, 185 F.3d 606, 613 (6th Cir. 1999).

## Defendant's Proposed Jury Instruction No. 12

### Lanham Act - False Advertising
### False or Misleading Statements

Nitro must also prove by a preponderance of the evidence that (1) Acushnet's statements of fact were either literally false, or (2) if the statements were literally true, that they were misleading or confusing to the consuming public. A statement is literally false if it is false on its face or explicitly false. The absence of tests, or data, or other proof substantiating a statement does not in itself establish that the statement is false.

If the statements made by Nitro are literally false, then you should find for Acushnet and end your inquiry on this claim because actual consumer confusion will not need to be proved. In determining whether Nitro's statements in its advertisements are literally false, you must consider the message conveyed by those statements in their full context.

The Lanham Act can also be violated by statements of fact that are literally true but nevertheless have a tendency to mislead or deceive the consumer. The question to be determined in this regard is what the person to whom the advertisement is directed would find to be the message and be misled or deceived by that message.

If a preponderance of the evidence establishes that Acushnet's statements were false or misleading statements of fact, then you must consider whether clear and convincing evidence establishes that Acushnet made objectively false statements to other persons, with actual knowledge of their falsity, about Nitro's products, and that Acushnet made false statements, in bad faith, about its patent or trademark rights. If clear and convincing evidence does not establish those facts, your verdict should be for Acushnet on this claim. However, if the evidence does establish those facts, then you must determine whether Nitro has proven by a preponderance of the evidence the other facts as to which I have instructed you with respect to Nitro's Lanham Act claim.

29

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:   <u>Am. Home Prods. Corp. v. Procter & Gamble Co.</u>, 871 F. Supp. 739 (D.N.J. 1994); <u>Novo Nordisk A/S v. Becton Dickinson & Co.</u>, 997 F. Supp. 470 (S.D.N.Y. 1998).

## Defendant's Proposed Jury Instruction No. 13

### Lanham Act - False Advertising
### Actual Deception

The second fact that Nitro must prove in order to establish a Lanham Act claim is proof of actual deception of customers.  If Acushnet's statements were literally false, actual deception of customers is presumed.  If Acushnet's statements were true but misleading, Nitro must prove that there was actual deception or at least a tendency to deceive a substantial portion of customers.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

---

Authority:   Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, 185 F.3d 606, 613 (6th Cir. 1999); Resource Devs., Inc. v. Statute of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 140 (2d Cir. 1991).

## **Defendant's Proposed Jury Instruction No. 14**

### **Lanham Act - False Advertising**
### **Materiality of Statements**

As to the third fact that Nitro must prove on this claim -- that is, the materiality of Acushnet's statements -- you are instructed that a material statement is one that is made to influence or tend to influence decisions whether to purchase Nitro's products.  If you find that a significant number of prospective purchasers were likely to attach importance to Acushnet's statements in determining whether to purchase Nitro's products, the statements were material.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:    In re Uranium Antitrust Litig., 473 F. Supp. 393, 408-09 (N.D. Ill. 1979);
Restatement (Third) of Unfair Competition (1993) §3, comment b.

**Defendant's Proposed Jury Instruction No. 15**

**Lanham Act - False Advertising**
**Causation of Harm to Nitro**

As to the fourth fact Nitro must prove to establish a Lanham Act claim against Acushnet -

- that is, a causal link between the allegedly false or misleading statements by Acushnet and

actual injury to Nitro's business -- Nitro must show that such statements were a substantial factor

in causing injury to Nitro.  If the potential customer denies having acted on the basis of

Acushnet's statements in making the customer's purchase decision or stated other reasons for its

decision not to purchase Nitro's products, you cannot infer or find from the nature of its purchase

decision or the mere timing of them that it made those decisions in reliance upon Acushnet's

statements.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

Authority:   Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1387 (5th Cir. 1996) (citing Am.
Rockwool, Inc. v. Owens-Corning Fiberglas Corp. 640 F. Supp. 1411, 1444
(E.D.N.C. 1986); Fenner v. Gen. Motors Corp., 657 F.2d 647, 651 (5th Cir.
1981).

## Defendant's Proposed Jury Instruction No. 16

### Lanham Act - False Advertising
### Damages

If you find for Nitro on its false and misleading advertising claim, then you must then determine the amount of any money damages to be awarded to Nitro. By instructing you on damages, I am not suggesting which party should prevail on any issue.

If you find that Acushnet did engage in false and misleading advertising, then you must calculate the profits, if any, that Nitro lost as a result of this conduct. Profit means net profit: the amount by which Nitro's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

To recover the net lost profits that Nitro claims, Nitro must first prove to a reasonable certainty that its alleged net lost profits were caused by Acushnet's alleged false advertising, rather than from other causes.

You must make a just and reasonable estimate of both the amount of net profits, if any, Nitro would have earned in future years and the length of time it would have earned those profits. You should consider the various uncertainties that could affect the future success of Nitro's business, such as general market conditions, competition Nitro would face in the future, and the like. You may also consider whether it is reasonable to project the stream of profit into the future for a period of years, as Nitro has done in this case. The damages may not be remote or speculative.

If you award future profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today. For example, if you receive $100 today that you would otherwise not receive until a year from now,

34

you can invest that $100 so that a year from now, the return on that $100 investment will make it worth something more than $100.

You are instructed that any person who claims damages as a result of an alleged wrongful act on the part of another has a duty under the law to "mitigate" those damages – that is, to take advantage of any reasonable opportunity that may have existed under the circumstances to reduce or minimize the loss or damage.  If a plaintiff fails to take reasonable steps available to it, and the failure to take those steps results in greater harm to the plaintiff than it would have suffered had it taken those steps, the plaintiff may not recover damages for injury it would have avoided had it taken reasonable actions that would have reduced its injury.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    15 U.S.C. § 1117(a); McClaren v. Plastic Industries, Inc., 97 F.3d 347, 361 (9th Cir. 1996); ABA Sample Jury Instructions in Civil Antitrust Cases, F13, F16-17, F23; Eleventh Circuit Pattern Jury Instruction (Civil), Supplemental Damages Instructions 1.1.

<u>**Defendant's Proposed Jury Instruction No. 17**</u>

**Product Disparagement**
**Nature and Elements of Claim**

As its second claim, Nitro asserts that Acushnet made false statements about Nitro's products and that those statements constituted product disparagement in violation of Florida law. The substance or gist of a product disparagement claim is intentional interference with another's economic relations.

In order to prevail on this claim, Nitro must prove by a preponderance of the evidence four specific facts: 1) Acushnet made false statements of fact about Nitro's products to another person; 2) Acushnet knew or reasonably should have known that its false statements would influence the actions of others with respect to the purchase of Nitro's products; 3) Acushnet's false statements did in fact influence others not to purchase Nitro's products; and 4) those statements caused special damages to Nitro.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:   <u>Salit v. Ruden, McClosky, Smith, Scushter & Russell, P.A.</u>, 742 So. 2d 381, 386 (Fla. 4th DCA 1999); <u>Bothmann v. Harrington</u>, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984).

36

**Defendant's Proposed Jury Instruction No. 18**

**Product Disparagement**
**Falsity of Statements**

The first fact that Nitro must prove to establish its claim for product disparagement is that Acushnet made statements to other persons that were in some significant respect false statements of fact.  A statement is in some significant respect false if its substance or gist conveys a materially different meaning than the truth would have conveyed. In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance or gist of the statement.  Statements of pure opinions or mixed expressions of opinion are not statements of fact, and you are to follow the instructions I have previously given you on those issues in determining this claim.

In addition, I have previously instructed you regarding a patent holder's and trademark owner's privileged right to make statements in the marketplace about its patents and its trademarks, and about statements made with respect to a legitimate public controversy or a limited public figure, and you are to apply those instructions in determining this claim.

If a preponderance of the evidence establishes that Acushnet's statements were statements of pure opinion or expressions of mixed opinion, rather than statements of fact, your verdict should be for Acushnet on this claim.  If Nitro has established by a preponderance of the evidence that Acushnet's statements were statements of fact, then you must determine whether clear and convincing evidence establishes that Acushnet made objectively false statements to other persons, with actual knowledge of their falsity, about Nitro's products, and that Acushnet made false statements, in bad faith, about its patent or trademark rights.  If clear and convincing evidence does not establish those facts, your verdict should be for Acushnet on this claim.  However, if the evidence does establish those facts, then you must determine whether Nitro has proven by a preponderance of the evidence the other facts as to which I have instructed you on

Nitro's product disparagement claim.

<div style="text-align: right">

Given   _____

Given as Modified  _____

Denied  _____

Withdrawn  _____

</div>

Authority:    Restatement (Second) of Torts §§ 634, 651; <u>Univ. of Fla. Research Found., Inc. v. Orthovita, Inc.</u>, 1998 WL 34007129, at *26 (N.D. Fla. 1998); <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 489-90, 104 S.Ct. 1949, 1953-54, 80 L.Ed.2d 502 (1984); <u>Unelko Corp. v. Rooney</u>, 912 F.2d 1049, 1057-58 (9th Cir. 1990), <u>cert. denied</u>, 499 U.S. 961, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991); <u>Blatty v. New York Times Co.</u>, 42 Cal.3d 1033, 1045, 232 Cal.Rptr. 542, 549, 728 P.2d 1177 (1986); <u>Salit v. Ruden, McClosky, Smith, Scushter & Russell, P.A.</u>, 742 So. 2d 381, 386-87 (Fla. 4th DCA 1999); <u>Bothmann v. Harrington</u>, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984).

## Defendant's Proposed Jury Instruction No. 19

**Product Disparagement**
**Knowledge That Statements Would Influence Others**

The third fact that Nitro must prove on this claim by a preponderance of the evidence is that Acushnet knew or reasonably should have known that the allegedly false statements it allegedly made to other persons would influence or tend to influence the purchasing decisions of Nitro's customers and potential customers. Nitro must prove that, considering the circumstances under which such statements were made, a reasonable person would have foreseen that the statements would influence the conduct of Nitro's customers or potential customers.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:   Salit v. Ruden, McClosky, Smith, Scushter & Russell, P.A., 742 So. 2d 381, 386-387 (Fla. 4th DCA 1999).

**<u>Defendant's Proposed Jury Instruction No. 20</u>**

**Product Disparagement
Materiality and Causation**

The fourth fact that Nitro must prove on this claim is that Acushnet's allegedly false statements had a material effect on others' purchasing decisions. The statements were material if they were likely to influence others' purchasing decisions.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

_____

Authority:  <u>Servicetrends, Inc. v. Siemens Med. Sys., Inc.,</u> 870 F. Supp. 1042, 1067 (N.D. Ga. 1994); <u>In re Uranium Antitrust Litig.,</u> 473 F. Supp. 393, 408 (N.D. Ill. 1979); <u>Aerosonic Corp. v. Trodyne Corp.,</u> 402 F.2d 223 (5th Cir. 1968).

**Defendant's Proposed Jury Instruction No. 21**

**Product Disparagement**
**Causation and Special Damages**

Finally, to prove its claim for product disparagement, Nitro must prove that it suffered special damages -- that is, actual pecuniary loss that has been realized by Nitro, such as specific lost net profits.  By instructing you on damages, I am not suggesting which party should win on any issue.

Acushnet's allegedly false statements must have been a legal cause of Nitro's claimed pecuniary losses.  This means that the losses claimed by Nitro must have been foreseeable and normal consequences of Acushnet's allegedly false statements and that Acushnet's statements must have been a substantial factor in bringing about Nitro's damages.  Damages are limited to those that result directly and immediately from the effect of Acushnet's allegedly false statements on the conduct of customers, and potential customers, and the expenses incurred by Nitro to counteract the making of those statements.

To recover for lost net profits, as Nitro claims, Nitro must first prove to a reasonable certainty that its alleged lost net profits were caused by Acushnet's alleged product disparagement rather than from other causes.  Nitro must then prove by a preponderance of the evidence the amount of damages caused by the statements you have found to be false and misleading advertising in violation of Florida law, based upon a reasonable calculation of such damages.  The amount of damages you award may not be remote or speculative.  The same instructions I have already given you on calculation of lost net profits and the mitigation of damages apply equally here.

Given _____
Given as Modified _____
Denied _____

41

Withdrawn _____

_____

Authority:    15 U.S.C. § 1117(a); <u>Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.</u>, 742 So. 2d 381, 388 (Fla. 4th DCA 1999); <u>Bothmann v. Harrington</u>, 458 So. 2d 1163, 1170 (Fla. 3d DCA 1984); <u>Cont. Dev. Corp. of Fla. v. Duval Title and Abstract Co.</u>, 356 So. 2d 925 (Fla. 2d DCA 1978); <u>McClaren v. Plastic Industries, Inc.</u>, 97 F.3d 347, 361 (9th Cir. 1996).

**Defendant's Proposed Jury Instruction No. 22**

**Unfair Competition
Nature and Elements of Claim**

As its third claim, Nitro asserts that Acushnet made false and misleading statements about Nitro and its products, and that this constituted unfair competition in violation of Florida law. In order to prevail on its unfair competition claim, Nitro must prove by a preponderance of the evidence that Acushnet made false statements of fact that misled, or had the tendency to mislead, customers into believing that Nitro's products were illegal and counterfeit and that Nitro is dishonest, disreputable and engaged in unlawful business activities, and that those persons accordingly refused to purchase Nitro's products.

In determining this claim, you are to follow the instructions I have previously given to you to determine whether statements are statements of fact or are instead statements of pure opinion or expressions of mixed opinion. You are also to follow the instructions I have given you regarding the privileges for statements made on a matter of legitimate public controversy and statements by a patent holder regarding its patent rights or by a trademark owner regarding its trademark.

Furthermore, if you find that Acushnet's statements were merely incidental to the accomplishment of a legitimate purpose, such as lawful competition or attempted protection of trademark and patent rights, there is no unfair competition.

If Nitro did not prove by clear and convincing evidence that Acushnet made false statements, in bad faith, about Acushnet's patent or trademark rights or that Acushnet made objectively false statements of fact about Nitro's products with actual knowledge of their falsity, your verdict should be for Acushnet on this claim. However, if Nitro did prove those facts by clear and convincing evidence, and a preponderance of the evidence supports Nitro's claim on the other issues on which I have instructed you, then your verdict should be for Nitro on its

unfair competition claim.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

Authority:   <u>Monsanto Co. v. Campuzano</u>, 206 F. Supp. 2d 1252 (S.D. Fla.2002); Restatement (Third) of the Law of Unfair Competition § 1; <u>Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.</u>, 262 F.3d 1152 (11th Cir. 2001); 55 Fla. Jur. 2d Trademarks and Unfair Competition § 16; <u>Hunter Lyon, Inc. v. Walker</u>, 152 Fla. 61, 11 So. 2d 176 (1942); RESTATEMENT (THIRD), UNFAIR COMPETITION (1993) § 1, comment g; 55 Fla. Jur. 2d Trademarks and Unfair Competition § 16; <u>Hunter Lyon, Inc. v. Walker</u>, 11 So. 2d 176, 177 (1942).

**Defendant's Proposed Jury Instruction No. 23**

**Unfair Competition**
**Damages**

If you find for Nitro on its unfair competition claim, then you must then determine the amount of any money damages to be awarded to Nitro. By instructing you on damages, I am not suggesting which party should win on any issue.

To recover the lost net profits that Nitro claims, Nitro must first prove to a reasonable certainty that its alleged lost net profits were caused by Acushnet's alleged unfair competition, rather than from other causes. Nitro must then prove, by a preponderance of the evidence, the amount of damages caused by the statements or conduct you have found to constitute unfair competition, based upon a reasonable calculation of such damages. The amount of damages you award may not be remote or speculative. The same instructions I have already given you on calculation of lost profits and mitigation of damages apply here.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:     McClaren v. Plastic Industries, Inc., 97 F.3d 347, 361 (9th Cir. 1996).

45

**Defendant's Proposed Jury Instruction No. 24**

**False and Misleading Advertising – Florida Law
Nature and Element of Claims**

As its fourth claim, Nitro alleges that Acushnet made false and misleading statements about Nitro's products in Acushnet's advertising, in violation of Florida law.  Nitro alleges that Acushnet made false or misleading advertisements, with the intent of inducing the public not to purchase Nitro's products.

In order to prevail on this claim, Nitro must prove by a preponderance of the evidence four specific facts: (1) Acushnet made false statements of material fact to others; (2) Acushnet knew or should have known of the statements' falsity; (3) Acushnet intended that its statements would induce others to rely and act on its statements; (4) others did rely and act on Acushnet's statements, and (5) Nitro suffered damages as a result of those statements.  Misleading advertisements are statements of material fact to the public that are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be false and misleading.

In determining this claim, you are to follow the instructions I have previously given you both with respect to Nitro's federal law false advertising claim and with respect to whether statements are statements of fact or statements of pure opinion and mixed expressions of opinion. If a preponderance of the evidence establishes that Acushnet's statements were statements of pure opinion or mixed expressions of opinion, your verdict must be for Acushnet on this claim.

If a preponderance of the evidence establishes that Acushnet's statements were statements of fact, then you are to follow the instructions I have previously given you regarding statements by a patent holder regarding its patent rights and a trademark owner regarding its trademarks, and the instructions I have given you regarding statements addressing a legitimate public controversy or limited public figure.  If Nitro did not prove by clear and convincing

evidence that Acushnet made objectively false statements, with actual knowledge of their falsity, about Nitro's products in Acushnet's advertising, or that Acushnet made false and bad faith statements regarding its patent or trademark rights, your verdict should be for Acushnet on this claim.  However, if Nitro did prove such facts by clear and convincing evidence, then you must determine whether Nitro has proven by a preponderance of the evidence the other facts as to which I have instructed you on this claim.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     § 817.40(5), Fla. Stat. (1997); § 817.41(1), Fla. Stat. (1997); <u>Samuels v. King Motor Co. of Ft. Lauderdale</u>, 782 So. 2d 489, 496 (Fla. 4th DCA 2001); <u>Vance v. Indian Hammock Hunt & Riding Club, Ltd.</u>, 403 So.2d 1367, 1370 (Fla. 4th DCA 1981).

**Defendant's Proposed Jury Instruction No. 25**

**False and Misleading Advertising – Florida Law**
**Damages**

If you find for Nitro on its Florida false and misleading advertising claim, then you must then determine the amount of any money damages to be awarded to Nitro.  By instructing you on damages, I am not suggesting which party should win on any issue.

To recover the lost net profits that Nitro claims, Nitro must first prove to a reasonable certainty that its alleged lost net profits were caused by Acushnet's false and misleading advertising in violation of Florida law, .rather than from other causes.  Nitro must then prove, by a preponderance of the evidence the amount of such damages, based upon a reasonable calculation of such damages.  The amount of damages you award may not be remote or speculative.  The same instructions I have already given you on calculation of lost profits and mitigation of damages apply here.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:     § 817.40, Fla. Stat., et seq. (1997); <u>McClaren v. Plastic Industries, Inc.</u>, 97 F.3d 347, 361 (9th Cir. 1996).

48

**Defendant's Proposed Jury Instruction No. 26**

**Interference With Advantageous and Prospective Business Relations
Elements of Claim and Factors to be Considered**

As its fifth claim, Nitro alleges that Acushnet tortiously interfered with Nitro's advantageous business relations and prospective advantageous business relations. In determining this claim, you are to follow the instructions I have previously given you regarding statements of fact and statements of pure opinion or mixed expressions of opinion, and the instructions I have given you regarding a patent holder's and trademark owner's privilege to speak truthfully and in good faith regarding its patent and trademark rights, and a party's privilege to speak truthfully on matters of relating to a legitimate public controversy or a limited public figure.

Accordingly, in determining this claim, you are not to consider any statements of Acushnet that you have found to be statements of pure opinion or mixed expressions of opinion, or any statements that you have found to be protected by the privileges afforded to patent holders and trademark owners. You should only consider whether other alleged conduct of Acushnet constituted tortious interference. If, however, you find that any of Acushnet's statements were statements of fact that are not protected by the privileges of patent holders and trademark owners, then you should consider those statements together with Acushnet's other conduct in determining this claim.

In order to prevail on this claim, Nitro must prove four specific facts by a preponderance of the evidence: First, the existence of advantageous business relationships or prospective advantageous relationships between Nitro and specifically identifiable customers or potential customers; second, that Acushnet had knowledge of those relationships; third, that Acushnet intentionally and without justification interfered directly with those relationships; and fourth, that such interference caused damage to Nitro.

49

The first question you must determine on this claim is whether Acushnet interfered with Nitro's advantageous relationships with [name] or Nitro's prospective business relations with [name] by inducing or otherwise causing them not to enter into a business relationship with Nitro or not to continue to do business with Nitro.  In order to prove this claim, Nitro must prove that the alleged interference by Acushnet was direct interference.  It is not enough for Nitro to show an interference that was merely an indirect consequence of Acushnet's general conduct in the market place.

If you find that Acushnet did directly interfere with Nitro's business relations or prospective business relations, the second question you must determine is whether the interference by Acushnet was improper. A party who enjoys business relations with another is entitled to protection from improper interference with that relationship. However, another party is entitled to compete for the business or advance its own financial interests, so long as it has a proper reason or motive and it uses proper methods.

A party who interferes with the business relations or prospective business relations of another with the motive and purpose, at least in part, to advance or protect its own business or financial interests, does not interfere with an improper motive. But one who interferes solely out of spite, or to do injury to others,  or for other bad motive, has no justification, and such interference is improper.

So also, a party who interferes with another's business relations using ordinary business methods of competition does not interfere by an improper method. But one who uses misrepresentations or illegal conduct has no privilege to use those methods, and its interference using  such methods is improper.  Tortious interference can only arise from conduct that is unlawful or improper according to contemporary business standards.  Lawful competition, however aggressive, cannot support this claim.  The law allows a competitor to compete for

customers, and a competitor has a privilege of interference in order to acquire the business for itself.

In determining whether the alleged interference is improper under the particular circumstances of this case, you must determine whether, upon a consideration of the relative significance of the factors I will now explain to you, the conduct should be permitted without liability, despite its effect or harm to another.  In this regard, you should weigh against each other and balance the following factors, in the light of all the evidence presented to you:

1)    the nature of Acushnet's conduct;
2)    Acushnet's motive;
3)    the interests of Nitro with which Acushnet's conduct interfered;
4)    the interests sought to be advanced by Acushnet;
5)    the social interests in protecting the freedom of action of Acushnet and the business interests of Nitro;
6)    the proximity or remoteness of Acushnet's conduct to the interference; and,
7)    the relations between the parties.

In considering the first and second factors, you are instructed that it is not unlawful for a party to solicit customers or potential customers of a competitor.  In addition, a party has a legal right to refuse to do business with another party if that party does business with a competitor. Nor is it unlawful for a party to use persuasion, or even exert limited economic pressure, in order to cause another party not to do business with a competitor.

In considering the fourth factor -- that is, the interests sought to be advanced by Acushnet -- you should consider, as I have previously instructed you, that Acushnet had a legal right to act in order to prevent potential infringement of its patents, which are presumed by the law to be valid, and its trademarks.  You are further instructed that Acushnet has that right even if it does not pursue all potential infringers.  If you find that Acushnet's conduct was the result of an honest and reasonable desire and purpose to guard against and prevent any perceived misuse of its trademarks or infringement of its patents, then your verdict should be for Acushnet on this claim.

51

In considering the fifth factor -- that is, the social interests in protecting the freedom of action of Acushnet and the business interests of Nitro -- you should consider the public's interest in the free flow of information on matters of public concern.  As I have previously instructed you, the statements at issue by Acushnet related to a legitimate public controversy and a limited public figure.  As such, those statements can only be a basis for Nitro's tortious interference claim if they were objectively false and were made with actual knowledge of their falsity at the time the statements were made.  As I have also instructed you, Acushnet's statements of pure opinion or mixed expressions of opinion cannot be a basis for Nitro's claim of tortious interference.

In considering the final factor -- that is, the relations between the parties -- the fact that Nitro and Acushnet are competitors should be considered in determining whether Acushnet's actions were taken at least in part to further its own business interests or rather were taken solely for improper purposes.

If Acushnet's interference was improper, the last question is whether it was intentional as well.  Interference is intentional if Acushnet knew of the business relationships or prospective business relationships of Nitro with which it was interfering, knew it was interfering with such relationships, and desired to interfere or knew that interference was substantially certain to occur as a result of its actions.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:     Adapted from Fla. Standard Jury Instructions, MI 7.2; Restatement (Second) of
               Torts §767; International Sales & Service, Inc., v. Austral Insulated Products,
               Inc., 262 F.3d 1152 (11th Cir. 2001); Seminole Tribe of Florida v. Times Pub. Co.,

Inc., 780 So.2d 310 (Fla. 4th DCA 2001); Lake Gateway Motor Inn v. Matt's
Sunshine Gift Shops, Inc., 361 So. 2d 769, 772 (Fla. 4th DCA 1978); Wackenhut
Corp. v. Maimone, 389 So. 2d 656, 658 (Fla. 4th DCA 1980); Restatement (First)
of Torts § 768 (1); Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc.,
254 F. Supp. 2d 1007, 1012 (N.D. Ill. 2003).

**Defendant's Proposed Jury Instruction No. 27**

**Tortious Interference**
**Damages**

If you find for Acushnet on this claim, you will not consider the matter of damages. If, however, you find for Nitro on this claim, you should award Nitro an amount of money that a preponderance of the evidence shows will fairly and adequately compensate Nitro for such loss or damage as was caused by Acushnet's intentional interference. Such interference is the cause of loss or damage if it directly and in a natural and continuous sequence produces or contributes substantially to producing such loss or damage.

If you find that Nitro is entitled to a verdict on this claim in accordance with these instructions, but you do not find that the evidence is sufficient to show that Nitro has sustained any substantial damages, then you may return a verdict for Nitro and award compensatory damages in a nominal sum such as $1.00.  Nominal damages are damages of an inconsequential amount that are awarded to vindicate a right where a wrong is established but no damage is proved.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

Authority:        Adapted in part from Fla. Standard Jury Instructions (Civil), MI 7.2 (2003).

## Defendant's Proposed Jury Instruction No. 28

### Tortious Interference
### Lost Profits

In order for Nitro to establish its claim for loss of net profits as damages, it must prove (1) with reasonable certainty, that its claimed damages flowed as the natural and proximate result of Acushnet's alleged wrongful conduct, and (2) that there is a reasonable standard, such as established market data of businesses similar to Nitro, by which the amount of Nitro's net lost profits can be determined. Lost profits may not be based upon speculation or conjecture. Nitro must come forward with evidence other than merely estimates of the net profits it hoped it might receive in the future. On the other hand, Nitro's inability to establish the exact or precise amount of its net lost profits does not preclude an award of damages so long as there is a reasonable, objective basis in the evidence for determining the amount of damages.

The amount of damages you award may not be remote or speculative. Nitro can recover damages only for a reasonable time into the future. The same instructions I have given you regarding the calculation of lost net profits and mitigation of damages apply equally here.

If you find that Nitro is entitled to a verdict on this claim in accordance with these instructions, but you do not find that the evidence is sufficient to show that Nitro has sustained any substantial damages, then you may return a verdict for Nitro and award compensatory damages in a nominal sum such as $1.00. Nominal damages are damages of an inconsequential amount that are awarded to vindicate a right where a wrong is established but no damage is proved.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

---

Authority:    Halliburton Co. v. Cement Corp., 672 So. 2d 844, 847 (Fla. 4th DCA 1996)
(citing Gay Mech. Contractor, Inc. v. Wharfside Two Ltd., 545 So. 2d 1348, 1351

(Fla. 1989)); <u>U.S. v. Penn Foundry & Mfg. Co.</u>, 337 U.S. 198 (1949); <u>Royal Typewriter Co., Div. of Litton Business Systems, Inc. v. Xerographic Supplies Corp.</u>, 719 F.2d 1092, 1105 (U.S. App., 1983) (citing <u>Aldon Industries, Inc. v. Don Myers & Associates, Inc.</u>, 517 F.2d 188, 191 (5th Cir. 1975)).

**Defendant's Proposed Jury Instruction No. 29**

**Defamation**
**Elements of Claim**

As its sixth claim, Nitro alleges that Acushnet made defamatory statements about Nitro and Nitro's products, in violation of Florida law.  To prevail on this claim, Nitro first must prove two specific facts by a preponderance of the evidence: First, that Acushnet made the statements concerning Nitro that Nitro alleges; and, second, that the statements concerning Nitro were in some respect a false statement of fact that tended to injure Nitro in its business or charged that Nitro committed a crime.  If Nitro proves those two facts by a preponderance of the evidence, Nitro must then prove by clear and convincing evidence that, at the time statements were made, Acushnet knew the statements were false or had serious doubts as to their truth.

On this claim, Nitro alleges that Acushnet made the following statements to others and that those statements were defamatory:

1) statements in a press release about this litigation and Acushnet's claims in it;

2) statements by various sales representatives to the effect that Nitro's product is illegal, or that Acushnet had "legal issues" with Nitro's product;

3) a statement by one sale representative to one retailer that Nitro's product is "crap."

On the first issue that Nitro must prove by a preponderance of the evidence, you are instructed that a statement is in some significant respect false if its substance or gist conveys a materially different meaning than the truth would have conveyed. In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement.

There are different types of counterfeiting.  You are instructed that accusing a party of committing the civil offense of trademark counterfeiting is not charging that party with

57

commission of a crime.

Statements that are merely harsh name calling or puffing (that is, exaggeration of the qualities of the product) of a product are not defamatory.  In evaluating the statements at issue, you are to consider the context in which they are made and the period of time to which they are directed.  In determining this issue, you are to follow the instructions I have previously given you regarding how to determine whether a statement is a statement of fact or a statement of pure opinion or an expression of mixed opinion.

If the preponderance of the evidence establishes that Acushnet's statements were statements of pure opinion or were expressions of mixed opinion, your verdict must be for Acushnet on this claim.  If the preponderance of the evidence establishes that Acushnet made statements of fact that tended to injure Nitro in its business or charged that Nitro committed a crime, then you must next determine whether clear and convincing evidence shows that, at the time the statements were made, Acushnet knew the statements were false or had serious doubt as to their truth.

In determining this claim, you are also to follow the instructions I have previously given to you regarding the privileges afforded to patent holders and trademark owners and regarding statements relating to a legitimate public controversy or a limited public figure.

If clear and convincing evidence does not establish that Acushnet made false statements with actual knowledge at the time of their falsity or at the time had serious doubt as to their truth, your verdict should be for Acushnet on this claim.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

_____

Authority:       Adapted in part from Fla. Standard Jury Instructions (Civil), 4.1; <u>Martin-Marietta</u>
<u>Co. v. Evening Star Newspaper Co.</u>, 417 F. Supp. 947, 958 (D.C. 1976); <u>Garrison</u>

v. Lousiana, 379 U.S. 64, 73 (1964); Bass v. Rivera; 826 So. 2d 534, 535 (Fla. 2d DCA 2002); Silvester v. Am. Broad. Co., 839 F.2d 1491, 1498 (11th Cir. 1988); Mile Marker, Inc. v. Petersen Publ'g, LLC, 811 So. 2d 841, 845-46 (Fla. 4th DCA 2002); Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984); LRX Inc. v. Horizon Assoc. Joint Venture, 842 So. 2d 881, 885 (Fla. 4th DCA 2003); Barnes v. Horan, 841 So. 2d 472, 476-77 (Fla. 3d DCA 2003); Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974); Town of Sewall's Point v. Rhodes, 852 So. 2d 949, 950 (Fla. 4th DCA 2003); From v. Tallahassee Democrat, Inc., 400 So. 2d 52 (Fla. 1st DCA 1981); Coastal Abstract Servs., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1999); Gen. Cigar Holdings, Inc. v. Altadis, S.A., 205 F. Supp. 2d 1335 (S.D. Fla. 2002); Flowers v. Carville, 310 F.3d 1118, 1127 (9th Cir. 2002); Levinksy's Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 129-30 (1st Cir. 1997); U.S. v. New South Farm & Home Co., 241 U.S. 64, 71 (U.S. 1916).

**Defendant's Proposed Jury Instruction No. 30**

**Defamation**
**Causation And Damages**

If you find for Acushnet on Nitro's defamation claim, you will not consider the matter of

damages.  By instructing you on the issue of damages, I am not suggesting which party should

prevail on any issue, including this issue.  But, if you find for Nitro, you should award Nitro an

amount of money that the preponderance of the evidence shows will fairly and adequately

compensate Nitro for such damage as the preponderance of the evidence shows was caused by

the statements complained of.  A statement is a cause of damage if it directly and in natural and

continuous sequence produces or contributes substantially to producing damage.

If you find that Nitro is entitled to a verdict on this claim in accordance with these

instructions, but you do not find that the evidence is sufficient to show that Nitro has sustained

any substantial damages, then you may return a verdict for Nitro and award compensatory

damages in a nominal sum such as $1.00.  Nominal damages are damages of an inconsequential

amount that are awarded to vindicate a right where a wrong is established but no damage is

proved.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

_____

Authority:    Adapted from Fla. Standard Jury Instructions (Civil), MI 4.4 (2003).

## Defendant's Proposed Jury Instruction No. 31

### Punitive Damages

I will now instruct you on Nitro's claim for punitive damages against Acushnet.  By instructing you on punitive damages, I am not suggesting which party should prevail on any issue, including this issue, or whether punitive damages are appropriate or not appropriate in this case.

If you find for Nitro and against Acushnet on Nitro's defamation claim, its tortious interference claim, or its product disparagement claim, and you find also that the clear and convincing evidence shows that (name managing agent, primary owner, or other person whose conduct may warrant punitive damages without proof of a superior's fault) was personally guilty of intentional misconduct or gross negligence that was a substantial cause of injury or damage to Nitro and that such conduct warrants punitive damages against him, then in your discretion you may also determine that punitive damages are warranted against Acushnet.

"Intentional misconduct" means that (name person whose conduct may warrant punitive damages) had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Nitro would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the conduct of (name person whose conduct may warrant punitive damages) was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:      Adapted from Fla. Standard Jury Instructions (Civil), PD2(b)(2) (2003).

61

### Defendant's Proposed Jury Instruction No. 32

### Punitive Damages

If you find for Nitro and against Acushnet on Nitro's defamation claims, its tortious interference claim, or its product disparagement claim, and you find also that (name employee/agent) was personally guilty of intentional misconduct or gross negligence which was a substantial cause of injury or damage to Nitro and that such conduct warrants punitive damages against (name employee/agent), then in your discretion you may also determine that punitive damages are warranted against Acushnet, if you find that clear and convincing evidence also shows that:

• Acushnet actively and knowingly participated in such conduct of (employee/agent); or the [officers] [directors] [or] [managers] of Acushnet knowingly condoned, ratified, or consented to such conduct of (name employee/agent); or

• Acushnet engaged in conduct that constituted gross negligence and that contributed to the damage or injury suffered by Nitro.

"Intentional misconduct" means that (name person whose conduct may warrant punitive damages) had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Nitro would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the conduct of (name person whose conduct may warrant punitive damages) was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:      Adapted from Fla. Standard Jury Instruction PD2(c)(2).

## Defendant's Proposed Jury Instruction No. 33

### Punitive Damages

Acushnet is a corporation, and it can only act through its officers, directors or managing agents authorized to make corporate policies or its employees.

Thus, when I say that Nitro must prove by clear and convincing evidence that "Acushnet" acted intentionally and with reckless disregard of the rights of persons exposed to the effects of such conduct, I mean that Nitro must prove by clear and convincing evidence either that:

(1) a specific officer, director, or managing agent who has power to make corporate policies personally acted in this manner; or

(2) a specific lower-ranking Acushnet employee acted intentionally and with malice, moral turpitude, wantonness, and outrageousness and in addition, there was fault on the part of a specific officer, director, or managing agent that foreseeably contributed to Nitro's injury.

<div align="right">

Given _____  __

Given as Modified _____

Denied _____

Withdrawn _____

</div>

Authority:   Schropp v. Crown Eurocars, 654 So. 2d 1158, 1161 (Fla. 1995); Taylor v. Gunter Trucking Co., 520 So. 2d 624, 625 (Fla. 1st DCA 1988); Sunrise Olds-Toyota v. Monroe, 476 So. 2d 240, 241 (Fla. 5th DCA 1985); Mercury Motors Express v. Smith, 393 So. 2d 545, 549 (Fla. 1981); Bankers Multiple Line Ins. Co. v. Farish, 464 So. 2d 530, 533 (Fla. 1985); Kolstad v. Am. Dental Assoc. 527 U.S. 526 (1999).

**Defendant's Proposed Jury Instruction No. 34**

**Punitive Damages**

In determining the amount of punitive damages, if any, to be assessed as punishment and as a deterrent to others, you should decide any disputed factual issues by the preponderance of the evidence. You should consider the following:

(1)     the nature, extent and degree of misconduct and the related circumstances, including the following:

•       whether the wrongful conduct was motivated solely by unreasonable financial gain;

•       whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by Acushnet;

•       whether, at the time of injury or damage, Acushnet had a specific intent to harm Nitro and the conduct of Acushnet did in fact harm Nitro,

(2)     the following instructions I will give you.


Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:     Adapted from Fla. Standard Jury Instructions (Civil),  PD2(d)(2) (2003).

**<u>Defendant's Proposed Jury Instruction No. 35</u>**

**Punitive Damages**

Nitro has no right to recover punitive damages. Any punitive damages you assess would be in addition to any compensatory damages you award.  You have the discretion to decline to award punitive damages even if you find that the evidence supports such an award.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:    Adapted from Fla. Standard Jury Instructions (Civil) PD2(d)(2) (2003) (modified); <u>Humana Health Ins. Co. of Florida v. Chipps</u>, 802 So. 2d 492 (Fla. 4th DCA 2001); <u>St. Regis Paper Co. v. Watson</u>, 428 So. 2d 243, 247 (Fla. 1983); <u>Chrysler Corp. v. Wolmer</u>, 499 So. 2d. 823, 825 (Fla. 1986); <u>St. Regis Paper Co. v. Watson</u>, 428 So. 2d 243, 247 (Fla. 1983).

## Defendant's Proposed Jury Instruction No. 36

### Punitive Damages

The purpose of compensatory damages is to compensate an injured party to make it whole. However, a substantial award of compensatory damages also has the effect of punishing and deterring misconduct. Therefore, in determining the amount of punitive damages necessary for appropriate punishment and deterrence, you must consider the punishment and deterrent effect associated with an award of compensatory damages alone.

In this regard, you should consider the fact that any award of compensatory damages against Acushnet for alleged violations of the antitrust laws will be automatically, tripled -- that is, multiplied by three -- by the Court.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:    State Farm Ins. Co. v. Campbell, 123 S. Ct. 1513, 1525 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575-80 (1996).

**<u>Defendant's Proposed Jury Instruction No. 37</u>**

**Punitive Damages**

You may not award any punitive damages for the purpose of punishing Acushnet for

conduct that may be legal in other states or for the purpose of changing Acushnet's conduct

outside the State of Florida or in other countries.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:   <u>State Farm Ins. Co. v. Campbell</u>, 123 S. Ct. 1513, 1522 (2003); <u>BMW of N. Am.
v. Gore</u>, 517 U.S. 559, 672 (1996); <u>White v. Ford Motor Co.</u>, 312 F.3d 998 (9th
Cir. 2002).

**Defendant's Proposed Jury Instruction No. 38**

**Punitive Damages**

In determining the proper amount of punitive damages, if any, you may not consider Acushnet's size, wealth, or overall profits and revenues.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

Authority: State Farm Ins. Co. v. Campbell, 123 S. Ct. 1513, 1525 (2003); American Law Institute, Reporters' Study: Enterprise Responsibility for Personal Injury, Vol. II at 253-55 (1991); BMW of N. Am. v. Gore, 517 U.S. 559, 574-85 (1996); Honda Motor Co., Ltd. v. Oberg, 512 U.S. 415, 432 (1994); Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 508 (7th Cir. 1992); Kemezy v. Peters, 79 F.3d 33, 35 (7th Cir. 1996); Pivot Point Int'l, Inc. v. Charlene Prods., Inc., 932 F. Supp. 220, 223 (N.D. Ill. 1996); but see Rinaldi v. Aaron, 314 So. 2d 762 (Fla. 3d DCA 1975).

## **Defendant's Proposed Jury Instruction No. 39**

### **Cancellation of Trademarks**
### **Elements of Claim**

As its seventh claim, Nitro seeks cancellation of each trademark that Acushnet has asserted is infringed or diluted by Nitro.  Nitro alleges that Acushnet knowingly allowed others to engage in the unauthorized use of Acushnet's trademarks in connection with the advertising, promotion, and sale of used and stripped and repainted golf balls, and that Acushnet also engaged in uncontrolled licensing of its trademarks.  Nitro alleges that Acushnet thereby abandoned its trademarks.

In order to prove abandonment, Nitro must prove by "stringent proof" that, as a result of acts or omissions by Acushnet, its trademarks have lost all of their commercial significance as a trademark. Trademarks retain their significance as long as they serve to identify the source of the product on which they are used or have some use as an informational device.

Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1078-1079 (5th Cir. 1997); 15 U.S.C. § 1115(b)(1)-(2); Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 489 (5th Cir. 1992); Cumulus Media, Inc. v. Clear Channel Comm., Inc. 304 F.3d 1167, 1175 (11th Cir. 2002); Babbit Elec., Inc. v. Dynascan Corp., 38 F.3d 1161, 1180 (11th Cir. 1994); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001 (9th Cir.1985); Cuban Cigar Brands, N.V. v. Upmann Int'l, Inc., 457 F. Supp. 1090, 1098 n.28 (S.D.N.Y. 1978); Council of Better Bus. Bureaus, Inc. v. Better Bus. Bureau of S. Fla., 200 USPQ 282, 294 (S.D. Fla. 1978).

**Defendant's Proposed Jury Instruction No. 40**

**Cancellation of Trademarks**
**Other Infringers**

You are instructed that even if Acushnet decided not to prosecute or pursue a lawsuit against another infringer in the past, that fact alone is insufficient to establish abandonment of Acushnet's trademarks.

Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    Council for Better Bus. Bureaus, Inc. v. Better Bus. Bureaus of S. Fla., Inc., 200
U.S.P.Q. 282, 294- 295 (S.D. Fla. 1978); Elizabeth Taylor Cosmetics Co., Inc. v.
Annick Coutal, S.A.R.L., 673 F. Supp. 1238, 1248 (S.D.N.Y. 1987).

71

**Defendant's Proposed Jury Instruction No. 41**

**Cancellation of Trademarks
Uncontrolled Licensing**

Nitro contends that the 1996 consent decree entered against Birdie Golf constituted uncontrolled licensing of Acushnet's trademarks. Uncontrolled licensing occurs where the trademark owner allows another party to use its trademarks, without retaining any control over the quality of the products on which the trademark is used, to such an extent that the public no longer associates the trademark with the original trademark owner.

You are instructed that retention of trademark rights by a trademark owner requires only minimal quality control. Even a trademark owner's failure to exercise control over licenses does not result in an abandonment of trademark protection for the mark, unless the trademark thereby lost all commercial significance. Abandonment has not occurred so long as the trademark retains some commercial significance as a trademark.

Given as Modified _____
Denied _____
Withdrawn _____

Authority:   15 U.S.C. § 1127(2) (1998); Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1078-1079 (5th Cir. 1997); 15 U.S.C. § 1115(b)(1)-(2) (1998); Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1180 (11th Cir. 1994); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001 (9th Cir. 1985); Cuban Cigar Brands, N.V. v. Upmann Int'l, Inc., 457 F. Supp. 1090, 1098 n.28 (S.D.N.Y. 1978); Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 489 (5th Cir. 1992); Cumulus Media, Inc. v. Clear Channel Commun., Inc., 304 F.3d 1167, 1175 (11th Cir. 2002).

### Defendant's Proposed Jury Instruction No. 42

**Antitrust**
**Relationship of Patent Rights to Antitrust Laws**

As its eighth claim, Nitro asserts that Acushnet violated the federal antitrust laws. Because this case involves both patent and antitrust claims, I want to instruct you on the relationship between the patent laws and the antitrust laws before I instruct you on the specific elements of Nitro's antitrust claims.

The patent laws complement the antitrust laws in promoting competition. The basic purpose of both sets of laws is to promote innovation, industry, and competition. The patent laws seek to promote competition by encouraging people to invest in scientific research and product development. These investments can lead to new and better products, better ways of making things, new jobs, and entirely new industries. But a patent necessarily involves a restraint of trade – the right to exclude others from using the patented invention for the duration of the patent. This right to exclude is not an antitrust violation. Congress has decided that the restraint of trade created by the patent is a reasonable one because it promotes innovation and long-term competition.

Thus, as long as the patent owner acts only to take full advantage of the right to exclude created by its patent, it does not violate the antitrust laws. If, on the other hand, the patent owner seeks in bad faith to restrain trade beyond the right to exclude conferred by the patent, its conduct may be an antitrust violation.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Adapted from Sample Jury Instructions in Civil Antitrust Cases, 1999 Edition, D-2-D4; Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1579 (Fed. Cir. 1996).

73

**Defendant's Proposed Jury Instruction No. 43**

**Antitrust**
**Introduction**

The federal antitrust laws are designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.  They rest on the premise that unrestrained competition will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress.  That said, the antitrust laws do not guarantee success to those who enter into business.  They recognize that in the natural operation of our economic system, some competitors are going to lose business, or even go out of business, while others gain and prosper.  Acts become unlawful, therefore, only when they constitute an unreasonable restraint on commerce under the principles as to which I will instruct you now.

Nitro claims that Acushnet violated the antitrust laws by (1) monopolization and (2) attempted monopolization.  I am now going to explain to you what the elements of those two claims are.

In order to establish its claim of monopolization, Nitro must prove three specific facts by a preponderance of the evidence:

**First**, that Acushnet had monopoly power in a relevant market in which Nitro competes in a meaningful way;

**Second**, that Acushnet willfully acquired or maintained that power through predatory or exclusionary conduct, which I will define in a minute,  other than through the use of valid patents and trademarks;

**Third**, that Nitro was injured in its business or property because of Acushnet's predatory or exclusionary conduct.

If you find that Nitro proved each of these elements by a preponderance of the evidence,

74

you must find for Nitro and against Acushnet on its monopolization claim.  If you find that Nitro

failed to prove any one or more of these elements by a preponderance of the evidence, you must

find for Acushnet and against Nitro on its monopolization claim.

<div align="right">

Given _____ ____

Given as Modified _____ __

Denied _____ __

Withdrawn __ _____

</div>

_____  _____

Authority:     Adapted from Eleventh Circuit Pattern Jury Instructions (Civil), 3.1; Sample Jury
               Instructions in Civil Antitrust Cases, (1999 Ed.) C-2; Covad Commun. Co. v.
               BellSouth Corp., 299 F.3d 1272, 1283 (11th Cir. 2002); N. Pacific Ry. v. United
               States, 356 U.S. 1, 4 (1958).

**Defendant's Proposed Jury Instruction No. 44**

**Monopolization**
**Relevant Market**

Now I want to discuss in more detail the elements that Nitro must prove in order to prevail on its monopolization claim.

The first fact that Nitro must prove on its monopolization claim is that Acushnet has monopoly power in a relevant market in which Nitro competes in a meaningful way. Determining the relevant market is essential because you are required to make a judgment about whether Acushnet has the power to control market prices and exclude competition in that relevant market. The objective in defining the relevant market is to draw the boundary between those products that compete with each other, to some substantial degree, and those products that do not.

There are two aspects you must consider in defining the relevant market. The first is the relevant product market. In other words, you must identify all the products that compete with one another. The second is the relevant geographic market. You must identify the geographic area within which competition takes place.

Nitro and Acushnet agree that the relevant geographic market is the continental United States. Therefore, you are instructed that the relevant geographic market is the continental United States. You are further instructed that conduct occurring in Canada is outside the relevant geographic market and therefore cannot be considered by you in determining Nitro's antitrust claims.

Nitro and Acushnet do not agree about the relevant product market, and you must therefore determine what the relevant product market is in this case.

The relevant product market includes the product at issue and all reasonable substitutes for it. Products do not need to be identical to be in the same relevant product market. Rather, as

76

a practical matter, you must determine which products compete with each other based on whether they are reasonably interchangeable in use from a buyer's point of view.

In this case, Nitro alleges that the relevant product market is limited to what it calls "super-premium balls," which it defines as golf balls "of three and four piece, solid core construction" that "typically sell at the highest price points of all golf balls sold." In order to prove its claimed relevant market, Nitro must prove by a preponderance of the evidence that 3 and 4 piece, solid core construction golf balls are not reasonable substitutes by consumers for use in playing a round of golf with other golf balls that are not of 3 and 4 piece, solid core construction.

Acushnet asserts that the relevant product market consists of all golf balls, whether of 2 piece, 3 piece or 4 piece, solid core construction. Acushnet believes all golf balls are reasonable substitutes by consumers for the purpose of playing a round of golf. Acushnet further asserts that, if you find the relevant product market is "super-premium" golf balls as Nitro asserts, Nitro's used 3 and 4 piece golf balls do not compete in that market in any meaningful way, and Nitro therefore has no antitrust claims with respect to that relevant market.

There are a number of factors you may consider in determining whether certain golf balls are reasonable substitutes for other golf balls. You may consider customer views on the interchangeability of golf balls, the similarity or differences of end use, the presence or absence of specialized vendors, the industry or public perception, the views of companies in the industry regarding who their competitors are, and the existence or absence of different customer groups or distribution or sales channels.

You have heard evidence about the prices of different golf balls. You may consider whether a substantial difference in the price of the products causes a considerable number of customers to switch from that product to another. However, if you find that the first product was recently introduced into the marketplace and that pricing for that product and for competitive

products has not yet stabilized, a substantial difference in the price of the products will not indicate the existence of a separate product market.

You are further instructed that differences in price among various golf ball models do not create a separate product market if the differences are merely part of a spectrum of price and product options.  To constitute a separate product market, there must be a distinct break in the range of prices.  Other differences in the golf balls also do not necessarily create a separate product market unless you find that those differences are sufficient to mean the products are not reasonable substitutes for one another.

In sum, to determine the relevant product market, you must decide which products compete meaningfully with each other.  This is a practical determination.  Products do not have to be identical to be in the same relevant market, but they must compete meaningfully with one another.  Nitro must prove that its golf balls compete meaningfully in the relevant product market that it contends Acushnet monopolized.

If you find that Nitro has not proved by the preponderance of the evidence a "super-premium" golf ball market of "three and four piece, solid core construction" golf balls, then you should find for Acushnet on this claim.  If you find that Nitro has proved by a preponderance of the evidence its claimed relevant product market, then you should consider the remaining elements of Nitro's monopolization claim.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    Adapted from Sample Jury Instructions in Civil Antitrust Cases, 1999 Edition, C6-7; Am. Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569 (11th Cir. 1985).; ABA Antitrust Law Developments (Fifth), pp. 525, 532-541; In re Super Premium Ice Cream Distrib. Antitrust Litig., 691 F. Supp. 1262, 1268 (N.D. Cal. 1988); JBL Enters., Inc. v. Jhirmack Enters., Inc., 519 F. Supp. 1084, 1087-88 (N.D. Cal. 1981).

**Defendant's Proposed Jury Instruction No. 45**

**Monopolization**
**Competition Between Nitro and Acushnet in the Relevant Market**

If you find that Nitro has established that the relevant product market consists of "super-premium" golf balls, you must also determine whether Nitro's used 3 and 4 piece construction golf balls compete in that relevant product market in a meaningful way in order for Nitro to prove its monopolization claim. In determining whether Nitro's used 3 and 4 piece construction golf balls compete in a "super-premium" relevant product market, should you find that is the relevant market, you may consider a number of factors, no single one of which is dispositive: (1) whether the golfing industry or public recognizes Nitro's used 3 and 4 piece construction balls as comparable to new 3 and 4 piece construction balls; (2) whether Nitro's production facilities for its used balls are the same as production facilities for manufacturing new balls; (3) whether there are distinct prices between Nitro used balls and new 3 and 4 piece construction balls; (4) whether there are distinct customers for Nitro used balls and new 3 and 4 piece construction balls; (5) whether Nitro used balls generally are sold by the same vendors that sell new 3 and 4 piece construction balls; and (6) whether Nitro used balls ordinarily are used for the same purpose as new 3 and 4 piece construction balls.

In other words, if the golfing industry or public recognizes Nitro's used balls as comparable to all new 3 and 4 piece construction balls, that points toward their inclusion in the same market. If the golfing industry and public do not recognize Nitro's used balls as comparable, that points against their inclusion in the same market.

If Nitro's production facilities for its used balls are the same as production facilities for manufacturing new balls, that points toward their inclusion in the same market. If they are different, that points against their inclusion in the same market.

If there is a distinct price break between Nitro's used 3 and 4 piece construction balls and

new 3 and 4 piece construction balls, that points against their inclusion in the same market. If there is not such a break in prices between them, that points toward their inclusion in the same market.

If there are distinct customers for Nitro's used balls and new 3 and 4 piece construction balls, that points against their inclusion in the same market. If there are not, that points toward their inclusion in the same market.

If Nitro's used 3 and 4 piece construction balls generally are sold by the same vendors that sell new 3 and 4 piece construction balls, that points toward their inclusion in the same market. If they are not, that points against their inclusion in the relevant market.

If Nitro's used 3 and 4 piece construction balls ordinarily are used for the same purpose as new 3 and 4 piece construction balls, that points toward their inclusion in the market. If not, this points against their inclusion in the relevant market.

<div align="right">
Given  _____<br>
Given as Modified  _____<br>
Denied  _____<br>
Withdrawn  _____
</div>

_____

Authority:   Brown Shoe v. United States, 370 U.S. 294 (1962); Levine v. Central Fla. Medical Affiliates, Inc., 72 F.3d 1538, 1555 (11th Cir. 1996); Spanish Broad. Sys., Inc. v. Clear Channel Comm., Inc., 242 F. Supp. 2d 1350, 1363 (S.D. Fla. 2003).

**<u>Defendant's Proposed Jury Instruction No. 46</u>**

**Monopolization**
**Monopoly Power**

If you find that Nitro has proved its claimed relevant product market, of "super-premium" 3 and 4 piece, solid core construction golf balls, you must then determine whether Acushnet has monopoly power in that market.  Monopoly power is the power to control or dominate a market. This means the power to control market prices and exclude competition in the relevant market. Both are important because the ability to control price ultimately depends on an absence of meaningful competition.  The power to exclude competition means the ability to dominate the market by eliminating existing competition from that market and preventing new competition from entering that market.

Monopoly power that exists for only a short period of time will not support a monopolization claim.  However, to establish the possession of monopoly power, Nitro need not prove that prices were raised or that competition actually was excluded, but only that Acushnet had the power to raise prices and exclude competition in the relevant market.

In determining whether Acushnet has monopoly power in the relevant market, there are a number of factors you should consider, none of which is necessarily controlling.  For example, you have heard evidence about Acushnet's market share.  You may consider whether monopoly power exists from Acushnet's share of the relevant market.  Market share is a firm's share of total industry sales, shipments, production, capacity, or reserves, expressed as a percentage of the whole, taking into account all golf balls, whether new or used, you determine to be in the relevant market.  There are a variety of ways to measure market share, but whatever measure you use must be reasonable and consistently applied.

If you determine that Acushnet's share of the relevant market is 80 percent or higher, that

is strong evidence of the existence of monopoly power.  If you determine that Acushnet's market share is somewhere between 60 percent and 80 percent, you may, but are not required to, infer the existence of monopoly power from that share, although the inference is stronger the higher Acushnet's market share is within that range.  If you determine that Acushnet's share of the relevant market is less than 60 percent, then you must find that Acushnet lacks monopoly power in the relevant market.

If you find that Acushnet has more than 60 percent of the relevant market, you may also consider the trend in Acushnet's market share in determining whether it has monopoly power in the relevant market.  A declining market share may indicate the absence of monopoly power, though it does not foreclose such a finding, while an increasing market share may indicate the opposite, though it does not require such a finding.

You may also consider the history of entry into and exit from the market by other companies.  Entry of companies into the market may indicate that Acushnet lacks monopoly power.  On the other hand, departure of companies from the market, or the failure of companies to enter the market, may indicate that Acushnet has monopoly power.

You are instructed that, due to consumer preferences and brand loyalty, certain products are able to command higher prices than certain other prices.  That a product is sold at a higher price than a different but functionally interchangeable product may simply be a reflection of the value the market and consumers attach to that product.  It is not necessarily a reflection of a manufacturer's power to control prices in the relevant market nor is it indicative of the absence of price competition within that market.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:    <u>Am. Key Corp. v. Cole Nat'l Corp.</u>, 762 F.2d 1569 (11th Cir. 1985); Sample Jury Instructions in Civil Antitrust Cases, 1999 Edition, C-4, C-14-15; <u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 392 (1956); <u>Neumann v. Reinforced Earth co.</u>, 788 F. 2d 424, 430 (D.C. Cir. 1986); <u>Rural Tel. Co. v. Feist Publ.</u>, 957 F. 2d 765, 768 (10th Cir. 1992); <u>W. Parcel Express v. United Parcel Serv. Of Am.</u>, 65 F. Supp. 2d 1052, 1059 (N.D. Cal. 1998); <u>In re Super Premium Ice Cream Distrib. Antitrust Litig.</u>, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988); <u>Pac. Mailing Equip. Corp. v. Pitney Bowes, Inc.</u>, 1980 WL 2010 (N.D. Cal. 1980); ABA Antitrust Law Dev. (5th ed.), p. 230-231, 233-43; <u>Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic</u>, 65 F. 3d 1406, 1411-12 (7th Cir. 1995); <u>Forsyth v. Humana, Inc.</u> 114 f. 3d 1467, 1476 (9th Cir. 1997); <u>Bailey v. Allgas, Inc.</u>, 284 F. 3d 1237, 1246 (11th Cir. 2002); <u>U.S. Anchor Mfg. v. Rule Indus., Inc.</u>, 7 F.3d 986, 999 (11th Cir. 1993).

**Defendant's Proposed Jury Instruction No. 47**

**Monopolization**
**Low Entry Barriers**

A high market share may raise an inference of monopoly power.  But there can be no such inference if the barriers to entry into the relevant market are low or non-existent.  Where entry barriers are low, a business' market share does not accurately reflect its market power.

Therefore, even if you find that Acushnet has a market share exceeding 60 percent, you must consider whether there were low barriers to entry into the relevant market.  If there are low barriers, Acushnet may not have monopoly power in the relevant market.

If you find that Acushnet had monopoly power in the relevant market and that Nitro's golf balls compete in that market in a meaningful way, then you must find that Nitro has established this requirement and you must consider the two remaining elements of the monopolization claim.  If you find that Acushnet did not have monopoly power, in the relevant market or that Nitro's golf balls do not compete in a meaningful way in the relevant market, then you must find for Acushnet on Nitro's monopolization claim.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

---

Authority:   Moecker v. Honeywell Int'l, Inc., 144 F. Supp. 2d 1291 (M.D. Fla. 2001); Davis v. Southern Bell Tel. & Tel., No. 89-2839-CIV-NESBITT, 1994 WL 912242 *11 (S.D. Fla. 1994); ABA Antitrust Law Dev. (5th ed.), p. 237-41.

**Defendant's Proposed Jury Instruction No. 48**

**Monopolization**
**Willful Maintenance of Monopoly Power**

The second element that Nitro must prove on its monopolization claim is that Acushnet

willfully acquired or maintained monopoly power through predatory or exclusionary acts or

practices, that is, conduct that lacks a legitimate business purpose, rather than by ordinary means

of competition such as possessing and utilizing patents and trademarks, offering better products,

exercising superior business judgment, or just chance.

A company that lawfully acquires monopoly power does not violate the federal antitrust

laws merely by exercising that power and charging high prices.  Mere vigorous competition, or

the aggressive pursuit of legitimate business objectives, is not improper, even for a company that

has monopoly power and even when that conduct disadvantages competitors.  Motives such as

increasing profits or market share generally are legitimate.  In addition, a general intent to defeat

one's competitors and to obtain a monopoly status is not alone sufficient for Nitro to satisfy this

requirement.  Rather, predatory or exclusionary conduct is required

Whether Acushnet's conduct is predatory or exclusionary cannot be answered by simply

considering its effect on Nitro.  It is necessary to consider Acushnet's conduct on consumers and

whether its conduct has impaired competition as a whole in the relevant market, in an

unnecessarily restrictive way, rather than merely harmed a particular competitor.

You may not find that Acushnet has willfully acquired or maintained monopoly power if

it acquired or maintained that power solely through the exercise of superior foresight and skill; or

because of economic or technological efficiency, including efficiency resulting from scientific

research; or by obtaining a lawful patent; or because a change in cost or taste has driven out all

but one supplier; or simply because the market is so limited that it is impossible to efficiently

produce the product except by a plant large enough to supply the whole demand.  In addition, the

acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or extraordinary commercial success. A company does not act unlawfully merely when it engages in ordinary competitive behavior that would be an effective means of competition if it were engaged in by a firm without monopoly power or simply because it is large and efficient.

In other words, to establish willful maintenance of monopoly power, Nitro must prove that Acushnet acquired, maintained, or attempted to acquire a monopoly through actions harmful to competition as a whole. Even dominant firms are permitted, and in fact encouraged, under the antitrust laws, to compete vigorously in the battle for trade. So long as Acushnet has legitimate procompetitive business reasons for the conduct at issue, there is no violation of the antitrust laws.

Nitro asserts that Acushnet monopolized the relevant market by engaging in the following conduct that Nitro claims is predatory or exclusionary: (1) bringing sham lawsuits, including this lawsuit, challenging the resale of its golf balls with its trademarks, (2) falsely disparaging Nitro's products, (3) defaming Nitro and its products, (4) introducing the same product and brand into the market using different packaging; and, (5) refusing to deal with certain golf ball retailers who sell Nitro's golf balls and seeking exclusive dealing arrangements with other golf ball retailers. I will now instruct you on each of these claims in turn.

<div align="right">
Given _____<br>
Given as Modified _____<br>
Denied _____<br>
Withdrawn _____
</div>

---

Authority:  Adapted from Sample Jury Instructions in Civil Antitrust Cases, 1999 Edition, C-20-21, 23-24; Covad Communications Co. v. BellSouth Corp., 299 F.3d 1272, 1283 (11th Cir. 2002); Tech. Resource Servs., Inc. v. Dornier Med. Sys., Inc. 134 F.3d 1458, 1466 (11th Cir. 1998); Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial, Inc., 919 F.2d 1517, 1522 (11th Cir. 1990); Gould v. Sacred Heart Hosp. of Pensacola, 1998 WL 1017208 *24 (N.D. Fla. 1988).

## Defendant's Proposed Jury Instruction No. 49

### Predatory Conduct – Sham Litigation
### Introduction

Nitro first contends that Acushnet filed sham lawsuits, including its claims against Nitro in this litigation, as predatory or exclusionary acts that constituted a willful maintenance of monopoly power.  You are instructed in this regard that the United States Constitution insures the right of everybody to appeal to the courts for judicial action, recognizing that when people do so, they will naturally seek judicial action that favors them and may be unfavorable to others. The law provides that the right to appeal to the courts for judicial action is an important right, and a party's exercise of that right does not normally violate the antitrust laws.

In order to prove that Acushnet's lawsuits were a sham, Nitro must prove by the preponderance of the evidence:

**First**, that Acushnet's claims in the IGI, Birdie, and Dana Jones lawsuits were, and its claims in this lawsuit are, objectively baseless in the sense that no reasonable party could realistically expect to win any of those claims, and

**Second**, that Acushnet's subjective purpose in filing those lawsuits was solely an attempt to harass or interfere directly with competitors' business relationships by filing the suits and using the litigation process as a predatory or exclusionary weapon, as opposed to by the relief it might obtain in the suits.

Insert I from 90.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:    Adapted from Sample Jury Instructions in Civil Antitrust Cases, (1990 ed.), G-12–G-13; Prof. Real Estate Investors v. Columbia Pictures Indus., 508 U.S. 49, 60 (1993); Glass Equipment Dev., Inc. v. Besten, Inc., F.3d 1337, 1343-44 (Fed. Cir. 1999).

## Defendant's Proposed Jury Instruction No. 50

### Predatory Conduct – Sham Litigation
### Objectively Baseless

The first fact Nitro must prove on its sham litigation claim is that Acushnet's claims are objectively baseless. To prove this fact, Nitro must affirmatively disprove the legal viability of all of Acushnet's claims. It is not enough for Acushnet to lose on one or even all of its claims. Nitro must prove that no reasonable party could have realistically expected a favorable outcome or result on the merits of those claims at the time they were brought. If an objective party could believe that the suit is reasonably calculated to elicit a favorable outcome on at least one of the claims, the suit is not sham litigation for purposes of the antitrust laws.

You are further instructed that the genuineness of a lawsuit does not depend on whether it succeeds. Even if Acushnet is not successful on any of its claims against Nitro, as long as its lawsuit was reasonably based, it is not sham litigation.

Furthermore, even is Acushnet settled its lawsuits against other parties before any final determination was made as to its claims in those lawsuits, the lawsuits were not a sham as long as they were reasonably based.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

_____

Authority:    Prof. Real Estate Investors v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1993); Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556, 565 (4th Cir. 1990); Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 996 (9th Cir. 1979); Hunter Douglas, Inc. v. Comfortex Corp., 44 F. Supp. 2d 145, 151 (N.D.N.Y. 1999); Mitek Surgical Prod. Inc. v. Arthrex, Inc., 21 F. Supp. 2d 1309, 1318 (D. Utah 1998); BE & K Const. Co. v. NLRB, 536 U.S. 516, 531-32 (2002).

**Defendant's Proposed Jury Instruction No. 51**

**Predatory Conduct – Sham Litigation
Patent Counterclaim**

With respect to Nitro's allegation that Acushnet's patent claims in this case constitute sham litigation, you are instructed that Acushnet, as a patent owner, is entitled to assert patent infringement claims in an effort to protect its patent rights, and the bringing of such claims ordinarily does not violate the federal antitrust laws, even where the patent is later determined to be invalid or unenforceable. As I have previously instructed you, for Acushnet's patent infringement claims to violate the antitrust laws, Nitro must prove that Acushnet's patent infringement claims are objectively baseless.

If you find the patent infringement claims to be objectively baseless, you must determine whether Acushnet's bringing them was an attempt to interfere directly with the business relationships of one or more competitors through the government process as opposed to the outcome of the infringement claims. This requires you to determine whether Acushnet acted in good or in bad faith in bringing its patent claims. Acushnet is entitled to a presumption of good faith. You may disregard this presumption only if you find by clear and convincing evidence that Acushnet filed the lawsuit knowing it was seeking to enforce an invalid or unenforceable patent, that Acushnet had no reasonable basis to believe that Nitro had infringed Acushnet's patents.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:   Sample Jury Instructions in Civil Antitrust Cases, 1999 Edition, D67-68; Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.2d 1318 (Fed. Cir. 1998); Golan v. Dingel Enter., Inc., 310 F.3d 1360 (Fed. Cir. 2002).

89

**Defendant's Proposed Jury Instruction No. 52**

**Predatory Conduct – Sham Litigation**
**Denial of Preliminary Injunction**
**Consent Decree**

You have heard evidence about the denial of a preliminary injunction in Acushnet's lawsuit against Birdie Golf. You are instructed that the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until full trial on the merits can be held. A preliminary injunction is an extraordinary and drastic remedy, sought by a party before the evidence in a case is fully developed. In light of this, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction motion is customarily determined on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. Moreover, a party is not required to prove its claims in full at a preliminary injunction hearing. Therefore, the findings of facts and conclusions of law made by a court on a motion for preliminary injunction are not considered at a trial on the merits of the claims, nor do they have any binding effect either in that case or in a case involving claims against a different party.

Thus, the mere fact that Acushnet did not obtain the injunctive relief it sought in a prior case does not mean that its claim for that relief, or for the same relief against another party, in another case, is objectively baseless or even that Acushnet would have been unsuccessful had the matter proceeded to a full trial. Accordingly, you should not consider any such rulings on motions for preliminary injunction in determining whether Acushnet filed sham litigation. You have also heard evidence that Acushnet sued Birdie Golf, IGI, and Dana Jones, and that Acushnet settled its claims with those other parties. As a result of the settlement agreements reached by Acushnet and the defendants in other lawsuits, the court entered "Consent Decrees" in those prior cases. A consent decree is simply a settlement agreement between to parties engaged in litigation who wish to settle their differences and obtain a judicially enforceable order

with respect to the settlement.  When a court approves the parties' settlement and enters such a decree, it does not do so based on the court's findings of fact or conclusions of law.  Rather, the decree is entered solely to ratify the parties' agreed-to settlement terms, which then makes those settlement terms enforceable by the court, based on the parties' mutual agreement.

As a matter of law and good public policy, settlements of lawsuits are encouraged. Settlements represent a compromise.  In exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. You are therefore not to draw any inferences against Acushnet from the fact that it settled its lawsuits against Birdie Golf, IGI, or Dana Jones, nor may you consider those settlements in determining Nitro's claim that Acushnet filed sham litigation.

<div style="text-align:right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

---

Authority:   Univ. of Tex. v. Camenisch, 451 U.S. 390, 395-96 (1981); Clark v. K-Mart, Corp. 979 F.2d 965, 969 (3rd Cir. 1992); Universal City Studios, Inc. v. Nintendo Co. Ltd., 578 F. Supp. 911, 919-21 (S.D. N.Y. 1983); Playboy Enters., Inc. v. Chuckleberry Publg, Inc., 486 F. Supp. 414, 418 (S.D.N.Y. 1980); Matter of Munford, Inc., 97 F.3d 449, 455 (11th Cir. 1996); Insurance Concepts, Inc. v. Western Life Ins. Co., 639 F.2d 1108, 1111 (5th Cir. 1981); Kaspar Wire Works, Inc. v. Leco Engineering & Mach., Inc., 575 F.2d 530, 538 (5th Cir. 1978); United States v. Armour & Co., 402 U.S. 673, 681-82 (1971); Eaton v. Courtaulds of North America, Inc., 578 F.2d 87, 90-91 (5th Cir. 1978).

**Defendant's Proposed Jury Instruction No. 53**

**Sham Litigation**
**Improper Purpose**
**Risk of Abandonment Claim**

If a party in Acushnet's position could have had a reasonable belief at the time the lawsuits were filed that there was a chance of winning, the suit was not objectively baseless. If you find that Acushnet's lawsuits were not objectively baseless, you do not need to consider whether lawsuits were an attempt to interfere with the business relationships of its competitors. Instead, you must find for Acushnet and against Nitro on Nitro's allegation that Acushnet violated the antitrust laws by filing these lawsuits.

If, however, you determine that Acushnet's lawsuits were objectively baseless, you must then determine whether Acushnet's sole purpose in filing its claims was to injure Nitro's business by bringing or continuing the lawsuits, regardless of their ultimate outcome.

In this regard, you should consider that Acushnet could have been at risk of a claim that it abandoned its trademarks if it failed to challenge possible infringing conduct. Moreover, even if Acushnet's failure to sue did not constitute abandonment of its trademarks, infringers also could later claim that the strength of Acushnet's trademarks was weakened by the potentially infringing behavior that was not challenged by Acushnet.

The two-prong test that I have just given you is to be applied without regard for the number of lawsuits at issue in Nitro's sham litigation claim.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:    Uncas Mfg. Co. v. Clark & Coombs Co., 309 F.2d 818 (1st Cir. 1962); Univ. of Ga. Athletic Ass'n v. Laite, 756, F.2d 1535, 1545-1546 (11th Cir. 1985).

## Defendant's Proposed Final Jury Instruction No. 54

### Sham Litigation
### Repetitious Lawsuits

If you find that no reasonable person could have realistically expected to succeed on any of the claims in the lawsuits brought by Acushnet at the time those lawsuits were brought, and that Acushnet's sole purpose in bringing or continuing those lawsuits was to inflict harm on competitors by the lawsuit itself, as opposed to obtaining any of the relief claimed in the lawsuit, then you must consider whether Acushnet's actions in bringing the suit constitute predatory or exclusionary conduct in pursuit of monopoly power in the relevant market -- that is, whether the remaining elements of Nitro's claim have been proven.

Given   _____

Given as Modified   _____

Denied   _____

Withdrawn   _____

---

Authority:     BE&K Const. Co. v. NLRB, 536 U.S. 516 (2002); Proportion-Air, Inc. v. Buzmatics, Inc., 1995-2 Trade Cas. (CCH) ¶ 71,144 (Fed. Cir. 1995); Uniforce Temp. Personnel, Inc. v. Nat. Council on Compensation, 892 F. Supp. 1503 (S.D. Fla. 1995); Intermedia Commun., Inc. v. Bellsouth Tel., Inc., 173 F. Supp. 2d 1282 (M.D. Fla. 2000).

**Defendant's Proposed Final Jury Instruction No. 55**

**Monopolization**
**Product Disparagement**

Nitro also argues that Acushnet committed predatory or exclusionary acts by defaming or falsely disparaging Nitro and Nitro's product. I have previously instructed you on the requirements for defamation and product disparagement claims, and you should apply those same instructions here.

In addition to those instructions, you are further instructed that an antitrust claim premised upon defamation or product disparagement must overcome a presumption that such speech had a *de minimis* effect on competition. To rebut this presumption, Nitro must prove that the allegedly disparaging statements were (1) clearly false; (2) clearly material to a customer's buying decision; (3) clearly likely to induce a customer to unreasonably rely on the statement; (4) made to buyers having little understanding of the subject matter; (5) continued for extended time periods; and (6) not readily susceptible to counter statements, explanations or other neutralizing effort by Nitro. Nitro must satisfy all six of those elements to overcome the *de minimis* presumption and prove its claim.

---

Authority:  Nat'l Ass'n. of Pharm. Mfrs. v. Ayerst Labs., 850 F.2d 904 (2d Cir. 1988); Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc., 108 F.3d 1147 (9th Cir. 1997); In re Indep. Serv. Org. Antitrust Litig., 114 F. Supp. 2d 1070, 1095, 1096 (D. Kan. 2000); David L. Aldridge Co. v. Microsoft Corp., 995 F. Supp. 728 (S.D. Tex. 1998).

**Defendant's Proposed Final Jury Instruction No. 56**

**Monopolization**
**Enforcement of Trademark or Patent**

A trademark owner is entitled to exclude others from using the same or similar trademarks if it will potentially confuse the public.  Therefore, a trademark owner's desire to exclude others from unlawfully using its protected patents or trademarks is a presumptively valid business justification for allegedly predatory or exclusionary conduct, even if the company is a monopolist.  Additionally, a company's good faith effort to enforce a trademark or a patent is not the kind of predatory or exclusionary prohibited by the antitrust laws.

Given         _____
Given as Modified   _____
Denied         _____
Withdrawn      _____

Authority:        United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97-98 (1918);
Image Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1218
(9th Cir. 1997); Baltimore Luggage Co. v. Samsonite Corp., No. WN-86-
503, 1991 WL 307244, at *7 (D. Md. June 25, 1991); Alberto-Culver Co.
v. Andrea Dumon, Inc., 466 F.2d 705, 711 (7th Cir. 1972).

**Defendant's Proposed Final Jury Instruction No. 57**

**Monopolization**
**Brand Proliferation**

Nitro also alleges that Acushnet sells the same golf balls in different packages to retailers in an effort to obtain as much shelf space as possible for itself and to exclude competitors in what it claims as a relevant "super-premium" market. You are instructed that there is nothing inherently predatory or exclusionary competitive about selling physically identical or similar golf balls under different model names, at the same time. If you find that Acushnet did not in fact engage in this practice with respect to balls that you deem to be included in the relevant market, this practice cannot be construed as predatory or exclusionary. If you find that Acushnet engaged in this practice for golf balls included in the relevant market, but did for valid legitimate business reasons unrelated to willful maintenance of monopoly power in the relevant market, for example, as part of its normal marketing practices rather than out of a desire to improperly exclude competitors from the market, this also cannot be considered a predatory or exclusionary practice. However, if you find that Acushnet engaged in this practice with respect to golf balls included in the relevant market, without a legitimate business justification, in order to acquire or maintain monopoly power in the relevant market, this is evidence of a predatory or exclusionary practice.

<div align="right">

Given  _____

Given as Modified  _____

Denied  _____

Withdrawn  _____

</div>

_____

Authority:      Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985); Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451 (1992); Trans Sport, Inc. v. Stanter Sportswear, Inc., 964 F.2d 186, 190 (2d Cir. 1992).

**Defendant's Proposed Final Jury Instruction No. 58**

**Monopolization**
**Refusal to Deal**

You have heard evidence that Acushnet allegedly threatened to refuse to do business with certain customers -- The Sports Authority and Wal-Mart Canada -- unless they stopped doing business with Nitro.  The Court has determined as a matter of law that any conduct of Acushnet or Acushnet Canada with respect to Wal-Mart Canada cannot be considered by you in determining Nitro's antitrust claims, because those claims relate solely to trade and commerce in the United States.  The Court has further determined that this alleged conduct was lawful under Canadian law.  You are, therefore, to disregard that conduct when deciding the antitrust claims.

With respect to the evidence relating to The Sports Authority, you are instructed that a business ordinarily may deal or refuse to deal with whomever it pleases.  Even a business with monopoly power in a relevant market may refuse to deal with others, so long as legitimate business reasons exist for that refusal.

Given _____.
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:   Adapted from ABA Sample Jury Instructions in a Civil Case, 1999 edition, C32; Harbord Ins. Servs., Ltd., v. Ins. Corp. of British Columbia, 9 B.C.L.R.2d 8 (British Columbia 1993); Lake Gateway of Motor inn v. Matt's Sunshine Gift Shops, Inc. 361 So. 2d 769, 772 (Fla. 4th DCA 1978); Wackenhut Corp. v. Maimone, 389 So. 2d 656 (Fla. 4th DCA 1980); Restatement (First) of Torts § 768(1); Republic Tobacco, L.P. v. N. Atl. Trading Co., 254 F. Supp. 2d 1007, 1012 (N.D. Ill. 2003).

.

## Defendant's Proposed Final Jury Instruction No. 59

### Monopolization
### Exclusive Dealing

Nitro further alleges that Acushnet has entered into exclusive contracts with on-course pro shops that prohibit the pro shops from selling golf balls made by companies other than Acushnet, and that these exclusive contracts constitute predatory conduct in violation of the antitrust laws.  To find for Nitro on this issue, you must find that Acushnet has in fact entered into such contracts, and that these contracts foreclose a substantial percentage of the relevant market that you have found to exist.  Entering into an exclusive contract, by which a business only sells the product of a particular supplier and not the products of another supplier, is ordinarily lawful.  Exclusive contracts only become predatory conduct, and the subject of the antitrust laws, when they exclude competitors from a substantial percentage of the relevant market.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961); United States v. Microsoft Corp., 253 F.3d 34, 70-71 (D.C. Cir. 2001).

**Defendant's Proposed Jury Instruction No. 60**

### Monopolization
### Causation and Antitrust Injury

If you find that Acushnet did not willfully acquire or maintain monopoly power in the relevant market, then you must find for Acushnet on Nitro's monopolization claim.  If, however, you find that Acushnet willfully acquired or maintained monopoly power in the relevant market, then you must consider the remaining elements of Nitro's monopolization claim.

The fourth element Nitro must prove on its monopolization claim is that it suffered injury in its business or property as a "proximate result" of Acushnet's monopolization.  It is not unusual that some businesses suffer economic losses, or even go out of business, as a result of normal, lawful competition.  It is only when those losses are caused by unlawful practices that the antitrust laws are violated.

To establish antitrust injury, Nitro must have presented evidence that establishes with a fair degree of certainty that Acushnet's alleged monopolization in violation of the antitrust laws was a proximate result of Nitro's claimed injury.  An injury to a business is the "proximate result" of an antitrust violation when the violation directly and in natural and continuous sequence produces or contributes substantially to producing the injury.  In other words, the alleged violation must be a direct, substantial and identifiable cause of the injury that Nitro claims such that, but for the antitrust violation, the injury would not have occurred.

Futhermore, proof of an antitrust violation does not necessarily mean the plaintiff was damaged. Proof of an antitrust violation and antitrust injury must be shown independently. A plaintiff can recover only if it has sustained a loss resulting from harm to competition itself because of Acushnet's behavior.

99

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

---

Authority:      Am. Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569 (11th Cir. 1985); ABA
                Sample Jury Instructions In a Civil Case, 1999 edition, F2-F3..

**Defendant's Proposed Jury Instruction No. 61**

**Monopolization**
**Damages**

If you find that Nitro has proven its monopolization claim by a preponderance of the evidence, Nitro should then be fairly compensated for all damage, if any, to its business that was proximately caused by Acushnet's violation of the antitrust laws.  By instructing you in damages, I am not suggesting that an award of damages is or is not appropriate.  In determining the amount of damages, you should consider whether Nitro suffered net lost profits as a result of that violation.  An award for lost net profits may be included in the damages awarded only when there is a reasonable basis in the evidence for finding that Nitro has in fact suffered a loss of net profits as a result of Acushnet's violation.  In determining an amount of net lost profits to award, if any, you should apply the instruction I previously gave you regarding the calculation of net lost profits and mitigation of damages.

In determining damages, the difficulty or uncertainty in ascertaining or measuring the precise amount of any damages does not preclude recovery, and you should use your best judgment in determining the amount of such damages, if any, based upon the evidence.  You may not, however, determine damages by speculation or conjecture.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    <u>Am. Key Corp. v. Cole Nat'l Corp.</u>, 762 F.2d 1569 (11th Cir. 1985).

## Defendant's Proposed Jury Instruction No. 62

### Attempted Monopolization
### Elements of Claim

In addition to its monopolization claim, Nitro alleges that Acushnet has unlawfully attempted to monopolize the relevant market.  In order to prevail on its claim of attempted monopolization, Nitro must prove four specific facts by a preponderance of the evidence:

**First**, that Acushnet had a specific intent to achieve monopoly power in the relevant market in which Nitro's golf balls compete in a meaningful way.

**Second**, that Acushnet engaged in predatory or exclusionary conduct, other than use of valid patents and trademarks, in furtherance of its specific intent to monopolize;

**Third**, that there was a dangerous probability that Acushnet would obtain monopoly power in the relevant market; and

**Fourth**, that Nitro was injured in its business by Acushnet's predatory or exclusionary conduct.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

_____ _____

Authority:   Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); Covad Communications Co. v. BellSouth Corp., 299 F.3d 1272, 1283 (11th Cir. 2002); ABA Sample Jury Instructions in Civil Antitrust Cases, 1999 ed., C-80.

**Defendant's Proposed Jury Instruction No. 63**

**Attempt to Monopolize**
**Dangerous Probability of Obtaining Monopoly Power In Relevant Market**

If you find that Nitro has not proven a relevant market of "super-premium" golf balls in which Nitro's 3 and 4 piece construction golf balls are reasonable substitutes for Acushnet's 3 and 4 piece construction golf balls, or you find Nitro's golf balls do not compete in the relevant market in a meaningful way, you must find for Acushnet on Nitro's attempt to monopolize claim. In determining this issue, you should apply the instructions I have previously given you regarding the definition of a relevant market.

If you find that Nitro has proved a relevant market of "super-premium" golf balls in which Nitro's used 3 and 4 piece construction golf balls are reasonable substitutes for Acushnet's 3 and 4 piece construction golf balls but not for 2 piece construction golf balls, you may then decide whether Acushnet had dangerous probability that Acushnet would succeed in achieving its intended monopoly in that relevant market if it continued to engage in its allegedly predatory or exclusionary conduct.

In determining whether there was a dangerous probability of success, you should consider the following factors:

First, the market share and power of Acushnet as compared to its competitors;

Second, whether Acushnet's share of the relevant market was increasing or decreasing;

Third, the actual or probable impact on competition of predatory acts or practices;

Fourth, whether the barriers to entry into the market made it difficult for competitors to enter the market.

A dangerous probability of success need not mean that success was nearly certain. It means that the chance of success was substantial and real; that is, that there was a reasonable likelihood that Acushnet would ultimately achieve its goal of monopoly power.

You may infer a dangerous probability of achieving monopoly power by proof that Acushnet has a 50% or greater share of the market.  If you find that Acushnet's share of the relevant market is less than 50%, then you must find that Acushnet lacks a dangerous probability of obtaining monopoly power in the relevant market, and you must then find for Acushnet on Nitro's attempt to monopolize claim.

<div align="right">
Given _____<br>
Given as Modified _____<br>
Denied _____<br>
Withdrawn _____
</div>

_____

Authority:      Adapted from ABA Sample Jury Instructions in Civil Antitrust Cases, 1999 edition, C-89; Bailey v. Allgas, Inc., 284 F.3d 1237, 1246 (11th Cir. 2002).

**Defendant's Proposed Jury Instruction No. 64**

**Attempt to Monopolize**
**Specific Intent**

If you find that Acushnet has a dangerous probability of success in obtaining monopoly power in the relevant market, you must then determine whether Acushnet had a specific intent to monopolize that relevant market. In other words, you must decide if the preponderance of the evidence shows establishes Acushnet acted with the conscious objective of acquiring the power to control prices and to exclude competition in the relevant market. Nitro must show that Acushnet sought to create a monopoly by circumventing the competitive process.

In this regard, it is not enough for Nitro to prove that Acushnet had an intent to eliminate a particular competitor such as Nitro. An intent to obtain as much business as possible and to extinguish one's rivals through honest competitive struggle is legal. Rather, the intent to monopolize requires proof that Acushnet had the specific intent to destroy competition as a whole and thereby control prices.

Nitro must also prove that Acushnet engaged in predatory or exclusionary conduct in furtherance of its specific intent. I have already instructed you on the law applicable to this element when I instructed you on Nitro's monopolization claim, and you are to apply those same instructions to Nitro's attempted monopolization claim. You must remember, however, that Nitro's claim of attempt to monopolize is concerned only with those predatory or exclusionary acts or practices that have the actual or reasonably foreseeable effect of creating or furthering a dangerous probability of success by Acushnet in obtaining monopoly power.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

105

Authority:      <u>Am. Council of Certified Podiatrists Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.</u>, 323 F.3d 366, 369 (6th Cir. 2003); <u>Ala. Ambulance Serv., Inc. v. City of Phenix City</u>, 71 F. Supp. 2d 1188, 1192 (M.D. Ala. 1999); <u>Abcor Corp. v. A.M. Int'l, Inc.</u>, 916 F.2d 924, 947 (4th Cir. 1990).

## Proposed Final Jury Instruction No. 65

**Antitrust Claim**
**Canadian Trade**

You are reminded that the Court has previously instructed you that any evidence of conduct of Acushnet or Acushnet Canada with respect to Wal-Mart Canada is not to be considered by you in determining Nitro's antitrust claims.  Nitro's antitrust claims relate solely to trade and commerce in the United States.

Given         _____
Given as Modified   _____
Denied        _____
Withdrawn     _____

_____

Authority:    Harbord Ins. Servs., Ltd. V. Ins. Corp. of British Columbia, 9 B.C.L.R. 2d 81
              (British Columbia 1993).

**Defendant's Proposed Jury Instruction No. 66**

**Attempt to Monopolize**
**Damages**

If you should find for Nitro on its attempt to monopolize claim, the law provides that

Nitro should be fairly compensated for all damage, if any, to its business that was proximately

caused by Acushnet's violation of the antitrust laws.  In arriving at the amount of any such award

of damages, you should follow the instructions I  previously gave you with respect to Nitro's

claimed damages on its monopolization claim.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

_____

Authority:     <u>Am. Key Corp. v. Cole Nat'l Corp.</u>, 762 F.2d 1569 (11th Cir. 1985).

**Defendant's Proposed Jury Instruction No. 67**

**FDUTPA Claim**
**Nature and Elements of Claim**

Nitro's final claim against Acushnet is for allegedly unfair and deceptive trade practices in violation of Florida law. In order to prevail on this claim, Nitro must prove by a preponderance of the evidence that Acushnet's conduct concerning Nitro's "refurbishing" practices constituted an unfair method of competition, an unconscionable act or practice, or an unfair or deceptive act or practice in the conduct of Acushnet's business, and that such an act or practice was a legal cause of damage to Nitro.

In determining this claim, you are to follow the instructions I have previously given you with respect to Acushnet's rights as a patent holder and a trademark owner, and its privilege to make truthful statements in good faith about Nitro and its products.

If you find that Acushnet's statements about its patents were not clearly false statements, made in bad faith, you may not consider those statements in determining Nitro's FDUTPA claims.

You are also to follow the instructions I have given you for determining whether statements are statements of fact as opposed to statements of pure opinion or expressions of mixed opinion.  If you find by a preponderance of the evidence that Acushnet's statements were statements of pure opinion or expressions of mixed opinion, you may not consider those statements in determining Nitro's FDUTPA claims.

If you find that Acushnet's statements about Nitro's products were clearly not false statements or were not made with actual knowledge of their falsity, you may not consider those statements in determining Nitro's FDUTPA claims.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

_____

Authority:          §§ 501.201, 501.204, 501.211(2), Fla. Stat. (2001).

**Defendant's Proposed Jury Instruction No. 68**

**FDUTPA**
**Unfair Practices**

An act or practice is unfair in violation of Florida law when it offends established public policy, such as governmental regulations or guidelines, and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers or legitimate business enterprises. [Court to add legal rulings as to statements of public policy].

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

_____

Authority:   Urling v. Helms Exterminators, Inc., 468 So. 2d 451, 453 (Fla. 1st DCA 1985); § 501.201, Fla. Stat. (2001) et. seq.

**Defendant's Proposed Jury Instruction No. 69**

**FDUTPA**
**Causation**

An unfair or deceptive trade practice is a legal cause of a damage if it directly and in

material and continuous sequence produces or contributes substantially to producing such

damage.

<div align="right">

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

</div>

---

Authority:     Adapted from Fla. Standard Jury Instructions 5.1(a), MI 4.4 at p. 1, MI 10 at p. 1;
Eleventh Circuit Pattern Jury Instructions, State Claims, 1.3.

**Defendant's Proposed Jury Instruction No. 70**

**FDUTPA**
**Damages**

If you find for Acushnet on this claim, you will not consider the matter of damages. But, if you find for Nitro, you should award Nitro an amount of money that a preponderance of the evidence shows will fairly and adequately compensate Nitro for such loss or damage as was caused by the unfair or deceptive trade practice. Such a practice is the cause of loss or damage if it directly and in a natural and continuous sequence produces or contributes substantially to producing such loss or damage. Nitro may only recover damages for unfair or deceptive trade practices that you find Acushnet engaged in after July 1, 2001.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

_____

Authority:    Adapted from Fla. Standard Jury Instructions (Civil), MI 7.2 (2003); Guyana Tel. & Tel. Co. v. Melbourne Int'l Communications, Ltd., No.CIV.02-13676, 2003 WL 21018626 (11th Cir. May 7, 2003); Big Tomato v. Tasty Concepts, Inc., 972 F. Supp. 662, 664 (S. D. Fla. 1997); Niles Audio Corp. v. OEM Systems Co., Inc., 174 F. Supp.2d 1315, 1319 (S.D. Fla. 2001); Gritzke v. M.R.A. Holding, LLC, No.4:01CV495RH, 2002 WL 32107540, at *1 (N.D. Fla. Mar. 15, 2002).

**Defendant's Proposed Jury Instruction No. 71**

**Unclean Hands Defense**

As its first defense to Nitro's claims, Acushnet alleges that Nitro had "unclean hands" with respect to those claims and that Nitro's claims against Acushnet are accordingly barred by Nitro's "unclean hands." A party has "unclean hands" when its conduct has been inequitable, unfair, dishonest, fraudulent, or deceitful with respect to the matters upon which the party bases its claims. It is not necessary that this conduct be a crime; it is enough that it be found wrongful by honest and reasonable persons.

The wrongful acts that Acushnet alleges caused Nitro to have "unclean hands" are Nitro's alleged violation of federal and state trademark and unfair competition law, false advertising laws and federal patent laws. I will instruct you later on those issues, and you are to follow those instructions in determining this defense.

Acushnet also alleges that, although Nitro contends that it relied on the Birdie Golf consent decree as authorizing Nitro to use Acushnet's trademarks on Nitro's stripped and re-painted golf balls, Nitro failed to request such permission from Acushnet to do so. Nitro failed to comply with all of the terms of that consent decree, including its requirement of payment of monies to Acushnet.

Additionally, Acushnet claims that Nitro has "unclean hands" because it acquired certain assets of International Golf, Inc. ("IGI"), on April 29, 1992, with knowledge of the obligations imposed under the consent decree entered against IGI, its assigns, and those acting in concert with IGI. That consent decree prohibits the sale of stripped and repainted golf balls bearing the Acushnet trademarks. Further, the consent decree prohibits the sale of clear-coated golf balls without the specific packaging disclaimer specified in the consent decree. You must determine whether Nitro conducted itself in a manner consistent with that consent decree.

114

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    Roberts v. Roberts, 84 So. 2d 717, 720 (Fla. 1956); Hensel v. Aurilio, 417 So.2d 1035, 1038 (Fla. 4th DCA 1982); Henry v. Ecker, 415 So. 2d 137, 140 (Fla. 5th DCA 1982); Faber v. Landman, 123 So. 2d 405, 407-08 (Fla. 2d DCA 1960).

## **Defendant's Proposed Jury Instruction No. 72**

### **Equitable Estoppel Defense**

As its second defense, Acushnet asserts that Nitro's claims are barred by the doctrine of equitable estoppel.  Acushnet asserts that, because Nitro relies upon the Birdie Golf consent decree as allegedly having authorized Nitro's stripping and repainting practices, Nitro cannot assert that Acushnet's trademarks that were the subject of that consent decree are invalid or unenforceable as abandoned.  Further, Acushnet asserts that, having accepted the benefits of IGI's assets, with knowledge of the IGI consent decree, Nitro cannot challenge the validity or enforceability of Acushnet's trademarks that are the subject of that consent decree.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    Southeast Grove Mgmt., Inc. v. McKiness, 578 So. 2d 883, 886 (Fla. 1st DCA 1991); Watson Clinic, LLP v. Verzosa, 816 So.2d 832, 834 Fla.2d DCA 2002); Ennis v. Warm Mineral Springs, Inc., 203 So. 2d 514, 519 (Fla. 2d DCA 1967); Lewis v. State, 659 So. 2d 1255, 1256-57 (Fla. 4th DCA 1995).

116

**Defendant's Proposed Jury Instruction No. 73**

**Legal Justification and Privilege Defense**

As its third defense, Acushnet claims that its conduct in question was legally justified in all respects and that its actions were privileged as a legitimate exercise of its economic interests and its rights and duties as a patent holder and a trademark owner.  In determining the validity of this defense, you are to follow the instructions I have previously given you with respect to Acushnet's rights and privileges as a patent and trademark owner, with respect to determining whether statements are statements of fact or rather are statements of pure opinion or expressions of mixed opinion, and with respect to statements relating to a legitimate public controversy or a limited public figure.

Given _____ _____
Given as Modified _____
Denied _____ ___
Withdrawn _____

---

Authority:    Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1321 (11th Cir.1998); Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533, 1540 (11th Cir. 1993); Morris Communications Corp. v. PGA Tour, Inc., 235 F.Supp.2d 1269,(M.D.Fla.2002); Zenith Electronics Corp. v. Exzec, Inc., 182 F.3d 1340, 1353 (Fed. Cir. 1999); Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1336-37; Golan v. Pingel Enterprise, Inc., 310 F.3d 1360, 1371 (Fed. Cir. 2002).

**Defendant's Proposed Jury Instruction No. 74**

**Lanham Act**
**Trademark Infringement**
**Elements of Claim**

Acushnet's first claim against Nitro is for trademark infringement in violation of the Federal Lanham Act.  There are two specific facts that Acushnet must prove by a preponderance of the evidence in order to establish its trademark infringement claim: (1) that Nitro used Acushnet's trademarks on Nitro's stripped and repainted balls and Nitro's clear-coated balls, without Acushnet's consent, at any time during the period of time from January 15, 1998 to the present time, and (2) that such use was likely to cause confusion to customers, potential customers, users, observers or second-hand purchasers as to the source of these golf balls or was likely to suggest sponsorship or approval by Acushnet of those golfballs.

Nitro's voluntary cessation during this lawsuit of certain of the practices alleged by Acushnet to constitute trademark infringement does not affect Acushnet's right to sue Nitro for prior trademark infringement.  However, it may affect the amount of future damages that Acushnet may recover on this claim.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

---

Authority:   Burger King Corp. v. Mason, 710 F.2d 1480, 1491-92 (11th Cir. 1983); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1307 (11th Cir. 1998); Nitro Leisure Products, L.L.C. v. Acushnet Co., 341 F.3d 1356, 1359 (Fed. Cir. 2003).

**Defendant's Proposed Jury Instruction No. 75**

**Trademark Infringement**
**Likelihood of Confusion**

In determining whether there was a likelihood of confusion from Nitro's use of Acushnet's federally registered trademarks on Nitro's stripped and repainted and clear-coated balls, you should consider each of the following factors: (1) the strength or distinctiveness of the trademarks, (2) the similarity of the trademarks, (3) the similarity of the products the trademarks represent, (4) the similarity of the parties' customers, retail sellers, and channels or avenues of trade or distribution, (5) the similarity of the advertising used, (6) Nitro's intent to use Acushnet's trademark, and (7) actual confusion.  None of these factors is dispositive, and not all of the factors need be present for you to find there is a likelihood of confusion in this case.  Of these factors, the most important are the strength or distinctiveness of the trademarks and, if present, evidence of actual confusion.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    Freedom Sav. and Loan Ass'n v. Way, 757 F.2d 1176, 1182 (11th Cir. 1985);
Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 122 F.3d 1379,
1382 (11th Cir. 1997); Swatch Watch, S.A. v. Taxor, Inc., 785 F.2d 956, 958
(11th Cir. 1986); Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330,
1335 (11th Cir. 1999); Planetary Motion, Inc. v. Techplosion, Inc., 261 F.3d
1188, 1200 (11th Cir. 2001).

**Defendant's Proposed Jury Instruction No. 76**

**Trademark Infringement**
**Likelihood of Confusion**

With regard to the first of these factors, you are instructed that distinctive trademarks which do not describe or merely suggest the products they are placed on receive the strongest protection. The Court has determined that Acushnet's trademarks are incontestable. Incontestable status is conclusive evidence of the strength and validity of the trademark and of the owner's exclusive right to use the trademark in commerce, subject only to the defenses as to which I will later instruct you.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:     Contemporary Rest. Concepts, Ltd. v. Las Tapas – Jacksonville, Inc., 753 F. Supp. 1560, 1563-64 (M.D. Fla. 1991); Dieter v. B & H Indus. of Southwest Fla., Inc., 880 F.2d 322, 327-29 (11th Cir. 1989); 15 U.S.C. § 1115 (2003).

**Defendant's Proposed Jury Instruction No. 77**

**Trademark Infringement**
**Likelihood of Confusion**

With respect to the second through the fifth factors, you are instructed that the greater the similarity between the products, the greater the likelihood of confusion.

Additionally, the test of infringement if not whether the conduct may mislead the careful and discriminating purchaser, but rather whether it may mislead the ordinary and casual buyer. You must also consider whether potential consumers, users, observers, and second-hand purchasers might believe that Nitro's products were authorized by Acushnet as the owner of the federally registered trademarks.

It is not necessary that the evidence show any specific person has been confused or misled by Nitro's use of Acushnet's trademarks.  It is enough if you find that the sale of such products by Nitro would, in all reasonable possibility, confuse the public as to the source, sponsorship, approval, or affiliation of those products by Acushnet.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    Exxon Corp. v. Texas Motor Exch. of Houston, 628 F.2d 500, 505 (5th Cir. 1980); Boston Prof'l. Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004, 1010 (5th Cir. 1975); Univ. of Ga. Athletic Ass'n v. Laite, 756 F.2d 1535, 1547 (11th Cir. 1985); Playboy Enterprises, Inc. v. Frena, 839 F. Supp. 1552, 1560 (M.D. Fla. 1993); Singer Mfg. Co. v. Briley, 207 F.2d 519, 520 n.3 (5th Cir. 1953); Adapted from ¶4.05[1], ABA Business Torts; Rolex Watch USA v. Forrester, 2 USPQ.2d 1292 (S.D. Fla. 1986); Payless Shoesource, Inc. v. Reebok Int'l, Ltd., 998 F.2d 985, 989 (Fed. Cir. 1993); United States v. Hon., 904 F.2d 803, 808 (2d Cir. 1990); T&T Mfg. Co. v. A.T. Cross. Co., 449 F. Supp. 813 (D.R.I. 1978); G.H. Mumm Champagne v. E. Wine Corp., 142 F.2d 499, 501 (2d Cir. 1944); A.T. Cross Co. v. Jonathan Bradley Pens, Inc., 470 F.2d 689 (2d Cir. 1972); Mastercrafters Clock & Radio Co. v. Vacheron & Constantin - Le Coultre Watches, 221 F.2d 464, 466-67 (2d. Cir. 1955).

**Defendant's Proposed Jury Instruction No. 78**

**Trademark Infringement**
**Likelihood of Confusion**

As I have instructed you, proof of actual confusion is not necessary for finding a likelihood of confusion. However, where there is evidence of actual confusion by even a small number of customers, that is strong evidence of the likelihood of confusion. In other words, the existence of actual confusion should weigh heavily in favor of your ultimate determination that confusion is likely.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:  Bauer Lamp Co. v. Shaffer, 941 F.2d 1165, 1071-72 (11th Cir. 1991); Scan Design of Fla., Inc. v. Scan Design Furniture, Inc., No. 01-6695-Civ., 2001 U.S. Dist. LEXIS 7945 at *16 (S.D. Fla. May 18, 2001); Exxon Corp. v. Texas Motor Exch. of Houston, Inc., 628 F. 2d 500, 507 (5th Cir. 1980); James Burrough, Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 279 (7th Cir. 1976); Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 42 (D. Mass. 1995).

**Defendant's Proposed Jury Instruction No. 79**

**Trademark Infringement**
**Likelihood of Confusion**

In determining whether a likelihood of confusion exists, it is not necessary that the channels or avenues of trade or distribution be identical.  It is enough that the products compete and that consumer confusion is likely.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:    <u>Electronic Design & Sales, Inc. v. Electronic Data Systems Corp.</u>, 954 F.2d 713, 717 (Fed. Cir. 1992).

**Defendant's Proposed Jury Instruction No. 80**

**Trademark Infringement
Likelihood of Confusion**

Also in determining whether there is a likelihood of confusion, you should not simply consider the direct customers or potential customers themselves.  Once the product has been sold, confusion, mistake or deception about the source or sponsorship of the product can occur at a future time.  You should therefore consider whether observers of the product or second-hand purchases of the product may be confused or misled and may attribute the inferior quality of the product to Acushnet.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

_____

Authority:   Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 989-90 (Fed. Cir. 1993); United States v. Torkington, 812 F.2d 1352, 1354-55 (11th Cir. 1987); Rolex Watch, U.S.A., Inc. v. Michel Co., 179 F. 3d 704 (9th Cir. 1999); Bulova Watch Company, Inc. v. Allerton Company, Inc., 328 F.2d 20 (7th Cir. 1964).

124

**Defendant's Proposed Jury Instruction No. 81**

**Trademark Infringement**
**Likelihood of Confusion**

With respect to the sixth factor, you are instructed that an intent to use a copy of

another's trademark on one's products creates a presumption of likelihood of confusion.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    <u>Bauer Lamp Co. v. Shaffer</u>, 941 F.2d 1165, 1172 (11th Cir. 1991); <u>Babbitt Elecs.,</u>
<u>Inc. v. Dynascan Corp.</u>, 38 F.3d 1161, 1179 (11th Cir. 1994); <u>My-T Fine Corp. v.</u>
<u>Samuels</u>, 69 F.2d 76, 77 (2d Cir. 1934).

125

**Defendant's Proposed Jury Instruction No. 82**

**Trademark Infringement**

You are also instructed that liability for trademark infringement can be found regardless of Nitro's intent to infringe or its good faith.

<div style="text-align: right;">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

_____

Authority:    <u>Lindy Pen Co. v. Bic Pen Corp.</u>, 982 F.2d 1400 (9th Cir. 1993).

**Defendant's Proposed Jury Instruction No. 83**

**Trademark Infringement
Fair Use Defense**

If you find Acushnet has proven by a preponderance of the evidence that Nitro has infringed any of Acushnet's federally registered trademarks, you must then consider Nitro's first defense to this claim.

As its first defense to this claim, Nitro alleges that it is entitled to use Acushnet's trademarks on Nitro's stripped and re-painted golf balls and on its "recycled" golf balls. Nitro asserts that it restores the used golf balls so far as possible to their original condition and that it is accordingly entitled to use Acushnet's federally registered trademarks on those golf balls in a truthful, non-misleading manner to accurately describe their original origin.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:   15 U.S.C. § 1115(b)(4); Institute for Scientific Information, Inc. v. Gordon and Breach, Science Publishers, Inc., 931 F.2d 1002, 1008 (3d Cir.1991); Coherent, Inc. v. Coherent Technologies, Inc., 736 F.Supp. 1055, 1061 (D.Colo.1990), aff'd, 935 F.2d 1122 (10th Cir.1991).

**Defendant's Proposed Jury Instruction No. 84**

**Trademark Infringement**
**Fair Use Defense**

In determining Nitro's "fair use" defense, you are instructed that federal law assures Acushnet's right to control the quality of the goods manufactured and sold under Acushnet's federally registered trademarks. Every product is composed of a bundle of special characteristics. Customers who buy a trademarked product are entitled to expect to receive the same special characteristics every time. However, used and repaired goods can be sold under the trademark of the original manufacturer so long as the accused infringer has attempted to restore as far as possible the original condition of the goods, such that the difference in the goods is nothing more than would be expected for used goods, and, in addition, full disclosure is made about the true nature of the goods.

Thus, if you find that Nitro is merely restoring "so far as possible" the original condition of a used golf ball by its stripping and re-painting process, such that the differences in Nitro's golf balls from the original golf balls are nothing more than would be expected for used golf balls, and Nitro is not altering the balls' basic design or otherwise altering the balls in such a way that they are no longer TITLEIST golf balls, there is no trademark infringement, so long as adequate disclosures are also provided by Nitro on the balls and on their packaging that fully and truthfully convey to the public the true nature and performance characteristics of Nitro's stripped and repainted golf balls. On the other hand, if Nitro changes the design of the golf balls or if its stripping and re-painting process is so extensive or changes the balls in such a basic way that it would be inappropriate to call the golf balls Titleist golf balls, Nitro is not allowed to replace the Acushnet's TITLEIST trademark on the balls, even if Nitro places disclaimers on the golf balls or its packaging.

128

In determining whether Nitro's stripping and re-painting process merely restores "so far as possible" the original condition of the used golf balls or instead changes them in some basic way, you should consider whether the paint on the golf balls is a necessary and integral part of Acushnet's TITLEIST golf balls.  If you find that either the type of paint Acushnet uses on its golf balls, or the manner in which it is applied, is a necessary and integral part of Acushnet's golf balls and that Nitro's application of a different paint in a different manner alters the balls in such a basic way as to result in a new product, then Nitro is not entitled to use the TITLEIST trademark on those golf balls.

If, however, you find that Nitro is restoring used golf balls to their original condition "so far as possible," and does not alter Acushnet's golf balls in any basic way, then you must consider whether the disclaimer Nitro places on the balls and on its packaging is adequate to fully and truthfully convey to the public the true nature and performance characteristics of Nitro's stripped and repainted golf balls.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

---

Authority:   Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 129-30 (1947); Rolex USA, Inc. v. Michel Co., 179 F.3d 704, 710 (9th Cir. 1999); Green v. Electric Vacuum Cleaner Co., 132 F.2d 312 (6th Cir. 1942) (citing Champion); Electric Vacuum Cleaner v. Green, 41 F. Supp. 562 (N.D. Ohio 1941); Bulova Watch Co. v. Allerton Co., 328 F.2d 20 (7th Cir. 1964); Nitro Leisure Products, L.L.C. v. Acushnet Co., 341 F.3d 1356, 1363 (Fed. Cir. 2003).

**Defendant's Proposed Jury Instruction No. 85**

**Trademark Infringement**
**Adequacy of Disclosures and Disclaimers**

Under Federal Trademark Law, a disclosure or disclaimer about a "used" and "repaired" or "reconditioned" product must be placed on both the product and its packaging, and it must be so clearly labeled as to convey to the buying public the true nature and performance characteristics of the product. In particular, it must disclose both that the product is "used" and is "repaired" or "reconditioned," and that non-original parts or products have been used. One factor you should consider in determining the adequacy of Nitro's disclosures is whether Nitro's advertising and promotional materials suggest that its product is a new product or that its product is not inferior to the original product.

You must determine the adequacy of Nitro's various disclosures and disclaimers on its stripped and repainted golf balls and its packaging for those golf balls at all times during the entire period from January 15, 1998, to the present time, and not just Nitro's current disclosures and disclaimers. The fact that Nitro has changed its disclosures and disclaimers during the period of time does not affect Nitro's liability for its sales of stripped and repainted balls without adequate disclosures at other times during this period of time. However, you may consider such changes in assessing any damages you may award on this claim.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:  Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 129-30 (1947); Singer Mfg. Co. v. Briley, 207 F.2d 519 (5th Cir. 1953); Bulova Watch Company, Inc. v. The

Allerton Company, 328 F.2d 20, 24 (7th Cir. 1964); Rolex USA, Inc. v. Michel
Co., 179 F.3d 704 (9th Cir. 1999).

**Defendant's Proposed Jury Instruction No. 86**

**Trademark Infringement**
**Disclosures and Disclaimers - Down Stream Consumers**

In determining the adequacy of Nitro's various disclosures and disclaimers during the time period between January 15, 1998, and the present time, you must determine whether the disclosures that Nitro has placed on its golf balls were adequate alone to prevent confusion by "down-stream" consumers. A "down-stream" consumer is someone who does not see the golf ball or its packaging at the point of purchase but instead only sees the golf ball itself after its purchase.

_____

Authority:     Karl Storz v. Surgical Technologies, Inc., 285 F. 3d 848, 854 (9th Cir. 2002);
Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 989-90 (Fed. Cir. 1993).

**Defendant's Proposed Jury Instruction No. 87**

**Trademark Infringement**
**Defective Reconditioning is Not Fair Use**

Nitro may not use Acushnet's trademarks on golf balls that were modified in order to conceal defects in the golf balls that the public would ordinarily want to know about in assessing the condition of the ball.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:    Champion Spark Plug Co. v. Sanders, 331 U.S. 125 (1947).

**Defendant's Proposed Jury Instruction No. 88**

**Trademark Infringement**
**Limited Scope of Fair Use**

Even if you find that Nitro is permitted to use Acushnet's federally registered trademarks on Nitro's golf balls, you are instructed that Nitro may not otherwise use Acushnet's federally registered trademarks except to the extent reasonably necessary to identify the product being sold. Nitro may only use Acushnet's federally registered trademarks in an incidental manner to the extent necessary to identify the original product.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____ _____

Authority:   Prestonettes, Inc. v. Coty, 264 U.S. 359 (1924).

**Defendant's Proposed Jury Instruction No. 89**

**Trademark Infringement**
**Disclosure Inadequate Acommpanied by Improper Advertising**

An otherwise adequate disclosure is not sufficient if Nitro used contrary or improper advertising.

Nitro may not use Acushnet's federally registered trademarks to sell Nitro's stripped and re-painted golf balls if Nitro's advertising makes reference to the properties and characteristics of a new golf ball or to otherwise suggest that Nitro's balls have the properties and characteristics of a new golf ball.

Nitro likewise may not represent the quality of its golf balls so as to suggest to the general public that the golf balls are of a better quality as a result of the stripping and re-painting than they in fact are.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____   _____

Authority:      Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 129-30 (1947)

135

**Defendant's Proposed Jury Instruction No. 90**

**Trademark Infringement
Defense - Abandonment of Trademarks**

As its second defense to Acushnet's trademark infringement claim, Nitro asserts that Acushnet has abandoned its federally registered trademarks by failing to sue certain infringers and by entering into consent decrees with other infringers that allow them to sell used golf balls bearing Acushnet trademarks under certain terms and conditions and in return for certain monetary payments.

You are instructed that a trademark owner is not required to sue every infringer in order to preserve its trademark rights. A failure to take legal action where a possible infringement of trademarks is relatively insignificant to the trademark owner or only occurs in small or insignificant markets does not constitute abandonment of the trademark.

You are further instructed that a consent decree that enforces trademarks cannot itself be found to abandon those trademarks. Thus, if you find that the consent decrees that Acushnet has obtained granted Acushnet at least some relief with respect to the future use of its trademarks by others, your verdict must be for Acushnet on this defense.

Given _____ ____
Given as Modified _____ __
Denied _____
Withdrawn _____

Authority:   Univ. of Ga. Athletic Ass'n v. Laite, 756, F.2d 1535, 1545- 1546 (11th Cir. 1985); Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Dev., Inc., 924 F. Supp. 1576, 1583-1584 (S.D. Fla. 1993).

**Defendant's Proposed Jury Instruction No. 91**

**Trademark Infringement**
**Defense of Abandonment - Licensee Estoppel**

In considering Nitro's abandonment defense, you are instructed that a party to whom the owner of trademarks has granted a license is not allowed to subsequently challenge the validity or enforceability of the trademarks.  This is true even after the license expires.  To the extent that Nitro contends that it was authorized under the <u>Birdie Golf</u> decree to use Acushnet's trademarks, Nitro is legally barred from asserting that Acushnet's trademarks have been abandoned as a result of any licensing authorized under that consent decree.

_____

Authority:    <u>Creative Gifts, Inc. v. UFO</u>, 235 F.3d 540, 548 (N.M. 2000); 3 Rudolf Callmann, <u>Unfair Competition, Trademark & Monopolies</u> § 19.48, at 434 (4th ed. 1998 and 2000); J. Thomas McCarthy, <u>Trademarks & Unfair Competition</u> § 18:63 (4th ed. 2000).

## Defendant's Proposed Jury Instruction No. 92

### Trademark Infringement - Damages

If you find that Nitro infringed upon Acushnet's federally registered trademarks, you shall then determine the amount of damages, if any, that Acushnet is entitled to recover for Nitro's trademark infringement.

Acushnet is entitled to recover damages in the amount of Nitro's profits attributable to Nitro's trademark infringement. Acushnet is only required to prove the amount of Nitro's sales by a preponderance of the evidence. Nitro must then prove all elements of its cost or any deduction claimed as to damages.

If you find that Acushnet is entitled to a verdict on this claim in accordance with these instructions, but you do not find that the evidence is sufficient to show that Acushnet has sustained any substantial damages, then you may return a verdict for Acushnet on this claim and award compensatory damages in a nominal sum such as $1.00. Nominal damages are damages of an inconsequential amount that are awarded to vindicate a right where a wrong is established but no damage is proved.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:     Adapted from § 4.06[2], ABA Business Torts; 15 U.S.C. § 1117(a).

**Defendant's Proposed Jury Instruction No. 93**

### Trademark Counterfeiting
### Nature of Claim

Acushnet's second claim against Nitro is for trademark counterfeiting in violation of the Federal Lanham Act.  The Lanham Act prohibits the use of a counterfeit trademark in a manner likely to cause confusion in consumers.  Counterfeiting occurs when a false trademark that is identical to, or substantially indistinguishable from, the genuine trademark is placed on a product in such a way as to confuse the public.  Counterfeiting also occurs when the original trademark is left on a product that either has been modified in such a way that the fair use doctrine does not apply or has been sold without disclaimers on the product and its packaging that disclose fully the true nature of the modification of the product.

Acushnet alleges that the following conduct by Nitro constitutes trademark counterfeiting in violation of the Lanham Act:  (1) Nitro's use of Acushnet's registered trademarks on golf balls manufactured by companies other than Acushnet (2) Nitro's clear-coating of what it calls its "recycled" golf balls, without appropriately disclosing that fact to the consumer, ("clear-coating"); (3) Nitro's stripping and repainting Acushnet golf balls with paint and clear coat that is not of the same quality or characteristics of, and is also not applied in the same manner as, a genuine TITLEIST golf ball, and then re-marking those balls with Acushnet's registered trademarks; and (4) Nitro's stripping and repainting Acushnet golf balls and further by mismarking those balls with a model side stamp trademark that was not on the original ball as manufactured by Acushnet ("mis-marking side stamp").

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:    15 U.S.C. §§ 1114, 1116, 1117, 1125; <u>Gift of Learning Foundation, Inc. v. TGC, Inc.</u>, 329 F.3d 792, 797 (11th Cir. 2003); <u>Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.</u>, 106 F.3d 355, 358 (11th Cir.1997); <u>Babbitt Elec., Inc. v. Dynascan Corp.</u>, 38 F.3d 1161. 1180-81 (11th Cir. 1994); <u>Rolex USA, Inc. v. Michel Co.</u>, 179 F.3d 704 (9th Cir. 1999); <u>Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.</u>, 106 F.3d 894, 899-900 (9th Cir. 1997); <u>Lorrilard Tobacco Co. v. Omar LLC</u>, No.3:03CV1502 (D. Conn  Sep. 12, 2003).

**Defendant's Proposed Jury Instruction No. 94**

**Trademark Counterfeiting
Elements of Claim**

To prevail on its trademark counterfeiting claim, Acushnet must establish by a preponderance of the evidence that Nitro's use of Acushnet's federally registered trademarks on balls manufactured by companies other than Acushnet, on Nitro's stripped and repainted balls, and on Nitro's clear-coated golf balls was not authorized by Acushnet, and that this use of Acushnet's trademarks was likely to cause confusion in customers, potential customers, down-stream consumers, users, observers, or second-hand purchasers.

With respect to the practices and products at issue on Acushnet's trademark counterfeiting claim, there is no difference under the law between (1) the unauthorized use of an original trademark and (2) applying a reproduction of the trademark without approval.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:   15 U.S.C. §§ 1114, 1116, 1117, 1125; Gift of Learning Foundation, Inc. v. TGC, Inc., 329 F.3d 792, 797 (11th Cir. 2003); Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir.1997); Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 899-900 (9th Cir. 1997); Lorrilard Tobacco Co. v. Omar LLC, No.3:03CV1502 (D. Conn Sep. 12, 2003); Babbitt Elec., Inc. v. Dynascan Corp., 38 F.3d 1161, 1180-81 (11th Cir. 1994).

141

## Defendant's Proposed Jury Instruction No. 95

### Trademark Counterfeiting
### Intent is Not an Element

You are instructed that intent to counterfeit (as opposed to intent to use Acushnet's mark) is not an element of a counterfeiting claim. The test is likelihood of confusion, and whether Nitro intended to use a copy of Acushnet's trademark is a factor in that analysis. However, whether Nitro intended to counterfeit in using Acushnet's trademarks is not and you should consider that only if you find Nitro liable for counterfeiting and are considering what damages, if any, to award Acushnet on this claim.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:   15 U.S.C. §§ 1114(a); 1117(c)(2); Squirt Co. v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980); Microsoft Corp. v. Ion Techn. Corp., 2003 WL 21356084 *4 (D. Minn. 2003); Microsoft Corp. v. Logical Choice Computers, Inc., 2001 WL 58950 *8 (N.D. Ill. 2001); Gen. Elec. Co. v. Speicher, 877 F.2d 531 (7th Cir. 1989); Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 899 (9th Cir. 1997); Nike Inc. v. Variety Wholesalers, Inc., 274 F.Supp.2d 1352, 1369 (S.D.Ga. 2003); Lorillard Tobacco Co. v. Omar, 2003 WL 22216891 *2 (D. Conn. 2003).

**Defendant's Proposed Jury Instruction No. 96**

**Trademark Counterfeiting**
**Amount of Counterfeiting**

Trademark counterfeiting violates the Lanham Act, even if there was only a minimal number of counterfeit golf balls.  The amount of harm that an infringer inflicts goes to the amount of damages, rather than to its liability for trademark counterfeiting.  You must accordingly first determine whether Nitro is liable to Acushnet for trademark counterfeiting.  You may then consider the extent of the counterfeiting in determining what damages, if any, to award Acushnet on this claim.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:   Rolex Watch, U.S.A., Inc. v. Michel Co., 179 F.3d 704, 708 fn. 4 (9th Cir. 1999);
Microsoft Corp. v. Md. Micro.com, Inc., 2003 WL 21805213 *11 (D. Md. 2003);
Microsoft Corp. v. V3 Solutions, Inc., 2003 WL 22038593 (N.D. Ill. 2003);
Microsoft Corp. v. Logical Choice Computers, Inc., 2001 WL 58950 *3 (N.D. Ill. 2001); Hard Rock Café Licensing Corp. v. Concession Svcs., Inc., 955 F.2d 1143, 1147-1148 (7th Cir. 1992).

**Defendant's Proposed Jury Instruction No. 97**

**Trademark Counterfeiting
Likelihood of Confusion**

In order to find Nitro liable for trademark counterfeiting, you must find that Nitro's use of Acushnet's federally registered trademarks on balls manufactured by companies other than Acushnet, on Nitro's stripped and repainted balls, and on Nitro's clear-coated balls is likely to cause confusion.

Likelihood of confusion is proven where the counterfeit and genuine trademarks are substantially identically in design and the products bearing the counterfeit trademarks are sold to the public. I have previously instructed you on the factors you are to consider and weigh in order to determine whether there is a likelihood of confusion by use of trademarks, and you are to apply those same factors in determining this claim.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

---

Authority:    Monsanto Co. v. Campuzano, 206 F.Supp.2d 1252, 1262 (S.D. Fla. 2002) (citing Polo Fashions v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987)); Microsoft Corp. v. V3 Sol., Inc., 2003 WL 22038593 (N.D. Ill. 2003); Microsoft Corp. v. CMOS Tech., Inc., 872 F. Supp. 1329 (D.N.J. 1994).

**Defendant's Proposed Jury Instruction No. 98**

**Trademark Counterfeiting**
**Statutory Damages**
**[TO BE GIVEN ONLY IF ACUSHNET ELECTS STATUTORY DAMAGES]**

If you find that any of Acushnet's federally registered trademark that has been infringed by counterfeiting, then you are to award Acushnet damages, within your discretion, in an amount not less than $500 or more than $100,000 for each counterfeit trademark that has been infringed.

If you decide that the counterfeiting was willful, you may award damages, within your discretion, in an amount not less than $500 or more than $1,000,000 for each counterfeit trademark that was willfully infringed.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:      15 U.S.C. § 1117(c).

**Defendant's Proposed Jury Instruction No. 99**

**Unfair Competition - Lanham Act
Nature of Claim**

Acushnet's third claim against Nitro is for unfair competition in violation of the Federal Lanham Act.  In order to prevail on this claim, Acushnet must prove by a preponderance of the evidence Nitro has used any of Acushnet's trademarks, whether registered or not, on Nitro's stripped and repainted golf balls and its clear-coated golf balls, without Acushnet's authorization, and, if so, whether that use is likely to cause confusion as to the affiliation or association of Acushnet with Nitro's golf balls, or as to the origin, sponsorship or approval of Nitro's golf balls by Acushnet.

In making this determination, you are to apply the instructions I  have just given you with respect to determining the likelihood of confusion in connection with Acushnet's trademark infringement claim.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

Authority:    15 U.S.C. § 1125(a)(1); <u>Gift of Learning Foundation, Inc. v. TGC, Inc.</u>, 329 F.3d 792, 802 (11th Cir.2003).

146

### Defendant's Proposed Jury Instruction No. 100

### False Advertising - Federal Lanham Act
### Nature of Claim

As its fourth claim, Acushnet alleges that Nitro violated the Federal Lanham Act by making false or misleading statements on the packaging of its products and on its website regarding the nature of the process it uses to make its stripped and repainted golf balls and the nature, characteristics, or performance of those stripped and repainted golf balls, and that Nitro's false advertising is likely to mislead the public.  Specifically, Acushnet alleges that the following statements made by Nitro constitute false advertising in violation of the Federal Lanham Act:

·  Nitro's statement on packaging that its "proprietary refurbishing process restores [the TITLEIST golf balls] to extremely high levels of performance and appearance [without] . . . impact[ing] the aerodynamic qualities of the original manufacturer."

·  Nitro's statement on packaging that "[e]ach ball is closely inspected before and after it goes through our [i.e., Nitro's] proprietary re-furbishing process, EnviroCleanse® which naturally restores the finest products on the golf market to the extremely high levels of performance and appearance."

·  Nitro's statements on its websites that its refurbished balls have a "pristine appearance" and that "[e]ach [refurbished] ball has been fully refinished."

·  Nitro's statements on its websites and packaging that Nitro's "new" products are "new," contain "newly designed Tungsten TI-Core and Titanium mix cover [that] was designed specifically to provide durability without sacrificing feel."

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

---

Authority:    Acushnet's Answer to Third Amended Complaint, Affirmative Defense and Counterclaims.

## Defendant's Proposed Jury Instruction No. 101

### False Advertising - Lanham Act
### Elements of False Advertising

There are four specific facts that Acushnet must prove by a preponderance of the evidence in order to prevail on this claim:  (1) that Nitro has made false or misleading statements of fact in its advertisements or promotional materials concerning its products; (2) the statements actually deceived or tended to deceive a substantial portion of the intended audience; (3) the statements are material -- that is, they would likely influence the deceived consumers' purchasing decisions; and, (4) there is a causal link between those statements and actual harm to Acushnet.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:    Lanham Act § 43(a), 15 U.S.C., § 1125(a); Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Brd. Of Podiatric Surgery, 185 F.3d 606, 613 (6th Cir. 1999); Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242 (11th Cir. 2002); Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc., 915 F. Supp. 360, 366 (S.D.Fla. 1996), aff'd, 136 F.3d 139 (11th Cir. 1998); 15 U.S.C. § 1125(a).

**Defendant's Proposed Jury Instruction No. 102**

**False Advertising - Lanham Act**
**Voluntary Cessation of Advertising and Promotional Statements**

You must consider all of Nitro's advertising and promotional statements during the period of time between January 15, 1998, and the present time, not just its current advertising and promotional materials.  You must do so despite the fact that Nitro states that it voluntarily stopped using and certain of its advertising and promotional statements after this lawsuit was filed, and that it does not intend to use those advertising and promotional statements in the future.  If you find that Nitro's statements constituted false advertising, the Court will enter an injunction prohibiting the use of such advertising and promotional statements by Nitro in the future, and that injunction will be judicially enforceable by the Court against Nitro.  Furthermore, if you find that any of Nitro's statements constitute false advertising, Acushnet is entitled to damages for Nitro's false advertising up to the time that Nitro stopped using those statements.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____ _____

Authority:   Minuteman Intern., Inc. v. Critical-Vac Filtration Corp., 1997 WL 370204, * 12
(N.D. Ill.1997)

**Defendant's Proposed Jury Instruction No. 103**

### False Advertising - Lanham Act
### Advertising or Promotional Materials

On its Lanham Act claim, Acushnet must first prove that Nitro has made false or misleading statements of fact in its commercial advertising or promotional materials about its stripped and repainted and "recycled" golf balls.

In order to determine whether the statements Nitro allegedly made about its products were "commercial advertising or promotions," you must determine whether the statements constitute commercial speech. Commercial speech is a communication that involves only the commercial interests of the speaker and the audience. In this regard, you must determine whether statements were communicated widely to the purchasing public for which Acushnet and Nitro are in competition, and whether the statements were made by Nitro for the purposes of influencing the purchase of its goods and services. Isolated or sporadic statements do not create Lanham Act liability. In other words, were Nitro's statements aimed at a large number of customers for which Nitro and Acushnet are competing.

If the preponderance of the evidence establishes that the statements Nitro makes about its products are "commercial advertising or promotion," then Acushnet has proven the first element of its Lanham Act claim against Nitro. If, however, the preponderance of the evidence establishes that the statements Nitro makes about its products were not "commercial advertising or promotion," then your verdict must be for Nitro on this claim.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

| | |
|---|---|
| Authority: | Fane v. Edenfield, 945 F.2d 1514, 1517 (11th Cir.1991); Fuente Cigar, Ltd. v. Opus One, 985 F.Supp. 1448 (M.D.Fla.1997); BellSouth Advertising & Pub. Corp. v. Lambert Pub., 45 F.Supp.2d 1316 (S.D.Ala.1999); Gordon and Breach Science Publishers S.A. v. American Institute of Physics, 859 F.Supp. 1521, 1535-36 (S.D.N.Y.1994); Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 |

150

(5th Cir.1996); <u>Garland Co. v. Ecology Roof Sys. Corp.</u>, 895 F.Supp. 274, 277 (D.Kan.1995); <u>Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software</u>, Inc., 880 F.Supp. 1005, 1019-20 (S.D.N.Y.1994); <u>Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.</u>, 447 U.S. 557, 561-62, 65 L.Ed.2d 341, 100 S.Ct. 2343 (1980); <u>United States v. Edge Broadcasting</u>, 509 U.S. 418, 426, 125 L.Ed.2d 345, 113 S.Ct. 2696 (1993).

**Defendant's Proposed Jury Instruction No. 104**

**False Advertising - Lanham Act**
**Statement of Fact**

Acushnet must also prove by the preponderance of the evidence that Nitro's advertising was a statement of fact, not a statement of opinion. In order to be a statement of fact, the statement must be capable of being proven false.

Statements of pure opinion are not statements of fact. Pure opinion occurs when a statement is made based on facts which are set forth with the opinion or which are otherwise known or available to the reader or listener as a member of the public. In determining whether a statement is a statement of fact or pure opinion, you must examine the statement in the context in which it was made and consider all of the circumstances surrounding the statement.

If you find that the statements made by Nitro are pure opinion, then your verdict should be for Nitro on this claim. If you find that the statements are not pure opinion, then you should consider whether they are mixed expression of opinion.

A mixed expression of opinion is a statement that implies the existence of undisclosed facts as the basis of the opinion. In order to determine whether a statement is pure opinion or mixed opinion, you must look at the totality of the statement, the context in which is was published, and the words used.

If you find that the statements made by Nitro are mixed expressions of opinion, then your verdict should be for Nitro on this claim.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

Authority: General Cigar Holdings, Inc. v. Altadis, S.A., 205 F. Supp. 2d 1335, 1357 (S.D. Fla. 2002); Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Brd. Of Podiatric Surgery, 185 F.3d 606, 614 (6th Cir. 1999).

**Defendant's Proposed Jury Instruction No. 105**

**False Advertising - Lanham Act**
**False or Misleading Statements**

Acushnet must also prove by a preponderance of the evidence that (1) Nitro's statements of fact were either literally false or (2) if the statements were literally true, that they were misleading or confusing to the consuming public. A statement is literally false if it is false on its face or explicitly false. The absence of tests, or data, or other proof substantiating a statement does not establish that the statement is false.

If the statements made by Nitro are literally false, then you should find for Acushnet and end your inquiry on this claim because actual consumer confusion will not need to be proved. In determining whether Nitro's statements in its advertisements are literally false, you must consider the message conveyed by those statements in their full context.

There can be a violation of the Lanham Act by statements that are literally true but nevertheless have a tendency to mislead or deceive the consumer. The question to be determined by you in this regard is what the person to whom the advertisement is directed would find to be the message and be mislead or deceived by that message.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:  Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002); Clorox Co. of Puerto Rico v. Procter & Gamble Commercial Co., 228 F.3d 24 (1st Cir. 2000); Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222 (3d Cir. 1990); Johnson & Johnson-Merck v. Rhone-Poulenc Rorer, 19 F.3d 125, 129 (3d Cir. 1994); Castrol Inc. v. Pennzoil Co., 799 F.Supp. 424, 437 (D.N.J.), aff'd, 987 F.2d 939 (3d Cir. 1993); McNeil PCC, Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991); Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 516 (8th Cir.1996).American Home Products Corp. v. Procter & Gamble Co., 871 F.Supp. 739 (D.N.J. 1994); Novo Nordisk A/S v. Becton Dickinson and Co., 997 F.Supp. 470 (S.D.N.Y. 1998) (citing Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 317 (2d Cir. 1982)).

**Defendant's Proposed Jury Instruction No. 106**

**Lanham Act**
**Actual Deception**

The second fact that Acushnet must prove in order to establish a Lanham Act claim is proof of actual deception of customers. If Nitro's statements were literally false, actual deception of customers is presumed. In addition, if Acushnet proves by a preponderance of the evidence that Nitro intentionally set out to deceive the public, and that Nitro's intentional conduct in this regard is of an egregious nature, actual consumer deception also is presumed.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

---

Authority:    Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1990); Clorox Co. of Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24 (1st Cir. 2000); Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc., 926 F.2d 134, 140 (2d Cir. 1991); Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982).

**Defendant's Proposed Jury Instruction No. 107**

**Lanham Act**
**Materiality of Statements**

As to the third fact that Acushnet must prove on this claim -- that is, the materiality of

Nitro's statements -- you are instructed that a material statement is one that is made to influence

or tend to influence whether to purchase Acushnet's products.  If you find that a significant

number of prospective purchasers were likely to attach importance to Nitro's statements in

determining whether to purchase Acushnet's products, the statements were material.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

Authority:   Aerosonic Corp. v. Trodyne Corp., 402 F.2d 223 (5th Cir. 1968); In re Uranium
             Antitrust Litig., 473 F.Supp. 393, 408-409 (N.D. Ill. 1979); RESTATEMENT
             (THIRD), UNFAIR COMPETITION (1993) § 3, comment b.

## Defendant's Proposed Jury Instruction No. 108

### Lanham Act
### Causation of Harm to Acushnet

As to the fourth fact Acushnet must prove to establish a Lanham Act claim against Nitro -- that is, a casual link between the allegedly false or misleading statements by Nitro and actual injury to Acushnet's business – Acushnet must show that the allegedly deceptive statements were a substantial factor in causing injury to Acushnet.  If the potential customer denies having acted on the basis of Nitro's statements in making the customer's purchase decision or stated other reasons for its decision not to purchase Acushnet's products, you cannot infer or find from the nature of its purchase decision or the mere timing of them that it made those decisions in reliance upon Nitro's statements.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:   Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1387 (5th Cir. 1996) (citing Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp. 640 F. Supp. 1411, 1444 (E.D.N.C. 1986); Fenner v. Gen. Motors Corp., 657 F.2d 647, 651 (5th Cir. 1981).

**Defendant's Proposed Jury Instruction No. 109**

**Lanham Act**
**Damages**

I will instruct you about the measure of damages under the Lanham Act. By instructing you on damages, I am not suggesting which party should win on any issue. If you decide that any trademark has been infringed or that Nitro has engaged in Unfair Competition or trademark counterfeiting and that no defenses are applicable to such conduct, then you must then determine the amount of any money damages to be awarded to Acushnet to compensate Acushnet for the infringement.

Acushnet is entitled to receive compensatory damages to recover (1) Nitro's profits attributable to the infringing conduct; and (2) damages sustained by Acushnet. Acushnet is only required to prove by a preponderance of the evidence the amount of Nitro's sales. Thereafter, it is up to Nitro to prove all elements of cost or deduction claimed as to damages.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:      15 U.S.C. § 1117.

157

**Defendant's Proposed Jury Instruction No. 110**

**Patent Infringement**
**General Instruction**

Acushnet's sixth claim is for patent infringement.  Acushnet asserts that Nitro infringed a United States Patent owned by Acushnet, United States Patent  No. 5,609,535, which I will call the "'535 patent," when Nitro made and sold Nitro-branded Titanium model golf balls from used balls through a process of grinding covers below the dimples of the used balls, and then remolding a new plastic cover on top of the of the remaining core and cover fragment.

Acushnet also asserts that Nitro infringed four other United States Patents owned by Acushnet relating to the manufacture of golf ball products, which I will call the "Acushnet Manufacture" patents.  Acushnet asserts that Nitro infringed the claims of the Acushnet Manufacture patents when Nitro made Nitro-branded Titanium model golf balls from damaged used golf balls that were originally manufactured by Acushnet.

Acushnet's patent claims do not apply to either Nitro's clearcoating process, or to Nitro's stipped and repainted balls.  They relate only to balls whose covers were removed, after which new material was added.  Although not all of these balls were necessarily stamped with the Nitro "Titanium" brand, I will refer to them as Nitro "Titanium" balls for convenience.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:      Acushnet's Answer to Third Amended Complaint, Affirmative Defenses and Counterclaims.

**Defendant's Proposed Jury Instruction No. 111**

**Patent Infringement
Nature of Patents and Patent Process**

Before describing the legal issues involved in this count, I will explain what a patent is and how one is obtained.

Patents are granted by the United States Patent and Trademark Office (sometimes called "the PTO"). The process of obtaining a patent is called patent prosecution. A valid United States patent gives the patent owner the right for a limited time to prevent others from making, using, offering to sell, or selling the patented invention within the United States or from importing it into the United States without the patent holder's permission. A violation of the patent owner's rights is called infringement. The patent owner may try to enforce a patent against persons believed to be infringers by a lawsuit filed in federal court.

To obtain a patent one must file an application with the PTO. The PTO is an agency of the federal government that employs trained examiners who review applications for patents. The application includes what is called a "specification," which must contain a written description of the claimed invention telling what the invention is, how it works, how to make it and how to use it so others skilled in the field will know how to make or use it. The specification ends with one or more numbered sentences. These numbered sentences are called the patent "claims." When the patent is eventually granted by the PTO, the claims define the boundaries of its protection and give the public notice of those boundaries.

After the applicant files the application, a PTO patent examiner reviews the patent application to determine whether the claims are patentable and whether the specification adequately describes the invention claimed. In examining a patent application, the patent examiner reviews records available to the PTO for what is referred to as "prior art." The examiner also will review prior art if it is submitted to the PTO by the applicant. Prior art is

defined by law, and I will give you specific instructions as to what constitutes prior art at a later time.  However, in general, prior art includes things that existed before the claimed invention, things that were publicly known or used in a publicly accessible way in this country, or that were patented or described in a publication in any country.

The examiner considers, among other things, whether each claims define an invention that is new, useful, and not obvious with respect to the prior art.  A patent lists the prior art which the examiner considered; this list is called the "cited references."  After the prior art search and examination of the application, the patent examiner then informs the applicant in writing what the examiner has found and whether any claim is patentable, and thus would be "allowed."  This writing from the patent examiner is called an "office action."

If the examiner rejects the claims, the applicant then responds and sometimes changes the claims or submits new claims.  This process, which is confidential between the examiner and the patent applicant, may go back and forth for some time until the examiner is satisfied that the application and claims meet the requirements for a patent.  The papers generated during this time of communicating back and forth between the patent examiner and the applicant make up what is called the "prosecution history."  All of this material is kept secret between the applicant and the PTO for some time, often until the patent is issued, when it becomes available to the public.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:     Adapted from <u>Model Patent Jury Instructions for the Northern District of California</u> at A.1 [hereinafter N.D. Cal. Model].

160

**Defendant's Proposed Jury Instruction No. 112**

**Patent Infringement
Nature of Claims and Defenses**

Acushnet alleges that Nitro infringed the Acushnet patents by making, importing, using, selling and offering for sale products and practicing methods that are covered by claims of those patents.  Acushnet also alleges that Nitro has actively induced infringement of these claims of the patents by others and contributed to the infringement of these claims by others.  The products and methods that are alleged to infringe Acushnet's patents are the Nitro Titanium golf balls manufactured using a method of grinding off covers and remolding new covers upon them.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:      Adapted from N.D. Cal. Model at A.1.

161

**Defendant's Proposed Jury Instruction No. 113**

**Patent Infringement**
**Interpretation of Claims**

The Court has interpreted the meaning of some of the language in the patent claims involved in this case, and you must accept these interpretations as correct. However, these interpretations should not be taken as an indication that I have a view regarding the issues of infringement and invalidity. The findings regarding infringement and invalidity are yours to make.

**The '535 Patent.** Exhibit ___ is United States Patent No.5,609,535, titled "Method of Restoring Used Golf Ball." Seven claims of the '535 Patent, claims 1, 4 through 8 and 11 are asserted in this case. All of the claims are directed to a method of treating a golf ball that is set forth in the claims. I have interpreted the meaning of some of the claim language as follows:

"Core" means the non-dimple bearing layers of a golf ball;

"Cover" means the dimple-bearing layers of a golf ball including a dimple-bearing layer of cover material, and may also include any or all of indicia, paint or clear coat;

"Depth" means a substantially uniform perpendicular measurement downward from the exterior periphery of the cover to the exterior surface of the core;

Diameter" means the length of a straight line through the center of a figure or body and extending to the periphery of the golf ball.;

"Intermediate cover surface" means the surface of a residual portion of the cover material remaining at the conclusion of the step of removing;

"Predetermined diameter" means a particular diameter fixed beforehand by the manufacturer of the golf ball;

"Predetermined thickness" means a particular thickness fixed beforehand by the manufacturer of the golf ball; and

"Thickness" means a layer, stratum or ply.

**The Acushnet Manufacture Patents.** Exhibit ___ is United States Patent No. 5,000,459, titled "Golf Ball Cover." Two claims of this patent, Claims 1 and 7 are asserted in

162

this case.  These claims are directed to a golf ball as recited in the claims.  I have interpreted the meaning of some of the claim language as follows:

"Ionomer resin" means a polymer with small ionically dissociating bond concentrations, such as a copolymer of an olefin and an alpha, beta ethylenically unsaturated carboxylic acid comprising acid groups that have been neutralized by a metal ion, and including resins of the type sold under the trademark "SURLYN."

The remaining three Acushnet Manufacture Patents are similar, so I will give you my interpretation of language for their claims together.  Exhibit ___ is United States Patent No. 4,546,980, titled "Process for Making a Solid Golf Ball."  Seven claims of this patent, claims 1, 9, 17 and 19 through 22 are asserted in this case.  These claims are directed to a method for making a golf ball product and to golf ball products formed in the manner set forth in the claims.

Exhibit ____ is United States Patent No. 4,692,497, titled "Process for Curing a Polymer and Product Thereof."  Seven claims of this patent, claims 1, 6, 8 and 10 through 13 are asserted in this case.  These claims are directed to a method for making a product and to products formed in the manner set forth in the claims.

Exhibit ___ is United States Patent No. 4,770,422, titled "Composition for Making Durable Golf Balls and Other Products."  Eight claims of this patent, claims 1, 7, 21, 29, 38, 45, 54 and 60 are asserted in this case.  These claims are directed to a method for manufacturing a golf ball product, a method for making a product, and to golf ball products and other products made in the manner set forth in the claims.

I have interpreted the claim language common to these three patents as follows:

"form" means to make;

"formed from" means "made from," designating an open-ended claim, as in "comprising";

"free radical initiator" means a chemical which, when added to an admixture of polybutadiene and a metal salt of an unsaturated carboxylic acid, promotes the crosslinking of the polybutadiene by the metal salt of the unsaturated carboxylic acid, including peroxides such as a dicumyl peroxide;

"golf ball product" is a generic term for all or any part of a golf ball;

"initial velocity" means the velocity of a golf ball when struck by an apparatus, as measured using the standard United States Golf Association (USGA) test as of the time of issue of the patent;

"product" means something that is produced, that is, the result of work or effort;

"swell index" means a measurement obtained by taking a weighted sample of a material, immersing it in toluene under ambient conditions for four days and then calculating the swell index according to the formula:
(final weight – initial weight) / initial weight; and

"unsaturated" means having double or triple bonds in its molecules.

Given ＿＿＿＿＿

Given as Modified ＿＿＿＿＿

Denied ＿＿＿＿＿

Withdrawn ＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿

Authority:     Markman v. Westview Instruments, Inc., 517 U.S. 370, 384-391 (1996); Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304-13 (Fed. Cir. 1999); Cybor Corp. v. FAS Techs., 138  F.3d 1448 (Fed. Cir. 1998) (en banc); Markman v. Westview Instruments, Inc., 52 F.3d 967, 977  (Fed. Cir 1995) (en banc).

**Defendant's Proposed Jury Instruction No. 114**

**Patent Infringement**
**Infringement – Burden of Proof**

I will now instruct you on the law you must follow in deciding whether Acushnet has proven that Nitro has infringed one or more of the asserted claims of the patent in suit. To prove patent infringement, Acushnet has to establish by a preponderance of the evidence that at least one claim of any one patent is or has been infringed.  It is not necessary for Acushnet to prove that all the claims of a patent have been infringed, or that a claim in every patent has been infringed.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Adapted from <u>Standard 8.1</u>; <u>Seal-Flex, Inc. v. Athletic Track and Court Constr.</u>,
               172 F.3d 836, 842 (Fed. Cir. 1999); <u>Morton Int'l, Inc. v. Cardinal Chem. Co.</u>, 5
               F.3d 1464, 1468-69 (Fed. Cir. 1993).

**Defendant's Proposed Jury Instruction No. 115**

**Patent Infringement**
**Infringement – Generally**

The claims define what is covered by the patent.  A product or method directly infringes a patent if it is covered by at least one claim of the patent.  Deciding whether a claim has been directly infringed is a two-step process.  The first step is to decide the meaning of the patent claim.  I have already made this decision, and I have already instructed you as to the meaning of the terms in the asserted patent claims.  The second step is to decide whether Nitro has made, used, sold, offered for sale or imported within the United States a product covered by a claim of the patent or that was manufactured using a method covered by a claim of the patent.  You, the jury, make this decision.

You must consider each of the asserted claims of the patent individually, and decide whether Nitro's product or method infringes that claim.  There are two ways in which a patent claim may be directly infringed.  A claim may be "literally" infringed, or it may be infringed under the "doctrine of equivalents."  The following instructions explain these two types of direct infringement.

---

Authority:    Adapted from <u>N.D. Cal. Model 3.2</u>; 35 U.S.C. § 272(a)-(g); <u>Warner-Jenkinson Co., Inc. v. Hilton Davies Chemical Co.,</u>  520 U.S. 17 (1997); <u>DeMarini  Sports, Inc. v. Worth, Inc.</u>, 239 F.3d 1314, 1330 (Fed. Cir. 2001); <u>Seal-Flex, Inc. v. Athletic Track  and Court Constr.</u>, 172 F.3d 836, 842 (Fed. Cir. 1999); <u>Carroll Touch, Inc. v. Electro Mech. Sys.,  Inc.</u>, 15 F.3d 1573, 1576 (Fed. Cir. 1993).

**Defendant's Proposed Jury Instruction No. 116**

**Patent Infringement**
**Literal Infringement**

To determine whether Nitro's product – which I have called the Nitro Titanium balls – and Nitro's methods for making them literally infringe a claim of a patent, you must compare the product and method with the patent claim and determine whether every requirement of the claim is included in that product or method.  If so, Nitro's product or method literally infringes the claim.  If, however, Nitro's product or method does not have every requirement in the patent claim, Nitro's method does not literally infringe that claim.  You must decide literal infringement for each claim separately.

If you find that Nitro's products include all of the elements in any one claim, the fact that Nitro's products might include additional components does not, by itself, avoid literal infringement of such claim.

A person cannot avoid infringement by contracting with another party to perform some steps or add parts to a claimed invention on its behalf.  If you find that Nitro contracted with another party to perform some step or add some part of a claimed invention, you are to treat those acts as though Nitro, itself, performed the step or added the part.

<div align="right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

---

Authority:    Adapted from N.D. Cal. Model 3.3; Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 212 F.3d 1377, 1382-83 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, 200 F.3d 795, 811-12 (Fed. Cir. 1999); McDermott v. Ovid Int'l, Inc., 723 F. Supp. 1221 (S.D. Ohio), aff'd, 833 F.2d 1026 (Fed. Cir. 1989); Shields v. Halliburton Co., 493 F. Supp. 1376 (W.D. La. 1980), aff'd, 667 F.2d 1232 (5th Cir. 1982).

**Defendant's Proposed Jury Instruction No. 117**

**Patent Infringement**
**Infringement Under the Doctrine of Equivalents**

If you find that Nitro's products or method do not literally infringe a patent claim, you must determine whether the products or method infringe the claim under what is called the "doctrine of equivalents."  Under the doctrine of equivalents, the products or method can infringe a patent claim if it includes parts or steps that are identical or equivalent to the requirements of the claim.  If the product or method is missing an identical or equivalent part or step to even one requirement of the patent claim, the product or method cannot infringe the claim under the doctrine of equivalents.  Thus, in making your decision under the doctrine of equivalents, you must look at each individual requirement of the patent claim and decide whether the products or method has an identical or equivalent  part or step to that individual claim requirement.

A part or step of a product or method is equivalent to a requirement of a patent claim if the differences between the part or step and the requirement would be considered not to be substantial by a person of ordinary skill in the field at the time of the alleged infringement. One way to determine whether any difference between a requirement of a patent claim and a part or step of the products or method is not substantial is to consider whether, as of the time of the alleged infringement, the part or step of the products or method performed substantially the same function, in substantially the same way, to achieve substantially the same result as the requirement in the patent claim.

In deciding whether any difference between a claim requirement and the products or method is not substantial, you may also consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the part or step with the claimed requirement.  The known interchangeability between the claim requirement and the part or step of the product or method is not necessary to find infringement under the

doctrine of equivalents.  However, known interchangeability may support a conclusion that the

difference between the part or step in the part or method and the claim requirement is not

substantial.  The fact that a part or step of the product or method performs the same function as

the claim requirement is not, by itself, sufficient to show known  interchangeability.


Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authorities:   Adapted From N.D. Cal. Model 3.4; Warner-Jenkinson Co., Inc. v. Hilton Davies
Chemical Co.,  520 U.S. 17 (1997); Graver Tank &  Mfg. Co. v. Linde Air Prods.
Co., 339 U.S. 605, 609 (1950); Multiform Desiccants, Inc. v.  Medzam, Ltd., 133
F.3d 1473, 1480 (Fed. Cir. 1998); Dolly, Inc. v. Spalding & Evenflo Cos., 16 F.3d
394, 397 (Fed. Cir. 1994).

**Defendant's Proposed Jury Instruction No. 118**

**Patent Infringement**
**Indirect Infringement**

Acushnet also alleges that Nitro contributed to another's infringement and induced another to infringe claims Acushnet's patents.  Nitro cannot contribute to infringement or induce another to infringe unless Acushnet proves that someone other than Nitro directly infringed by making, using, selling, offering for sale or importing a product, or practicing a method that includes all of the requirements of the asserted claims.  In other words, Nitro cannot indirectly infringe unless Acushnet can show that someone has directly infringed.

Contributory infringement arises when someone supplies something that is used to infringe one or more of the patent claims.  If you find that someone has directly infringed a claim of Acushnet's patents, then contributory infringement exists if: (1) Nitro supplied an important component of the infringing part of the product or method; (2) The component is not a common component suitable for non-infringing use; and (3) Nitro supplied the component with the knowledge of the patent and knowledge that the component was especially made or adapted for use in an infringing manner.

Acushnet alleges that Nitro has actively induced another party to infringe a patent-in-suit.  Active inducement exists if Nitro actively and knowingly assists or encourages the direct infringement by another party.  In order to induce infringement, Nitro must have intended to cause the acts that constitute the direct infringement, and Nitro must have known or should have known that its actions would cause direct infringement.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

170

Authority: Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1468-69 (Fed. Cir. 1990); Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed. Cir. 1986); Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 485-486 (1964); Mentor H/S, Inc. v. Medical Device Alliance, Inc., 244 F.3d 1365, 1379 (Fed. Cir. 2001); Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co., 803 F.2d 1170, 1174 (Fed. Cir. 1986); Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1311-12 (Fed. Cir. 1998); Insituform Techs, Inc. v. Cat Contracting, Inc., 161 F.3d 688, 695 (Fed. Cir. 1998); Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553-54 (Fed. Cir. 1990).

**Defendant's Proposed Jury Instruction No. 119**

**Patent Infringement**
**Willful Infringement**

Acushnet also alleges that Nitro willfully infringed patents other than the '535 Patent.  To prove that an infringement was willful, Acushnet must meet a higher standard than the one for infringement.  It is not enough for Acushnet to prove that it is "more probable than not" that Nitro committed willful infringement.  To prove willful infringement, Acushnet must not only establish that it is more probable than not that the infringement occurred, but must additionally establish that it is "highly probable" that the infringement was willful.

Specifically, Acushnet must prove by a preponderance of the evidence that it is highly probable that:

A.      Nitro had actual knowledge of the patent; and

B.      Nitro had no reasonable basis for believing at the time of the infringement (1) that Nitro's  products or method infringed the patent or (2) that the patent was invalid or unenforceable.

In determining whether Nitro committed willful infringement, you must consider all of the facts, which include but are not limited to:

A.      Whether Nitro intentionally copied a product of Acushnet covered by the patent;

B.      Whether Nitro, when it knew of Acushnet's patent  protection, investigated the scope of the patent and formed a good-faith belief that the patent was invalid or unenforceable or that it was not infringed;

C.      Whether Nitro made a good faith effort to avoid infringing the patent; and

D.      Whether Nitro relied on a legal opinion at the time of infringement that appeared to it to be well supported and believable and that advised Nitro (1) that the

products or method did not infringe the patent or (2) that it was invalid or

enforceable.

<div align="right">

Given  _____

Given as Modified  _____

Denied  _____

Withdrawn  _____

</div>

_____

Authority:      Adapted from N.D. Cal. Model 3.11; Crystal Semiconductor Corp. v. Tritech
Microelectronics Int'l, Inc., 246 F.3d 1336, 1346 (Fed.  Cir. 2001); WMS Gaming
Inc. v. Int'l Game Tech., 184 F.3d 1339, 1354 (Fed. Cir. 1999); Read  Corp. v.
Portec, Inc., 970 F.2d 816 (Fed. Cir. 1992); Gustafson, Inc. v. Intersystems Indus.
Prods., Inc., 897 F.2d 508, 510 (Fed. Cir. 1990).

**Defendant's Proposed Jury Instruction No. 120**

**Patent Infringement**
**Burden of Proof -- Invalidity**

I will now instruct you on the law you must follow in determining whether Nitro has proven its defense that claims 1, 4, 5, 7, 8, and 11 of the '535 Patent are invalid. You are instructed that a patent duly issued by the Patent Office is presumed to be valid. Moreover, each claim is presumed to be valid independently of the validity of the other claims. Nitro has the burden of proving by clear and convincing evidence that Acushnet's patent or claim in the patent is not valid.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Adapted from Standard 8.1; 35 U.S.C. § 282.

**Defendant's Proposed Jury Instruction No. 121**

**Patent Infringement**
**Invalidity – Anticipation (Novelty)**

A patent claim is invalid if the claimed invention was not new at the time it was invented. For a claimed invention to be invalid as not new, Nitro must prove by clear and convincing evidence that all of the requirements of the claimed invention were present in a single prior art reference.

There are two ways Nitro can show that an invention is not new:

A.      if the claimed invention was already publicly known or publicly used by others in the United States before the invention was conceived or July 9, 1991.

B.      if the claimed invention was already made by someone else in the United States before the invention was conceived or July 9, 1991, unless the other person abandoned the invention or kept it secret.

As I have instructed you, for a claim to be invalid in this way, all of the requirements of the claim must be met in a single previous method before the conception of the invention or more than one year earlier than the effective filing date of the '535 application, which was July 9, 1992. We call this a "prior art reference."

In this case, Nitro relies on alleged prior art references arising from an alleged public use by Glebar or Spalding, and an alleged public disclosure of such use by Glebar. Private or secret knowledge, such as knowledge confidentially discussed within a group or company, is not enough to invalidate a patent claim. Secret use by another party is not an invalidating public use. Thus, if the particular process was used by Glebar or Spalding under circumstances of secrecy, that does not invalidate the patent. Likewise, sale by Spalding of a product made by the patented process is not a public use of the process if the process was practiced in secrecy and the public could not learn the process from the product sold. In order to rely on such a public use or

175

disclosure to prove a patent claim is not new, Nitro must prove by clear and convincing evidence

that the alleged use or public disclosure was not kept secret.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:   Adapted from N.D. Cal. Model 4.3a1-2; AIPLA Model Anticipation Nos. 2-3; 35
U.S.C. § 102; Apotex U.S.A., Inc. v. Merck & Co., 254 F.3d 1031, 1035 (Fed.
Cir. 2001); Mycogen Plant Science, Inc. v. Monsanto Co., 243 F.3d 1316, 1330
(Fed. Cir. 2001); Ecolochem, Inc. v. S. Cal. Edison Co., 227 F.3d 1361, 1367-70
(Fed. Cir. 2000); Singh v. Brake, 222 F.3d 1362, 1366-70 (Fed. Cir. 2000);
Pannu v. Iolab Corp., 155 F.3d 1344, 1349 (Fed. Cir. 1998); Gambro Lundia AB
v. Baxter Healthcare Corp., 110 F.3d 1573, 1576-78 (Fed. Cir. 1997); Lamb-
Weston, Inc. v. McCain Foods, Ltd., 78 F.3d 540, 545 (Fed. Cir. 1996); In re
Bartfeld, 925 F.2d 1450 (Fed. Cir. 1985); Ralston Purina Co. v. Far-Mar-Co, Inc.,
772 F.2d 1570, 1574 (Fed. Cir. 1985); Trend Prods. Co. v. Metro Indus., Inc., 10
USPQ2d 1531 (C.D. Cal. 1989); Rosemount, Inc. v. Beckman Instruments, Inc.,
727 F.2d 1540, 1545-1546, 221 USPQ 1 12 (Fed. Cir. 1984); In re Caveney, 761
F.2d 671, 674-677, 226 USPQ (Fed. Cir. 1985); DL Auld Co. v. Chroma
Graphics Corp., 714 F.2d 1144, 1147, 219 USPQ 13 (Fed. Cir. 1983); Honeywell,
Inc. v. Sperry Rand Corp., 180 USPQ 673 (D. Minn. 1973); In re Smith, 714 F.2d
1127, 1128, 218 USPQ 976 (Fed. Cir. 1983); TP Lab., Inc. v. Professional
Positioners, Inc., 724 F.2d 965, 968-969, 220 USPQ 577 (Fed. Cir.), cert. denied,
469 U.S. 5 826, 224 USPQ 616 (1984); WL Gore & Assocs., Inc. v. Garlock, Inc.,
721 F.2d 1540, 1548-1550, 220 USPQ 303 (Fed. Cir. 1983), cert. denied, 469
U.S. 851 (1984); Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1265-
1267, 229 USPQ 805 (Fed. Cir. 1986); Kinzenbaw v. Deere & Co., 741 F.2d 383,
387-388, 222 USPQ 929 (Fed. Cir. 1984), cert. denied, 470 U.S. 1004 (1985); JA
LaPorte, Inc. v. Norfolk Dredging Co., 787 F.2d 1577, 1580-1582, 229 USPQ 435
(Fed. Cir.), cert. denied, 479 U.S. 884 (1986); Grain Processing Corp. v.
American Maize-Prods. Co., 840 F.2d 902, 906, 5 USPQ2d 1788 (Fed. Cir.
1988).

**Defendant's Proposed Jury Instruction No. 122**

**Patent Infringement
Invalidity – Obviousness**

Even if the invention is new, a claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in the art at the time of the effective filing date of the application, that is: July 9, 1992.  This means that even if all of the requirements of the claim cannot be found in a single prior art reference, a person of ordinary skill in the field who knew about all the prior art would have come up with the claimed invention.  The claimed invention is not obvious unless there was something in the prior art or within the understanding of a person of ordinary skill that would suggest the claimed invention.  Accordingly, you have to be careful not to look at the claimed invention with hindsight and just assume that someone of skill in the field would have thought to do it.

Your finding whether a claim is obvious must be based on several factual decisions that you must make.  First, you must determine the scope and content of the prior art.  Second you must determine what difference, if any, exists between the claim and the prior art.  Third, you must determine the level of ordinary skill in the field that someone would have had at that time the claimed invention was made.  Finally, you must consider any evidence that has been presented with respect to the following:

(a)  unsuccessful attempts by others to find the solution provided by the claimed invention;

(b)  copying of the claimed invention by others;

(c)  independent invention of the claimed invention by others before or at about the same time as the inventor thought of it,

The first three considerations may be an indication that a claimed invention would not have been obvious at the time this invention was made, and the presence of the last consideration

may have been an indication that the claimed invention would have been obvious at such time. Although you must consider any evidence of these considerations, the importance of any of them to your decision on whether the claimed invention would have been obvious is up to you.

In determining whether the claimed invention would have been obvious at the time it was made, you should also consider whether the level of ordinary skill in the field of restoring golf balls. When determining the level of ordinary skill in restoring golf balls, consider all the evidence introduced at trial for this decision, including:

(1)     the levels of education and experience of persons working in the field;

(2)     the types of problems encountered in the field; and

(3)     the sophistication of the technology.

Based on the factors I have just listed, and the evidence presented at this trial, you must determine what was the level of ordinary skill in the field.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:     N.D. Cal. Model 4.3b; Graham v. John Deere Co., 383 U.S. 1, 12-19 (1966); Arkie Lures, Inc. v. Gene Larew Tackle, Inc., 119 F.3d 953, 957 (Fed. Cir. 1997); Specialty Composites v. Cabot Corp., 845 F.2d 981, 989-991 (Fed. Cir. 1988); Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1000 (Fed. Cir. 1986), cert. denied, 477 U.S. 905 (1986); Pentec. Inc. v. Graphic Controls Corp., 776 F.2d 309, 313 (Fed. Cir. 1985).

**Defendant's Proposed Jury Instruction No. 123**

**Patent Infringement**
**Defense of Unenforceability**

I will now instruct you on the law you must follow in determining whether Nitro has

proven its defense that claims 1, 4, 5, 7, 8, and 11 of the '535 Patent are unenforceable.  You are

instructed that a patent duly issued by the Patent Office is presumed to be enforceable.  Nitro has

the burden of proving by clear and convincing evidence that Acushnet's patent is not

enforceable.

I have previously instructed you, after a patent application is filed, it is assigned to an

Examiner, who examines the application and attempts to determine whether or not the

application and the claims meet all of the requirements of the patent laws.  Because the Patent

and Trademark Office must rely on the patent applicant for information, patents applicants have

a duty of honesty and good faith in their dealings with the Patent and Trademark Office.  Persons

who have this duty include the inventor named on the patent application, persons who represent

the inventor before the Patent and Trademark Office, and other persons involved in a substantial

way with the application.

This duty of honesty and good faith exists from the time the application is filed and

continues for the entire time that an application is pending before the Patent and Trademark

Office.  It requires that the applicant, the applicant's representatives, and others involved in a

substantial way with the application fully disclose to the Patent and Trademark Office all

information of which they are aware that is material to examination of the application, including

all material prior art.  I will explain to you in a moment how you may determine whether or not

information is material.

Intentional failure to fulfill this duty of honesty and good faith is called inequitable

conduct.  When inequitable conduct occurs during the course of obtaining a patent, the patent is

unenforceable.  This means that the patent owner may not prevent others from using the invention covered by the claims of the patent and may not collect damages for patent infringement.

Nitro has the burden of proving inequitable conduct by clear and convincing evidence. Nitro must prove that the inventor, the inventor's lawyer, or some person who was involved in a substantial way with the application withheld or misrepresented information that was material to the examination of the '535 Patent application, and that this person or persons acted with an intent to deceive or mislead the Patent Examiner.  It is not sufficient for Nitro to show that a person employed by Acushnet might have been aware of material prior art – Nitro must prove by clear and convincing evidence that such a person was involved in a substantial way with the application.

I will now explain to you the requirements of materiality and intent.  I will then explain how you should balance any materiality and intent that you find in order for you to determine whether or not there was inequitable conduct.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:   Adapted from Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 11 [hereinafter Fed. Cir. Bar. Ass'n Model];  37 C.F.R. § 1.56 (2001); PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1318 (Fed. Cir. 2000); Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256-57 (Fed. Cir. 1997); N. Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 938-39 (Fed. Cir. 1990); Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc); KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571, 1576-77 (Fed. Cir. 1985).

**Defendant's Proposed Jury Instruction No. 124**

**Patent Infringement**
**Unenforceability -- Materiality**

In considering the issue of materiality, you must first determine whether information was withheld from or misrepresented to the Patent and Trademark Office. If you find that the inventor, the inventor's representative, or others involved in a substantial way with the application withheld or misrepresented information when applying for the '535 Patent, you must then determine whether or not that information was material.

Information is material if there is a substantial likelihood that a reasonable Patent Examiner would consider it important in deciding whether or not to allow the application to issue as a patent.

You must next consider whether there was an intent to mislead or deceive the Patent and Trademark Office.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:    Adapted from Fed. Cir. Bar. Ass'n Model 11.1; 37 C.F.R. § 1.56 (2000); Li Second Family Ltd. P'ship v. Toshiba Corp., 231 F.3d 1373, 1379-80 (Fed. Cir. 2000); PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321- 22 (Fed. Cir. 2000); Life Tech., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1324-26 (Fed. Cir. 2000); Union Oil Co. of Cal. v. Atl. Richfield Co., 208 F.3d 989 (Fed. Cir. 2000); SemiconductorEnergy Lab. Co. v. Samsung Elecs. Co., 204 F.3d 1368, 1374 (Fed. Cir. 2000); Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.3d 28, 31 (Fed. Cir. 1999); Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321 (Fed. Cir. 1998); Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1257-59 (Fed. Cir. 1997); Litton Sys., Inc. v. Honeywell, Inc., 87 F.3d 1559, 1570-71 (Fed. Cir. 1996); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178-79 (Fed. Cir. 1995).

**Defendant's Proposed Jury Instruction No. 125**

**Patent Infringement**
**Unenforceability -- Intent**

Evidence relevant to the question of intent to deceive or mislead the Patent and

Trademark Office includes any direct evidence of intent, as well as evidence from which intent

may be inferred.  The patent law recognizes that direct evidence of an actual intent to deceive or

mislead is rarely available.  You may, however, infer intent from conduct.  That means you may

conclude that a person intended the foreseeable results of his or her actions.  You should decide

whether  to infer an intent to deceive or mislead based on the totality of the circumstances,

including the nature of the conduct and evidence of the absence or presence of good faith.

$$\begin{array}{ll} \text{Given} & \underline{\hspace{2cm}} \\ \text{Given as Modified} & \underline{\hspace{2cm}} \\ \text{Denied} & \underline{\hspace{2cm}} \\ \text{Withdrawn} & \underline{\hspace{2cm}} \end{array}$$

---

Authority:     Adapted from Fed. Cir. Bar. Ass'n Model 11.2; Li Second Family Ltd. P'ship v.
               Toshiba Corp., 231 F.3d 1373, 1379-80 (Fed. Cir. 2000); PerSeptive Biosystems,
               Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321-22 (Fed. Cir. 2000);
               Semiconductor Energy Lab. Co. v. Samsung Elecs. Co., 204 F.3d 1368, 1374
               (Fed. Cir. 2000); Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120
               F.3d 1253, 1257-59 (Fed. Cir. 1997); Refac Int'l Ltd. v. Lotus Dev. Corp., 81
               F.3d 1576 (Fed. Cir. 1996); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180-81
               (Fed. Cir. 1995); Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d
               867, 876 (Fed. Cir. 1988) (en banc).

## Defendant's Proposed Jury Instruction No. 126

### Patent Infringement
### Unenforceability -- Balancing Of Materiality And Intent

If you find that Nitro has proved by clear and convincing evidence that material information was withheld or misrepresented and that there was an intent to deceive or mislead the Patent Examiner, you must then balance the degree of materiality and the degree of intent to determine whether or not the evidence is sufficient to establish clearly and convincingly that there was inequitable conduct.

The higher the materiality of the withheld or misrepresented information, the lower the intent needed to establish inequitable conduct.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:   Adapted from Fed. Cir. Bar. Ass'n Model 11.3;  Li Second Family Ltd. P'ship v. Toshiba Corp., 231 F.3d 1373, 1378 (Fed. Cir. 2000); Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998); Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995); FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1416 (Fed. Cir. 1987); Am. Hoist & Derrick Co v. Sowa & Sons, Inc., 725 F.2d 1350, 1363-64 (Fed. Cir. 1984).

**Defendant's Proposed Jury Instruction No. 127**

**Patent Infringement**
**Exhaustion – Repair and Reconstruction**

I will now instruct you on the law you must follow in determining whether Nitro has proven, by a preponderance of the evidence, its defense that it is not liable for any infringement of the Acushnet Manufacture Patents under the defense of patent exhaustion. The defense of patent exhaustion only applies to golf balls originally manufactured by Acushnet. You are instructed that the purchaser of a patented product has the right to repair the product, but does not have the right to reconstruct the product.

Nitro's remanufacturing process is impermissible reconstruction, and not repair, if it makes a new golf ball from a golf ball that has been spent in its entirety – that is, a golf ball that is used up. In determining whether a process is permitted repair or infringing reconstruction, the Court instructs you that you should consider all the evidence presented by the parties as to: (i) the nature of the actions by Nitro, (ii) the nature of the product and how it is designed, (iii) whether a market has developed to manufacture or service the part at issue and (iv) evidence of the intent of Acushnet – that is, whether Acushnet ever intended for this type of remanufacturing process to be performed on its golf balls. If you find that Nitro merely repaired Acushnet's golf balls when Nitro made its Nitro-branded Titanium model golf balls, as Nitro contends in defense of Acushnet's patent claims, rather than reconstructed them to make a new product, as Acushnet asserts in its patent claims, you must find for Acushnet on its unfair competition and FDUTPA claims. It would be unlawful for Nitro to advertise its Nitro-branded Titanium model golf balls as "new" "Nitro Titanium" balls if they were in fact remanufactured Titleist and Pinnacle golf balls.

You may also consider the proportional importance of a replaced part as compared to parts that were not replaced.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

_____

Authority:    <u>Aro Mfg. Co. v. Convertible Top Replacement Co</u>, 356 U.S. 336 (1961); <u>Husky Injection Molding Sys., Ltd. v. R&D Tool & Eng. Co.</u>, 291 F.3d 780 (Fed. Cir. 2002); <u>Aktiebolag v. E.J. Co</u>, 121 F.3d 669 (Fed. Cir. 1997).

**Defendant's Proposed Jury Instruction No. 128**

**Patent Infringement**
**Damages – Reasonable Royalty**

If you find that any claim of any patent has been infringed, and that the claim is not invalid or unenforceable, then you must then determine the amount of any money damages to be awarded to Acushnet to compensate Acushnet for the infringement. By instructing you on damages, I am not suggesting which party should win on any issue.

Acushnet is entitled to received a reasonable royalty for each infringing act by Nitro. A royalty is a payment made to a patent holder by a non-owner in exchange for the right to import, make, use or sell the claimed invention. A reasonable royalty is the payment that would have resulted from a hypothetical negotiation between a patent holder and the infringer taking place at the time when the infringing sales first began. In considering the nature of this negotiation, the focus is on what the expectations of the patent holder and infringer would have been had they entered into an agreement at that time and acted reasonably in their negotiations. In addition, you must assume that patent holder and infringer were willing to enter into an agreement; your role is to determine what that agreement would have been.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:   Adapted from <u>N.D. Cal. Model</u> at 5.1, 5.7; <u>Crystal Semiconductor Corp. v. Tritech Microelectornics Int'l, Inc.</u>, 246 F.3d 1336 (Fed. Circ. 2001); <u>Fromson v. Western Litho Plate & Supply Co.</u>, 853 F.2d 1568, 1574 (Fed. Cir 1998); <u>Minco, Inc. v. Combustion Eng. Inc.</u>, 95 F.3d 1109, 1119-20 (Fed. Cir. 1996); <u>Mahurkar v. C.R. Bard, Inc.</u>, 79 F.3d 1572, 1579 (Fed. Cir. 1996); <u>Rite-Hite Corp. v. Kelley Co.</u>, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc); <u>Maxwell v. Baker, Inc.</u>, 86

186

F.3d 1098, 1108-10 (Fed. Cir. 1996); <u>Georgia-Pacific Corp. v. United States Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

## Defendant's Proposed Jury Instruction No. 129

### Patent Infringement
### Damages - Date of Commencement

In awarding damages, if any, those damages should commence on the date that Nitro has both infringed and been deemed to be notified of the patent.

If you find that Acushnet properly marked the products it sold that are governed by the Acushnet Manufacture Patents, then damages began upon infringement with no requirement for actual notice.

Damages for infringement of the '535 Patent began on January 15, 1996.

You should not compute any damages for infringing activity that occurred prior to January 15, 1996.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:   35 U.S.C. § 287(a)-(b); <u>Crystal Semiconductor Corp. v. Tritech Microelectornics Int'l, Inc.</u>, 246 F.3d 1336 (Fed. Circ. 2001); <u>Nike Inc. v. Wal-Mart Stores</u>, 138 F.3d 1437, 1443-44 (Fed. Cir. 1998); <u>Maxwell v. Baker, Inc.</u>, 86 F.3d 1098, 1108-09 (Fed. Cir. 1996); <u>American Med. Sys. v. Medical Eng. Corp.</u>, 6 F.3d 1523, 1534 (Fed. Cir. 1993); <u>Devices for Med., Inc. v. Boehl</u>, 822 F.2d 1062, 1066 (Fed. Cir. 1987).

**Defendant's Proposed Jury Instruction No. 130**

**Trademark Dilution - Florida Law**
**Nature and Elements of Claim**

As its eighth claim, Acushnet alleges that Nitro's acts have diluted Acushnet's trademarks, in violation of Florida law.  In order to prevail on its claim for dilution of its trademarks, Acushnet must prove two specific facts by a preponderance of the evidence: first, that Nitro used a designation to identify its golf balls that resembled Acushnet's trademarks, and, second, that this designation was likely to cause injury to Acushnet's business reputation or the image associated with Acushnet's trademarks.

A dilution claim does not require competition between Nitro and Acushnet, nor does it require a likelihood of confusion.  However, to be protected from dilution, a trademark must be sufficiently distinctive to warrant such protection.  There are a number of factors that you should consider in determining whether Acushnet's trademarks have acquired sufficient distinctiveness to be protected from dilution.  Those factors are: 1) the inherent distinctiveness and uniqueness of Acushnet's trademark, 2) the duration and extent of its use, 3) the duration and extent of advertising that emphasizes the trademark, and 4) the degree of recognition of Acushnet's trademarks by prospective purchasers. Additionally, the extent, if any, of use of Acushnet's trademarks by other parties also bears on the degree of distinctiveness of the trademarks.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____
Authority:   Great Southern Bank v. First Southern Bank, 625 So.2d 463, 470-471 (Fla.1993);
Sakura Japanese Steakhouse, Inc. v. Lin Yan, Inc., 827 S.2d 1105, 1107 (Fla.
App. 2002).

**Defendant's Proposed Jury Instruction No. 131**

**FDUTPA Claim**
**Nature and Elements of Claim**

Acushnet's ninth claim against Nitro is for unfair and deceptive trade practices in violation of Florida law.  In order to prevail on this claim, Acushnet must prove by a preponderance of the evidence that Nitro's practices constituted an unfair method of competition, an unconscionable act or practice, or an unfair or deceptive act or practice in the conduct of Nitro's business, and that such an act or practice was a legal cause of damage to Acushnet.

In determining this claim, you are to follow the instructions I have given you for determining whether statements are statements of fact or rather are statements of pure opinion or expressions of mixed opinion.

If you find by a preponderance of the evidence that Nitro's statements were statements of pure opinion or expressions of mixed opinion, you may not consider those statements in determining Acushnet's FDUTPA claim.

If you find that Nitro's statements about its products were clearly not false statements, or were not made with actual knowledge of their falsity, you may not consider those statements in determining Acushnet's FDUTPA claims.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

Authority:      §§ 501.201, 501.204, 501.211(2), Fla. Stat. (2001).

190

**Defendant's Proposed Jury Instruction No. 132**

**FDUTPA**
**Unfair Practices**

An act or practice is unfair in violation of Florida law when it offends established public policy, such as governmental regulations or guidelines, and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers or legitimate business enterprises. [District Court to add legal rulings as to statements of public policy].

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Urling v. Helms exterminators, Inc., 468 So. 2d 451 (Fla. 1st DCA 1985); § 501.201, Fla. Stat. (2002) *et. seq.*

## Defendant's Proposed Jury Instruction No. 133

**FDUTPA**
**Causation**

An unfair or deceptive trade practice is a legal cause of a damage if it directly and in material and continuous sequence produces or contributes substantially to producing such damage.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

---

Authority:     Adapted from Fla. Standard Jury Instructions 5.1(a), MI 4.4 at p. 1, MI 10 at p. 1;
               Eleventh Circuit Pattern Jury Instructions, State Claims, 1.3.

## Defendant's Proposed Jury Instruction No. 134

### FDUTPA
### Damages

If you find for Nitro on this claim, you will not consider the matter of damages. But, if you find for Acushnet, you should award Acushnet an amount of money that a preponderance of the evidence shows will fairly and adequately compensate Acushnet for such loss or damage as was caused by the unfair or deceptive trade practice. Such a practice is the cause of loss or damage if it directly and in a natural and continuous sequence produces or contributes substantially to producing such loss or damage. Acushnet may only recover damages for unfair or deceptive trade practices that you find Nitro engaged in after July 1, 2001.

Given _____

Given as Modified _____

Denied _____

Withdrawn _____

Authority:   Fla. Standard Jury Instructions (Civil), MI 7.2 (2003); Guyana Tel. & Tel. Co. v. Melbourne Int'l Communications, Ltd., No.CIV.02-13676, 2003 WL 21018626 (11th Cir. May 7, 2003); Big Tomato v. Tasty Concepts, Inc., 972 F. Supp. 662, 664 (S. D. Fla. 1997); Niles Audio Corp. v. OEM Systems Co., Inc., 174 F. Supp.2d 1315, 1319 (S.D. Fla. 2001); Gritzke v. M.R.A. Holding, LLC, No.4:01CV495RH, 2002 WL 32107540, at *1 (N.D. Fla. Mar. 15, 2002).

**Defendant's Proposed Jury Instruction No. 135**

**FDUTPA Claim – Nitro's Use of Word "Recycled"**

Nitro uses the word "recycled" to describe some of its used golf balls.  The claim that a product is "recycled" may be made for a product only when it is made from materials that have been recovered or otherwise diverted from the solid waste stream, either during the manufacturing process (pre-consumer), or after consumer use (post-consumer).

It is a deceptive and unfair trade practice under Federal Trade Commission guidance as well as Florida law, to misrepresent, directly or by implication, that a product is made of recycled material, if it in fact merely includes recycled raw material, as well as used, reconditioned and remanufactured components. Unqualified claims of recycled content may only be made if the entire product or package, excluding minor, incidental components, is made from recycled material.  Additionally, for products that contain used, reconditioned or remanufactured components, a recycled claim should be adequately qualified to avoid consumer deception about the nature of such components. No such qualification would be necessary in cases where it would be clear to consumers from the context that a product's recycled content consists of used, reconditioned or remanufactured components.

Therefore, if you find that the preponderance of the evidence establishes that the balls that Nitro describes "recycled" are not made entirely from raw materials reclaimed from the waste process and if Nitro did not disclose to the consuming public during the period of time from January 15, 1998, to this date that those balls are merely used balls, then you must find that Nitro has violated FDUTPA.

<div style="text-align:right">

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

</div>

Authority:       § 501.203(3), Fla. Stat. (2002); 16 C.F.R. § 260.7(e)(1)

**Defendant's Proposed Jury Instruction No. 136**

**Unjust Enrichment**
**Nature and Elements of Claim**

As its tenth claim, Acushnet asserts that Nitro's use of Acushnet's trademarks and patents unjustly enriched Nitro.  The doctrine of unjust enrichment prohibits one party from unjustly enriching itself at the expense of another.  In order to establish its claim for unjust enrichment, Acushnet must prove that 1) it conferred a benefit on Nitro, who has knowledge of the benefit, 2) Nitro accepted and retained the benefit, and 3) under the circumstances, it would be inequitable for Nitro to retain the benefit without paying for it.

Unless otherwise allowed under the instructions I have given you, it is inequitable for Nitro to trade on the goodwill and reputation of Acushnet's trademarks that Acushnet has built up by advertisement and promotion.  Therefore, a trademark infringer can be required to turn over the profits it earns during the period of infringement.

If you find that Acushnet has established by a preponderance of the evidence that Nitro has infringed Acushnet's trademarks, then Acushnet is entitled to recover Nitro's profits from those sales on its claim of unjust enrichment.  In assessing the amount of Nitro's profits, Acushnet only has to prove the Nitro's sales; Nitro must prove all elements of cost or deduction claimed.  Further, it is Nitro's burden to prove any proportion of its total profits which may not have been due to the infringement.  Thus, Acushnet need only prove gross sales and then it is up to Nitro to prove which, if any, of those sales were not attributable to the wrongful act, and deductible costs and expenses to arrive at net profits.  Any doubts about the actual amount of gross sales or profits will be resolved against the infringing party.

Given    _____
Given as Modified    _____
Denied    _____
Withdrawn    _____

---

Authority:     15 U.S.C. § 1117 (2003); Timberland Consol. P'ship v. Andrews Land and Timber, Inc., 818 So. 2d 609, 611 (Fla. 5th DCA 2002);Duncan v. Kasim, Inc., 810 So. 2d 968 (Fla. 5th DCA 2002); N.G.L. Travel Associates v. Celebrity Cruises, Inc., 764 So. 2d 672 (Fla. 3d DCA 2000).

**Defendant's Proposed Jury Instruction No. 137**

**Trademark Infringement (Florida Common Law)**

As its eleventh claim, Acushnet's alleges that Nitro trades on the goodwill associated with Titleist Marks and misleads and deceives the public into assuming a connection between Nitro products and Acushnet products, in violation of Florida trademark infringement and unfair competition law.

To prevail in its claim for Florida common law trademark infringement, Acushnet must prove by a preponderance of the evidence that Acushnet first adopted the mark; that the trademark is distinctive; that Nitro used or intends to use the trademark or a confusingly similar trademark in competition with Acushnet; and that customer confusion of source or sponsorship of the goods is probable, likely or inevitable. You must presume that all trademarks that are incontestably registered are distinctive. Other trademarks are distinctive if they are fanciful, novel or arbitrary, or have acquired secondary meaning.

To prevail in its claim for Florida common law unfair competition, Acushnet must prove by a preponderance of the evidence that Nitro's conduct is likely to cause confusion in the trade as to the source of unauthorized products bearing Acushnet's trademarks, or is likely to cause confusion in the trade as to the source of unauthorized products bearing Acushnet's trademarks, or is likely to lead the public to believe that Nitro is in some way connected with Acushnet. Acushnet may also prevail in its claim for unfair competition if it shows that Nitro sold used Acushnet product bearing Nitro trademarks as new products, or falsely representing Nitro to be the source of Acushnet technology. The test for likely confusion under the common law of Florida is substantially the same as the tests I have previously given you for likelihood of confusion under Federal law.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     <u>Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.</u>, 889 F.2d 1018, 1025-26 (11th Cir.
               1990); 15 U.S.C. § 1115 (2003); <u>Chemical Corp. of Am. v. Anheuser-Busch, Inc.</u>,
               306 F.2d 433, 436-39 (5th Cir. 1962); <u>Am. Bank of Merritt Island v. First Am.
               Bank and Trust</u>, 455 So. 2d 443, 445-49 (Fla. 5th DCA 1984).

.

**<u>Defendant's Proposed Jury Instruction No. 138</u>**

**General Instructions -- Duty to Deliberate**

Any verdict you reach in the jury room must be unanimous.  In other words, to return a verdict you must all agree.  Your deliberations will be secret; you will never have to explain your verdict to anyone.

It is your duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so.  Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury.  While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong.  But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

Remember, that in a very real way you are judges -- judges of fact.  Your only interest is to seek the truth from the evidence in the case.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____
Authority:      Adapted from Eleventh Circuit Pattern Instructions, Basic Instructions 7.2.

**Defendant's Proposed Jury Instruction No. 139**

**General Instructions**
**Election of Foreperson, Explanation of Verdict Forms**

When you go to the jury room you should first select one of your members to act as your foreperson. The foreperson will preside over your deliberations and will speak for you here in court.

A form of verdict has been prepared for your convenience.

[Explain Verdict Form]

You will take the verdict form to the jury room. When you have reached unanimous agreement, you will have your foreperson fill in the verdict form, date and sign it, and then return to the courtroom.

If you should desire to communicate with me at any time, please write down your message or question and pass the note to the marshal who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you returned to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should not tell me your numerical division at the time.

Given _____
Given as Modified _____
Denied _____
Withdrawn _____

_____

Authority:     Adapted from Eleventh Circuit Pattern Instructions, Basic Instructions 8.