**NIGHT BOX**
**FILED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:02-14008-CIV-MIDDLEBROOKS

CLARENCE MADDOX
CLERK, USDC / SDFL / WPB

IN RE:  NITRO LEISURE PRODUCTS, LLC,
_____/

## NOTICE OF FILING DECLARATION

Nitro Leisure Products, LLC, through its undersigned attorneys, hereby files

the Declaration of Paul Kim in support of its Motion in Limine No. 3 to Exclude the

Testimony and Report of Acushnet's Survey Expert Charles Cowan.

FBN 0107816
ATTORNEY OF RECORD

**YOCCA PATCH & YOCCA LLP**

By: _____
Mark W. Yocca
California State Bar No. 137189
Ryan M. Patch
California State Bar No. 128042
19900 MacArthur Boulevard, Suite 650
Irvine, California 92612
Telephone:    (949) 253-0800
Facsimile:    (949) 253-0870

**RICHMAN GREER WEIL**
**BRUMBAUGH MIRABITO &**
**CHRISTENSEN, P.A.**
Gerald F. Richman
Florida Bar No. 066457
One Clearlake Centre - Suite 1504
250 Australian Avenue, South
West Palm Beach, FL 33401
Tel:  (561) 803-3500
Fax: (561) 820-1608
*Attorneys for Nitro Leisure Products, LLC*

Nitro\Acushnet\Pleadings\Nic Filing PK Decl.Cowan.wpd



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:02-14008-CIV-MIDDLEBROOKS/LYNCH

IN RE:  NITRO LEISURE PRODUCTS, LLC

_____/

### DECLARATION OF PAUL KIM IN SUPPORT OF PLAINTIFF
### NITRO LEISURE PRODUCTS, LLC'S MOTION IN LIMINE NO. 3 TO
### EXCLUDE THE TESTIMONY AND REPORT OF ACUSHNET'S SURVEY
### EXPERT CHARLES COWAN

I, PAUL KIM, declare as follows:

1.      I am an associate at Yocca, Patch & Yocca LLP, counsel of record for Plaintiff and Counter-Defendant Nitro Leisure Products, LLC ("Nitro") in this action.  I make this Declaration in support of Nitro's motion to exclude the testimony and report of Defendant Acushnet Company's ("Acushnet") survey expert, Charles Cowan ("Cowan").  I have personal knowledge of the facts set forth below and, if called as a witness, could and would competently testify thereto.

2.      Attached as Exhibit "A" hereto is a true and correct copy of Cowan's expert report served in this action.

3.      Attached as Exhibit "B" hereto is a true and correct copy of the relevant excerpts from Cowan's deposition transcript in this action.

I declare under penalty of perjury that the foregoing is true and correct, executed this 8th day of January, 2004, at Irvine, California.

PAUL KIM

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served this 8th day of January 2004

by U.S. Mail and Facsimile upon the following:

Chris S. Coutroulis, Esq.
CARLTON FIELDS, P.A.
777 S. Harbour Island Boulevard
Tampa, Florida 33602-5730
ccoutroulis@carltonfields.com
Facsimile 813-229-4133

PAUL KIM

**EXHIBIT  A**

# DR. CHARLES D. COWAN

# REPORT

# SEPTEMBER 26, 2003

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*

*September 26,2003*

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

In Re: Nitro Leisure Products, LLC

Expert Report of Charles D. Cowan

This report is presented as rebuttal to expert reports submitted in the above referenced case. My comments are specific to the reports of Dr. John W. Jepson and Mr. Thomas P. Mayer, and my report presents results of a survey conducted specifically to address issues raised in these reports regarding public perceptions of the relative performance of Nitro products.

My background in summary covers 30 years of research and study in the areas of statistics, economic methods, and their application to business problems. I currently serve as Managing Partner of Analytic Focus$_{LLC}$, a research company headquartered in Birmingham, Alabama. A significant portion of our work focuses on issues of regulatory compliance and operations optimization for financial institutions. We also conduct research in legal issues, including providing litigation support and expert witnessing when requested. The final area of our practice is in support of Federal and State agencies needing economic and financial analysis to pursue their missions. I am also an adjunct professor in the School of Business at the University of Alabama – Birmingham.

Prior to founding Analytic Focus, I was a director for ARPC, a firm in Washington, DC where I provided many of the same services currently offered by Analytic Focus. From the beginning of 1997 through the end of 1999, I was a Director for Price Waterhouse and subsequently PricewaterhouseCoopers. In this position I headed up two different staff groups, one the financial research group in the Survey Research Center (SRC) run by Price Waterhouse, the other the data mining group. Our research efforts in the SRC was in support of business to business consumer research and financial analysis and for the Federal Government to research regulatory impact. In the data mining group we provided fraud detection services for financial services organizations, optimization research for businesses concerned with supply chain issues in production, and analysis of delivery systems for a number of major delivery companies.

Before joining Price Waterhouse, I was Chief Statistician for the Federal Deposit Insurance Corporation and the Resolution Trust Corporation, where I was responsible for all research on valuation of properties and assets taken in by the FDIC and RTC in the banking crisis of the 1980s and 1990s. I also supported research into fraud, optimization of contracts with servicing companies, and consumer perceptions of their interactions with banks and savings and loans. I prepared and jointly presented results on the FDIC's consumer research to Congress, specifically the House Banking Committee in hearings on how consumers perceive what they are told regarding retail transactions in banks.

During this time, 1991 to 1996, I also served on a number of independent review committees for different Federal agencies to evaluate the quality of research conducted or research proposed for the National Institutes of Health, for the Department of Health and Human Services, for the Department of Justice, for Treasury, and for the Department of Agriculture. These committees were formed specifically to determine how to determine whether research presented to the

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                                    *September 26, 2003*

Federal government could support conclusions drawn or to consider whether research proposed in grant applications would be adequate to study the topic in question.

I also worked for a time in the private sector as Chief Statistician and a Vice President for Opinion Research Corporation, from 1989 through 1991. In this position I helped design over 100 consumer research studies focusing on acceptance of new products, pricing, and customer satisfaction. In particular I helped to design the largest ongoing customer satisfaction study conducted in the United States for the U.S. Postal Service to investigate all aspects of consumer reactions to operations of and interactions with the Postal Service.

From 1986 through 1989, I was the first Chief Statistician for the newly founded National Center for Education Statistics, an agency within the Department of Education. As the Chief Statistician I was responsible for the design of all surveys and research conducted by NCES, reports to Congress on the state of education in the U.S. and in the world, and on staff development in research methods. In particular, under my guidance, NCES was one of the first Federal statistical agencies to publish standards for operations and research. These standards are still required for the conduct of research by all NCES staff and all contractors working with the NCES.

From 1975 through 1986 I held a variety of positions at the U.S. Bureau of the Census, including Chief of the Survey Design Branch, where I was responsible for the technical aspects of all research conducted on the evaluation of surveys and the 1980 Decennial Census. I also designed research studies on the validity of surveys conducted by the Census Bureau, experiments to measure response validity, and helped a number of countries develop research programs regarding their economic and demographic research programs.

My first positions after graduation were with the Institute for Social Research at the University of Michigan and as Manager of the Survey Research Center at Oregon State University.

During this time I served on a number of different committees in professional associations including the American Statistical Association, the American Association for Public Opinion Research, and the Research Industry Coalition, including the presidency of the latter. For each of these associations I was involved in issues of ethics and professional standards in the research community.

I have also served as an adjunct or visiting professor at a number of universities, besides my current position as an adjunct at UAB. I have also been an adjunct professor teaching statistics at the George Washington University and a visiting research professor at the University of Illinois.

A full listing of my background and experience as well as my publications is given in my resume, attached to this report. A separate page lists all cases in the last four years in which I have given testimony or been deposed. My compensation for research conducted is $300 per hour and $400 for deposition or testimony.

The opinions I offer in this report are all opinions I currently hold regarding the expert reports submitted by Dr. Jepson and Mr. Mayer. However, as I have not received the electronic data files from the survey conducted by Mr. Mayer and as there is still some information unavailable regarding Dr. Jepson's report, I may form and offer new opinions if new information becomes

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                                    *September 26, 2003*

available. I start with the Jepson report and then address the issues raised by the Mayer report and survey.

The Jepson Report

This report presents a number of opinions regarding the expectations of golfers and the viability of an experiment using a mechanical testing device. My report addresses these opinions.

The first opinion to be addressed comes from Dr. Jepson's report, section II. <u>Opinions and Bases for Opinions</u>, paragraph 2, page 4. Dr. Jepson asserts:

> 2. Refurbished, recycled and new golf balls, including my opinions that (i) golfers have less performance expectations from a used golf ball that (sic) they do from a new golf ball, and (ii) Acushnet's new golf balls have failures with regard to specific golf ball features including, without limitation, such features as paint quality, dimple depth, defects in the cover and clear-coat.

In Dr. Jepson's statement regarding the performance expectations of golfers, he offers no support for this opinion – it seems to be merely a statement of his own opinion. Elsewhere, Dr. Jepson is careful to distinguish between new, rewashed, and refurbished balls, but here he combines rewashed and refurbished into a single category of used. There are differences in expectations of golfers and the understanding of golfers regarding the relative utility of new, rewashed, and refurbished golf balls. To demonstrate these differences, we conducted a survey regarding the beliefs of golfers regarding these three types of golf balls and the reaction of golfers to an independent study regarding the performance of these types of golf balls.

The survey was conducted by telephone during the week of September 15, 2003. The sample selected was a random digit dial sample conducted in the United States of persons in households. The survey asked the person answering the phone if they were over 21, and if they had played golf or had played golf in the last five years. People who are golfers or had played golf in the last five years and who are over the age of 21 were interviewed as the population of interest. A total of 250 golfers over the age of 21 were interviewed.

In the survey, golfers were first asked a set of questions regarding their expectations of the performance of "washed" (used but not refurbished) and refurbished golf balls. To ensure that all respondents had the same understanding of the distinction between the two types of balls, respondents were read an introductory statement:

> *I'd like to describe the results of a research study about golf balls and ask for your opinion. Three varieties of golf balls were tested using a machine – a mechanical golfer – to hit the golf balls. The test used a machine so that the balls would be hit with a driver off a tee. The machine hit each ball the same way with the same effort each time. All balls were made by the same manufacturer and were all the same type of ball.*

> *The only difference between the balls was that some were new, some were used and washed, and some were used and refurbished. Washed balls are pond balls that have been washed and repackaged to be sold. Refurbished balls are pond balls that have been stripped of the paint coating and then repainted and remarked with the original manufacturer's name. Several hundred golf balls overall were tested.*

3

Report by Dr. Charles D. Cowan
In RE:  Nitro Leisure Products

September 26, 2003

Following the introductory statement, golfers were asked if they expected there would be a difference in performance between washed balls and refurbished balls.  If the respondent indicated that he or she expected a difference, the respondent was asked which ball would perform better (washed or refurbished).  Three fourths of the respondents expected that the refurbished ball would perform as well as or better than the washed ball.

| Performance Expectations | Percent |
|---|---|
| No Difference Expected | 40% |
| Washed Should Perform Better | 14% |
| Refurbished Should Perform Better | 35% |
| Don't Know | 10% |
| Total | 100% |

Respondents were then asked two further questions.  The first gave the results regarding distance from the Felker study to the respondent .  The question was:

*In the test I described earlier, the new balls went 4 yards further than the washed balls.  In the same test the new balls went 11 yards further than the refurbished balls.  In comparing the washed with the refurbished balls, would you say that the performance of the refurbished balls is...?*
*> Much better than I would have expected*
*> Somewhat better*
*> About what I would have expected*
*> Somewhat worse*
*> Much worse than I would have expected*

The second gave the results regarding scatter from the Felker study to the respondent .  The question was:

*In the test I described earlier, there was no difference in the side to side dispersion between new and washed balls.  In the same test, refurbished balls had a scatter that was 3 yards greater than washed balls.  In comparing the washed with the refurbished balls, would you say that the performance of the refurbished balls is ...?*
*> Much better than I would have expected*
*> Somewhat better*
*> About what I would have expected*
*> Somewhat worse*
*> Much worse than I would have expected*

For both questions, the choices given above were read to the respondent.  The respondent could also say that they don't know in response to either question; this was treated as a nonresponse in the subsequent analysis.

The two questions above were cross-tabulated to determine the number of persons who said that the performance was somewhat worse or much worse on either question.  Chart 1 in the appendix to this report shows the distribution of responses for these questions for different key subgroups in the sample.  A significant portion of the respondents said that they expected the

4

Report by Dr. Charles D. Cowan
In RE: Nitro Leisure Products

*September 26, 2003*

---

refurbished ball to perform better.  When presented with the Felker results, 64 percent of these responded worse or somewhat worse to at least one of the questions regarding performance. When one considers respondents who said that they expected the refurbished ball to perform as well as or better than a used ball – a full 75 percent of the sample – 50 percent of this broader group said that performance was worse on at least one measure.  And when considering the full sample, without regard to which ball they expected would perform better, we found that 44 percent of the respondents who gave an answer to both questions responded worse to at least one of the two performance questions.

Even among those people who said that the washed balls would perform better, 25 percent of these respondents said that the refurbished balls performed worse than they expected a used ball to perform, and this group had lowered expectations at the outset.

My general conclusion from this survey is that a large portion of the population has an expectation that the refurbished balls will outperform used balls.  When presented with evidence on the actual performance of refurbished balls, as compared with a used but not refurbished ball, the majority of this group states that the performance was worse than expected.  Without regard to their prior expectations, a very large portion of the general population states that the performance was worse than expected from a used ball when presented the facts.

The Jepson Report – Part Two
There are two general problems with the second part of the Jepson report that addresses the results of the Felker study.  The first is that he ignores the test or survey methods employed. The second problem is his lack of understanding of statistical procedures and methodology.

In the Jepson Report section entitled Mr. Felker's Test Results, starting at paragraph 28, Dr. Jepson reviews the test results.  He makes a number of statements that are unsupported or which contradict other information that is generally available.  He follows these with statements that are simply wrong regarding the utility of the Felker test.  My comments below are in rebuttal to Dr. Jepson's specific statements.

The most severe problem with the Jepson report is that he completely ignores the design of the Felker research study.  In ignoring the design, Dr. Jepson raises concerns about the outcomes of the test that are false and misleading to any reader who is not familiar with the test design. Dr. Jepson raises three concerns that would have nothing to do with the validity of the test conducted regarding differences in performance.  Dr. Jepson complains in paragraphs 30, 31, and 32 that Mr. Felker conducted his tests in "unacceptable weather conditions", does not indicate whether he measured the relative humidity on the testing days, and does not describe the conditions of the areas of the ground to which the balls were being hit.

In raising these issues, he can't even bring himself to say that weather, humidity, or ground conditions did impact the results of the study.  In paragraph 30, he concludes that "these conditions are unacceptable for comparative golf ball testing".  In paragraph 31, he insinuates that the test is impaired in some way because "relative humidity may impact the test results".  In paragraph 32, he again implies that there are possible problems with the test because "the ground conditions will affect the roll of the golf ball".

5

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                                    *September 26, 2003*

The Felker study results could not be affected by any of these factors because of the design of the study.  Golf balls that were going to be tested were put into blocks of six balls, where new, used, and refurbished balls were included in each block and hit in a random order.

Report by Dr. Charles D. Cowan
In RE: Nitro Leisure Products

September 26, 2003

All six balls in a block were hit in rapid succession, so each set of balls in a block would be subject to substantially the same wind, humidity, and ground conditions. The report from this study states clearly that the randomized block design was chosen to control for these effects:

> Because it is difficult to completely control all testing conditions and because certain environmental conditions, such as wind, temperature and humidity, are uncontrollable and may change over time; we used the randomized block design to ensure that the new, washed and refurbished balls were compared under similar conditions. In this design, a block of balls consisting of equal numbers of the new, washed and refurbished balls are hit in a short period of time (in which experimental conditions are similar) in a randomized order. The randomization of order ensures that no ball (new, washed or refurbished) has an advantage over the others because of experimental conditions, for example, by always being hit first.[1]

In the analysis, there are multiple sources of variability that are considered in making comparisons of the performance of the golf balls. One source of variability is the difference between the blocks. A block of balls hit in the morning may perform completely differently than a block of balls hit in the afternoon, possibly because of a difference in wind conditions, possibly because the humidity has risen, or for any other change in test conditions. However, since all six balls are hit at almost the same time within each block, one would expect that the difference in performance within that block would be due primarily to differences between the balls, since the remaining conditions at the time the block is hit would be essentially the same for balls in the block. Dr. Jepson, in reviewing the report, ignores this critical component of the experimental design and wants us to believe that these factors would have some impact on the outcomes.

Other factors not mentioned in the Jepson report have also been addressed in the way the study was conducted. It is clear from the instructions given by Dr. Kelly to Mr. Felker that randomization was the key to a sound research design. The testers were instructed to randomly select balls to be tested from a bucket and to place them on the Iron Byron hitting surface without looking at them. There is no reason to believe that other factors systematically affected any portion of this research.

In summary, weather, humidity, and ground conditions were all substantially controlled by the design of the study. Almost all of the effects of these factors could be separated easily from true performance differences and in fact were. Differences reported from the Felker study were measured performance differences after controlling and removing the effects that Dr. Jepson says might impact the results.

Dr. Jepson, besides ignoring the design of the study, ignores basic principles of statistics in reviewing the results of the research. In paragraph 33 he fabricates conclusions that he says are Mr. Felker's that are clearly not in the report. Dr. Jepson says specifically that:

> Mr. Felker concludes that rewashed Titleist DT 2-Piece balls travel on average over 2 yards longer than new Titleist DT 2-Piece golf balls. Mr. Felker concludes that washed DT Series golf balls have, on average, less dispersion than new golf balls. And Mr. Felker concludes that washed Titleist PRO V1 golf balls have less carry dispersion than new Titleist Pro V1 golf balls.

---

[1] "Comparison of New, Washed and Refurbished Titleist Balls", report by Dr. Colleen Kelly, June 10, 2003.

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*

*September 26, 2003*

---

Mr. Felker and Dr. Kelly in fact draw no such conclusions. Each difference between different types of golf balls is clearly tested and the results of such tests are reported. All of the test reports presented are between refurbished balls and new balls or the refurbished balls and the rewashed balls – the header on each table states this clearly. No conclusions are drawn between washed and new balls.

However, if we look closely at the tables presented in the report, we can also see that the results that Dr. Jepson "quotes" are clearly not to be found in the tables. Dr. Kelly in her report does report numbers for dispersion and carry that show that the dispersion values are seemingly less for rewashed balls, but the differences are not statistically significant, meaning that no conclusions may be drawn.

In every statistical study, there is a formal testing procedure that considers whether differences observed are real or if they could have resulted because of differences due to the use of sampling. It would be physically impossible to test every single golf ball ever manufactured, so a sample must be selected for testing. In this case, three samples of balls were selected – one of new balls, one of rewashed balls, and one of refurbished balls. These samples are compared to try to measure whether there is a difference in the populations represented. Even though there is a difference observed in the samples, this does not mean that there is necessarily a difference in the populations. Different samples may yield different results. However, there is enough information in each sample to be able to tell how likely a particular difference might be in the population. For the differences in dispersion that Dr. Jepson touts, the differences exist in the sample, but there is no way to draw a conclusion about differences in the population. In the report, no conclusion is drawn – in fact, the opposite occurs and it is quite clear that Mr. Felker and Dr. Kelly are careful not to draw a conclusion regarding these two differences because they cannot. Dr. Jepson is stating that Mr. Felker drew conclusions when he did not.

This leaves one difference reported that Dr. Jepson, using his logic, would find suspect. This is the result that shows that a rewashed balls travels over 2 yards longer than a new ball. Of course, Felker and Kelly draw no conclusion about this difference despite what Dr. Jepson claims because no formal test of differences between rewashed and new balls is conducted or reported. The one place where there is a difference this large, however, is in Table 3 in the Kelly report. This is one test result out of 40 that are presented in the tables in the Kelly report. However, in the application of these tests, there is a secondary consideration that is addressed in the more comprehensive analysis conducted by Dr. Kelly, namely that if one conducts enough tests, one would expect that a small number of tests will appear significant just by chance. This is known as the problem of multiple comparisons.

Multiple comparisons problems surface when many tests are performed at a set level of significance. This occurs because of the nature of the test. The test being conducted is that there is no difference between treatment A and treatment B, versus the alternative that there is a difference between the two treatments. The test is usually conducted at the 95 percent level of significance. What this means is that 5 out of 100 times, one would expect to conclude, incorrectly, that there is a difference when there is not one. The numeric result, 5 out of 100 times, is mathematically the same as 1 out of 20 times, or 2 out of 40. In other words, we might easily expect to find one or two results out of 40 that are significant though spurious.

8

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                                                  *September 26, 2003*

Dr. Jepson doesn't seem to understand even what is being tested. His final conclusions show that he has not grasped the basics of the study. In his paragraph 34, Dr. Jepson claims that the "comparison of the new and refurbished golf balls is highly misleading, because it does not account for the effect of water and other outside influences on refurbished balls. New golf balls have not been in water or previously hit." In paragraph 35, Dr. Jepson makes the same claim regarding differences between refurbished and washed balls. However, in the test he is reviewing, the entire design is devoted to holding constant all other possible differences and looking only at the difference in performance in these three types of balls on five key indicators. The difference in performance can only come from the fact that the used balls have been in water and have been previously hit, and that the refurbished balls have been further processed.

Dr. Jepson claims that Mr. Felker's report fails to account for these differences. Mr. Felker's test is exactly about these differences – they are the only thing that could account for these differences. It is hard to grasp what Dr. Jepson thinks is being tested, especially in light of the next paragraph which claims that there is no difference in performance.

Dr. Jepson in his paragraph 35 states that there is an "insignificant difference in performance between the washed and refurbished golf balls, which difference would be generally undetectable to the end users of Nitro's refurbished golf balls." Dr. Jepson is incorrect in either sense of the word "insignificant". If he means "insignificant" in the technical sense, there is a formal "significant" difference in many of the indicators measured by Mr. Felker, as cited by Dr. Jepson. If, by using the word insignificant, he is attempting to indicate that the test results do not show any real differences in performance, they clearly do. If, instead, he is using the word "insignificant" to indicate a perceptual difference, this is also clearly incorrect. One difference stands out for the Pro V1 ball that cannot be ignored, namely that the refurbished ball travels 11 yards less than a new Pro V1 and seven yards less than a rewashed ball. This distance is the difference between clubs for a golfer; for example, for a shot requiring a five iron for a new ball, to get the same distance with a refurbished ball one would expect to have to use a four iron, giving up control to achieve the same distance. The difference between a five iron and a four iron is not "undetectable", as claimed by Dr. Jepson.

Although Dr. Jepson has trouble with the conduct and purpose of the test, these aren't the only problems he has in understanding the experiment. Dr. Jepson is also misleading in his characterization of the setup of the experiment. In paragraph 29 of the Jepson report, page 8, Dr. Jepson states that "By setting the Iron Byron to a swing speed of approximately 109 miles per hour, Mr. Felker maximized any performance differences between the golf balls. The swing speed used by Mr. Felker is substantially faster than the swing speed of the typical users of Nitro's refurbished golf balls. Higher swing speeds maximize performance differences between golf balls." No studies of Nitro customers are offered.

My final comment leads me to the Mayer study. Dr. Jepson repeats the statements made by Mr. Mayer, that the Iron Byron test does not replicate actual market conditions because it does not replicate the swing of the end users of Nitro's refurbished golf balls. He states that the Iron Byron makes a perfect golf swing every time and that the typical end user of Nitro's product rarely does so. It is disingenuous for Dr. Jepson to argue that the Felker study didn't control for wind, humidity, nor ground conditions, but that it's perfectly alright in the Mayer study to not control for these factors and in fact to add a source of variability that is greater than any of the others – the golfer.

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                              *September 26, 2003*

Dr. Jepson ignores the basic issue, which is difference in performance between the different types of balls. He argues for better controls on the one hand, and then as an afterthought argues that there should be more sources of variability, and that these would be uncontrolled. He simply cannot have it both ways.

<u>The Mayer Report</u>
The Mayer report suffers from similar inadequacies in terms of a lack of understanding of research method and the interpretation of statistical data. Mayer collects data from a convenience sample, analyzes the results as if they were obtained through a random process, and makes broad statements with no support for the conclusions drawn.

The Mayer survey has some very basic problems of execution. More problematic is the presentation of results and the lack of any statistical underpinning for the claims made.

Mr. Mayer claims that the marketplace is the golf course, or more specifically the driving range. I do not accept the validity of this claim, and I reserve the right to revisit this issue as well as any other issues that might arise from a further review of data. In particular, if we receive the electronic data necessary to adequately review the results of Mr. Mayer's endeavors, I would expect to use this data to conduct tests of Mr. Mayer's assertions. Even without this data and ignoring the unsupported claim that "marketplace testing" is better than the performance testing using the Iron Byron, there are more than enough problems with the "survey" to be able to question the conclusions that Mr. Mayer draws.

What Mr. Mayer does is have golfers hit golf balls. To do this, he conducts the equivalent of a mall intercept study or a clinical study, except he doesn't follow any of the protocols traditionally associated with these endeavors. Mr. Mayer hired a survey firm to go to three golf courses in Florida and solicit cooperation from golfers arriving at these courses.

Individuals solicited were asked a series of qualifying questions. If they answered the questions satisfactorily, they were then asked to hit two sets of golf balls. Some golfers were eliminated from the survey because of quotas established on the numbers of golfers that could qualify from different categories. We will return to this issue after the general description.

Each golfer warms up, and then hits five of each type, new versus refurbished, ignoring any questions that surface regarding differences between washed balls and the other two categories. Recognizing that there may be a bias due to the order in which the balls are hit, he randomizes whether the refurbished are hit as the first group or the second group. Although he goes to the bother of randomizing the order, he doesn't test to determine whether there is a difference in response from his golfers as to whether the first or second group is routinely preferred.

There is no record of how successful each golfer was in hitting the ball straight or instead striking the ball with the toe or the heel of the club, nor whether the ball has been struck too low or too high. If a ball is struck badly, there is no record that the golfer was able to strike a substitute ball to get the full five hits for each type of ball. At the end of the process we don't know the number of balls being considered by the golfer in his comparisons between the types.

We don't know whether the golfers have an accurate or indeed any perception of how far the balls went, nor whether the golfers could perceive how far different balls traveled. We don't know whether other golfers were hitting at the same time so that there could be confusion in which balls landed where after the first one or two balls were struck. No information was collected about whether the golfers interviewed could perceive differences in how far the balls traveled.

A set of questions is administered to the golfer after hitting five golf balls of each type from the driving range tees. The golfer is told to use the club "you would normally use off the tee", meaning that a golfer could have chosen any club in his bag, from a pitching wedge to a driver. Furthermore, there are no instructions telling the golfer not to switch clubs in the middle of the data collection, nor does there seem to be a training manual for the interviewers.

In the set of questions asked about the golf balls, a very general question is asked about the performance of the first set of balls hit, followed by a question about how likely the respondent is to buy the golf balls, without any qualification regarding price or manufacture. This form of question is unusual, given that later in the survey the golfer is asked what factors are important in the purchase decision. We don't know what is going on in the minds of golfers when answering this question. They could be thinking, yes I'd buy as long as the price is not above $x. They could be thinking, yes, but I'd never buy used balls. If some factors are important to the purchase of golf balls, they would also be important to asking purchase intent.

Asking a single question to get at a complex issue is akin to the methods used to forecast the outcome of the 1948 presidential election, where voters were asked whether they would vote for Dewey or Truman. Unfortunately, these voters were not asked whether they were likely to vote. The infamous results of that survey are still the prime example of bad survey design. In this survey the golfer is asked the bald question about how likely he is to purchase, but without asking a sufficient number of other questions to know what the golfer had in mind when responding. If respondents have a different context in mind from one another, then the results are pretty much meaningless in determining what their actual behavior might be regarding purchases.

*Methodological Issues - Weighting*
Let us return to the general methodology of conducting the survey. In any survey where differential rates of selection are used to obtain respondents, weighting of the survey must be used to make the survey projectible to the population. Suppose in a general survey of the population of the United States that 1,000 men were interviewed and 2,000 women. To project the results to the known population, which is approximately divided 50% male and 50% female, the responses from the males would have to be given twice the weight of the responses from the females so as to balance the contribution of the males and females in estimating a total. The use of weights usually leads to an increase in the variability of the results of a survey, which means a decrease in the reliability of the estimates produced. In the Mayer survey there is no indication that any weighting of the data was done.

As noted earlier, there are no records indicating the number of people interviewed who did not qualify for the survey, even though an interview must have been filled out so that a determination could be made as to whether the person being interviewed qualified as a respondent. None of these forms were provided to us, so it is impossible to know how many people did not qualify under these rules.

Report by Dr. Charles D. Cowan
In RE: Nitro Leisure Products

September 26, 2003

Nor were any recording forms provided to us to indicate how many people were contacted for the survey at the driving range. And we do not know how many people might have been eliminated from the survey because quotas established for the survey were exceeded. Both sets of information would be important to establishing survey weighting procedures and for use in calculation of reliability estimates. If they do not exist then the survey cannot be properly weighted to project to the universe claimed by Mr. Mayer.

*Methodological Issues – The arbitrary elimination of data from analysis*
We did receive 17 questionnaires that were completed but not used in analysis. In total we received 217 questionnaires to review, but only 200 are tabulated. It is possible to determine which surveys were included in the analysis, but it is impossible to determine the reason that the additional 17 were not used. As this number is nearly 10 percent of the total examined, this is a very significant reduction in what could be analyzed. One test we would like to conduct is whether the non-use of these surveys is directly correlated with preferences for golf ball types. Why eliminate surveys that cost a significant amount to collect when processing costs are negligible? Without the electronic data we did not have the data needed to conduct such a test.

*Methodological Issues – Representativeness of the sites*
As mentioned above, three golf courses that are within a few miles of one another were chosen. No explanation is given of how these courses were selected, how they are more broadly representative of golf courses in Florida or the United States, nor what would make the golfers at these three courses more broadly representative of golfers at other courses in other parts of Florida or the United States. If these three courses are located in an especially affluent area, for example, responses to questions about intent to purchase might be completely different than responses that would be obtained from other parts of Florida.

There is also no statement in the report regarding what counting rules might have been applied for deciding who to approach. In some surveys of this sort, it is difficult to contact everyone who comes by as the rate at which golfers arrive may be too high to accept individuals on a sequential basis. The alternative to deal with this problem is to select a one in k sample, where a count of individuals is kept so that a systematic random sample of individuals is contacted. With no supplemental records to the survey, there is no way to know if or how this was done.

*Methodological Issues - Quotas*
Mr. Mayer states that "the survey universe was designed to include the following skill levels: Approximately 10% of the golfers shot 80 or less over 18 holes. Another 10% shot 100 or more over 18 holes. Approximately 50% of the golfers shot between 91 and 100 over 18 holes and approximately 30% of the golfers shot between 81 and 90 over 18 holes. This universe approximates the golf scores of the population." There seems to be severe confusion in terms used in describing what was done. It seems that Mr. Mayer was attempting to establish what proportion of golfers would be in several strata defined by skill levels. In doing so, however, it is clear that instead of using traditional stratification techniques commonly used in surveys, Mr. Mayer used quotas to try to hit these proportions exactly.

No rationale is offered as to why these proportions are used. We don't know if these proportions are the national proportions of golfers that shoot 18 holes with these scores, or if this is the distribution peculiar to Florida, or if these are even applicable to the three golf courses chosen. If skill levels differed for the three courses chosen, it also means that no controls were introduced to account for course differences in how people were sampled or eliminated because

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                                    *September 26, 2003*

---

of quotas. Mr. Mayer states that "this universe (sic) approximates the golf scores of the population". We believe he means distribution; we don't know what authority would be cited by Mr. Mayer to establish that this is the distribution of golfers by skill level within some population.

Furthermore, as noted earlier there was no attempt to weight the data in the survey to account for the use of quotas. If the golf courses chosen had a different distribution of skilled golfers than the quotas established, then differential rates of sampling would have been used to solicit members of the sample. This in turn would necessitate differential weighting of the sample to make it truly projectible to some population.

*Conclusions Drawn and Analytical Issues*
Mr. Mayer offers a number of conclusions that are not borne out by the tabular results he provided as a supplement to his report. The charts in his report, exhibits "C" through "M", offer a very biased view of the results of the survey, are very misleading, and in fact come to the wrong conclusion regarding preferences in the survey. In the attachment to this report, the charts prepared by Mr. Mayer are presented again, but in doing so we separate categories that Mr. Mayer has combined to give a more objective view of the results.

In Mayer's Exhibit C, Mr. Mayer presents the result that 85% of the respondents found that Nitro is longer or the same as "my regular brand of golf ball" with the corresponding number for Titleist being 89%. Chart 2 in the appendix to this report shows that in fact 29% of the respondents preferred Nitro while 35% preferred Titleist. This is the only chart in which the conclusion does not change: Titleist is preferred on distance to Nitro.

In the remaining exhibits, Mr. Mayer obfuscates the results of his survey by combining categories to make it seem that the Nitro ball is the equal of the Titleist ball. The table below on the next page summarizes some of these results, but charts 3, 4, 5, and 6 in the appendix to show exactly how on each question the preference is for Titleist over Nitro in head-to-head comparisons and also when both sets of balls are compared to the balls usually used by the respondent.

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                                   *September 26, 2003*

| | Longer off Tee | | Accuracy | | Roll | | Preference | |
|---|---|---|---|---|---|---|---|---|
| | Mayer Presents | Separate Categories | Mayer Presents | Separate Categories | Mayer Presents | Separate Categories | Mayer Presents | Separate Categories |
| Nitro is same as or better than Titleist | 48 | | 54 | | 64 | | 46 | |
| Titleist is better than Nitro | 52 | | 46 | | 36 | | 54 | |
| Nitro is better than Titleist | | 40.5 | | 36.5 | | 25.5 | | 40.5 |
| Titleist is better than Nitro | | 52 | | 46 | | 36 | | 54.5 |
| Nitro and Titleist are about the same | | 7.5 | | 17.5 | | 39 | | 5 |

Mr. Mayer states in his report that golfers were very satisfied with the performance of Nitro's balls. Mr. Mayer never actually asks a question regarding satisfaction with the performance of Nitro's balls or Titleist's balls – his questions focus on comparisons with the regular ball played or direct comparisons. This may be poetic license taken by Mr. Mayer in describing his results. But he goes on to say that golfers generally did not detect a difference in performance between the Nitro and Titleist balls. In fact, in table after table and chart after chart, Titleist always comes out better or preferred to Nitro. Mr. Mayer ignores the repeated choice of Titleist by at least ten percent of the respondents to his own survey.

*Methodological Concerns – Order Effects*
Some of the more interesting results from the Mayer survey are not presented in his report. Mr. Mayer carefully introduced a methodological device that randomized the order in which the balls were hit. In other words, half the time the respondents hit the Nitro balls first and half the time the respondents hit the Titleist balls first. Mr. Mayer states that "The order in which the ball groups were tested was changed in order to eliminate 'order bias'. "

Using the method of randomizing the order in which the balls are hit does not eliminate order bias if there is an order bias, it simply makes it possible to estimate that there is an order bias. Estimates from the survey are called into question because it may be that there is no real preference for either ball – respondents are simply choosing the first or second group of balls more frequently. And in fact, that is what happens in this survey, as can be seen in the tables that were provided after Mr. Mayer's report. It is difficult to state that there is a firm preference for anything from Mr. Mayer's survey given that the order effects sometimes outweigh any differences cited for preferences.

Conclusions
Given all the problems listed above for the selection of the sample, the processing of the survey, the biased methods used for presenting the data, and the methodological concerns, it is impossible to put any credence in the results presented in Mr. Mayer's report. This survey is flawed and its utility for decision making is nil.

14

*Report by Dr. Charles D. Cowan*
*In RE: Nitro Leisure Products*                    *September 26, 2003*

Respectfully,

Charles D. Cowan, Ph.D.



Chart 1: A Substantial Proportion of Respondents Find the Performance of a Refurbished Ball to be Worse than They Expected from a Used Ball



Chart 2:  When Distance Relative to Regular Ball Is Presented As "Longer" & "No Difference", Titleist Is Better Than Nitro on Distance

# Chart 3: When Accuracy Relative to Regular Ball Is Presented As "More Accurate" & "No Difference", Titleist Is Better Than Nitro on Accuracy



Chart 4:  Head-to-Head on Better Accuracy,
Titleist Is Better Than Nitro on Accuracy

Note Accuracy Rating is
Reversed in Direct Comparison

Titleist
More
Accurate
46%

No
Difference
17.5%

Nitro
More
Accurate
36.5%

54%

What Mayer Presents for Comparison

% of Golfers

60
50
40
30
20
10
0



Chart 5:  Head-to-Head on Better Roll,
Titleist Is Better Than Nitro on Roll



Chart 6: Head-to-Head on Better Performance, Titleist Is Better Than Nitro on Performance

Note Performance Rating is Reversed in Direct Comparison

Titleist Preferred 54%

No Diff. 5%

Nitro Preferred 41%

46%

What Mayer Presents for Comparison

% of Golfers

















**CHARLES D. COWAN, Ph.D.**
ANALYTIC FOCUS LLC

**KEY QUALIFICATIONS:**

Charles D. Cowan is Chief Executive Officer of ANALYTIC FOCUS LLC. Dr. Cowan has 30 years of experience in statistical research and design. He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department. He has provided expert advice to corporations, independent organizations, and governmental bodies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing. These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems, such as regulatory reporting forms, accounts payable and receivable, travel records, and litigation related systems for banks, regulatory agencies, and law firms;

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, for nonprofit institutions, and for defendants in several lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

---

**CHARLES D. COWAN**
(Page 2)

- Model fitting and development of projection procedures to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in numerous systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;
- Incorporation of population demographic models with financial assessment models to predict risk for insurance companies and corporations in terms of number and value of potential claims in mass tort litigation.

Dr. Cowan has taught graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis. He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy. He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS₁₁ᴄ, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research, survey research, and audit sampling. From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's and capitalization requirements for the RTC funds from the U.S. Treasury. Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T. Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

**EDUCATION**
Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and Economics, The University of Michigan, 1972

**PROFESSIONAL ASSOCIATIONS**
Adjunct Professor, Statistics, University of Alabama – Birmingham, 2002-2003.
Associate Professor, Statistics, George Washington University, 1993 - 1998.
Visiting Research Professor, Survey Research Laboratory, U. of Illinois, 1983 - 1989.
Consultant, Dept. of Community Psychiatry, Johns Hopkins U., July 1985 - Dec 1987.

**CHARLES D. COWAN**
(Page 3)

PROFESSIONAL EXPERIENCE
Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.
Director, ARPC, November, 1999 to December, 2001.
Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.
Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.
Chief Statistician, Opinion Research Corporation, 1989 to 1991.
Chief Statistician, National Center for Education Statistics, U.S. Department of
    Education, 1986 to 1989.
Bureau of the Census: Assistant Division Chief, International Statistical Programs
    Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984;
    Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting
    Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976
    to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976
Survey Research Center, Oregon State University: Manager, 1974 to 1975
Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.


PROFESSIONAL SOCIETIES - POSITIONS
President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of American Association for Public Opinion
    Research (AAPOR), 1998
Program Chair, American Association for Public Opinion Research, 1991-2
Program Chair, Section on Survey Research Methods, American Statistical Association
    (ASA), 1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981


PROFESSIONAL SOCIETIES – MEMBERSHIPS
American Statistical Association
International Association of Assessment Officers

**CHARLES D. COWAN**
(Page 4)

PUBLICATIONS

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection: Some Considerations", <u>Proceedings of the Computer Science and Statistics: Eleventh Annual Symposium on the Interface, 1978</u>.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Survey", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1978</u>.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection: A Practical Application Using Census Data", <u>Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978</u>.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980</u>.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980</u>.

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Cowan, Charles D. "Interviews and Interviewing", <u>The Social Science Encyclopedia</u>, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", <u>Encyclopedia of Statistical Science</u>, John Wiley and Sons, New York, N.Y., 1984.

**CHARLES D. COWAN**
(Page 5)

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", <u>Journal of the American Statistical Association</u>, June 1986, Vol. 81, # 394, pp. 347-353, and <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984</u>.

Cowan, Charles D. <u>The Effects of Misclassification on Estimates from Capture-Recapture Studies</u>.  Unpublished doctoral dissertation, The George Washington University, September 1984.

Cowan, Charles D. "Misclassification of Categorical Data", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985</u>.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., <u>Evaluating Censuses of Population and Housing</u>, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986</u>.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986</u>.

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", <u>Proceedings of the Fourth Annual Research Conference (ARC IV)</u>, U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data:  Recent Trends in Mortality Rates", <u>Journal of the National Cancer Institute</u>, Vol. 84, No. 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in <u>Homelessness, Health, and Human Needs</u>. Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government: Practices in the Center for Education Statistics", <u>Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988</u>.

**CHARLES D. COWAN**
(Page 6)

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", <u>Science</u>, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials: The Philosophy of Inference from Different Types of Research Designs" in <u>Marketing Research: A Magazine of Management & Applications</u>, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts: Principles of Design for Research" in <u>Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop</u>, September, 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in <u>Housing Policy Debate:  Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers</u>, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in <u>Proceedings of the Section on Survey Research Methods, American Statistical Association, 1992.</u>

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in <u>Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys</u>, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in <u>Controlled Clinical Trials</u>, Vol.15, pp.24-29, 1994.

Cowan, Charles D., and Klena, Matthew K. "Use of the EM Algorithm for Allocation of Proceeds from Auctions and Bulk Sales" in <u>Proceedings of the Section on Business and Economic Statistics, American Statistical Association</u>, 1995.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in <u>Journal of Drug Issues</u>, October, 2001.

Cowan, Charles D., "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in <u>Proceedings of the International Association of Assessment Officers</u>, October, 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation:  An Empirical Investigation of a Subprime Lender", submitted to <u>The Journal of Banking and Finance</u>, January, 2003.

**CHARLES D. COWAN**
(Page 7)

**DEPOSITIONS AND TESTIMONY SINCE 1999**

Castro v. Ford Motor, Inc.  Wrongful Death Suit filed in California.  Deposition and Testimony in 2001.

Samples et al. v. Conoco, Agrico, et. al, Property Diminution Case filed in Florida. Deposition in 2001.

**EXHIBIT  B**

1

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

2

               CONSOLIDATED CASE NO.:

3            02-14008-CIV-MIDDLEBROOKS/LYNCH

4

5

6

7

- - - - - - - - - - - - - -x

8  IN RE:               :
                       :

9  Nitro Leisure Products, LLC  :
                       :

10  - - - - - - - - - - - - - -x

11

12                        **ORIGINAL**

13

14  VIDEOTAPED
    DEPOSITION OF:      CHARLES DOUGLAS COWAN

15

    TAKEN:           By Counsel for

16                 Nitro Leisure Products, LLC

17  DATE:            October 31, 2003

18  PLACE:           Carlton Fields, P.A.
                 777 South Harbour Island Boulevard

19                 Tampa, Florida   33602

20  TIME:            Beginning at 9:42 a.m.

21  REPORTED BY:        Kathryn S. Bentley
                 Court Reporter

22                 Notary Public
                 State of Florida at Large

23

24

25

2

1   APPEARANCES:

2       JOHN J. DABNEY, ESQUIRE
        McDermott, Will & Emery
3       600 Thirteenth Street, N.W.
        Washington, D.C.  20005-3096

4
            Appeared via video conference
5           on behalf of Nitro Leisure Products

6       MARK A. BROWN, ESQUIRE
        Carlton Fields
7       One Harbour Place, 5th Floor
        777 South Harbour Island Boulevard
8       Tampa, Florida 33602-5730

9           Appeared on behalf of Acushnet

10

    ALSO PRESENT:
11
        MICK BOWMAN, Videographer
12

13

14                      INDEX

15                                          PAGE

16  Examination by Mr. Dabney.........................   4

17  Certificate of Reporter........................... 260

18  Signature Page/Errata Sheet....................... 261

19  Signature notification letter..................... 262

20

21

22

23

24

25

3

EXHIBITS MARKED FOR IDENTIFICATION

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | 9/26/03 report of Dr. Charles D. Cowan | 58 |
| 2 | Expert report of Eugene P. Ericksen | 113 |
| 3 | Expert report of Kenneth Hollander | 117 |
| 4 | The Trademark Reporter, Using Daubert-Kumho Gatekeeping to Admit and Exclude Surveys in Lanham Act Advertising and Trademark Cases | 144 |
| 5 | Practical Tips on Trademark Litigation | 146 |
| 6 | Federal Court decision in Nitro vs. Acushnet | 148 |
| 7 | Expert report of Gabriel M. Gelb | 158 |
| 8 | 9/12/03 e-mail to Charles Cowan from Brenda Obregon; survey used for programming | 171 |
| 9 | Charles Cowen's handwritten notes | 196 |
| 10 | Expert report of John W. Jepson | 205 |
| 11 | Supplemental Expert report of John W. Jepson | 205 |
| 12 | 9/16/03 e-mail to Charles Cowan from Brenda Obregon  re: Golf ball data | 242 |

4

1        The videotaped deposition of CHARLES DOUGLAS

2  COWAN was taken pursuant to notice by counsel for Nitro

3  Leisure Products, LLC, on the 31st day of October, 2003,

4  commencing at 9:42 a.m., at the offices of Carlton

5  Fields, P.A., 777 South Harbour Island Boulevard, Tampa,

6  Florida.  Said deposition was reported by Kathryn S.

7  Bentley, Court Reporter, Notary Public, State of Florida

8  at Large.

9        - - - -

10        THE VIDEOGRAPHER:  This is the videotaped

11    deposition of Charles Cowan taken in the matter

12    In Re: Nitro Leisure Products, held in Tampa,

13    Florida, on October 31, 2003, at approximately

14    9:36 a.m.

15        Will counsel please introduce themselves

16    beginning with the plaintiff.

17        MR. DABNEY:  John Dabney from McDermott

18    Will & Emery on behalf of plaintiff Nitro

19    Leisure Products.

20        MR. BROWN:  Mark Brown for Acushnet

21    Company.

22        THE VIDEOGRAPHER:  Thank you.  And will the

23    court reporter please swear the witness.

24  THEREUPON,

25        CHARLES DOUGLAS COHEN,

42

1    reading the packaging or looking at the golf ball would

2    change my opinions about their, you know, statistical

3    work.

4    BY MR. DABNEY:

5        Q    What about the telephone survey that you

6    conducted?

7        A    Well, the tel --

8            MR. BROWN:  Object to the form.

9        A    The telephone survey that I conducted had to do

10   with people's reactions to being presented information

11   about differences from an experiment.  The packaging

12   isn't going to change the results of that experiment, so

13   I don't see how that would change my opinion about -- or

14   the results of the survey.

15   BY MR. DABNEY:

16       Q    But isn't it correct, Dr. Cowan, that you

17   offered an opinion based on your survey about consumer

18   expectations in this case?

19           MR. BROWN:  Object to the form.

20       A    Well, first of all, I don't recall saying

21   anything about consumer expectations.  What I talked

22   about was the expectations of the golfers to whom we

23   spoke.

24           MR. BROWN:  John, excuse me.  I think your

25       package has arrived.  Is that correct --

45

1   their inspection of the Nitro golf ball.

2        A    Oh, thank you for the clarification.  I thought

3   you meant something different.  No, they didn't -- excuse

4   me.  The respondents did not inspect any golf balls.

5        Q    Okay.  And --

6        A    Nitro or other.

7        Q    And it -- I'm sorry.  What was that?

8        A    I'm sorry.  Nitro or otherwise.

9        Q    Okay.  And is it -- isn't it also true that

10  golfers -- that your survey is not based on golfers'

11  expectations arising from -- arising after playing a

12  Nitro golf ball?  Is that correct?

13       A    Yes.

14       Q    Dr. Cowan, have you ever worked in the golf

15  industry before?

16       A    No.

17       Q    Have you ever done any work for a golf

18  manufacturer?

19       A    No.

20       Q    Have you ever marketed a golf ball?

21       A    No.

22       Q    Have you ever conducted a golf ball survey?

23       A    No.

24       Q    Have you ever conducted a player -- a golf

25  player test?

150

1           MR. BROWN:  Object to the form.

2    BY MR. DABNEY:

3       Q    Do you agree with that?

4       A    Yes.

5       Q    Do you agree with the next sentence which says,

6    "There's an understanding on the part of consumers of

7    used or refurbished products that such products will be

8    degraded or will show signs of wear and tear and will not

9    measure up to or perform at the same level as if new"?

10   Do you agree with that statement?

11          MR. BROWN:  Object to the form.

12      A    No.

13   BY MR. DABNEY:

14      Q    Why don't you agree with that statement?

15      A    It's a little bit too broad.

16      Q    Is there -- in what sense is it too broad?

17      A    Well, just saying that there's a blanket

18   understanding on the part of consumers of used or

19   refurbished products that such products will be degraded

20   or will show signs of wear and tear obviously ignores all

21   purchasers of Mercedes preowned cars, where I wouldn't

22   expect if I were going in to buy a Mercedes that it would

23   necessarily show signs of wear and tear.

24          I'm trying to give you a specific example of why

25   I disagree with the breadth of the statement.

151

1   Q    What about this statement as it relates to used

2   golf balls, would you agree with the statement as it

3   relates to used golf balls?

4         MR. BROWN:  Object to the form.

5   A    Well, actually I have no idea and that's why I

6   disagreed with the statement.  I believe that you would

7   have to look at each individual product to make a

8   determination.

9   BY MR. DABNEY:

10  Q    And I just asked you -- you indicated that with

11  respect to Mercedes you didn't think that statement was

12  true.  Is that correct?

13  A    For Mercedes preowned cars, yes.

14  Q    Okay.  And now I'm asking you to apply that

15  statement to used golf balls.

16  A    And my earlier response to you was:  In the case

17  of golf balls, I don't know.

18  Q    Would you agree with the statement that there's

19  an understanding on the part of consumers of used and

20  refurbished products that such products will not measure

21  up to or perform at the same level as if new?

22        MR. BROWN:  Same objection.

23  A    Actually, no.  Again, that's too broad of a

24  statement.  I think you need to look at the specific

25  product.

166

1      A    Okay.  Yes.

2    BY MR. DABNEY:

3      Q    Can you tell me what those instances are?

4      A    Okay.  Well, there's also a lot of game

5    theoretic research done on what people might spend or not

6    spend in response to, for example, changes in the tax

7    law.  Where research -- a research study is done about

8    tax law and then those reports are reported to people

9    about possible changes in tax law, and then you find out

10   whether or not people are going to change their spending

11   behavior based on what they hear about the study.

12     Q    Is there any other instances that you can think

13   of?

14     A    Other than those about -- we're up to about

15   fifteen now.

16     Q    Are there any other instances?

17     A    No.

18     Q    What about in a trademark case, have you ever

19   seen someone conduct a survey of a study?

20     A    Well, I really object to the phrasing that

21   you're using.  But if we're in agreement as to what it is

22   you're talking about, no.

23     Q    You've never seen that done before, have you?

24     A    In a trademark survey -- in a trademark setting?

25     Q    Correct.

190

1    A    Well, yes.

2    Q    And what does that mean to you?

3    A    Well, it means different things in different

4    contexts.  So, for example, in some context, like a

5    pharmaceutical study, it may be simply looking at

6    different pricing points for -- I mean, you asked me the

7    question about whether or not --

8    Q    Yeah.  If I may interrupt you.  I'm asking what

9    does it mean to you in terms of a likelihood of confusion

10   survey?

11   A    Making conditions -- creating conditions within

12   the survey that would allow the respondent to at least

13   put themselves in the mindset of what would be their use

14   in the marketplace.

15   Q    Would you say your telephone survey -- would you

16   describe it as a likelihood of confusion survey?

17   A    No.

18   Q    What would you describe it as?

19   A    It's a survey of consumer perceptions.

20   Q    Do you think it's important to replicate

21   marketplace conditions in a survey of consumer

22   perception?

23   A    No.

24   Q    Did you use any controls in your survey?

25   A    No.

260

1                        CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA          )

4    COUNTY OF HILLSBOROUGH   )

5

6         I, Kathryn S. Bentley, Notary Public in and for the

7    State of Florida at Large, do hereby certify that I

8    reported in machine shorthand the foregoing proceedings

9    at the time and place therein designated; and that the

10   foregoing pages are a true and correct, verbatim record

11   of the aforesaid proceedings.

12        I further certify that I am not an attorney or

13   counsel of any parties, nor a relative or employee of any

14   attorney or counsel connected with the action, nor

15   financially interested in the action.

16        WITNESS my hand and seal the 6th day of November,

17   2003, City of Tampa, County of Hillsborough, State of

18   Florida.

19

20

21              Kathryn S. Bentley
                Notary Public
22              State of Florida at Large
                My Commission No.: DD105129
23              Expires:  April 13, 2006

24                                    Kathryn Bentley
                                MY COMMISSION # DD105129 EXPIRES
25                                      April 13, 2006
                                BONDED THRU TROY FAIN INSURANCE, INC.


**DREYER & ASSOCIATES**
REGISTERED PROFESSIONAL REPORTERS
TAMPA              1-800-321-1545              LAKELAND

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served this 8th day of January 2004

by U.S. Mail and Facsimile upon the following:

Chris S. Coutroulis, Esq.
CARLTON FIELDS, P.A.
777 S. Harbour Island Boulevard
Tampa, Florida 33602-5730
ccoutroulis@carltonfields.com
Facsimile 813-229-4133

**MARK W. YOCCA**