UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 02-14008-CIV-MIDDLEBROOKS

IN RE: NITRO LEISURE PRODUCTS, LLC
_____/

**OPPOSITION OF PLAINTIFF NITRO LEISURE PRODUCTS, LLC
TO ACUSHNET'S MOTION IN LIMINE TO EXCLUDE EVIDENCE
REGARDING ACUSHNET'S CORPORATE WEALTH AND SIZE AND TO
EXCLUDE EVIDENCE REGARDING ACUSHNET'S PARENT COMPANY**

Plaintiff and Counterdefendant Nitro Leisure Products, LLC ("Nitro") respectfully submits this Memorandum of Law in opposition to the motion in limine of Acushnet Company ("Acushnet") to exclude evidence regarding Acushnet's corporate wealth and size and to exclude evidence regarding Acushnet's parent company.

In large measure, Acushnet's motion represents in "motion in limine" clothing a motion to separate the punitive damages issues from the remainder of the trial. The Court should deny the motion as untimely without even reaching the "merits" of the motion. Second, Nitro will be prejudiced and the jury inconvenienced by a bifurcation of the proceedings. Third, a motion to bifurcate is governed by Federal Rule of Civil Procedure 42(b), not state law, and this Court may deny a bifurcation of liability and punitive damages despite any state law purportedly requiring bifurcation.

Nitro\Acushnet\Pleadings040115.Opp Punitive Damages.wpd



Fourth, evidence of the net worth of Acushnet and its parent company and the statements made by Fortune Brands' CEO are relevant to proving Acushnet's liability under the antitrust laws. Finally, Acushnet misconstrues recent Supreme Court authority, and a defendant's "financial resources" remain a relevant criterion in considering punitive damages. The motion should be denied.

## PRELIMINARY STATEMENT

On October 17, 2003, Acushnet filed a motion to bifurcate the antitrust and tort claims from the trademark and patent claims. (DE #372). That motion made no mention of any request to bifurcate the trial into liability and punitive damages claims. The motion was denied on December 15, 2003 (DE # 555). Nearly a month after the proposed jury instructions had already been filed with the Court, Acushnet now brings its motion to separate the punitive damages issues.

In Count XI of its Third Amended Complaint, Nitro states claims for relief for monopolization and attempted monopolization under section 2 of the Sherman Act (15 U.S.C. §2). Among other things, Nitro alleges that "Acushnet has monopoly power in the super-premium golf ball market in the United States" (¶ 114) and "deceptively sold low priced product such 'X-OUTS,' 'Practice' balls or 'Logo Overruns' to retailers to squeeze competitors such as Nitro from the marketplace and otherwise engaged in unfairly competitive tactics" (¶ 115).

Acushnet is an operating company of Fortune Brands, Inc. In an interview appearing

in the September 2003 issue of *Delta Sky* magazine, the following colloquy occurred between the reporter and Norm Wesley, Fortune Brands' chairman and CEO:

**Back to golf: What have you done to counter Nike and others who are going after your golf ball business?**

Actually, our share is higher than it was before either Nike or Callaway entered the business. We've done that through innovation and new products, [such as the Titleist] Pro V1x, which is leading the high-end golf ball business.

. . .

## ARGUMENT

### POINT I

### THE MOTION SHOULD BE DENIED AS UNTIMELY IN THAT ACUSHNET HAS WAITED UNTIL AFTER THE JURY INSTRUCTIONS HAVE BEEN PREPARED TO REQUEST A BIFURCATION OF THE PROCEEDINGS

While cast as a motion in limine to exclude all evidence relating to punitive damages (or at least until after liability has been established), Nitro respectfully submits that Acushnet's true aim in bringing this "motion in limine" is to separate the punitive damages issues from the remainder of the trial.

"A party seeking bifurcation should request relief as soon as the need becomes apparent. Delay may be a factor affecting the court's exercise of discretion." 3 W.

SCHWARZER, A.W. TASHIMA & J. WAGSTAFFE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL ¶ 16:160.1 (2003).

Acushnet does not even attempt to explain its failure to bring this matter to the Court's attention at an earlier date. In this regard, Acushnet filed a motion to bifurcate these proceedings on October 17, 2003. However, that motion did not even mention a request to separate the punitive damages issues in this litigation. Rather, instead of bringing a motion to trifurcate at that time, Acushnet has waited until after the parties' proposed jury instructions have already been filed and less than three weeks before the trial date. This delay alone is sufficient to justify the Court denying Acushnet's motion without reaching the "merits" of its arguments. *See McLaughlin v. State Farm Mutual Automobile Insurance Co.*, 30 F.3d 861, 870 (7th Cir. 1994).

## POINT II

## PLAINTIFF WOULD BE PREJUDICED AND THE JURY INCONVENIENCED BY A BIFURCATION OF THE PROCEEDINGS

"[U]nder the principles enunciated in *Willemijn*...prejudice 'may simply amount to unfair delay of the final disposition of the matter.'" *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992)(citing *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F. Supp. 1429, 1435 (D. Del. 1989)). Bifurcation of the instant action not only decreases Acushnet's incentive to settle the case prior to trial, but also

impedes upon swift judicial resolution and convenience. *Light v. Allstate Insurance Co.*, 182 F.R.D. 210-213 (S.D. W. Vir. 1998). Moreover,

> [B]ifurcating a trial creates its own problems, not the least of which is that to do so leaves the court on the horns of a dilemma. On the one hand, if the court does not tell the jury beforehand that further proceedings may result in the event of a verdict in favor of the plaintiff, upon returning such a verdict the jurors (believing their duties fulfilled) will receive the unexpected news that they are obliged to sit through more evidence, more instructions and yet another round of deliberations. This is simply not fair to the jury. On the other hand, if the court informs the jury at the outset that there will be further proceedings in the event of a verdict for the plaintiff, it creates a subtle incentive for the jury to return a verdict for the defendants. This would be unfair to the plaintiff. In light of these concerns, the court is unwilling to upset the traditional decision making process of the jury by artificially bifurcating the issues of this case.

*Hamm v. American Home Products Corp.,* 888 F. Supp. 1037, 1039 (E.D. Cal. 1995).

POINT III

ACUSHNET HAS FAILED TO SHOW

"EXCEPTIONAL CIRUCMSTANCES"

THAT WOULD JUSTIFY A SEPARATION

<u>OF THE PUNITIVE DAMAGES CLAIMS</u>

Acushnet relies exclusively on the Florida Supreme Court's decision in *W.R. Grace & Co. – Conn v. Waters,* 638 So. 2d 502 (Fla. 1994) in support of its position requesting bifurcation. That reliance is singularly misplaced for "there is ample precedent holding that bifurcation is a procedural issue for purposes of *Erie* analysis." *Hamm,* 888 F. Supp. at 1039.

Federal procedural rules apply where they "cover[] the point in dispute," *Hanna v. Plumer,* 380 U.S. 460, 470 (1965), at least where no conflicting state rule "would substantially affect. . . primary decisions respecting human conduct." *Id.* at 475 (Harlan, J., concurring). As the Second Circuit has noted, "a rule governing bifurcation is a clear example of a rule of adjudication, with virtually no impact upon primary conduct." *Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277, 283 (2d Cir.), *cert. dismissed,* 497 U.S. 1057 (1990). Thus, several federal courts have held that it is permissible **not** to bifurcate liability and punitive damages despite any state laws requiring bifurcation. *Getty Petroleum Corp. v. Island Transportation Corp.,* 862 F.2d 10, 14-15 (2d Cir. 1988), *cert. denied,* 490 U.S. 1006 (1989); *Hamm,* 888 F. Supp at 1038-39.

Having determined that Federal Rule of Civil Procedure 42(b), not state law, governs these proceedings, the question then becomes whether, in the exercise of its discretion, the

court should order bifurcation. "Severance is a 'procedural device to be employed only in exceptional circumstances.'" *Hatfield v. Herz,* 9 F. Supp. 2d 368, 373 (S.D.N.Y. 1998); *See also Marisol A. v. Giuliani,* 929 F. Supp. 662, 693 (S.D.N.Y. 1996). Motions to separate "'are to be granted by the court on a case-by-case basis only when the separation will result in judicial economy and will not unduly prejudice any party.'" *Spectra-Physics Lasers,* 144 F.R.D. at 101(citations omitted). As the party seeking bifurcation, Acushnet has the "burden of proving that the bifurcation will promote judicial economy and avoid inconvenience or prejudice to the parties." *Accord, Lowe v. Philadelphia Newspapers, Inc.,* 594 F. Supp. 123, 125 (E.D. Pa. 1984). That burden has not been met here.

"[S]eparation of issues for trial is not to be routinely ordered." Fed. R. Civ. P. 42(b), 1966 advisory committee note. To the contrary, the general principle is that a single trial tends to lessen the delay, expense and inconvenience to all parties, and the burden of overcoming this presumption is on the party seeking bifurcation. *Lowe,* 594 F. Supp. at 125.

"[A]n overlapping of issues is significant to the decision whether to bifurcate." *Willemijn,* 707 F. Supp. at 1434 (D. Del. 1989). As more fully discussed in Point IV below, where, as here, the issue of Acushnet's liability under the antitrust laws is inextricably interwoven with the net worth of Acushnet and its parent corporation, bifurcation should be denied. Indeed, even applying Florida law, "*W.R. Grace* does not compel bifurcation of issues so that the defendant can prevent prejudicial information regarding his liability for punitive damages from reaching the jury." *Dessanti v. Contreras,* 695 So. 2d 845, 847 (Fla. 4th DCA 1997).

## POINT IV

### EVIDENCE OF THE NET WORTH OF ACUSHNET AND ITS PARENT COMPANY AND THE STATEMENTS MADE BY FORTUNE BRANDS' CEO ARE RELEVANT TO PROVING <u>ACUSHNET'S LIABILITY UNDER THE ANTITRUST LAWS</u>

An essential element of a claim for monopolization is that the defendant has "market power" in the relevant market. *United States v. Grinnell Corporation,* 384 U.S. 563, 570-71 (1966); *Covad Communications Co. v. BellSouth Corp.,* 299 F.3d 1272, 1283 (11th Cir. 2002). Similarly, attempted monopolization requires that there is "a dangerous probability of achieving monopoly power." *Spectrum Sport, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)(citing 3 P. AREEDA & D. TURNER, ANTITRUST LAW ¶ 820, at 312 (1978)). *See also U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 993 (11th Cir. 1993).

"Net worth" and a defendant's "assets" are two among many factors that the courts have considered in determining monopoly power. *Indiana Grocery Co. v. Super Valu Stores, Inc.,* 647 F. Supp. 254 (S.D. Ind. 1986) is instructive in this regard. In *Indiana Grocery,* a local grocery store chain brought an action against national grocery store chains for attempted monopolization and price discrimination.

In support of these allegations, Indiana Grocery alleges the following facts.

\* \* \*

Super Valu owns and operates retail grocery stores in numerous

markets throughout the United States and has assets totaling over one billion dollars. Super Valu has annual sales in excess of five billion dollars and a net worth in excess of three hundred seventy million dollars. . . .

Kroger owns and operates more than one thousand, four hundred retail grocery stores throughout the United States and has assets totalling over thirteen billion dollars and a net worth in excess of one billion the dollars. . .

*Id.* at 256.

In ruling on the defendants' motions to dismiss, the Court held that these allegations of the defendants' "financial resources," if believed, supported plaintiff's contention that Super Valu and Kroger had the capacity to create a monopoly. *Id.* at 258, 260. Likewise here, evidence of "net worth" is relevant to the proof of Acushnet's market power and, therefore, its liability under the antitrust laws. In sum, there is an overlap between the evidence that relates to the compensatory claim and the punitive claim, and any slight evidence that might accrue to the defendant by bifurcation would be outweighed by the added problems of attempting to sort out the evidence.

"[S]ince the evidence usually overlaps substantially, the normal procedure is to try compensatory and punitive damage claims together with appropriate instructions to make clear to the jury the difference in the clear and convincing evidence required for the award of punitive damages." *McLaughlin v. State Farm Mutual Automobile Insurance Co.*, 30 F.3d 861, 871 (7th Cir. 1994). This "normal procedure" should likewise be applied here.

Second, the net worth of both Acushnet and Fortune Brands is relevant to Nitro's claims of predatory or other exclusionary pricing. "In its classical form predatory pricing involves an immediate sacrifice of profits through unreasonably low prices. These low prices destroy rivals or intimidate them from selling at a lower price than the defendant charges. Then follows a 'recoupment' period, during which the defendant enjoys monopoly prices or profits." III PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 723a (2d ed. 2002)(footnote omitted).

> The often given vague formalizations of the predatory pricing offense overlook the fact that predation in any meaningful sense cannot exist unless there is a temporary sacrifice of net revenues in the expectation of greater future gains. Indeed, the classic feared case of predation has been the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition. Thus, predatory pricing would make little economic sense to a potential predator unless it had. . . greater financial staying power than its rivals. . . .

*Id.* at 723c.

The net worth of the defendant (and any parent or subsidiary corporation from which it may borrow funds, if needed) provides persuasive evidence of a defendant's "greater staying power" and thereby its ability to "weather the storm" of predatory pricing. Nitro should be afforded the opportunity here to prove the collective staying power of Acushnet

and its parent company, Fortune Brands.

Further, in his *Delta Sky* interview, Fortune Brands' CEO admits that there is indeed a "high-end golf ball business" and that Acushnet's share of this market is higher than it was before either Nike or Callaway entered the market. However, the importance of this admission would be lost on the jury unless Nitro is allowed to explain Norm Wesley's connection with Acushnet and its significance.

Finally, in a separate motion in limine to exclude testimony regarding Wal-Mart Canada, Acushnet asserts that it should be allowed to explain its corporate structure in an attempt to demonstrate why it is not responsible for the conduct of Acushnet-Canada, Inc . Acushnet should not be able to have it both ways. If evidence of Acushnet's corporate structure regarding its Acushnet-Canada subsidiary is admissible, then evidence of Acushnet's corporate structure should be equally admissible regarding Acushnet's parent corporation.

POINT V

A DEFENDANT'S "FINANCIAL RESOURCES"

ARE A RELEVANT CRITERION IN CONSIDERING

THE AMOUNT OF PUNITIVE DAMAGES

Acushnet itself admits that "Florida case law historically held that evidence of a defendant's wealth is relevant to a decision on the amount of any punitive damages award." (Acushnet's Mem. at p. 4). Indeed, the Florida Standard Jury Instructions expressly provide that, in determining the amount of punitive damages, the jury should consider "[the][each] defendant's financial resources." *See., e.g.,* Florida Standard Jury Instructions in Civil Cases, Instruction PD 2 at PD2, page 6. That a defendant's "financial position" may be an appropriate factor in assessing punitive damages was expressly approved by the United States Supreme Court in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462 & n.28 (1993) and *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 21-22 (1991).[*]

Nevertheless, Acushnet argues that "the Supreme Court has now made it clear that personal wealth, including corporate wealth, should play no role in the process of determining the amount of a punitive damages award." (Acushnet Mem. p.6). To support this remarkable statement, Acushnet purports to rely on the *State Farm* and *Gore* cases. A

---

[*] "We note. . . .that in *Haslip* we referred to the 'financial position' of the defendant as one factor that could be taken into account in assessing punitive damages." *TXO Production Corp.,* 509 U.S. at 464 (examining *Haslip, supra*).

judicious review of those decisions, however, reveals that this view is as unsupported by those authorities as it is unsupportable.

The fundamental fallacy in Acushnet's reasoning is that *BMW* "did not hold that Alabama's punitive damages laws are unconstitutional; instead, it held that they had been unconstitutionally applied." *Old Republic Union Insurance Co. v. Tillis Trucking Co.,* 124 F.3d 1258, 1264 (11th Cir. 1997)(examining *BMW of North America, Inc. v. Gore,* 517 U.S. 559, at — - —, 116 S. Ct. at 1598-99 (1996)). To the contrary, the *BMW* court expressly observed: "The Alabama court said it gave weight to several factors, including. . .the financial position of the defendant, and the costs of litigation. These standards, we previously held, 'impos[e] a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages." *BMW,* 517 U.S. at 610-11 (citing *Haslip,* 499 U.S. at 22)(other citations omitted).

Further, as Justice Scalia poignantly observed in his dissenting opinion:
Apparently (though it is by no means clear) all three federal "guideposts" can be overridden if "necessary to deter future misconduct"--a loophole that will encourage state reviewing courts to uphold awards as necessary for the "adequate protect[ion] of state consumers.

. . . And it must be noted that the Court nowhere says that these three "guideposts" are the *only* guideposts; indeed it makes very clear that they are not--explaining away the earlier opinions that do not really follow these "guideposts" on the basis of *additional* factors, thereby "reiterat[ing] our

rejection of a categorical approach.

*BMW,* 509 U.S. at 605-06 (Scalia, J.)(citation omitted)..

Similarly, in *State Farm,* the majority opinion agreed that evidence of a defendant's wealth in assessing punitive damages "'does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of the other factors, such as "reprehensibility" to constrain significantly an award that purports to punish a defendant's conduct.'" *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S. Ct. 1513, 1525 (citing with approval *BMW,* 517 U.S. at 591 (Breyer, J., concurring).

Since *State Farm* was decided on April 7, 2003, at least two courts have reaffirmed the importance of considering the defendants' financial ability in the assessment of punitive damages under Florida law. *Zuckerman v. Robinson,* 846 So. 2d 1257 (Fla. 4th DCA 2003); *Liggett Group Incorporated v. Engle*, 835 So. 2d 434 (Fla. 3d DCA 2003).

## CONCLUSION

For the reasons stated herein, Nitro respectfully submits that Acushnet's motion in limine should be denied.

                    **RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.**

By: _____
GARY S. BETENSKY
Gerald F. Richman
Florida Bar No. 066457
Gary S. Betensky
Florida Bar No. 434302
Donall O'Carroll
Florida Bar No. 107816
One Clearlake Centre - Suite 1504
250 Australian Avenue, South
West Palm Beach, FL 33401
Tel: (561) 803-3500
Fax: (561) 820-1608

**YOCCA PATCH & YOCCA LLP**
Mark W. Yocca
California State Bar No. 137189
Ryan M. Patch
California State Bar No. 128042
19900 MacArthur Boulevard, Suite 650
Irvine, California 92612
Tel:   (949) 253-0800
Fax:   (949) 253-0870
*Attorneys for Nitro Leisure Products, LLC*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served this 20th day of January 2004 by FAX and First Class Mail, postage prepaid, upon the following:

Chris S. Coutroulis, Esq.
CARLTON FIELDS, P.A.
777 S. Harbour Island Boulevard
Tampa, Florida 33602

_____
GARY S. BETENSKY