

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 02-14008 CIV–MIDDLEBROOKS/LYNCH

**IN RE: NITRO LEISURE PRODUCTS, LLC**

_____/

## NITRO'S OPPOSITION TO ACUSHNET'S MOTION IN LIMINE TO
## STRIKE THE EXPERT REPORTS AND TESTIMONY OF DR. JOHN JEPSON

Acushnet has moved to strike expert reports and testimony of Dr. John Jepson. For the reasons that follow, that motion should be denied.

### STATEMENT OF FACTS

**A.      Dr. Jepson's Education And Professional Experience**

Dr. Jepson is the former highest ranking official at Titleist. (Expert Report of John W. Jepson at 2, attached as Exhibit A.) Before Acushnet, Dr. Jepson earned a Masters of Science Degree and Ph.D. in Mechanical Engineering from Yale University. (*Id.*) Dr. Jepson has spent virtually his entire professional career – over 35 years – in the golf industry. (*Id.* at 2-4.)

Dr. Jepson was employed by Acushnet Company for 22 years. (*Id.*) He founded the golf ball research and development department and golf ball aerodynamics department at Acushnet. (*Id.*) Dr. Jepson initiated the purchase of the first Iron Byron mechanical robot ever used at Acushnet. (*Id.*) Dr. Jepson has substantial experience in both mechanical golf ball testing and player testing, including in developing and implementing testing procedures and protocols for such tests and analyzing data from such tests. (*Id.*) At one time, Dr. Jepson was in charge of golf ball operations at Acushnet and in that capacity was responsible for developing and manufacturing various TITLEIST and PINNACLE golf balls. (*Id.*) From 1982 until 1990, Dr. Jepson served on the Board of Directors for Acushnet and from 1979-1989 Dr. Jepson served on the Board of Directors of the National Golf Foundation – a resource for data and information

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

on golfers and golfing habits in the United States. (*Id.*) He is current on USGA rules and regulations with respect to golf balls and various golf customs and practices. (*Id.*)

Since 1990, Dr. Jepson has worked for several different golf companies and has started two of his own golf companies. (*Id.*) He has invented technology for golf balls, and is a named inventor in 29 U.S. patents relating to golf balls and golf products. (*Id.*) Dr. Jepson has also been an avid golfer for over 50 years and is a very accomplished player, and has decades of experience with purchasing and playing with used golf balls. (Supplemental Expert Report of John Jepson at 1, attached as Exhibit B; Jepson Dep. Tr. at 391, attached as Exhibit C.) He is current on developments in the golf industry through his regular and frequent reading of golf publications. (Supplemental Expert Report of John Jepson at 1.)

**B.      Dr. Jepson's Preparatory Work In This Case**

For his assignment in this case, and in addition to his vast personal experience and knowledge as outlined above, Dr. Jepson conducted substantial research and analysis. Dr. Jepson conducted numerous on-site inspections of Nitro's golf ball facility in Stuart, Florida. (Expert Report at 4, 11.) Dr. Jepson carefully inspected hundreds of Nitro and Titleist golf balls, including golf balls that were produced by Acushnet. (*Id.*) Dr. Jepson communicated with Nitro's President, Mr. Amin Khoury, regarding Nitro's refurbishing process and the quality of Nitro's used golf balls. (Ex. B to Expert Report of John Jepson.) Dr. Jepson carefully reviewed and analyzed voluminous evidentiary materials, including the Felker/Kelly golf ball study, the Mayer golf ball study, the expert reports of Smits and Ibarguen, numerous court documents relating to the Birdie Golf refurbishing facility, the depositions of Messrs. Sine, Morgan and Khoury, and Acushnet's responses to certain interrogatories. (Expert Report of John Jepson at

2

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

11; Jepson Dep. Tr. at 434.) Dr. Jepson also researched the nature and quality of the used golf ball industry in the United States. (Supplemental Report of Jepson.) In that regard, Dr. Jepson spent hours looking at books at a public library and conducting factual research on the internet on used golf ball sellers. (*Id.*) Dr. Jepson caused used TITLEIST golf balls to be purchased from various third-party providers. (*Id.*) Examples of those balls are attached as Exhibit B to Dr. Jepson's Supplemental Expert Report. (*Id.*) Those balls have also been produced to Acushnet. Dr. Jepson also has personally used the Nitro refurbished golf balls on occasion.

**C.      Dr. Jepson's Expert Opinions**

Based on the foregoing, Dr. Jepson has rendered numerous expert opinions regarding Nitro, Nitro's refurbishing process, Nitro's refurbishing facilities, Nitro's golf balls, the used golf ball industry, including the nature and quality of used TITLEIST golf balls that are openly sold by the millions in this country, and golfers' perceptions and expectations with respect to new and used golf balls. (Expert Report of John W. Jepson; Supplemental Expert Report of John W. Jepson.) Dr. Jepson has also rendered a number of opinions with regard to Acushnet and Acushnet's golf balls. (*Id.*) And Dr. Jepson has rendered expert testimony rebutting the golf ball study and analysis of Dr. Felker and supporting the study of Mr. Mayer. (Expert Report of Jepson at 5-6, 8-10). In denying Acushnet's motion for a preliminary injunction, the Court relied, in part, on expert opinions offered Dr. Jepson and the Federal Circuit affirmed that denial. (*See* Order Denying Motion for Preliminary Injunction dated August 8, 2002 at 9; *Nitro v. Acushnet Co.*, 341 F.3d 1356, 1364-65 (Fed. Cir. 2003).)

3

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

**D.     Acushnet's Motion In Limine To Exclude Dr. Jepson**

Acushnet has moved to strike all of the expert reports and opinions of Dr. Jepson.  (*See* Expert
Report of John Jepson & Supplemental Expert Report of John Jepson & Exs. attached to those
reports.)  However, that motion is disingenuous because it challenges only *isolated* opinions of
Dr. Jepson and then asks the Court to strike *all* of Dr. Jepson's opinions.  By way of limited
example, Acushnet's motion does not challenge (i) Dr. Jepson's detailed analysis and critique of
the faulty Felker study, (ii) Dr. Jepson's detailed analysis and opinions – based on his personal
on-site visits and golf ball inspections – on the nature and quality of Nitro's refurbishing facility
and golf balls, (iii) Dr. Jepson's analysis and opinions on the Birdie Golf Ball refurbishing
process, or (iv) Dr. Jepson's opinions on the advertising, promotion and sale of Nitro's and
Acushnet's golf balls.  (*See* Expert Report of John Jepson at 4-10.)  Acushnet's failure to
properly identify those narrow portions of Dr. Jepson's testimony to which its motion is directed
is reason enough to deny the motion.  And even if the Court does not summarily reject
Acushnet's motion, any relief should be tailored to those narrow portions of Dr. Jepson's
opinions that the Court finds unsuitable.

Acushnet's motion is limited to challenging the following opinions of Dr. Jepson:
(i) Dr. Jepson's opinion that "Acushnet has pursued this lawsuit not because of perceived lack of
quality in the Nitro refurbished golf ball, but in an effort to use the legal process as a means to
destroy legitimate competition," (Acushnet Mem. at 3) and (ii) Dr. Jepson's opinion that golfers
have less performance expectations from a used golf ball than from a new golf ball (*id.* at 5), and
(iii) Dr. Jepson's overview of the used golf ball industry (*id.*).  Tellingly, Acushnet does not
challenge Dr. Jepson's credentials and vast experience and knowledge in the golf industry.

4

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

(Expert Report of John Jepson at 1-4.)  Nor does Acushnet challenge the relevance of those opinions and their potential to assist the jury.  Indeed, Acushnet's motion does not challenge the veracity of any opinion rendered by Dr. Jepson.  Instead, the bulk of Acushnet's motion is based on the unsupported allegation that certain of Dr. Jepson's opinions are unreliable.

## LEGAL ARGUMENT

**A.     Dr. Jepson's Opinion Regarding Acushnet's Motivations For Pursuing This Action Is Reliable And Admissible Testimony**

Based on his extensive review of evidentiary materials in this case regarding the quality and performance of Nitro's golf balls and Acushnet's golf balls and his personal experience after working for Acushnet for 22 years, including several years as the highest ranking official at Acushnet, Dr. Jepson has opined that Acushnet pursued this lawsuit because of its belief that Nitro refurbished golf balls are a very good product and that the sale of those golf balls is a significant threat to Acushnet's sale of new golf balls.  (Expert Report of John Jepson at 5.) Acushnet contends (Mem. at 3-4) that this opinion is inadmissible because Dr. Jepson does not have personal knowledge of Acushnet's current practices and policies.  The only evidence that Acushnet offers in support of that contention does not support it.  Specifically Acushnet cites (*id.*) to deposition testimony where Dr. Jepson testifies that he does not know why Acushnet ended his employment at Acushnet.  The fact that Dr. Jepson does not know why Acushnet took a certain action with respect to his employment does not mean that Dr. Jepson does not have personal knowledge, understandings and opinions with respect to other actions that Acushnet takes – particularly with respect to actions that are within the scope of his prior duties at Acushnet, i.e., competitors in the marketplace.   And Dr. Jepson's first-hand knowledge of

5

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

Acushnet and its business practices combined with his extensive review of the evidence in this case make such an opinion perfectly reliable and admissible.[1]

**B.   Dr. Jepson's Opinion On The Expectations Of Golfers Is Reliable And Admissible Evidence**

Dr. Jepson also has rendered expert opinions regarding golfers' performance expectations of used balls and new balls.  (Jepson Report at 4-6.)  Acushnet contends (Mem. at 5) that Dr. Jepson's opinion is based on "speculation and conjecture."   But Dr. Jepson's opinion regarding golfers' expectations and experiences is based on 50 years personal experience as an avid golfer and a user of used and new golf balls and 35 years of work experience in the golf industry.  (Jepson Report at 1-5, 11; Jepson Dep. Tr. at 391-92.)  Moreover, Acushnet's own expert witness regarding golfer perception – Mr. Ed Ibarguen – renders an opinion on golfers' perceptions and expectations based on experience and knowledge in the golf industry (*see* Ed Ibarguen Expert Report dated July 7, 2003) that is far less impressive than the experience, knowledge and expertise that Dr. Jepson brings to the table.   Dr. Jepson's expert opinions regarding golfers' expectations and perceptions of new, used and refurbished golf balls are reliable and admissible.  *See CBS, Inc. v. Primetime 24 Joint Venture,* 9 F. Supp.2d 1333, 1342-43 (S.D. Fla. 1998) (refusing to exclude testimony of expert witness because his opinions were based on his experience, personal knowledge and data made available to him); *see also Quiet Tech. DC-8, Inc. v. Hurel Dubois UK Ltd.,* 326 F.3d 1333, 1343-46 (11th Cir. 2003); *Maiz v.*

---

[1] There is also no merit to Acushnet's contention (at 5) that Dr. Jepson should be precluded from rendering this opinion simply because Acushnet's intent is "a question for the jury to decide."  *See* **F. R. Evid. 704(a)** (mere fact that a witness is testifying to an ultimate issue to be decided by the jury does not mean that testimony is inadmissible).

6

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

*Virani*, 253 F.3d 641, 665-66 (11th Cir. 2003); 235 F.3d 1307, 1312 (11th Cir. 2000); *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999).

**C.     Dr. Jepson's Opinion On The Used Golf Ball Industry And The Quality And Nature Of Those Balls Is Reliable And Admissible Evidence**

Dr. Jepson has rendered opinions on the used golf ball industry and has offered compelling physical evidence on the quality and nature of the used TITLEIST balls that are sold by third parties. (Suppl. Expert Report of John W. Jepson at 1-3 & Exhibit B thereto.)  Those opinions are based on Dr. Jepson's 35 years of experience in the golf industry, including as the highest ranking official at Titleist, his frequent and regular review of golf publications, his personal experience as an avid golfer for over 50 years, his own independent research and investigation and golf industry customs and practices. (*Id.* at 1; Expert Report of John W. Jepson at 1-4, 10-11.)  Based on the foregoing, Dr. Jepson has opined that there are thousands of third-party providers of used TITLEIST golf balls, including balls that have been merely washed. (Supplemental Expert Report of John Jepson at 2.)  Dr. Jepson has opined on the quality of used TITLEIST balls offered for sale by third parties based on his personal observations of a sampling of those balls obtained during his personal research. (*Id.* at 3; Jepson Dep. Tr. at 460-63, 471-73 ("We looked at hundreds of golf balls in the process of finding out what's in the marketplace."), 476-77, 488-91.)  Color photographs of some of those balls are attached as Exhibit B to Dr. Jepson's Supplemental Report and were provided to Acushnet for inspection.  Based on Dr. Jepson's careful inspection of those used golf balls, Dr. Jepson has testified that Nitro's refurbished golf balls are superior in performance and appearance to much of the used TITLEIST

7

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

product that is sold every day in this country with Acushnet's express consent.[2] (Supplemental Expert Report of John Jepson at 3.)

Acushnet does not challenge Dr. Jepson's qualifications, the relevance of Dr. Jepson's opinions and evidence, or its potential to aid the jury in this case. Nor does Acushnet challenge the substance of any opinion of Dr. Jepson on the used golf ball industry. Rather, Acushnet argues (at 6-7) that Dr. Jepson's opinions about the used golf industry are "unreliable" because Dr. Jepson did not conduct any "independent research, testing or surveys" regarding this topic. That is not true; Dr. Jepson conducted independent research and investigation in formulating his opinions on these topics and inspected "hundreds" of used TITLEIST golf balls that were purchased from third parties. (Supplemental Report of John W. Jepson at 2-3; Jepson Dep. Tr. at 460-63, 471-73 ("We looked at hundreds of golf balls in the process of finding out what's in the marketplace."), 476-77, 488-91.) Further, Dr. Jepson relied on his extensive reading of golf publications, a review of the golf books and internet research on the subject of the used ball industry. (Supplemental Expert Report of Jepson at 2-3; Jepson Dep. Tr. at 92-93, 460-63, 471-73, 476-77, 488-91.) Dr. Jepson also relied on his personal experience in purchasing and playing with used golf balls – something he has been doing for over 50 years as an avid golfer. (*See* Jepson Dep. Tr. at 92-93.) Dr. Jepson's opinions on the used golf ball industry and his analysis of Nitro's used balls versus the used ball product that is readily available on the market is

---

[2] Acushnet has stated time and time again to this Court and the Federal Circuit that it does not object to golf balls that are retrieved from water hazards and merely washed off. Because it is not a "misnomer" to use the Titleist name on these balls, which have cracks and holes, then it is not a "misnomer" to use the Titleist name on Nitro's refurbished balls which are far superior.

8

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

reliable and admissible evidence.[3]  *See, e.g., CBS, Inc. v. Primetime 24 Joint Venture,* 9 F. Supp.2d 1333, 1342-43 (S.D. Fla. 1998) (refusing to exclude testimony of expert witness because his opinions were based on his experience, personal knowledge and data made available to him); *Quiet Tech. DC-8, Inc. v. Hurel Dubois UK Ltd.,* 326 F.3d 1333, 1343-46 (11th Cir. 2003); *Maiz v. Virani,* 253 F.3d 641, 665-66 (11th Cir. 2003); 235 F.3d 1307, 1312 (11th Cir. 2000); *United States v. Majors,* 196 F.3d 1206, 1215 (11th Cir. 1999).[4]

## CONCLUSION

For all of the foregoing reasons, the Court should deny Acushnet's motion to strike Dr. Jepson's testimony.

---

[3] Acushnet's expert, Ed Ibarguen, has rendered expert opinions on the economics of golf industry and the marketing of golf balls that are based only on his personal experience in the industry without any" independent research, testing or surveys." (*See* Expert Report of Ed Ibarguen dated July 7, 2003 at 2.)

[4] Acushnet alleges in passing (Mem. at 8) that Dr. Jepson's opinions regarding the "suitability and adequacy" of Nitro's refurbishing process and the quality and performance of Nitro's golf balls is unreliable because Dr. Jepson failed to conduct an independent analysis of the information provided to him by his lawyers.  That is ridiculous. Dr. Jepson's opinions are based on his numerous personal visits to Nitro's golf ball facility, a review of the reports of Acushnet's own expert, David Felker, the player study of Thomas Mayer, and a careful analysis of hundreds of Nitro and Acushnet golf balls.  (Jepson Expert Report at 1-11.)  It is Acushnet's expert witnesses, i.e., Hollander and Cowan, who simply accept as true all of the factual information that the Acushnet lawyers provided to them.  (*See* Hollander Dep. Tr. at 15-16 (no independent research on how Nitro's golf balls are sold – just accepted Acushnet's counsels' representation as to how those balls are sold); Cowan Dep. Tr. at 80-84 (no independent investigation of the bona fides of the Felker study or the conflicting studies conducted by Felker – just accepted the accuracy of the final study without any independent research.)

9

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

Respectfully submitted,

RICHMAN GREER WEIL BRUMBAUGH
MIRABITO & CHRISTENSEN, P.A.
*Attorneys for Nitro Leisure Products, LLC*
One Clearlake Centre – Suite 1504
250 Australian Avenue, South
West Palm Beach, FL 33401
Tel:  (561) 803-3500
Fax:  (561) 820-1608

By: _____
GERALD F. RICHMAN
Florida Bar No. 066457
grichman@richmangreer.com
GARY S. BETENSKY
Florida Bar No. 434302
gbetensky@richmangreer.com
DONALL O'CARROLL
Florida Bar No. 0107816
docarroll@richmangreer.com

and

MARK YOCCA, ESQUIRE
myocca@ypylaw.com
RYAN M. PATCH, ESQUIRE
rpatch@ypylaw.com
PAUL KIM, ESQUIRE
pkim@ypylaw.com
YOCCA PATCH & YOCCA, LLP
19900 MacArthur Blvd., Suite 650
Irvine, CA 92612
Tel: (949) 253-0800
Fax: (949) 253-0870

10

*In Re: Nitro Leisure Products, LLC*
Case No. 02-14008-CIV-MIDDLEBROOKS/LYNCH
Nitro's Opposition to Acushnet's Motion in Limine to Strike
the Expert Reports and Testimony of Dr. John Jepson

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing Opposition to Acushnet's Motion in Limine to Strike the Expert Reports and Testimony of Dr. John Jepson was delivered via electronic mail and U.S. Mail this 20ᵗʰ day of January 2004 to: Robert L. Ciotti, Esquire, Carlton Fields, P.A., One Harbour Place, 777 South Harbour Island Boulevard Tampa, Florida 33602-5730 and Steven J. Brodie, Esquire, Carlton Fields, P.A., 100 S.E. Second Street, Suite 4000, Miami, Florida 33131.

By: _____
DONALL O'CARROLL

i:\litig\6984-1\pleadings\opp. to mot. to strike jepson.doc

11

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.:02-14008-CIV
## MIDDLEBROOKS

IN RE: NITRO LEISURE PRODUCTS, LLC

_____/

## EXPERT REPORT OF JOHN W. JEPSON
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and Local Rule

16.1-K., Nitro Leisure Products, LLC's ("Nitro") expert, John W. Jepson, hereby submits

his expert report.

### I.    QUALIFICATIONS

Attached as **Exhibit A** to this report is a true and correct copy of my

*curriculum vitae.* I graduated from Northeastern University with a Bachelor of Science

Degree in Mechanical Engineering in 1954. I then earned a Masters of Science Degree

and Ph.D. in Mechanical Engineering from Yale University.

After I received my Doctorate from Yale, I worked for Bell Telephone

Laboratories for ten years until 1968. While at Bell Telephone, I worked on various

government research and development projects, including the Nike Zeus anti-ballistic

missile.

In 1968, I left Bell Telephone to work for Acushnet. I received a job offer

from Acushnet after proposing the establishment of a Corporate Research &

**Exhibit _A_**

Development Department at Acushnet. I founded and headed the first Research & Development Department at Acushnet. During my tenure as the Director of Acushnet's Corporate R&D Department, I created and implemented a golf ball aerodynamics program and introduced a new dimple pattern for golf balls. I also recommended and arranged for, Acushnet's purchase of the "Iron Byron" mechanical golfer to test Acushnet's golf balls and golf equipment. I set up, used, and supervised the "Iron Byron" mechanical testing device throughout my tenure as the Director of Acushnet's Corporate R&D Department.

In 1979, I was promoted to Vice President of Operations of the Titleist Golf Division of Acushnet. In my capacity of Vice President of Operations, I managed Titleist's golf equipment plants in the United States and in the United Kingdom. I was also responsible for, and integrally involved with, developing and manufacturing Acushnet's Pinnacle golf ball. This involved a new manufacturing technique of replacing a solid rubber center that is wound with thread with a new one-piece center -- a new concept for Acushnet. The development and manufacture of the Pinnacle golf ball marked Acushnet's entry into the two-piece solid ball segment of the golf ball market.

In 1982, I was promoted to Executive Vice President and General Manager (the highest-ranking position) of Acushnet's Titleist Golf Division. While in this position, sales and operating income increased, and I led the creation of a joint venture in Japan to manufacture and distribute Titleist products in Japan and other Southeast Asian

JUL-8-2003  TUE  15:56    TEL:509-759-9722          HOME MOTI POW SEUTCES          P  7

countries. I also began serving on the Board of Directors for Acushnet from 1982 until my retirement from Acushnet in 1990. From 1984 to 1990, I served as the Executive Vice President and General Manager of Acushnet's Rubber Division. During this time, I was responsible for manufacturing the core of a Pinnacle golf ball, and for overseeing the restructuring of various departments within Acushnet's Rubber Division, including Marketing and Sales, Manufacturing, Quality Assurance, Management Information Systems and Human Resources.

Upon my retirement from Acushnet in 1990, I joined the Ben Hogan Company as an Executive Vice President. At the Ben Hogan Company, I was responsible for Golf Ball and Club Development and Quality Assurance. In 1992, I left the Ben Hogan Company and founded the Naples Golf Company, which markets and sells a golf teaching aid. I also started Noble Golf Company, which designs and manufactures putters.

Besides my significant work experience in the golf industry for the past 34 years, I have also been a member of the Board of Directors of the National Golf Foundation, from 1979 to 1989. Moreover, I am the inventor of 29 U.S. patents and a total of approximately 75 foreign patents relating to golf balls and other products. My significant golf industry experience includes extensive testing and development of golf balls, as well as inventing technology concerning golf balls. I also have a detailed and broad knowledge of various technological and quality control concepts and issues relating

to the invention, design, development, manufacture, and testing of golf balls and golf ball materials. I am qualified to render the opinions that are contained in this report.

**II.    OPINIONS AND BASES FOR OPINIONS**

At trial in this matter, I intend to render the following expert opinions on the following topics, many of which I addressed in my Declaration submitted in opposition to Acushnet's Motion for preliminary injunction, which Declaration is incorporated herein and attached as **Exhibit B**:

1.      Nitro's golf ball refurbishing process, procedures and facility, including, without limitation, my opinions that (i) Nitro operates a first-rate, state-of-the-art golf ball refurbishing operation, (ii) Nitro's refurbished golf balls, including refurbished Pro V1 golf balls, are of a high quality and offer a good value to golfers, (iii) Nitro's refurbishing process improves the appearance and, in many instances, the performance of the used balls that are refurbished, and (iv) the legend on Nitro's refurbished golf balls, packaging and web site informs golfers of the nature of the product sold by Nitro. These opinions are based on, among other things, my personal visits to the Nitro facility where I witnessed the Nitro golf ball refurbishing process, which was detailed in my Declaration attached as Exhibit B, and which is expressly incorporated herein.

2.      Refurbished, recycled and new golf balls, including my opinions that (i) golfers have less performance expectations from a used golf ball that they do from a

new golf ball, and (ii) Acushnet's new golf balls have failures with regard to specific golf ball features including, without limitation, such features as paint quality, dimple depth, defects in the cover and clear-coat.

3.      Player testing of the type conducted by Mr. Thomas Mayer in this case provides critical insight into the performance of the golf balls in the marketplace and is a more reliable measure of marketplace conditions than machine testing.

4.      Based upon, among other things, my review of Mr. Mayer's player test, my experience in the industry, my review of the deposition testimony of Messrs. Sine and Morgan, my review of documents relating to the lawsuit between Acushnet Company and Birdie Golf company, and my personal observations of the Nitro refurbishing facility and operations, I have concluded that Acushnet has pursued this lawsuit because of its belief that the Nitro refurbished golf balls, including the refurbished Pro V1 golf balls, are a very good product and that the sale of those golf balls is a significant competitive threat to Acushnet's sale of new golf balls, including new Pro V1 golf balls. Nearly half of the golfers surveyed by Mr. Mayer either preferred Nitro's refurbished Pro V1 golf ball to Acushnet's new Pro V1 golf ball or had no preference between the two balls and the purchase interest between the Nitro refurbished Pro V1 and Acushnet's new Pro V1 was very similar (56% for the refurbished ball versus 59% for the new ball). Moreover, approximately 80% of the golfers rated Nitro's refurbished Pro V1 golf ball as equal to or better than the golf ball that they regularly play. Nitro's refurbished Pro V1 golf ball is so

good that approximately two-thirds of the golfers surveyed were unable to tell which group of golf balls were new and which group were used. Nitro's refurbished Pro V1 golf balls are a substantial threat to Acushnet's sale of new Pro V1 golf balls. For a large percentage of golfers that purchase Pro V1 golf balls or similarly constructed golf balls, the Nitro refurbished Pro V1 golf balls and Acushnet's new Pro V1 golf balls are essentially interchangeable products.

> 5.     USGA rules and regulations relating to golf balls, including the importance to tournament players and the industry that new golf balls comply with USGA rules and regulations, including the USGA rule relating to aerodynamic symmetry. The ramifications of a new golf ball's failure to comply with USGA regulations, including, without limitation, that the golf ball will be removed from approved use in tournament play, and the damage that an illegal new golf ball, including, but not limited to, one that does not comply with the rule of aerodynamic symmetry, does to the integrity of the game of golf and the sale of other golf balls.

> 6.     Mechanical golf ball testing methodology, standards, industry practice and usage, procedures and protocol, the limitations of mechanical testing, including its failure to measure how golfers perceive golf ball performance, and the USGA's use of mechanical testing to determine whether a golf ball satisfies USGA rules and regulations.

JUL -8-2003   TUE   15:57   TEL:5??-7??-????         ???:????   ???   ??????

7.　　　Advertising, marketing and promotion of Acushnet's new golf balls, including my opinion that Acushnet's sale of the same golf ball under two separate brand names, e.g., the Pinnacle Distance and the Pinnacle Gold, is a misleading practice designed to increase Acushnet's revenues by deceiving golfers as to the nature of the balls being sold.

8.　　　The golf ball refinishing process which was used by Birdie Golf, including my opinions that the Nitro refurbishing process and facility are far superior in quality and nature to the Birdie process. The Birdie process which involves, among other things, dipping stripped golf balls into a vat of clear coat with fishing nets and setting them out to air dry in milk crates, is a rudimentary procedure that, to the best of my knowledge, is not used by any significant golf ball manufacturer. The Birdie process would have been considered outdated and obsolete among significant golf ball manufacturers when I started my career in the golf industry approximately 35 years ago. The Birdie process involves far less sophisticated sorting procedures as evidenced by the fact that there were tens of thousands of golf balls that were mislabeled by the Birdie company. By contrast, the Nitro facility is a state of the art, first-rate facility that employs protocols and procedures that are commonly used in the industry.

9.　　　The Birdie process results in golf balls that are inferior to the Nitro refurbished golf balls. For example, there was evidence in the Birdie case of a difference of approximately 9 yards between a new Acushnet golf ball and a refinished golf ball by

WDC99 781709-1.051998.0073

7

JUL-8-2003  THE  15:57    TEL:508-758-9782        HOME·MOT DAY SELNT SEE

Birdie. In this case, Mr. Felker has submitted a report (discussed in more detail *infra*) that purports to show a difference in distance between a new Acushnet golf ball and a Nitro refurbished golf ball of between 4.6 and 6.7 yards for (the DT 2 Piece and the DT 100), which is less of a difference than what Acushnet's evidence showed in Birdie. The fact that the Court allowed the continued sale of the Birdie golf balls and the fact that Acushnet consented to the continued sale of birdie golf balls, which balls are inferior in quality to the Nitro refurbished golf balls, supports my opinion that Acushnet has pursued this lawsuit not because of a perceived lack of quality in the Nitro refurbished golf ball, but in an effort to use the legal process as a means to destroy legitimate competition.

10.     Mechanical golf ball testing and other testing performed by Acushnet's expert David Felker including, without limitation, the opinions and statements in my Declaration submitted in opposition to Acushnet's motion for a Preliminary Injunction (see **Exhibit B**) and others, such as:

(a)     Acushnet's use of the Iron Byron mechanical testing device in attempting to measure alleged performance differences between new, used, and refurbished golf balls, and Acushnet's failure to follow proper procedures and protocol in that testing;

(b)     Acushnet's use of inappropriate swing and golf ball speeds to attempt to maximize any possible performance differences between new, recycled, and refurbished golf balls;

(c) Acushnet's mechanical testing which was conducted in inappropriate weather conditions, including, without limitation, highly windy conditions, and the proper conditions under which mechanical testing should be performed;

(d) Acushnet's mechanical testing which failed to measure the relative humidity, and the importance of measuring relative humidity during the mechanical testing of golf balls;

(e) Acushnet's mechanical testing which failed to properly institute a club cleaning procedure, and the importance of keeping the face of a golf club clean during mechanical testing;

(f) Acushnet's mechanical testing which failed to account for roll conditions, and the importance of measuring roll conditions in mechanical golf ball testing;

(g) Acushnet's mechanical testing which failed to measure what it purported to measure, *e.g.*, alleged performance differences between recycled golf balls and refurbished golf balls, because it failed to offer appropriate comparisons of golf balls;

(h) Other defects in Acushnet's mechanical testing which led to unreliable and misleading conclusions about alleged performance differences between new, recycled, and refurbished golf balls, including, without limitation, such suspect conclusions that a used Titleist golf ball which has been retrieved from a pond travels on average over 2 yards farther than a new Titleist golf ball, which has never been in a pond;

WDC99 781709-1.051998.0073

(i)      Mr. Felker's conclusions regarding alleged differences in performance characteristics between Acushnet's new golf balls, Nitro's recycled golf balls, and Nitro's refurbished golf balls, which alleged differences would not be detectable to end users of Nitro's golf balls; and

(j)      Golf balls with an elastomer cover that were refurbished by Nitro did not violate any USGA specifications according to Felker's report.

I may also provide testimony to rebut the opinions and bases of those opinions of Acushnet's witnesses related to the above topics, if and when Acushnet designates any such witnesses. I am continuing to review documents and things that have been provided to me in this case, and I understand that additional documents and things may be made available to me in the future. I reserve my right to render additional opinions or to modify the opinions offered herein based on my consideration of those documents and things.

I intend to base the above opinions on the following:

1.      My extensive training, experience, and expertise in mechanical testing of golf products and in the golf industry (see my *Curriculum Vitae* attached as **Exhibit A**);

2.      My Declaration submitted in opposition to Acushnet's Preliminary Injunction in this case (see Declaration of John W. Jepson attached as **Exhibit B**);

JUL -8-2003   THE   15:50   TEL:500-750-0700       HOME-MOTL POV SELITCES          P   11

3.      My personal inspections and observations of Nitro's factory operations, procedures and refurbished golf balls;

4.      Golf industry customs and practices as they relate to performance differences between golf balls;

5.      Golf industry customs and practices as they relate to mechanical testing of golf balls;

6.      Golfers' perceptions and expectations for used golf balls and new golf balls, including the Declaration and Expert Report of Thomas Mayer; and

7.      Declaration and supporting exhibits relating to David Felker's mechanical golf ball test.

8.      Various documents relating to the *Acushnet v. Birdie Golf* litigation.

9.      Acushnet's Responses to Nitro's Interrogatories, including without limitation, interrogatories seeking information regarding the identity of golf balls that are identical in construction but that are sold under two separate marks.

10.     Depositions of William Morgan, George Sine and Amin Khoury given in this case.

## III.   PRIOR EXPERT RETENTION AND ARTICLES PUBLISHED

I have been retained as an expert and qualified as an expert in the following matters:

1. <u>Maxfli v. Acushnet Company</u> (1999) – retained by Maxfli to provide an expert opinion on patent issues relating to golf balls;

2. <u>Acushnet Company v. Maxfli</u> (2001) – retained by Maxfli to provide an expert opinion on patent issues relating to golf balls.

I have not published any articles in the past ten years.

## IV. <u>COMPENSATION</u>

I am being paid at an hourly rate of $200 for my services.

Dated: July _8_ , 2003

John W. Jepson

## JOHN W. JEPSON

### WORK EXPERIENCE

| | | |
|---|---|---|
| 1992-Present | Founder and President | NOBLE GOLF COMPANY, Goodyear, AZ |

- Designs, manufactures and markets putters and other golf equipment.

| | | |
|---|---|---|
| 1993-Present | Founder and President | NAPLES GOLF COMPANY, Naples, FL |

- Golf equipment and accessories company.
- Presently marketing ON-MARK USA, game improvement aid.

| | | |
|---|---|---|
| 1990-1992 | Executive Vice President | BEN HOGAN COMPANY, Ft. Worth, TX |

- Responsible for Ball & Club Development, Ball Operations, Company Q.A., Patents & Trademarks.
- Assisted Present on General Management Issues.
- Double Ball Sales in 2 years.

THE ACUSHNET COMPANY, New Bedford, MA
- $750MM manufacturer of Golf equipment, footwear and precision molded elastomeric products.

1982-1990    Board of Directors - Acushnet

1984-1990    Executive Vice President & General Manager, Rubber Division
- Increased sales $8.5MM or 22% and operating income $2.4MM or 275%.
- Entered into joint venture to build manufacturing plant in Bangkok, Thailand.  Fully operational in 1990.
- Developed self-sufficient computer hardware/software capability.  Completely revamped costing system by introducing Business Resource Planning - current rating class C.
- Manufactured the "core," a key component, for Pinnacle Golf Balls.
- Restructured the Marketing/Sales, Manufacturing, Quality Assurance, MIS and Human Resources management, of the Division.

1982-1984    Executive Vice President and General Manager - Titleist Golf Division
- Increased sales $20.3MM or 19% and operating income $3.6MM or 22%.
- Increased sales significantly in all product categories - balls, clubs, putters, bags, carts and gloves.
- Started joint-venture in Japan to distribute product line in Japan and other Southeast Asian countries.

1979-1982    Vice President Operations - Titleist Golf Division
- Managed 4 Manufacturing Plants geographically located across the country and the U.K., comprising 1,000 employees, that produced golf balls, clubs, putters and carts.
- Restructured manufacturing organization by integrating R&D group resulting in more effective cooperation.
- Implemented automation in the Ball Plant, reducing direct headcount by 100, or 20%.
- Developed and manufactured Pinnacle Golf Ball, Titleist's entry into 2-piece solid ball segment of market. Market share grew to 35% in three years.

1974-1979    Vice President, Corporate Research & Development - The Acushnet Company
1968-1974    Director Corporate Research & Development - The Acushnet Company

1958-1968    BELL TELEPHONE LABORATORIES

# Exhibit __A__

## OTHER ACTIVITIES

| | |
|---|---|
| 1979-1989 | Board of Directors, National Golf Foundation |
| 1987-1988 | Chairman of the Board, National Golf Foundation |

Holder of 29 U.S. and over 75 foreign patents

## EDUCATION

| | |
|---|---|
| BSME | Northeastern University, 1954 |
| M.S. | Yale University, 1955 (mechanical engineering) |
| Ph.D. | Yale University, 1958 (mechanical engineering) |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 02-14008-CIV-MIDDLEBROOKS

IN RE: NITRO LEISURE PRODUCTS, L.L.C.

————————————————————————————— /

DECLARATION OF JOHN W. JEPSON
PURSUANT TO 28 U.S.C. § 1746

I, John W. Jepson, declare as follows:

1.      I have been retained by the law firm of McDermott, Will & Emery, counsel for Nitro Leisure Products, L.L.C. ("Nitro"), to review certain materials submitted by Acushnet Company ("Acushnet") in support of its Motion for a Preliminary Injunction. In preparation for submitting this Declaration. I reviewed several volumes of materials including the following: the Nitro's First Amended Complaint; Acushnet's Memorandum in Support of Preliminary Injunction; the Declaration, and the Report and Exhibits/Attachments of David Felker. I also visited the Nitro facility in Stuart, Florida on several occasions, including on April 11, 17, 18, 23 and 24, 2002 in order to meet the President of Nitro, and to review Nitro's business practices and the process that Nitro uses to refurbish used golf balls. I have personal knowledge of the matters contained herein.

2.      I understand that my Declaration is being submitted in opposition to Acushnet's Motion for a Preliminary Injunction to enjoin Nitro's production, advertising, promotion and sale of refurbished golf balls.

Exhibit  _B_

### Education and Employment Background

3.      Attached as Exhibit A to this Declaration is my *curriculum vitae*, which describes my work experience and education. I graduated from Northeastern University with a Bachelor of Science Degree in Mechanical Engineering in 1954. I then studied at Yale University where I earned a Masters of Science Degree in Mechanical Engineering in 1955, and a Ph.D. in Mechanical Engineering in 1958.

4.      Following receiving my Doctorate from Yale in 1958, I was employed by Bell Telephone Laboratories for ten years -- until 1968. At Bell Laboratories, I worked on various government research and development projects, including the Nike Zeus anti-ballistic missile. I designed radomes for the "target-tracking antenna." I also participated in the design of the Telstar antenna and was in charge of Bell Labs' hydrophone and projector (underwater microphone and sound source) development that was part of an anti-submarine protection system.

5.      I left Bell Labs in 1968, to work for Acushnet. I received a job offer to work at Acushnet after I had proposed to the management of Acushnet the establishment of a Corporate Research and Development Department. I founded and headed the first Research and Development ("R&D") Department at Acushnet.

6.      The projects on which I worked during my tenure as Director of Corporate R&D at Acushnet included the creation and implementation of a golf ball aerodynamics program and the introduction of a new dimple pattern. This groundbreaking work was followed by the development of many additional new golf balls with different dimple patterns, numbers and sizes throughout the time that I was in charge of Corporate R&D at Acushnet -- from 1968 until 1979.

2

7.     In or around 1969, while I was Director of Acushnet's Corporate R&D Department, I recommended, and arranged for, Titleist's purchase of the True Temper "Iron Byron" mechanical golfer. I set up and used, and supervised use of, the Iron Byron testing device, throughout my long tenure at Acushnet, especially when I was employed in the Corporate R&D area. I am thoroughly familiar with using the Iron Byron mechanical golfer testing device.

8.     In 1974, I was promoted to Vice President of Corporate R&D. In 1979, I was promoted to Vice President of Operations of the Titleist Golf Division of Acushnet. My various responsibilities in this role included the management of Titleist's plants across the United States and in the United Kingdom. These manufacturing plants manufactured Titleist golf balls, putters and golf carts, and employed approximately 1,000 employees. I also led the restructuring of the manufacturing organization at Titleist by integrating Titleist's Research and Development Group. This restructuring resulted in more effective cooperation between the golf development group and Corporate R&D at Titleist. I also implemented the automation of several sections of Titleist's golf ball plant located in New Bedford, Massachusetts. This implementation resulted in substantially reducing the labor-intensive operation.

9.     In my capacity as Vice President of Operations at Titleist (in or around 1980), I also was responsible for, and integrally involved with, the development and manufacturing of the Pinnacle Golf Ball. This involved a new manufacturing technique of replacing a solid rubber center that is wound with thread with a new one piece center - a new concept for Titleist. The development and manufacturing of the Pinnacle Golf Ball

3

marked Titleist's entry into the two-piece solid ball segment of the golf ball market. Titleist's market share in this segment of the market grew substantially in three years.

10.    In 1982, I was promoted to Executive Vice President and General Manager (the highest ranking position) of Acushnet's Titleist Golf Division. While I held this position, sales and operating income increased. Notably, during my tenure, sales increased in many product categories. As Executive Vice President and General Manager, I also led the creation of a joint venture in Japan to manufacture and distribute the Titleist brand products in Japan and other Southeast Asian countries. I served on the Board of Directors of Acushnet from 1982 until my retirement in 1990.

11.    From 1984 until 1990, I was Executive Vice President and General Manager of Acushnet's Rubber Company, a Division of Acushnet. Under my direction, the Rubber Division of Acushnet sales and operating income increased. During this time, I also spearheaded Acushnet's entry into a joint venture in Thailand to build a manufacturing plant, which plant became operational in 1988. I was also responsible for the manufacturing of the "core" for the Pinnacle Golf Ball. As Executive Vice President and General Manager of Acushnet's Rubber Division, I also was responsible for restructuring the Marketing and Sales, Manufacturing, Quality Assurance, Management Information Systems and Human Resources areas of this Division.

12.    Upon my retirement from Acushnet in 1990 (after 22 years with the Company), I joined the Ben Hogan Company as Executive Vice President. At the Ben Hogan Company, I was responsible for Golf Ball and Club Development, Company Quality Assurance, and patents and trademarks. Golf ball sales at the Ben Hogan Company doubled during the two years of my leadership and direction.

13.     After I left the Ben Hogan Company in 1992, I founded The Naples Golf Company, in Naples, Florida. This Company markets a golf teaching aid. I also founded the Noble Golf Company, which designs and manufactures putters.

14.     Besides my significant work experience in the golf industry for the past 34 years, most significantly at Acushnet, I also was elected to the Board of Directors of the National Golf Foundation — and held this position from 1979-1989. In addition, from 1987-88, I served as the Chairman of the Board of the National Golf Foundation.

15.     I am the inventor of 29 U.S. patents and a total of approximately 75 foreign patents relating to golf balls and other products, a partial list of which is attached hereto.

16.     I have extensive education and decades of work experience involving the golf industry. As set forth above and described in my *curriculum vitae*, my experience includes, but is not limited to, extensive testing and development of golf balls, and inventing technology concerning golf generally and specifically golf balls, which technology is the subject of dozens of U.S. and foreign patents. I have detailed and broad knowledge of various technological and quality control concepts and issues concerning invention, design, development, manufacture, and testing of golf balls and golf ball materials. I am qualified to render the opinions contained in this Declaration.

### Nitro's Refurbishing Facility And Refurbished Golf Balls

17.     In my opinion, Nitro's refurbishing facility is a first-class operation that provides a high quality, reliable used product. My opinions are based on the facts set forth below.

18.     Nitro purchases used balls from companies that have obtained the balls from lakes and other hazards on golf courses.

19.     The balls are sorted by hand to eliminate badly damaged balls and to segregate the balls into groups of approximate value.

20.     The high value balls go through a model/name sort where the balls are sorted by brand and (if applicable) model and placed in predesignated areas. My understanding based on my visits and conversations with Nitro's President, Amin Khoury, is that Nitro sorts by model only those balls for which there is a high demand among Nitro's customers. For example, the Titleist Pro V1's are sorted apart from the other balls.

21.     The balls are then sorted by hand again so that all golf balls are placed in the appropriate group. The balls that are in sufficiently good condition to resell without refurbishing are identified and resold as used golf balls. The remaining balls, which have scuff marks, cart path marks, tree marks and/or the like, are sent to the final quality control sort. Thus, the balls that are recycled are generally in superior condition to the balls that are eventually refurbished.

22.     The balls are then hand-sorted again so that no ball is in the wrong group. Thereafter, the balls are refurbished by removing the base paint coat and clear coat from the balls, which also removes the markings from the balls. For some golf balls, such as the "Titleist DT," no base coat of paint is removed, because the original golf ball did not have a base coat of paint.

23.     Nitro then reapplies the base coat paint (if appropriate). The balls are then re-stamped with the appropriate marks. My understanding is that Nitro restamps the

6

precise model type only for those models that its consumers have expressed a demand, e.g., Titleist Pro V1's. For the other balls, the precise model type is not reapplied.

24.     To ensure that customers understand that the golf balls are used and refurbished, Nitro stamps the following notice on each refurbished ball:

"REFURBISHED BY SECOND CHANCE" or "REFURBISHED BY GOLFBALLSDIRECT.COM."

25.     Nitro then re-applies the clear coat. Every golf ball is then inspected by hand once again and its compression is checked. If the compression falls outside of a pre-established range, the ball is rejected. Nitro then randomly selects golf balls to be weighed and tested for roundness.

26.     Based on my several days of on-site inspections of Nitro, I am familiar with the process that Nitro uses to refurbish golf balls. I was thoroughly impressed with Nitro's refurbishing facility. Given the high quality of Nitro's refurbishing, I believe that Nitro's refurbished golf balls are a high quality product and offer consumers good value for their money.

27.     Based on my knowledge in the industry and what I saw during my visits to Nitro's refurbishing factory, I also believe that Nitro's customers generally are unable to discern any performance difference between a refurbished "Titleist" golf ball and a new "Titleist" golf ball.

### Mr. Felker's Test Results

28.     I have reviewed Mr. Felker's Declaration and supporting volumes of data and I have concluded that Mr. Felker's test and conclusions are unreliable, misleading and should be given no weight.

7

29.   By setting the Iron Byron to a swing speed of approximately 109 miles per hour, Mr. Felker maximized any performance differences between the golf balls. The swing speed used by Mr. Felker is substantially faster than the swing speed of the typical users of Nitro's refurbished golf balls. Higher swing speeds maximize performance differences between golf balls.

30.   Mr. Felker conducted the tests in unacceptable weather conditions, with winds velocities as high as 13 mph. The wind changed throughout the day in relation to where the balls were being hit. These conditions are unacceptable for comparative golf ball testing.

31.   Mr. Felker does not indicate whether he measured the relative humidity on the testing days. Relative humidity may impact the test results.

32.   Mr. Felker's analysis fails to describe the conditions of the areas of the ground to which the balls were hit. Conditions of the testing grounds are important because the ground conditions will affect the roll of the golf ball.

33.   In view of the foregoing, it is not surprising that Mr. Felker arrives at several highly suspect conclusions. For example, Mr. Felker concludes that rewashed Titleist DT 2-Piece balls travel on average over 2 yards longer than new Titleist DT 2-Piece golf balls. Mr. Felker concludes that washed DT Series golf balls have, on average, less dispersion than new golf balls. And Mr. Felker concludes that washed Titleist PRO V1 golf balls have less carry dispersion than new Titleist Pro V1 golf balls.

34.   Mr. Felker's comparison of new and refurbished golf balls is highly misleading, because it does not account for the effect of water and other outside influences on refurbished balls. New golf balls have not been in water or previously hit.

8

35.     Mr. Felker's comparison between refurbished and washed balls is unreliable and does not measure the effect, if any, of Nitro's refurbishing process on golf balls.  Golf balls that Nitro washes and resells as recycled golf balls are in better condition when they arrive at Nitro's refurbishing facility than the balls that are refurbished.  Mr. Felker's report fails to account for that significant difference.

36.     Mr. Felker's study shows an insignificant difference in performance between the washed and refurbished golf balls, which difference would be generally undetectable to the end users of Nitro's refurbished golf balls.

37.     Mr. Felker's Iron Byron test does not replicate actual market conditions, because it does not replicate the swing of the end users of Nitro's refurbished golf balls.  On the contrary, the "Iron Byron" makes a "perfect" golf swing every time it hits the ball.  The typical end user of Nitro's refurbished balls rarely "perfectly" swings the golf club.

38.     For these reasons, I believe that the conclusions contained in Mr. Felker's Declaration are inherently unreliable, deceptive and unworthy of any weight whatsoever.

I declare under penalty of perjury of the laws of the State of Florida and of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.  Executed at _Fort Lauderdale, FL_, this _15_ day of May, 2002.

_John W. Jepson_
John W. Jepson

9

# EXHIBIT "A"

# JOHN W. JEPSON

## WORK EXPERIENCE

| 1992-Present | **Founder and President** | NOBLE GOLF COMPANY, Goodyear, AZ |

- Designs, manufactures and markets putters and other golf equipment.

| 1993-Present | **Founder and President** | NAPLES GOLF COMPANY, Naples, FL |

- Golf equipment and accessories company.
- Presently marketing ON-MARK USA, game improvement aid.

| 1990-1992 | **Executive Vice President** | BEN HOGAN COMPANY, Ft. Worth, TX |

- Responsible for Ball & Club Development, Ball Operations, Company Q.A., Patents & Trademarks.
- Assisted Present on General Management Issues.
- Double Ball Sales in 2 years.

THE ACUSHNET COMPANY, New Bedford, MA

- $750MM manufacturer of Golf equipment, footwear and precision molded elastomeric products.

| 1982-1990 | Board of Directors - Acushnet |

| 1984-1990 | Executive Vice President & General Manager, Rubber Division |

- Increased sales $8.5MM or 22% and operating income $2.4MM or 275%
- Entered into joint venture to build manufacturing plant in Bangkok, Thailand. Fully operational in 1990.
- Developed self-sufficient computer hardware/software capability. Completely revamped costing system by introducing Business Resource Planning - current rating class C.
- Manufactured the "core," a key component, for Pinnacle Golf Balls.
- Restructured the Marketing/Sales, Manufacturing, Quality Assurance, MIS and Human Resources management, of the Division.

| 1982-1984 | Executive Vice President and General Manager - Titleist Golf Division |

- Increased sales $20.3MM or 19% and operating income $3.6MM or 22%.
- Increased sales significantly in all product categories - balls, clubs, putters, bags, carts and gloves.
- Started joint-venture in Japan to distribute product line in Japan and other Southeast Asian countries.

| 1979-1982 | Vice President Operations - Titleist Golf Division |

- Managed 4 Manufacturing Plants geographically located across the country and the U.K., comprising 1,000 employees, that produced golf balls, clubs, putters and carts.
- Restructured manufacturing organization by integrating R&D group resulting in more effective cooperation.
- Implemented automation in the Ball Plant, reducing direct headcount by 100, or 20%.
- Developed and manufactured Pinnacle Golf Ball, Titleist's entry into 2-piece solid ball segment of market. Market share grew to 35% in three years.

| 1974-1979 | Vice President, Corporate Research & Development - The Acushnet Company |
| 1968-1974 | Director Corporate Research & Development - The Acushnet Company |

| 1958-1968 | BELL TELEPHONE LABORATORIES |

## OTHER ACTIVITIES

1979-1989     Board of Directors, National Golf Foundation
1987-1988     Chairman of the Board, National Golf Foundation

Holder of 29 U.S. and over 75 foreign patents

## EDUCATION

BSME   Northeastern University, 1954
M.S.     Yale University, 1955 (mechanical engineering)
Ph.D.    Yale University, 1958 (mechanical engineering)

Sep 29 03 03:34p

08/29/03  MON 16:14 FAX                                                                P.2
                                                                                       ☑002

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:02-14008-CIV
MIDDLEBROOKS

IN RE:  NITRO LEISURE PRODUCTS, LLC
_____/

## SUPPLEMENTAL EXPERT REPORT OF JOHN W. JEPSON PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and Local Rule 16.1-K., Nitro Leisure Products, LLC's ("Nitro") expert, John W. Jepson, hereby submits his supplemental expert report.

### I.   QUALIFICATIONS

My qualifications are set forth in my Expert Report submitted in this matter. I have worked in the golf industry for 35 years, including at Acushnet Company where I was the highest ranking officer in the golf division. I have been an avid golfer for over 50 years and am current on developments in the golf industry through, among other things, my regular and frequent reading of golf publications. Based on my experience in the golf industry, I have substantial knowledge and expertise in the advertising and sale of golf products, including golf balls and golf clubs.

I am qualified to render the opinions that are contained in this report.

### II.   OPINIONS AND BASES FOR OPINIONS

At trial in this matter, and in addition to the opinions set forth in my Expert Declaration, I intend to offer expert opinions on the following topics:

Nitro/Discovery/ExpertReports/Jepson.Supp.ExpertReport
WDC99 817925-1.051998.0073

Exhibit _b_

N-EXP-00446

Case 2:02-cv-14008-DMM   Document 682   Entered on FLSD Docket 01/22/2004   Page 39 of 44
Sep 29 03 03:34p
09/29/03  MON 18:14 FAX

P.3
@003

1.      For decades, golf products have been reconditioned and resold.
Everything from golf carts to golf clubs to golf balls is refurbished and resold at a
discount.  There are thousands of providers of reconditioned products in the United
States and tens of millions of dollars of such products are sold annually.  Sales of
reconditioned golf products are substantial because golf is an expensive game to
play and golfers frequently seek bargains and good value.

2.      Golf balls, like golf carts and golf clubs, are also reconditioned and
resold.  In fact, golf balls have been recycled and resold in the U.S. for over half a
century.  Reconditioned balls have become so much a part of the game of golf that
it is not unusual to find human interest stories that refer or relate to such balls.
Attached as Exhibit A are several examples of human interest articles that refer or
relate to reconditioned balls.  In one article, a golfer recounts a hole in one that he
made using a "reconditioned" TITLEIST golf ball.  (Sun Sentinel Florida -- July 1,
2001).  Another article tells the story of a man in Texas who, at 80 years old, claims
to be the oldest golf ball recycler in the U.S. (AP dated August 15 2003).  This
person has been recycling golf balls since 1953.  (*Id.*)

3.      The quality of used golf balls is varied.  Some refurbishers, e.g., Nitro
Leisure Products, employ a highly sophisticated, state-of-the-art process, which
results in a high quality used product.  Nitro's process is described in detail in my
Expert Report.  Others employ a less sophisticated process, which results in a low
quality used product.  For decades, golf ball recyclers have openly sold tens of
millions of used TITLEIST golf balls that are inferior to Nitro's refurbished

N-EXP-00447

Sep 29 03 03:35p
09/29/03 MON 16:14 FAX                                                P.4
                                                                      @004

TITLEIST golf balls. I inspected used golf ball samples from Usedgolfballdeals.com, Re-Tee Golf and Links Choice. Nitro's refurbished golf balls are superior to the used golf balls that I inspected and that are sold at these locations. Attached as Exhibit B are pictures of golf balls from these sellers.

4.     Birdie Golf Ball Company also sells refurbished TITLEIST golf balls. Birdie's refinishing process is described in my Expert Report. The Birdie refinishing process is far less sophisticated than Nitro's process.

5.     As part of my investigation in this lawsuit, I have also undertaken a review of golf balls Acushnet and its counsel in this action have in their custody, possession and control. However, because of the reckless manner in which these golf balls have been kept, I have been unable thus far to inspect all of the golf balls. Thus far, I have found the following with respect to the golf balls maintained by Acushnet and its counsel relative to this lawsuit:

   a.   There does not appear to be any rhyme or reason for the maintenance of many of the golf balls. For instance, when I first reviewed the golf balls on August 29, 2003, I noticed that there were at least 40 boxes, all apparently containing golf balls. Upon further inspection, however, I found that some of the boxes contained bags marked "Evidence," even though the bags had been emptied before my inspection. No chain of custody documents were included in the boxes indicating where the missing golf balls were.

N-EXP-00448

Sep 29 03 03:35p

09/29/03  MON 16:15 FAX

P.5
@005

b.  Some boxes of golf balls that I inspected and that are in Acushnet's possession for this lawsuit are golf balls that are over 30 years old. I know this because the golf balls contain dimple patterns that were in production when I started working at Acushnet in 1968, and were subsequently discontinued because the dimple patterns became obsolete.

c.  Several other boxes contained golf balls that were not Nitro's refurbished golf balls. I know that the golf balls were not Nitro's because the product packaging and the golf balls themselves had markings of other third parties selling used golf balls, such as PGSI.

d.  Other refurbished golf balls that I inspected were from Nitro, and I know this because they had Nitro's trade name GOLFBALLSDIRECT.COM or SECOND CHANCE stamped directly on each golf ball. These golf balls were in excellent condition and had a pristine appearance. They looked "like new" in all respects.

I reserve my right to offer additional expert opinions as additional evidence is made available to me.

Dated: September 29, 2003

John W. Jepson

Nitro/Discovery/ExpertReports/Jepson.Supp.ExpertReport
WDC09 817925-1.051998.0073

4

N-EXP-00449

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that one copy of the foregoing "SUPPLEMENTAL EXPERT REPORT OF JOHN W. JEPSON PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)" was served by Federal Express courier service, this 29th day of September 2003, upon the following:

Steven J. Brodie, Esq.
Jeffrey M. Cohen, Esq.
Carlton Fields, P.A.
Attorneys for Acushnet
100 S.E. Second Street, Suite 4000
Miami, Florida 33131

and

Robert L. Ciotti, Jr., Esq.
Carlton Fields, P.A.
Attorneys for Acushnet
777 S. Harbour Island Boulevard
Tampa, Florida 33602

_____
Attorney for Nitro Leisure Products, LLC

N-EXP-00450

## John Willisford Jepson - Confidential

Page 1

```
 1              C O N F I D E N T I A L

 2            PURSUANT TO PROTECTIVE ORDER

 3

 4         IN THE UNITED STATES DISTRICT COURT

 5         FOR THE SOUTHER DISTRICT OF FLORIDA

 6    ---------------------------X

 7    ACUSHNET COMPANY,              )

 8    Plaintiff,                     )

 9         vs                        )

10    NITRO LEISURE PRODUCTS LLC, )

11    d/b/a GOLFBALLSDIRECT.COM,  )   Civil File No.:

12    NITRO LEISURE SERVICES,       )   02-14091

13    LLC, d/b/a NITRO GOLD and   )

14    NITROGOLF.COM.,               )

15         Defendants.              )

16    ---------------------------X

17    VIDEOTAPED DEPOSITION OF JOHN WILLISFORD JEPSON

18                 Washington, D.C.

19            Tuesday, November 5, 2003

20    Reported by:  Cindy L. Sebo, RPR, CRR, RMR

21    Job No. 156209

22    Video Job No. 156208
```

## John Willisford Jepson - Confidential

Page 391

1      regarding refurbished, recycled new golf

2      balls?  Maybe it will help to take a look at

3      your Opinion Number 2.

4            A     Yes, I'm just doing that right now.          5:43:01PM

5                  All right.                                   5:43:02PM

6            Q     Do you have opinions on that?               5:43:18PM

7            A     Yes, I do.                                   5:43:20PM

8            Q     And what are they?                          5:43:20PM

9            A     Those that are stated here.                 5:43:22PM

10           Q     Any others?                                 5:43:23PM

11           A     Not for the moment.                         5:43:24PM

12           Q     Okay.  On Number 1, "Golfers have          5:43:25PM

13     less performance expectation from a used golf

14     ball than they do from a new golf ball."

15                 On what do you base that opinion?          5:43:31PM

16           A     Lots of years of personal use --           5:43:32PM

17     use of used golf balls.

18           Q     You're basing that on your personal        5:43:44PM

19     impressions; is that right?

20           A     Yes, that; and knowledge of the            5:43:46PM

21     industry and the occasional individual I've

22     talked to on and off over a long period of