UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO.: 02-14008-CIV-MIDDLEBROOKS/LYNCH

IN RE NITRO LEISURE PRODUCTS, L.L.C.

_____/

FILED by IW D.C.
JAN 23 2004
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### FINAL JUDGMENT AND INJUNCTION UPON CONSENT

Upon the pleadings and proceedings herein, and with the express consent of Plaintiff, Nitro Leisure Products, LLC (Nitro) and Defendant, Acushnet Company (Acushnet) this Final Judgment and Injunction Upon Consent is entered as follows:

A. This Court has jurisdiction of the subject matter of this action and of the parties hereto.

B. Acushnet is the owner of various trademarks, logotypes and scripts and has rights to those trademarks, logotypes and scripts both at common law and pursuant to the United States Trademark Act (collectively the "Acushnet Marks") including without limitation United States Trademark Registration Nos. 316,118 for TITLEIST; 516,729 and 929,942 for ACUSHNET; 1,601,034 for TITLEIST #1 BALL IN GOLF; 1,112,381 for DT; 1,165,697 for PINNACLE and 2,806,919 for PRO V1.

C. Acushnet is also the owner of certain United States letters patent (collectively the "Acushnet Patents") including without limitation United States Patent Nos. 5,000,459, 5,609,535 4,770,422, 4,546,980 and 4,692,497.

D. All such Acushnet Marks and Acushnet Patents are subsisting, valid and enforceable.

E. The aerodynamic performance of a golf ball is materially affected by the ball's surface geometry including its surface coatings, as well as by its weight and size. Minute

TPA#1878039.3

changes to these properties of a golf ball can significantly alter the ball's design and performance. A process that (i) applies one or more coats of paint over the original manufacturer's paint, and then applies new or reapplies the original markings on the balls, or (ii) removes the original manufacturer's paint and markings from a golf ball and applies a new paint and then applies new or reapplies the original markings, creates a substantial likelihood that the resulting golf balls are so different from the originals (or the originals after use) that it would constitute a misnomer for them to be designated by the original manufacturer's trademark, even if there is full disclosure of the process to consumers and the balls themselves are marked as "used and refurbished" or "used and refinished" or similar language.

F. Nitro and Acushnet agree, without any admission of liability or wrongdoing, to the entry of a permanent injunction on the terms below.

Accordingly, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

1. Nitro, its officers, directors, successors and assigns and all those persons in active concert with them or any of them shall be and hereby are permanently enjoined and restrained from engaging in any of the following activities:

    A. Engaging in the sale, offer for sale, advertisement, or promotion of any golf balls that have had applied to them one or more coats of paint over an original manufacturer's paint and which have been remarked with any trademark, including without limitation, the Acushnet Marks, or any reproduction, counterfeit, copy or colorable imitation of any such marks or any mark confusingly similar thereto;

    B. Engaging in the sale, offer for sale, advertisement, or promotion of any golf balls that have had the original manufacturer's paint and markings removed and have had applied to them a new paint and markings which include any trademark, including without

limitation the Acushnet Marks, or any reproduction, counterfeit, copy or colorable imitation of any such marks or any mark confusingly similar thereto;

C. Engaging in the sale, offer for sale, advertisement, or promotion of any used golf balls unless Nitro prominently discloses on its product packaging the word "USED" in clearly legible lettering in such style, size and color as to be easily readable and clearly distinguishable and visible;

D. Engaging in the manufacture, importing, exporting, transshipping, distributing, offering for sale or sale of golf balls which contain one or more core components that were originally manufactured by another golf ball manufacturer but which were re-covered with a new cover or dimple layer;

E. Applying any Acushnet Marks or any reproduction, counterfeit, copy or colorable imitation of any of the Acushnet Marks or any mark confusingly similar thereto, on any golf ball, golf ball packaging, advertisement or promotional material  This shall not preclude references to identify Acushnet golf ball models in block type in any listings of products sold or offered for sale by Nitro;

F. Using any Acushnet packaging or Acushnet promotional materials or any reproduction, counterfeit, copy or colorable imitation thereof on any golf ball packaging, advertisement or promotional material;

G. Using in connection with the sale, offer for sale, advertisement or promotion of any used golf balls the words or phrases "like new," "near new," "almost new," that the balls have a "pristine" appearance, that the balls are in "perfect condition" or any other words or phrases that are likely to cause purchasers to believe that the golf balls are, or are comparable to, new products.  This shall not preclude reference to used golf balls by categories of condition,

such as "AAA," "AA," "A," or "Pearl," so long as Nitro does not use any words that are likely to cause purchasers to believe that the golf balls are, or are comparable to, new products; and

H. Advertising, publicizing, promoting or otherwise indicating, implying or leading the trade or public to believe that any sale by Nitro of used golf balls is in any way approved, sponsored or authorized by Acushnet, directly or indirectly.

Provided however, that with respect to subparagraphs A, B, and D of this paragraph 1, Nitro shall not be deemed to be in violation with respect to any used golf balls that Nitro unknowingly and inadvertently receives product which has been delivered as a "pond run" from a golf course , which balls have already been subjected to one or more of the processes described in those subparagraphs, and Nitro unknowingly and inadvertently sells, offers for sale, advertises, or promotes them in a manner otherwise in conformity with this Final Judgment and Injunction Upon Consent.

2. The terms of this Permanent Injunction are binding on any purchaser, transferee, licensee, or assignee of any of Nitro's assets, including without limitation any purchaser, transferee, licensee or assignee of any of Nitro's painting, stripping or clear-coating equipment or any of Nitro's trade names or trademarks, including without limitation the "Second Chance," "Golfballsdirect.com" and "Nitro" marks. Nitro is directed to provide a copy of this Final Judgment and Injunction to any purchaser, transferee, licensee or assignee of such assets before any such sale, transfer, license or assignment and to require that such purchaser, transferee, licensee or assignee acknowledge that such sale, transfer, license or assignment is subject to this Final Judgment and Injunction.

3. This action is otherwise dismissed with prejudice as to each party, with each party to bear its own attorneys' fees and costs. Each party has waived all rights of appeal with respect to this action.

4. Either party may seek immediate relief in this Court to enforce this Final Judgment and Injunction.

5. Notwithstanding paragraphs 1 and 2 above, Nitro shall be permitted to manufacture and sell up to $300,000.00 or 15,000 dozen, whichever is greater, used and refurbished or refinished golf balls, as well as to use Nitro's existing packaging, for a period of 60 days following the date of entry of this Final Judgment.

6. This Court shall retain jurisdiction of this matter for purposes of enforcement of this Final Judgment, the Settlement Agreement between the parties, and any other further proceedings relating to this Final Judgment.

**DONE AND ORDERED** at West Palm Beach, Florida, this 23rd day of January, 2004.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies furnished to:

All counsel of record